# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

*In re* Application of

MOUSSY SALEM,

            Applicant,

FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM BENO
SALEM

Civil Action No.

**Declaration of Simon Goldring in**
**Support of Application for an Order**
**Pursuant to Take Discovery Pursuant**
**to 28 U.S.C. § 1782 From Beno Salem**

I, SIMON GOLDRING, hereby declare under penalty of perjury as follows:

1.      I am a lawyer qualified to practice in England & Wales and am a Partner at Maurice Turnor Gardner LLP.  My firm acts as solicitors for Moussy Salem ("**Applicant**") in connection with court proceedings ("**English Proceedings**") before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD) (the "**English Court**"), Claim No. BL-2022-000926, against Freddy Salem, Monline UK Limited ("**Monline UK**"), Salim Levy, and Ezra Aghai.

2.      I am submitting this declaration in support of Applicant's Application for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782 (the "**Application**").

3.      I am knowledgeable about the matters described below, and the facts stated herein are true and correct to the best of my knowledge and belief.

4.      Applicant took over prosecution of the claims at issue in the English Proceedings on October 4, 2022.

5.      On November 2, 2022, Applicant submitted an Amended Particulars of Claim.  A true and correct copy of Applicant's Amended Particulars of Claim is attached hereto as **Exhibit A**.

1

6.      On January 17, 2023, Applicant submitted his Reply responding to the defenses raised by the defendants.  That Reply was subsequently amended on March 21, 2023. A true and correct copy of Applicant's Amended Reply is attached hereto as **Exhibit B**.

7.      Applicant further set forth the basis of his claims in his Response to the Second and Fourth Defendants' Request for Further Information, dated March 2, 2023.  A true and correct copy of Applicant's Response to the Second and Fourth Defendants' Request for Further Information is attached hereto as **Exhibit C**.

8.      As alleged in the Response to the Second and Fourth Defendants' Request for Further Information, Beno Salem is a member of the Salem Family and serves as the head of what is known as the "B Branch" of the Salem Family.  **Exhibit C**, pages 6-8.  Applicant believes that Beno Salem assisted in the exclusion of Applicant from the operational activities associated with running a substantial trading business in West Africa operated by the Salem Family (the "**African Businesses**").  **Exhibit C**, pages 6-8.  As part of this exclusion, Applicant had no access to the email systems or physical offices used to run the affairs of the African Businesses, such systems owned and office occupied by Parker Logistics Limited ("**Parker Logistics**"), Monline International Limited ("**Monline International**") and then Monline UK.

9.      Applicant has further alleged that he has been wrongfully excluded from benefiting from the profits of the African Businesses by certain members of the Salem Family, including Beno Salem.  **Exhibit C**, page 7.

10.     The key issue in dispute in the English Proceedings is the provision of logistics services to the African Businesses, such services as are defined in the English Proceedings as the "**Parker Services**".  The Parker Services were originally provided by Parker Logistics to Morsgate International Limited (a company which acts or acted, *inter alia*, as a treasury company to the

African Businesses, "**Morsgate**").  In March 2016, the provision of the Parker Services was transferred to Monline International.  Then, in or around August 2016, the provision of the Parker Services was transferred, on the Applicant's case without consideration and as part of an unlawful means conspiracy, to Monline UK.  Subsequently in July 2017, Monline UK ceased providing the Parker Services to Morsgate and instead provided them to a Lebanese company, Gestcom International Trading Offshore SAL/Gee Trading (Offshore) SAL ("**Gestcom**") which the Applicant alleges is the successor to Morsgate in the African Businesses.  It is the transfers of the provision of the Parker Services to Monline UK and the receipt of the Parker Services to Gestcom, which are the subject of dispute in the English Proceedings.

11.  The Applicant's claim in the English Proceedings alleges that Monline UK may also have provided the Parker Services to unknown third parties (**Exhibit C**, page 9).  On July 11, 2023 and August 2, 2023, Defendants in the English Proceedings admitted that Gestcom replaced Morsgate as the recipient of the Parker Services in or around July 2017.  The Defendants further admitted that in or around March 2021, Monline UK ceased to provide the Parker Services entirely.  The provision of the Parker Services after July 2017 remains an ongoing line of inquiry in the English Proceedings.

12.  The Applicant also seeks equitable compensation for the business lost to Monline International.  **Exhibit C**, page 8.  In order to assess that compensation, evidence of, *inter alia*, the activities of the African Businesses (including as to the operations and expenditure of those businesses) will be relevant, as the fees for the Parker Services were calculated by reference to a percentage of the expenditure incurred to provide the Parker Services.  Such evidence will also be necessary to assess whether the compensation paid (if any) for the transfer of the business of Monline International to Monline UK was adequate.

13.     I understand that Beno Salem has declared under oath that he is a Florida-domiciled individual.  He therefore would not ordinarily be subject to the jurisdiction of the English Court.  Thus, this Application is the most suitable method of obtaining documents and information from Beno Salem.

14.     The English Proceedings are still at a relatively early stage, and the parties to those proceedings were provided the opportunity to proffer submissions on the appropriate scope of topics for disclosure.  On July 19, 2023, the English Court issued an order setting of the relevant issues for disclosure at this stage of the English Proceedings.  This order was issued after Applicant filed its first application for discovery from Beno Salem pursuant to 28 U.S.C. § 1782 in the United States Court for the Eastern District of New York.  The order sets the topics for disclosure as the following:

a.     the winding up of Parker Logistics,

b.     the sale of Parker Logistics' business (*i.e.*, the provision of the Parker Services) to Monline International,

c.     the beneficial ownership of Monline UK,

d.     the transfer of Monline International's operations (*i.e.*, the provision of the Parker Services) and assets to Monline UK,

e.     Monline International's UK bank account (or lack thereof),

f.     the control of Monline UK,

g.     what services were provided to Morsgate, what payments were made for those services and to whom and what role did First and Fourth Defendants in the English Proceedings play in the management or affairs of Morsgate,

h.     whether Monline UK provided the Parker Services (or similar) to any entity other than Morsgate (including without limitation Gestcom),

i.     what became of assets transferred to Monline UK,

j.     whether there should be set-off of payments made by Monline UK to Moussy, and

4

k.      the assignment of the claim in the English Proceedings to Moussy Salem.

15.     In light of the English Court's order, Applicant's current Application limits the discovery sought to the "Salem Businesses," which are a subset of the African Businesses that are connected to Morsgate, or that have been involved in the provision of the Parker Services.  They include, in addition to Parker Logistics, Monline, Monline UK and Morsgate:

a.      Great Brands Nigeria Limited, Blue Arrow TSW Limited, Société Cobexim Sarl ("**Cobexim**"), Forewin (Ghana) Limited, and Lewadis FZ Limited, which each own a share of Morsgate;

b.      Glynfield Finance Limited and Transglobe Logistics Management Limited, which had a key role in invoicing arrangements within the African Business, such invoicing being a part of the Parker Services; and

c.      Gestcom, which was the recipient of the Parker Services from at least 2017 to 2021 and BS Gestcom Holdings Corp., a shareholder in Gestcom of which the Respondent is a shareholder.

16.     Applicant further understands that Beno directly owns 40% of Cobexim, although whether that is for his own benefit or for the benefit of the R, F and B Branches of the Salem Family is a subject in dispute.

17.     Applicant has neither requested, nor been denied, the discovery sought through this Application in the English Proceedings.

18.     As of the filing of this Application, the English Proceedings remain pending before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:       London, England
             August 2 1, 2023

_____
Simon Goldring

5

# Exhibit A

**Claim no. BL-2022-000926**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS & PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

**BETWEEN:**

**(1) MOUSSY SALEM**

**Claimant**

**and**

**(1) FREDDY SALEM**
**(2) MONLINE UK LIMITED**
**(3) SALIM LEVY**
**(4) EZRA AGHAI**

**Defendants**

---

### AMENDED PARTICULARS OF CLAIM

---

**Substitution**

1.  This claim (the "**Claim**") was originally issued by Monline International Limited (a company in liquidation in the BVI, the "**Company**").  On 4 October 2022, the Claimant and the Company entered into a deed of assignment, in which the Company legally and absolutely assigned its right, title and interest in the Claim to the Claimant.  The Claimant is a creditor in the liquidation of the Company and also suffered indirect loss as a result of the actions pleaded in the Claim. The Claimant now purses the Claim in the place of the Company.

**The Company**

2.  The Company was incorporated in the British Virgin Islands ("**BVI**") on 23 September 2005.

3.  On 12 October 2020, the BVI Court ordered the Company to be wound up and appointed Mr Matthew Richardson and Mr Michael Leeds as the company's liquidators ("**the Liquidators**").

4.  The Company is one of a number of companies associated with the Salem family, of which the Claimant is a member, which runs a substantial trading business in Africa.

5.  To the best of the Claimant's knowledge and belief, at all material times the shares in the Company have been: (i) legally owned by a number of corporate entities (with association with

Salem family trusts and/or the First Defendant and/or Claimant) and (ii) beneficially owned by the First Defendant as to 50% and by Claimant and/or Mireille Salem as to 50%.

6.      The Company was dormant until approximately March 2016 when it took over the business of an English company, Parker Logistics Limited (in members' voluntary liquidation) ("**Parker**").

7.      The Company, however, only traded for a short period of time as the First Defendant caused and/or procured the transfer of its assets and business to the Second Defendant on or around 7 June 2016.

8.      The Liquidators investigated the affairs of the Company and have identified claims against each of the Defendants.  Those claims have been assigned to, and are being pursued by, the Claimant.

**The First Defendant**

9.      The First Defendant is resident in England and was appointed a director of the Company on 16 February 2016.

10.     Further:

(a)      the First Defendant is the uncle of the Claimant;

(b)      Mireille Salem is the mother of the Claimant;

(c)      the First Defendant has been in dispute with the Claimant and Mireille Salem in relation to the Salem family's business interests since at least 2014;

(d)      the First Defendant, the Claimant and Mireille Salem are resident in England.

**The Second, Third and Fourth Defendants**

11.     The Second Defendant is a company incorporated in England on 7 June 2016. According to Companies House Records:

(a)      The Third and Fourth Defendants were appointed directors of the Second Defendant on incorporation.

(b)      The Third and Fourth Defendants have held 50% each of the issued shares in the Second Defendant since incorporation.

**Duties owed by the First Defendant to the Company**

12.     As a matter of BVI law, the First Defendant owed fiduciary duties (at common law and/or in equity) to the Company including duties:

(a)     to act in good faith and in the best interests of the Company;

(b)     to exercise his powers only for proper purposes and not for any collateral purpose;

(c)     not to misappropriate, misapply, divert or misuse the Company's funds, assets or opportunities;

(d)     to exercise independent judgement; and

(e)     to avoid situations in which he had, or could have, a direct or indirect interest that conflicted, or might conflict, with the interests of the Company.

13.     Further, in his capacity as a director of the Company, the First Defendant owed the duties set out at sections 120 to 125 of the BVI Business Companies Act 2004 ("**the BCA**") at the time when he was a director of the Company, including duties:

(a)     to act honestly and in good faith and in what he believed to be the best interests of the company (s. 120(1) BCA);

(b)     to exercise his powers as a director for a proper purpose and not to act, or agree to any company acting, in a manner that contravened the BCA or the memorandum and articles of the company (s. 121 BCA); and

(c)     to exercise reasonable care, diligence and skill (s. 122 BCA).

14.     Further, as a director for the Company, the First Defendant was required to keep, or to cause to keep:

(a)     books and records sufficient to show and explain that company's transactions, at common law and/or pursuant to s. 98 BCA); and

(b)     copies of minutes of all meetings and resolutions of directors or members (or committees of directors or members), at common law and/or pursuant to s.102 BCA.

**The transfer of the Company's business and assets to the Second Defendant**

15.     At all material times prior to 30 March 2016:

(a)     The First Defendant and the Claimant were the registered directors of Parker;

3

    (b)    Parker was legally and beneficially owned by the First Defendant as to 50%, the Claimant as to 25% and Mireille Salem as to 25%;

    (c)    The sole business of Parker was the provision of services to Morsgate International Limited ("**Morsgate**") pursuant to a Logistics Agreement dated 14 March 2000;

    (d)    Morsgate was beneficially owned by various members of the Salem family;

    (e)    Parker was a profitable business. Parker's draft Annual Report and Accounts for the year ended 31 March 2014 record that Parker's retained profits were £2.3 million in 2013 and £2.4 million in 2014.

16.    In or around 2016, a decision was taken to transfer the business and assets of Parker to the Company. The Claimant understood this was consequential to a wider settlement reached between members of the Salem family and for tax reasons. Subsequently:

    (a)    On 16 February 2016 the Company opened a first UK establishment which was registered at Companies House on 7 March 2016.

    (b)    On 30 March 2016:

        (i)    the business and assets of Parker were transferred to the Company pursuant to an Asset Sale Agreement of the same date ("**the ASA**");

        (ii)    Parker entered members' voluntary liquidation in England;

        (iii)    Morsgate confirmed in writing that it wished to appoint the Company to provide logistical services in place of Parker.

17.    Under the ASA, the Company agreed to pay Parker a total consideration of £132,000. This consideration was apportioned to the fixed assets of Parker (listed in Schedule 1 to the ASA) and did not include any consideration for the value of the business and goodwill being transferred.

18.    As above set out, the Second Defendant was incorporated on 7 June 2016. At or around the same time, the entire business and assets of the Company were transferred to the Second Defendant ("**the UK Transfer**").

19.    The Claimant's position is that:

(a)   In 2016 he was asked by a representative of the First Defendant to agree the transfer of the Company's business and assets to a newly incorporated UK company because the Company was not able to open a UK bank account by reason of its BVI domicile;

(b)   He was only prepared to agree to a transfer the Company's business and assets to a newly incorporated UK company if he and the First Defendant were both appointed directors of the new company and their beneficial interests mirrored their interests in the shares in the Company as above set out; and

(c)   He was not informed about the UK Transfer and did not give his consent to the UK Transfer in his capacity as a director or beneficial shareholder of the Company or in any other capacity.

20.   To the best of the Claimant's current knowledge and belief:

(a)   The Third and Fourth Defendants are former employees of Parker and the Company and have never held (directly or indirectly) any shareholding interest in Parker or the Company;

(b)   There is no written agreement or any other contemporaneous documents recording the reasons for, and the terms of, the UK Transfer;

(c)   No directors' or shareholders' meetings were held to approve the UK Transfer and no resolutions approving the transfer were passed in breach of the Company's Articles of Association;

(d)   No consideration was paid by the Second Defendant to the Company in relation to the UK Transfer at the time the UK Transfer was made.

21.   On or about 9 December 2020 the First Defendant in his capacity as sole director of the Company swore a statement of affairs pursuant to section 255 of the BVI Insolvency Act 2003 which stated that the Second Defendant owed the Company the sum of £66,288 being in respect of fixed assets in the sum of £13,000, staff loans in the sum of £46,000 and profits earned by the Company during the period end of March 2016 to end of May 2016 inclusive in the sum of £7,288.

22.   On or about 25 May 2022 the Second Defendant paid the sum of £50,000 into the bank account of the Joint Liquidators and on or about 26 May 2022 the Second Defendant paid the sum of £16,288 into the bank account of the Joint Liquidators which together total the sum of £66,288

and was accepted by the Joint Liquidators solely on the basis that the sum of £66,288 was not in full and final settlement of the Company's claim against the Second Defendant

23.    In the premises, there was no consideration, or alternatively no adequate or valuable consideration, for the UK Transfer and it is to be inferred that the UK Transfer was not entered into for any good commercial reason and/or for the sole benefit of the First Defendant and/or that the Third and Fourth Defendants hold their shares in the Second Defendant on trust for the First Defendant. The UK Transfer constituted, either wholly or in part, a gratuitous transfer to the Second Defendant and therefore a misapplication of the Company's assets at a time when the First Defendant was in dispute with the Claimant and Mireille Salem as to the ownership of various Salem family business interests.

24.    Further or alternatively, if and to the extent that the First Defendant became the beneficial owner of the Second Defendant, the UK Transfer was an unlawful distribution of capital and/or *ultra vires* the Company under the BCA.

**Breaches of Duty by the First Defendant**

25.    In causing and/or procuring and/or permitting the UK Transfer, the First Defendant:

(a)    diverted the business of the Company and/or a corporate opportunity of the Company (namely the provision of services to Morsgate) to the Second Defendant;

(b)    misapplied the Company's assets; and/or

(c)    caused and/or procured and/or permitted the Company to make unlawful distributions of capital to one of its shareholders; and/or

(d)    exercised his powers for an improper purpose and/or failed to have regard, or sufficient regard, to the interests of the Company and/or the interests of the Company's shareholders and/or creditors; and/or

(e)    preferred his own interests and/or those of the Second Defendant and/or those of the Third and Fourth Defendants over the interests of the Company; and/or

(f)    failed to obtain the approval of the other shareholders and directors for the UK Transfer; and/or

(g)    acted to the detriment of the Company.

26.     Further the First Defendant failed to keep or to cause the Company to keep proper books and records, including (but not limited to) records and explanations in relation to the UK Transfer.

27.     In the premises, the First Defendant breached his duties to the Company as set out in paragraphs 12 to 14 above.

**Gratuitous transfer and knowing receipt**

28.     The UK Transfer constituted, either wholly or in part, a gratuitous transfer to the Second Defendant and a misapplication of the Company's assets.

29.     The Company is accordingly entitled to the return of such assets as were misappropriated or their traceable proceeds, as may have been received (directly or indirectly) and retained by the Defendants.

30.     Further or alternatively, the First Defendant's knowledge is to be attributed to the Second Defendant. Accordingly, the Second Defendant knew (or reasonably ought to have known) that the UK Transfer represented misappropriations of the Company's assets and/or were made in breach of the First Defendant's duties to the Company. In all the circumstances it would be unconscionable for the Second Defendant to retain the benefit of the assets transferred pursuant to the UK Transfer and is liable to pay equitable compensation to the Company in relation to said transfer.

**Conspiracy**

31.     It is to be inferred that the UK Transfer was the product of concerted action in accordance with a combination, understanding or agreements reached in or around 2016 between at least the First and Second Defendants.

32.     The First and Second Defendants knew that the purpose of the UK Transfer was to divest the Company of all its assets for no consideration or at an undervalue with the purpose of putting those assets out of the reach of the other shareholders of the Company.

33.     The First and Second Defendants entered into the combination, understanding or agreement referred to at paragraph 28 above with the intention of causing loss to the Company (or, alternatively with the intention that the rights of its shareholders would be prejudiced).

34.     Pursuant to the combination, understanding or agreement, each of the First and Second Defendants participated in the UK Transfer.

35.     The concerted action involved the use of unlawful means in that by causing and/or procuring the Company to enter into the UK Transfer, the First Defendant acted in breach of his duties to the Company.

36.     The Company suffered loss as a result of the abovementioned conspiracy .

**Relief to be claimed**

37.     In the circumstances, the Claimant (having been assigned the Claim by the Company) is entitled to at least the following relief:

(a)     a declaration that the Third and Fourth Defendants hold their shares in the Second Defendant on trust for the First Defendant; and/or

(b)     a declaration that the First Defendant held his interest in the Second Defendant on constructive trust for the Company and now holds that interest for the Claimant pursuant to the assignment; and/or

(c)     an order that the Third and Fourth Defendants transfer the shares in the Second Defendant to the Claimant (as assignee of the Claim from the Company); and/or

(d)     equitable compensation and/or damages from the First Defendant in relation to his breaches of duty to the Company as above set out; and/or

(e)     equitable compensation and/or damages in respect of the assets transferred pursuant to the UK Transfer from the Second Defendant; and/or

(f)     the return of the assets transferred pursuant to the UK Transfer or their traceable proceeds, as may have been received (directly or indirectly) and retained by any of the Defendants; and/or

(g)     an account of profits in respect of the assets received (directly or indirectly) by the Defendants from the Company pursuant to the UK Transfer and any benefit received therefrom;

(h)     damages against the First and Second Defendants for unlawful means conspiracy.

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in these particulars of claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Full name:  SIMON GOLDRING

Dated:  2 November 2022

Address for receiving documents:

Maurice Turnor Gardner LLP
15th Floor Milton House
Milton Street
London
EC2Y 9BH

Solicitors for the Claimant

# Exhibit B

Amended Reply pursuant to CPR rule 17.1(2)(a) dated 21 March 2023

Claim No. BL-2022-000926

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
BUSINESS LIST (ChD)

B E T W E E N:

MOUSSY SALEM

Claimant

- and –

(1)   FREDDY SALEM
(2)   MONLINE UK LIMITED
(3)   SALIM LEVY
(4)   EZRA AGHAI

Defendants

AMENDED REPLY

1. The Claimant joins issue with the First Defendant on his Amended Defence ('Def1') and with the Second to Fourth Defendants on their separate Defence ('Def2').   References below to the paragraphs of the Claimant's Amended Particulars of Claim ('APTC') are in the form 'APTC para[s] #' and references to the paragraphs of the Defendants' Defences are in the form '[Def1 OR Def2] para[s] #'. The Claimant adopts the terms defined in APTC and certain terms defined in Def1.

**A.  Reply to Def1**

2. Def1 para 1 is embarrassing and should be struck out, except where it consists of admissions, as:

   a.  it fails to admit, not-admit or deny the validity of the assignment from the Company to the Claimant referred to in APTC para 1; and

   b.  it consists of comment and/or references to irrelevant matters.

3. Def1 para 3 is embarrassing in so far as it fails to admit, not-admit or deny APTC paras 4 and 5 and accordingly should be struck out, except where it consists of admissions. Subject to that:

   a.  Def1 paras 3.a to 3.d are admitted save that it is averred that the Rabiu 1 and Rabiu 2 Trusts also held substantial interests in the African Business, so that it was entirely owned or alternatively almost entirely owned for the benefit of members of the Salem Family by the R1 Trust, F1 Trust, B1 Trust, Rabiu 1 Trust and Rabiu 2 Trust ('R/F/B Trusts');

   b.  Def1 para 3.e is denied, save that it is admitted or averred that the shares in the Company

1

were held at all material times in the names of First Court Ltd and Second Court Ltd, professional nominees within what is now the Sequent Group ('the Nominees') and in the proportions alleged;

c.   it is averred that the Company had originally been formed or purchased from a formation agent as a company owned by one or more of the R/F/B Trusts and that by 16 March 2016:

   i.   the corporate professional trustees and suppliers of trust and corporate services within what is now the Sequent Group, who then acted among other things as trustees of the R/F/B Trusts ('the Trustees') had been asked by or on behalf of the Claimant and the First Defendant to provide a suitable offshore corporate vehicle for use as the intended transferee of the business and assets of Parker, prior to the intended voluntary liquidation of that company;

   ii.   the Company was dormant, had no assets or liabilities and was surplus to the requirements of the Trustees for whom until about that date the Company's shares had been held by the Nominees on bare trust, and accordingly the Company had been put forward by the Trustees in response to the Claimant and the First Defendant's request as a suitable vehicle and on the express basis that, when used in that intended role, the Company would be held for the benefit of the same persons and in the same proportions as Parker;

   iii.   it was accordingly agreed or understood and/or it remained thereafter the common intention between the Trustees, the Claimant, the First Defendant and the Nominees that the beneficial ownership of the Company, if  or when used as the transferee of the business and assets of Parker, would be the same as the beneficial ownership of Parker which (as is admitted at Def1 para 10) was 25% Mireille, 25% the Claimant, and 50% the First Defendant and that the Company's shares would be transferred by the Nominees to those beneficial owners in those proportions or as they might direct, on request;

   iv.   this was the basis on which the Claimant, the First Defendant and Parker proceeded when Parker entered into the ASA with the Company;

   v.   accordingly, Mireille, the Claimant and the First Defendant became and remained the beneficial owners of the Company in those proportions and/or the First Defendant is estopped from denying the same;

2

d.  Def1 para 3.f.i is admitted, save that it is denied, for the reasons set out below, that the Company did not have a contractual relationship with Morsgate;

e.  the agreement between the Second Defendant and Morsgate dated 1 August 2016 referred to at Def1 para 3.f is referred to below (to avoid confusion) as the '2016 Logistics Agreement' ;

f.  Def1 para 3.f.ii is denied for the reasons given below;

g.  alternatively, if as is denied, the benefit of any contract for the supply of Parker Services (as defined below) subsisting between the Company and Morsgate as at 6 June 2016 was not assigned by the Company to the Second Defendant and/or the Company did not agree with Morsgate and the Second Defendant expressly or by conduct to novate that contract, so that it became a contract between the Second Defendant and Morsgate on the same terms, it is averred that:

    i.  nevertheless, on or after 7 June 2016 (immediately on the Second Defendant's incorporation) with the knowledge and approval of the First Defendant, the Third Defendant and the Fourth Defendant and by agreement between the Defendants and Morsgate, the Second Defendant wrongfully supplanted the Company and thereafter supplied the Parker Services (as defined below) to Morsgate in place of the Company;

    ii.  the Defendants thereby wrongfully diverted the benefit and value of the Company's business and goodwill (acquired by the Company for value from Parker under the ASA) to the Second Defendant and/or deprived the Company of the opportunity to contract with Morsgate, as alleged at APTC para 23 and below;

h.  Def1 para 3.f.iii is denied for the reasons given above and below, save that it is admitted or averred that the former employees of Parker provided services to Morsgate on behalf of the Company that (as the Second Defendant to Fourth Defendants admit at Def2 para 7) were substantially the same as had been supplied to Morsgate by Parker ('Parker Services') and it is averred that following the ASA and the voluntary winding up of Parker on 30 March 2016 and down to 6 June 2016 they did so pursuant to a contract between the Company and Morsgate or alternatively on the basis of a mutual understanding between the Company and Morsgatre that a contract was to be entered between them for the continued provision of the Parker Services as set out in paragraph 5 below;

3

i.   Def1 paras 3.f.iv and 3.f.v are denied for the reasons given above and below, save that it is admitted or averred that:

    i.   Parker Services were supplied by the Company to Morsgate for reward from 30 March 2016 to 6 June 2016;

    ii.   in that period Parker Services were provided to Morsgate on the Company's behalf by its employees, the former employees of Parker (including the Third Defendant and the Fourth Defendant);

    iii.   further or in any event, all sums due with respect to the supply of Parker Services were properly due to the Company and that (as is admitted at Def1 para 3.f.iv) this was recognised by the Second Defendant and Morsgate at all material times;

    iv.   the unaudited accounts of the Company for the year ended 31 December 2016 ('Company 2016 Accounts') prepared in or about October 2017 on the instructions of the First Defendant and signed by the First Defendant (the accuracy of which is not admitted) recorded fees receivable, earned by the Company with respect to Parker Services in that initial 10 week period, of £153,886, equivalent to £15,386 per week and to £800,207 per year;

    v.   accordingly, it is averred that £800,207 is the minimum amount that would have been receivable by the Company from Morsgate for the continuing supply of Parker Services in the 12 months to 30 March 2017 and annually thereafter but for the wrongful actions of the Defendants set out in the APTC and that the true amount is likely to have been substantially higher;

    vi.   the Company 2016 Accounts record (consistently with the Claimant's case) that "the Company commenced trading on 30 March 2016 when it acquired the trade and assets of [Parker] and ceased trading on 6 June 2016 when it transferred its trade and assets to [the Second Defendant]."

    vii.   the Company 2016 Accounts recorded a net profit for the year of £7,591 indicating that the Company's trading from the supply of the Parker Services to Morsgate had been profitable;

j.   further, it is averred that at all material times the management of Morsgate and in particular the management of Morsgate's relationship with Parker and later with the Company as supplier of Parker Services was in practice in the hands of the First Defendant and/or

Fourth Defendant, acting as the point of contact between the professional directors of Morsgate and members of the Salem family involved in the management of the African Business but not, after 2013, the Claimant or other members of the R Branch, for example on 30 March 2016 Morsgate's letter to the Company of that date referred to in Def1 para 4.g ('Morsgate Letter') and at paragraph 4.d below was sent by email to the First Defendant by the administrator of Morsgate (Trident Trust) and then forwarded by email on the same date by the First Defendant to the Claimant and the Fourth Defendant.

4.  As to Def1 para 4:

    a.  Def1 paras 4.b to 4e are admitted, save that:

        i.  it is denied, as alleged in Def1 para 4.b that the Company did not acquire the benefit of contracts from Parker, including the benefit of the Parker Logistics Agreement, under the terms of the ASA;

        ii.  it is denied as or in so far as is alleged in Def1 paras 4.c and 4.d that the Claimant's agreement to the winding up of Parker was made on the basis of alleged advice as to or on the basis of the alleged tax considerations or so as to produce any particular tax effect;

        iii.  it is averred that in any event as the First Defendant was aware at the time, the Claimant's agreement was made on the basis of and was conditional upon any transfer of Parker's assets or business pre-liquidation being made to a company with the same ownership as Parker and paragraph 3.c above is repeated;

        iv.  it is further averred in answer to Def1 para 4.c that :

            a.  the Claimant brings these proceedings as assignee of the Company's claims and asserts no personal claim;

            b.  the Company is not (and is not alleged to be) unable to assert the true facts concerning its ownership (set out in paragraph 3 above) by reason of an alleged agreement between the Claimant and the Defendant to which it was not and is not alleged to have been party;

            c.  the allegation that the Claimant personally claimed Entrepreneurs' Relief on the liquidation of Parker is irrelevant to

5

the Company's claims and is not pleaded to;

    d.   in any event paragraph 4.a.ii above is repeated.

b.   further, it is averred that:

    i.   the express purpose of the ASA was for the Company to purchase all Parker's business assets prior to its voluntary liquidation (as recorded by recital B to the ASA);

    ii.   as provided by clause 2.1.f of the ASA, the assets purchased by the Company expressly included all Parker's contracts and in any event, as provided by clause 2.1.i of the ASA, included all Parker's property not specifically listed in clauses 2.a to 2.h;

    iii.   the benefit of the Parker Logistics Agreement was not among the only assets excluded from the sale pursuant to clause 2.2 of the ASA;

    iv.   accordingly, the benefit of the Parker Logistics Agreement was included in the Assets sold to the Company, as defined in the ASA;  and

    v.   the ASA was entered into to enable the Company to stand in Parker's shoes so as to continue to provide Parker Services to Morsgate under the terms of the Parker Logistics Agreement;

c.   Def1 para 4.f is denied, save that Def1 paras 4.f.i and 4.fii are admitted;

d.   Def1 para 4.g is admitted and it is averred (if the same is denied or not admitted) that the Morsgate Letter was sent by Morsgate and received by the Company on or about 30 March 2016 (as to which paragraph 3.j above is repeated) and that the Morsgate Letter confirms that the purpose of the transfer of Parker's assets to the Company and the TUPE transfer of the employment of Parker's employees to the Company on the same date was and was known to Morsgate at the time to be to allow the Company to supply Parker Services to Morsgate from 30 March 2016 in place of Parker;

e.   Def1 para 4.h is denied;

f.   Def1 para 4.i is denied, save that it is not admitted that by 6 June 2016 the Company had not yet opened a UK bank account or that it had encountered any substantial difficulty in doing so and averred that, on the face of it, any problem that there may have been in the Company opening a UK bank account could readily have been addressed without causing prejudice to the Company, including by the formation of a wholly owned UK subsidiary of the Company;

6

g.  Def1 para 4.j is denied and APTC para 19 is repeated;

h.  Def1 para 4.k.i is denied;

i.  Def1 para 4.k.ii is denied, save that it is admitted or averred that an effect of the UK Transfer was that as from 7 June 2016 (the date of the Second Defendant's incorporation) all of the Company's employees became the employees or officers of the Second Defendant and continued to perform the same duties they had performed as employees of the Company, so that the Second Defendant thereafter wrongfully supplied the Parker Services to Morsgate in place of the Company.

5.  It is averred that, from 30 March 2016 to 6 June 2016, the Company supplied Parker Services to Morsgate pursuant to the Parker Logistics Agreement, as Parker's assignee under the ASA:

a.  alternatively, substantially on the terms of the Parker Logistics Agreement, under a new contract arising between the Company and Morsgate from the provision of Parker Services by the Company for reward after 30 March 2016 and on the basis it was mutual understanding of the Company and Morsgate at the time that these services were supplied on that basis, pending any subsequent agreement between them to vary the terms of the Parker Logistics Agreement or to enter into a new agreement;

b.  alternatively, substantially on the terms of the 2016 Logistics Agreement, which would have been formalised and recorded in writing as a new contract between the Company and Morsgate (or as a variation of the Parker Logistics Agreement), with effect from 30 March 2016, on or before 1 August 2016 but for the wrongful acts of the Defendants set out in the APTC;

c.  alternatively, if, as is denied, there was no contract between the Company and Morsgate as at 6 June 2016, those wrongful acts deprived the Company of the opportunity of contracting with Morsgate on the substantially the same terms as the Parker Logistics Agreement or the 2016 Logistics Agreement, which it is averred Morsgate would have done on or before 1 August 2016 and with effect from 30 March 2016 (as indicated among other things by the Morsgate Lettee); and

d.  it is averred, in further support of the above, that at all material times after 6 June 2016 Morsgate continued to require Parker Services and, but for those wrongful acts of the Defendants, the Company would have remained the only person or the best person in a position to provide those services.

7

6.  As to Def1 para 5:

    a.  the non-admission as to APTC para 8 in the first sentence of Def1 para 5 is noted;

    b.  the Claimant does not reply to the remainder of Def1 para 5 on the basis that it is irrelevant to the Claimant's claim or to any pleaded defence to it, or is comment and/or alternatively is inconsistent with Def1 para 1 and in the premises are embarrassing and should be struck out.

7.  Def1 para 6 is denied save in so far as it consists of admissions.  It is denied that the indemnity offered by Art. 76 of the Company's Articles provides any protection to the First Defendant, in that it is denied that the First Defendant believed the UK Transfer to be in the best interests of the Company within the meaning of BCA, ss.132(2), such that BCA, s.132(5) applies and that accordingly that indemnity is void and of no effect.

8.  As to Def1 paras 7.a to 7.d :

    a.  Def1 para 7.a. and 7.b are admitted and it is averred that at all material times the Third Defendant and the Fourth Defendant held and continue to hold other positions of responsibility in the African Business and that in all of those positions they reported and continue to report directly and only to the First Defendant;

    b.  Def1 para 7.c is denied and paragraph 4.f above is repeated, save that no admissions are made as to whether the Company did open a UK bank account;

    c.  Def1 para 7.d  is denied save that is admitted and averred that:

        i.   between 30 March 2016 and 6 June 2016 the First Defendant and the Second Defendant agreed and combined with the Third Defendant and the Fourth Defendant that the Third Defendant and the Fourth Defendant (who were then employees of the Company engaged in supplying Parker Services on behalf of the Company to Morsgate) that the Third Defendant and the Fourth Defendant would terminate their employment by the Company and would become employees and/or directors of and shareholders in the Second Defendant (holding their shares on bare trust for or as nominees for the First Defendant) and thereupon would continue to provide Parker Services to Morsgate on behalf of the Second Defendant; and

        ii.  on or about 6 and 7 June 2016, pursuant to that agreement, the Third Defendant

8

and the Fourth Defendant terminated their employment with the Company without notice and on 7 June 2016 were appointed directors of the Second Defendant and registered as the shareholders of the Second Defendant and thereafter provided or procured the provision of the Parker Services to Morsgate on behalf of the Second Defendant.

9. Def1 para 7.e is not replied to in so far as it consists of comment, it is otherwise denied save that:

    a. it is admitted that the 2016 Logistics Agreement provided on its face for a Service Fee of 10% ('Service Fee'), it is not admitted that the level of Service Fee or other payments received by the Second Defendant from Morsgate for the Parker Services was limited to 10%;

    b. it is admitted and averred that :

        i. the Parker Logistics Agreement had provided for a Service Fee of 15%;

        ii. although dated 1 August 2016, the 2016 Logistics Agreement was made with effect from 7 June 2016, further confirming that from that date and from incorporation the Second Defendant wrongfully took the Company's place in supplying Parker Services to Morsgate;

        iii. the benefit to Parker of the Parker Logistics Agreement was sufficient to support the payment by Parker of directors remuneration and consultancy fees of at least £1 million per year and averred that this reflects (in part) the level of benefit that the Company would and should have received from the continued supply of Parker Services to Morsgate after 6 June 2016 but for the wrongful actions of the Defendants and APTC para 15(e) is repeated;

    c. no admissions are made as to the gross or net benefit received by the Second Defendant or by its officers or shareholders or directly or indirectly by the First Defendant from the supply of Parker Services under the 2016 Logistics Agreement or otherwise or from the supply of logistics services to other companies within the African Business or from any other trading activities of the Second Defendant from 7 June 2016 to date or as to the Second Defendant's true turnover or gross or net profits in that period, save that:

        i. it is admitted that as at 30 September 2021 the Second Defendant had retained earnings of at least £197,329 and that those retained earnings had increased as against retained earnings as at 21 March 2020;

      ii.   it is averred that the minimum level of fees receivable by the Second Defendant under the 2016 Logistics Agreement was £800,207 per year and was likely to be substantially higher and paragraph 3.i above is repeated;

  d.  no admissions are made as to whether or, if so, when Morsgate ceased to trade or as to any arrangements made for the transfer of Morsgate's trade to other companies or the continuance of that trade by other companies in place of Morsgate or as to the arrangements that may have been put in place between the Second Defendant and those transferees or continuers or others, or by which the Second Defendant continued to supply logistical services with respect to the same on terms similar to the 2016 Logistics Agreement or otherwise;

10. It is admitted that the shares in Morsgate were owned directly and indirectly as set out in Def1 para 10, save that it is denied that Maurice Salem held or holds any interest or any beneficial interest in Societe Samex and averred that Societe Samex was owned or beneficially owned 100% by the R/F/B Trusts and averred that the ultimate ownership of Morsgate by the R/F/B Trusts, in the manner admitted or averred, of which various members of the Salem family are the beneficiaries, is consistent with APTC para 15.d.

11. As to Def1 para 12 :

  a.  Def1 para 12.a.i is denied;

  b.  Def1 para 12.a.ii is denied save that it is admitted or averred that, as the Defendants knew, funds the Claimant had advanced as loans to and for the benefit of the Company were used after 6 June 2016 for the benefit of D2, of whose existence the Claimant was unaware at the time, without the Claimant's knowledge or consent;

  c.  Def1 para 12.a.iii is denied and paragraph 4.a above is repeated. In any event:

      i.  the Claimant brings these proceedings as assignee of the Company's claims and alleges that the shares in the Second Defendant are or should be held on trust for him in that capacity and on the basis of those claims only;

      ii.  the agreement between the Claimant and the First Defendant alleged at Def1 para 4.c regarding Parker and the First Defendant's allegations as to the beneficial ownership of the Company are irrelevant to the Company's claims against the Defendants based upon the UK Transfer.

  d.  Def1 para 12.b is embarrassing and should be struck out in that :

    i.  the First Defendant has wrongly failed to admit that, as alleged at APTC para 20(c), there was no meeting or resolution of the members of the Company in relation to the UK Transfer;

    ii.  it is averred that that at all material times after 30 March 2016 the Company's members (the Nominees) would have met only at the request of and with the knowledge of the beneficial owners of the Company, including the First Defendant, and with the knowledge of the directors of the Company, including the First Defendant, and that accordingly or in any event any alleged meeting or resolution of the Company's members relating to the UK Transfer would be within the First Defendant's knowledge; and

    iii.  at Def1 para 12.b the First Defendant admits that, to the best of his knowledge, there was no such meeting or resolution.

12.  Paragraphs 3 to 5 and 8 above are repeated in reply to Def1 para 14.

13.  As to Def1 para 15 :

    a.  Def1 para 15.a is denied in so far as it is alleged that the misconduct of the First Defendant as a director of the Company complained of was reasonable;

    b.  Def1 para 15.b is denied and paragraph 11 above is repeated; and

    c.  Def1 para 15.c is denied, the First Defendant was and is the beneficial owner of the Second Defendant.

14.  As to Def1 para 16 :

    a.  Def1 para 16 is denied in so far as it consists of positive averments and save in so far as it consists of admissions;

    b.  the last line of Def1 para 16.b is relied upon as an admission of the breach of the First Defendant's duties as a director of the Company;

    c.  as to Def1 para 16.a it is averred that as at 6 June 2016 the Company was perfectly able to continue to supply Parker Services to Morsgate and but for the wrongful acts of the Defendants would have continued to trade profitably as a result, as the First Defendant admits the Company had done in the period 30 March 2016 to 6 June 2016;

    d.  it is denied, as alleged at Def1 para 16.b, that the Claimant was taking no active part in the operations of the Company or of Parker and averred that these allegations are in any

event inconsistent with the First Defendant's case as to the Claimant's alleged involvement in and knowledge of the affairs of the Company and of Parker at Def1 paras 4.e, 4.f, 7.b and 12.a and should accordingly be struck out;

e.  further or alternatively, it is denied in any event that the degree to which the Claimant as a director of Parker or of the Company was or was not actively taking part in its management or did or did not acquiesce in the UK Transfer (which it is averred the Claimant did not) could or did provide a reasonable excuse for the First Defendant to breach his duties to the Company as a director by allowing or procuring the Second Defendant, the Third Defendant and the Fourth Defendant to act together to supplant the Company as the provider of services to Morsgate and by causing, allowing or procuring the UK Transfer, as alleged in APTC paras 20 to 34;.

f.  as to paragraph 16.c :

   i.  paragraphs 4.a and 11.c above are repeated;

   ii.  even on the First Defendant's own case (in so far as it is understood) there is no apparent connection between:

      1.  the agreement regarding Parker alleged at Def1 para 4.c and the First Defendant's allegation at Def1 para 3.e that ultimate beneficial ownership of the Company was the same as the ownership of the African Business generally (and so not the same as Parker) on the one hand; and

      2.  the UK Transfer, involving (on the Defendants' cases) the unconnected transfer of the Company's business to a company owned legally and beneficially by the Third and Fourth Defendants on the other;

   iii.  in the premises, Def1 para 16.c is embarrassing and should be struck out.

15. Def1 para 17 is denied in so far as it consists of positive averments.

16. Def1 para 18 is denied in so far as it consists of positive averments and paragraph 8 above is repeated. At all material times the Second Defendant was and now is under the de facto control of the First Defendant (the beneficial owner of the Second Defendant) and the First Defendant was and is now the controlling mind or (with the Third Defendant and the Fourth Defendant) part of the controlling mind of the Second Defendant.

17. Def1 para 19 is denied in so far as it consists of positive averments.

**B.  Reply to Def2**

18. As to the denials contained in Def2 paras 8, 25, 30 and 33(a) concerning the UK Transfer, paragraphs 3 to 5 above are repeated.

19. Def2 paras 11, 15(b), 17, 19, 26, 27 and 29 are embarrassing and should be struck out in so far as they consist of non-admissions, in that the matters not admitted are within the knowledge of:

    a.  the First Defendant, the beneficial owner and controlling mind or part of the controlling mind of the Second Defendant, as to which paragraph 16 above is repeated;

    b.  the Third and Fourth Defendants, who are and have been at all material times close and trusted associates of the First Defendant (and paragraph 8.a above it repeated) and of other members of F and B branches of the Salem family (headed by the First Defendant and his brother Beno Salem respectively) and who at all material times, through acting in formal and informal capacities in the African Business and in the family's financial affairs more generally, had:

        i.  extensive and detailed knowledge of the nature and extent of the dispute and of attempts to settle that dispute and as to how that dispute and those settlement attempts related to and affected the African Business as at March to August 2016;

        ii.  extensive and detailed knowledge of the structure of the African Business in 2016 and later, including for these purposes the ownership structures of Parker, the Company, Morsgate and of the operations of Morsgate in 2016 and thereafter; and

        iii.  full knowledge of the reasons for the ASA, Parker's liquidation, and the intended role of the Company as the supplier of Parker Services to Morsgate;

    c.  the Second Defendant, for the reasons given in this paragraph.

20. As to Def2 para 18, it is admitted and averred that Parker's statutory accounts for the year ended 31 March 2013 showed shareholders funds of £2,309,425 and for the year ended 31 March 2014 showed shareholders funds of £2,446,516.

21.  As to the denials contained in Def2 paras 21, 24, 25 and 33(a) concerning the scope and effect of the ASA, paragraphs 3 to 5 above are repeated.

13

22. As to Def2 para 23, paragraph 3.j above is repeated and relied upon to show that all Defendants were aware of the Morsgate Letter at all material times (in the case of the Second Defendant at all material times after 7 June 2016).

23. As to the last sentence of Def2 para 33(d) and as to Def2 paras 33(e) and 34, paragraph 8 above is repeated.

24. Def2 paras 35(b) and 35(c) are denied, in that at all material times the Second to Fourth Defendants knew that the First Defendant was not acting in the interests of the Company when he caused, procured or allowed the UK Transfer to the Second Defendant but was instead acting in breach of duty, as alleged at APTC paras 20 to 25. Paragraph 19 above is repeated.

25. Def2 para 42 is denied, save that:
    a. is it admitted that on or about 4 November 2016 the Claimant received a payment of £80,365.05 from the Second Defendant;
    b. no admission is made that the payment was made by mistake as alleged or for the reasons alleged in Def2 paras 42(a) and 42(b); and
    c. Def2 para 42(c) is admitted.

26. It is averred that no sum is due to the Second Defendant from the Claimant as alleged or at all.


MARK HUBBARD

MARK HUBBARD


Statement of truth

The Claimant believes that the facts stated in this Reply are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.


Signed: ……………………………………………………………….


Full name: SIMON GOLDRING

Dated: 17 January 2023

Statement of truth

The Claimant believes that the facts stated in this Amended Reply are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ...........................................................

Full name: ...... SIMON GOLDRING ..........

Dated: ...... 71/03/23 ..........

15

# Exhibit C

**Claim No. BL-2022-000926**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**BUSINESS LIST**

**BETWEEN**

**MOUSSY SALEM**

<u>**Claimant**</u>

**and**

**(1) FREDDY SALEM**
**(2) MONLINE UK LIMITED**
**(3) SALIM LEVY**
**(4) EZRA AGHAI**

<u>**Defendants**</u>

---

**CLAIMANT'S RESPONSE TO THE SECOND TO FOURTH DEFENDANTS' REQUEST FOR FURTHER INFORMATION DATED 16 FEBRUARY 2023**

---

This is the response of the Claimant to the Second to Fourth Defendants' Request for Further Information dated 16 February 2023 made pursuant to CPR Part 18 in respect of the case stated by the Claimant in his Reply dated 17 January 2023.

CPR rule 18.1(1) provides that the court may at any time order a party to (a) clarify any matter which is in dispute in the proceedings, or (b) give additional information in relation to any such matter, whether or not the matter is contained or referred to in a statement of case.

CPR PD18 paragraph 1.2 provides that a Request for Further Information should be confined to matters which are reasonably necessary and proportionate to enable the requesting party to prepare his own case or to understand the case he has to meet.

Pursuant to CPR rule 2.3(1) this Response to Request for Further Information comprises one of the statements of case in these proceedings.

Unless otherwise stated, references to paragraph numbers are to the paragraphs of the Reply. The Claimant adopts the defined terms used in the Amended Particulars of Claim dated 2 November 2022 and in the Reply.

1

**Under paragraph 3(h)**

Of: "it is averred… that the former employees of Parker provided services to Morsgate on behalf of the Company that…were substantially the same as had been supplied to Morsgate by Parker ('Parker Services') and it is averred that following the ASA and the voluntary winding up of Parker on 30 March 2016 and down to 6 June 2016 they did so pursuant to a contract between the Company and Morsgate or alternatively on the basis of a mutual understanding between the Company and Morsgate that a contract was to be entered between them for the continued provision of the Parker Services as out in paragraph 5 below."

**And under paragraph 5**

Of: "…the Company supplied Parker Services to Morsgate pursuant to the Parker Logistics Agreement, as Parker's assignee under the ASA:
a. alternatively, substantially on the terms of the Parker Logistics Agreement, under a new contract arising between the Company and Morsgate [for] the provision of Parker Services by the Company for reward after 30 March 2016 and on the basis it was [the] mutual understanding of the Company and Morsgate at the time that these services were supplied on that basis, pending any subsequent agreement between them to vary the terms of the Parker Logistics Agreement or to enter into a new agreement."

Request

1. Please confirm that the contract relied on by the Claimant is (i) a contract arising by conduct and (ii) that the conduct relied on is the provision by the Company to Morsgate of Parker services for reward after 30 March 2016.

Response

1. The Claimant's case is adequately set out in paragraphs 5 and 5(a).

Request

2. Please provide particulars of the facts and matters relied on in support of the alleged mutual understanding, including:

2.1 The natural persons alleged to have been party to the understanding on behalf of each of the Company and Morsgate;

2.2 The facts and matters relied on in support of any allegation that any natural person's understanding or knowledge is attributable to the Company or Morsgate (as applicable).

<u>Response</u>

2.1 The mutual understanding was shared by at least the Claimant and the First, Third and Fourth defendants.

2.2  The basis on which the knowledge of the Claimant and First, Third and Fourth  Defendants is to be attributed to the Company and the basis on which the knowledge of the First and Fourth Defendants is to be attributed to Morsgate is as stated in the Reply and in respect to the Fourth Defendant in Response 3 below.

**Under paragraph 3(j)**

Of: the whole paragraph.

<u>Request</u>

3. Please provide particulars of the facts and matters relied on in support of the allegations that:

3.1 The management of Morsgate and its relationship with Parker (and later the Company) as supplier of Parker Services "was in practice in the hands of" the Fourth Defendant;

3.2 The Fourth Defendant was the "point of contact" between the professional directors of Morsgate and the members of the Salem family involved in the management of the African Business.

Response

3. The Claimant relies upon the following facts and matters:

(a) The Claimant's case, as set out in paragraph 3(j) of the Reply, is that the management of Morsgate (and in particular the management of Morsgate's relationship with Parker and later the Company as supplier of Parker Services) was in practice in the hands of the First Defendant and/or Fourth Defendant, acting as the point of contact between the professional directors of Morsgate and members of the Salem family involved in the management of the African Business (as defined below) but not, after 2013, the Claimant or other members of the R Branch (being the wife and children of Raymond Salem).

(b) The Claimant refers to response 5 below, which sets out his understanding as to the nature and composition of the African Business, including as to how this was, and is, operated as a single unit.

(c) Until 30 March 2016 Parker (and its employees, including the Third and Fourth Defendants) played an important role in managing and directing the operations of the African Business. This included matters such as distribution, banking, IT, training, managing and overseeing employees, recruitment, interface with suppliers, shipping, transportation and forwarding, warehousing, logistics, and purchasing. Parker was often presented to existing and potential suppliers of consumer goods as the 'face' of the African Business, especially in the context of negotiations relating to supply and pricing. The African Business was, as a result, sometimes referred to as the 'Parker Logistics group of companies'.

(d) Morsgate operated as a treasury company for various entities within the African Business, and formed part of a corporate structure by which profits earned by trading companies operating in West Africa (including Great Brands (Nigeria) Ltd, Blue Arrow TSW Ltd, Cobexim Sarl, Forewin (Ghana) Ltd and Societe Samex, often referred to, with their subsidiaries and affiliates as the West African Trading Companies or "**WATCs**") were transferred up to the Salem family trusts as the ultimate beneficial owners of the African Business (albeit that after August 2013 these profits began to be wrongfully diverted away from the R Branch). In outline the corporate structure as at August 2013 and for several years thereafter involved revenue generated by the WATCs being paid to and held by Morsgate. Upstream companies, including Glynfield Finance Limited ("**Glynfield**") and Transglobe Logistics Limited ("**Transglobe**"),

invoiced the WATCs for services relating, for example, to finance and insurance. These invoices were satisfied by payments made by Morsgate to Glynfield and Transglobe. Glynfield and Transglobe then made payments to the Salem family trusts (albeit, after 2013, these payments began to be wrongfully diverted away from the R Branch).

(e) As set out in Response 4 below, the First Defendant has at all material times been one of the senior members of the Salem family who managed the African Business at the highest level, including the corporate structure described above.

(f) As pleaded by the First Defendant in paragraph 7(a) of his Defence (and admitted in paragraph 8(a) of the Reply), the Third and Fourth Defendants had been employees of Parker for nearly 20 years at the time Parker was wound up. Whilst employed by Parker and its successor companies, and particularly given the role of Parker within the African Business, in practice the Third and Fourth Defendants have worked in the wider African Business for many years, reporting directly to the First Defendant. The Third and Fourth Defendants' role in the African Business (including as employees of Parker and its successor companies) included managing the corporate structure described above and in particular the movement of funds through Morsgate.

(g) For example, on 13 June 2013 the Fourth Defendant sent to Rothschild (a corporate group acting as supplier of trust and corporate services to the Salem Trusts and the African Business and as trustee of the Salem family trusts) by email excel spreadsheets setting out calculations of sums to be invoiced by Glynfield or Transglobe to entities operating in Africa in respect of shipments of goods between October 2011 and December 2011. Rothschild, as the administrator of Glynfield and Transglobe, generated invoices from Glynfield and Transglobe in accordance with the Fourth Defendant's calculations, and sent these to Morsgate's bank, together with a request for payment. These invoices were settled by Morsgate (via its bank) on behalf of the entities operating in Africa, demonstrating that the Fourth Defendant's formal and informal positions in relation to Parker and the wider African Business were such that he was able in practice to direct the timing and amounts of payments to be made by Morsgate.

(h) By way of further example, on 13 July 2010 the Fourth Defendant sent email instructions for two wire payments to be made to Wafco Inc ("**Wafco**") in relation to the supply of Nokia mobile phone handsets. On 21 July 2010 a "Form M" import form relating to the import of mobile phone handsets into Nigeria by Blue Arrow TSW Limited for the benefit of Wafco was emailed to the Third and Fourth Defendants by an Umar

Ibrahim. The Claimant infers that the payments made to Wafco were 'cleared' by being closely followed by payments out to Morsgate. The Claimant also infers (given the Fourth Defendant's involvement at the earlier stages of the process) that the payments from Wafco to Morsgate were done by or under the direction of the Fourth Defendant.

(i) By way of yet further example, between 1 June 2009 and 30 July 2010 the Fourth Defendant sent almost daily emails to, amongst others, the Claimant, the First Defendant, and Beno Salem (another senior family member charged with managing the African Business at the highest level at the time as indicated below), reporting on the foreign currency transactions which had been effected in Nigeria by or for WATCs, and at what rate. The Claimant understands that the purchased currency (USD) was in due course remitted to Morsgate.

(j) By way of yet further example, on 24 March 2006 the Fourth Defendant was sent an email from one of the directors of Morsgate requesting that the Fourth Defendant explain the "rationale behind the activities" of Morsgate and particularly the reasons for payments made to and from Morsgate and requesting explanations of the relationships between paying entities. The email also states that the Fourth Defendant maintains "detailed records of the funds received and invoices paid on behalf of the five shareholders" of Morsgate.

Request

4. Please provide particulars of the members of the Salem family referred to in paragraph 3(j).

Response

4. The Claimant's response is as follows:

(a) Until 1993/1994 the African Business was run by four brothers, Isaac Salem ("**Isaac**"), the late Raymond Salem ("**Raymond**") who was the Claimant's father and Mireille Salem's ("**Mireille**") husband and head of what is known as the R branch of the Salem family, the First Defendant, head of what is known as the F branch of the Salem family, and Beno Salem ("**Beno**"), head of what is known as the B branch of the Salem family.

(b) At that point (1993/4) agreements were reached between the brothers under which Isaac and his branch of the Salem family ceased to have any interest in the African Business and  (as later reflected or intended to be reflected in the structuring of the

Salem family trusts) that the R Branch, the F Branch and the B branch were to hold equal interests in the African Business and have equal entitlements to the profits derived from that business.   This remains the position to this day, albeit that, as indicated below, since 2013 the R Branch have in substance not received the benefit of their share in the African Business, the profits of which appear to have been wrongfully diverted to the F branch and the B branch.

(c) Between 1993/1994 and 1997 the African Business was run by Raymond, the First Defendant and Beno on the basis indicated above.

(d) In 1997 Raymond suffered a stroke and was incapacitated for the remainder of his life. The Claimant took over his father's role and from 1997 to 2013 ran the African Business with his uncles, the First Defendant and Beno, on the basis indicated above.

(e) In or by 2004 the First Defendant's son, Philip Salem ("**Philip**"), also took on a senior operational role.

(f) In 2013 the Claimant was excluded from operational activities associated with the running of the African Business which from then onwards has been under the control of the First Defendant, Philip and Beno.

(g) Since 2013 the members of the R Branch (including the Claimant) have been wrongfully excluded from benefiting from the profits of the African Business, principally by the actions of or directed by the First Defendant, Philip and Beno.

**<u>Under paragraph 8(a)</u>**

Of: "…it is averred that at all material times the Third Defendant and the Fourth Defendant held and continue to hold other positions of responsibility in the African Business and that in all of those positions they reported and continue to report directly and only to the First Defendant"

<u>Request</u>

5. Please explain what the Claimant means by 'African Business' (which is not defined in the Reply (or otherwise in the statements of case served as at the date hereof)), including the entities to which the Claimant is referring (if any).

<u>Response</u>

5. The Claimant's response is as follows:

(a) Paragraph 4 of the Amended Particulars of Claim (admitted and averred by the First Defendant in paragraph 3(a) of his Defence) refers to the African Business as a substantial trading business in Africa associated with the Salem family.

(b) The Third and Fourth Defendants are in any event well aware of what is meant by the African Business, which they have worked in and helped to manage, primarily under the direction of the First Defendant, for many years and continue to do so now.

(c) The operations of the African Business are extensive and include the import and distribution of consumer products including pharmaceuticals, tobacco products (including the exclusive right to distribute and retail British American Tobacco tobacco products in a number of countries), personal care, food, alcoholic and non-alcoholic beverages and confectionary. The countries of operation as at 2013 and thereafter include Nigeria, Benin, Ghana and Togo.

(d) To the best of the Claimant's knowledge, the entities set out below form part of or have formed part of the African Business, which at all material times has operated and still operates as a single business and since 2013 has done so under the direction of the First Defendant, Philip and Beno, albeit that others act and have acted as nominees for them or for other entities within the African Business or at their direction in respect of particular companies from time to time:

<u>Belgium</u>
Africa International Group

<u>Benin</u>
Cobetrac
Madison Sarl
Societe Cobexim SARL

<u>BVI</u>
The Company (Monline International Limited)
Boulder Finance Limited

8

Crownwell Trading Corp

Fernbridge International Limited

Glynfield Finance Limited

Great Brands (Holdings) Limited

Metrocom Holdings Inc

Nartnett Limited

Tabcom SA

Transglobe Logistics Management Limited

Universal Metrocom Limited

Velaire Limited

Westco Export Trading

<u>Ghana</u>

Bargain R Us

Comfu

Diplo FZ Limited

First Rec Ltd

Forewin (Ghana) Limited

HMD Africa Limited

HMD Africa Services Limited

HMD Forewin Limited

Lewadis FZ Limited

Mabani Seven Company Ltd

Mabani Six Company Limited

Mass Industries Limited

Star Games

Zoobashop Limited

<u>Guernsey</u>

Bracknell Investments Limited

Framwell Investments Limited

<u>Jersey</u>

Morsgate International Ltd

<u>Lebanon</u>

Chakras (Holding) SAL

Gestcom International Offshore SAL

Gestcom International Trading Offshore SAL/Gee Trading (Offshore) SAL

Globest Services Offshore SAL

<u>Luxembourg</u>

Conchee Holdings Sarl

Gateacre Holdings Sarl

<u>Mauritius</u>

Great Brands (Holdings) Limited

Mabani FBR Holding Mauritius Limited

Mabani Holdings Ghana Limited

Mabani Real Estate & Management Services (MI) Limited

Maiddat MI Ltd

Marchari Investments Ltd

<u>Nigeria</u>

Afro Ocean Bridge Nigeria Ltd

BA Nigeria Distribution Ltd

Best Tobacco Company Ltd

Big Bowl Company Nigeria Ltd

Blue Arrow TSW Limited

Dynabuy Nigeria Company Limited

Grand Concept Ltd

Great Brands Nigeria Limited

IDF Trading Company Ltd

Inter Market Distribution Company Ltd

Inter Trade Worldwide Distribution Company Ltd

Inter-Food Distribution Company Ltd

Mabani Five Nigeria

Mabani Four Nigeria

Mabani Real Estate Nigeria Limited

Mabani Three Nigeria

Mabani Two Nigeria

Maon Alpha Alliance Ltd

Maon Holdings Ltd

Maon Services Ltd

Maon Technology Ltd

Saharan Distillers Ltd

Ultra Trade Company Nigeria Ltd


Panama

Perron Trading Inc

Richon Trading Co Ltd

Simpex Limited

Wafco Inc


Spain

Royal Beverages Espana SL


Togo

Societe Samex Sarl

Togo Trading & Disribution SARL


United Kingdom

The Second Defendant (Monline UK Limited)

Parker (Parker Logistics Limited)


USA

Blue Arrow Warehousing & Logistics LLC

Bonita Warehouse LLC

BS Gestcom Holdings Corp

BS Global Holdings Corp

BS and DS Holding Corp

Renis Warehousing LLC


Request

6. Please provide particulars of the "positions of responsibility" it is alleged that each of the Third Defendant and Fourth Defendant held and continue to hold, including (i) the offices or roles and (ii) at or for the benefit of which entity or entities those offices or roles were (or continue to be) held.

<u>Response</u>

6. Response 3 is repeated.

**<u>Under paragraph 8(c)(i)</u>**

Of: "…between 30 March 2016 and 6 June 2016 the First Defendant and the Second Defendant agreed and combined with the Third Defendant and the Fourth Defendant that the Third Defendant and Fourth Defendant…would become…shareholders in the Second Defendant (holding their shares on bare trust for or as nominees for the First Defendant)…"

<u>Request</u>

7. Please provide particulars of the alleged agreement, including (i) if it was oral, when and where the agreement was concluded and (ii) the natural person who concluded the agreement on behalf of the Second Defendant.

<u>Response</u>

7. The Claimant's case as to the agreement in question is adequately set out in the Reply. The Claimant also relies on paragraph 7(d) of the First Defendant's Defence, which states: "…the First Defendant agreed with the Third and Fourth Defendants that they should become directors and shareholders of Monline UK to supply logistics services to Morsgate."

<u>Request</u>

8. To the extent it is the Claimant's case that the Third and Fourth Defendants hold their shares in the Second Defendant on bare trust or as nominees for the First Defendant, please provide particulars of the facts and matters relied on in support of that allegation.

<u>Response</u>

8. The Claimant relies on the following facts and matters in support of its clearly stated case in paragraphs 23 and 37(a) of the Amended Particulars of Claim and in paragraph 8(c)(i) of the Reply that the Third and Fourth Defendants hold their shares in the Second Defendant on bare trust for or as nominees for the First Defendant:

(a) Both Parker and the Company were owned as to 50% by the Claimant and/or Mireille, and as to 50% by the First Defendant. The Third and Fourth Defendants had no ownership interest in Parker or the Company.

(b) As the First Defendant alleges in paragraph 7(d) of his Defence, he agreed with the Third and Fourth Defendants that they should become directors and shareholders of the Second Defendant. The First Defendant also alleges in paragraph 16(b) of his Defence that he acquiesced in the incorporation of the Second Defendant by the Third and Fourth Defendants as its directors and shareholders.

(c) The Third and Fourth Defendants were otherwise employees of and agents for the African Business and specifically persons who reported directly to the First Defendant but who had no interest in that business or its profits of their own.

(d) Both the First Defendant and the Third and Fourth Defendants were accustomed to the use of nominees and bare trustees to hold particular companies (as and when circumstances made this convenient or advisable) in the African Business.

(e) It is not alleged that any consideration passed to the First Defendant from the Third and Fourth Defendants for his agreement or suggested why (if the basis of this agreement was not as it is alleged to have been by the Claimant) the creation of the Second Defendant as a company of which the Third and Fourth Defendants were to be the shareholders and directors required the agreement or acquiescence of the First Defendant at all.

(f) It is to be inferred in the circumstances that the First Defendant would not have and did not agree that the Second Defendant should be formed and that the business and undertaking of the Company should be transferred to and/or continued by the Second Defendant (or acquiesce in respect to the same) on any other basis than that:

    a. the Second Defendant would be beneficially owned by and controlled by the First Defendant so that the shares in the Second Defendant would be held for him by the Third and Fourth Defendants on bare trust for him or as his nominees; and

    b. such that the First Defendant would be able to benefit from the net income stream derived from the African Business which had previously been available to the directors and shareholders of Parker and of the Company, to the exclusion of the Claimant and/or Mireille.

**Under paragraph 11(b)**

Of: "it is averred that, as the Defendants knew, funds the Claimant had advanced as loans to and for the benefit of the Company were used after 6 June 2016 for the benefit of D2, of whose existence the Claimant was unaware at the time, without the Claimant's knowledge or consent."

Request

9. Please confirm whether it is the Claimant's case that the Second, Third and Fourth Defendants (or any of them) knew that (i) the Claimant was unaware of the existence of the Second Defendant and/or (ii) that the funds loaned by the Claimant to the Company were used for the benefit of the Second Defendant without the Claimant's knowledge or consent.

Response

9. The Claimant's case is adequately pleaded.

Request

10. To the extent that is the Claimant's case, please provide particulars of each of the Second Defendant's, Third Defendant's and Fourth Defendant's knowledge of the facts alleged.

Response

10. The Claimant's case where knowledge is expressly alleged is adequately pleaded and a general request for particulars of knowledge such as this is neither reasonable or proportionate.

**Under paragraph 16**

Of: "At all material times the Second Defendant was and now is under the de facto control of the First Defendant (the beneficial owner of the Second Defendant) and the First Defendant was and is now the controlling mind or (with the Third Defendant and the Fourth Defendant) part of the controlling mind of the Second Defendant.

14

**And under paragraph 19(a)**

Of: "…the First Defendant, the beneficial owner and controlling mind or part of the controlling mind of the Second Defendant…"

<u>Request</u>

11. Please provide particulars of the facts and matters relied on in support of the allegations that:

> 11.1 The First Defendant is the beneficial owner of the Second Defendant.

> 11.2 The First Defendant was and now is the controlling mind (or part of the controlling mind) of the Second Defendant.

<u>Response</u>

11. The Claimant repeats Response 8.

**Under paragraph 19(b)**

Of: the whole paragraph

<u>Requests</u>

12. Please (i) explain what the Claimant means by its allegation that "The Third and Fourth Defendant… have been at all material times close and trusted associates of the First Defendant" (if and to the extent what is alleged extends beyond an allegation that the Third and Fourth Defendants were prior to June 2016 employees of Parker and subsequently the Company) and (ii) provide particulars of the facts and matters relied on in support of that allegation.

13. Please explain what the Claimant means by its allegation that "The Third and Fourth Defendant…are…close and trusted associates of the First Defendant" and provide particulars of the facts and matters relied on in support of that allegation.

<u>Responses</u>

12. and 13. The meaning of the words is clear and no further explanation is required. The Claimant repeats Responses 3, 5, 6, 7 and 8.

<u>Requests</u>

14. Please explain what the Claimant means by its allegation that "The Third and Fourth Defendant…have been at all material times close and trusted associates of…other members of the F and B branches of the Salem Family" and provide particulars of the facts and matters relied on in support of that allegation, including particulars of the family members referred to.

15. Please explain what the Claimant means by its allegation that "The Third and Fourth Defendant…are…close and trusted associates of…other members of the F and B branches of the Salem Family" and provide particulars of the facts and matters relied on in support of that allegation, including particulars of the family members referred to.

<u>Response</u>

14. and 15. The Claimant repeats Responses 12 and 13 above. The family members referred to are Philip Salem and Beno Salem.

<u>Request</u>

16. Please provide particulars of the following allegations:

16.1 That the Third Defendant and Fourth Defendant "act[ed] in formal and informal capacities in the African Business…", including (i) when and (ii) for whom (or what entity) it is alleged the Third Defendant and Fourth Defendant each acted.

16.2 That the Third Defendant and Fourth Defendant "act[ed] in formal and informal capacities…in the family's financial affairs more generally…", including (i) when (ii) for whom (or what entity) and (iii) in relation to what "financial affairs" it is alleged the Third Defendant and Fourth Defendant each acted.

<u>Response</u>

16. The Claimant repeats Responses 3, 5, 6, 7 and 8.

<u>Request</u>

17. Please provide particulars of how the capacities in which it is alleged the Third Defendant and Fourth Defendant each acted provided them with the following:

> 17.1 "extensive and detailed knowledge of the nature and extent of the dispute [between the Claimant and the First Defendant] and of attempts to settle that dispute";

> 17.2 "extensive and detailed knowledge of … how that dispute [between the Claimant and the First Defendant] and those settlement attempts relate to and affected the African Business as at March to August 2016";

> 17.3 "extensive and detailed knowledge of … the structure of the African Business in 2016 …";

> 17.4 "extensive and detailed knowledge of … the ownership of Parker, the Company, Morsgate and the operations of Morsgate in 2016 and thereafter";

> 17.5 "full knowledge of the reasons for the ASA, Parker's liquidation, and the intended role of the Company as the supplier of Parker Services to Morsgate".

<u>Response</u>

17. The Claimant's case is as set out in paragraphs 3(j), 8(a) and 19(b).  Responses 3, 5, 6, 7 and 8 are repeated.

**Under paragraph 24**

Of: "…at all material times the Second to Fourth Defendants knew that the First Defendant was not acting in the interests of the Company when he caused, procured or allowed the UK Transfer to the Second Defendant but was acting in breach of duty…"

Request

18. Please provide particulars of the Second Defendant's, Third Defendant's and Fourth Defendant's knowledge of the facts alleged.

Response

18. The Claimant's case is as set out in in paragraphs 11, 20, 23, 24, 28, 30 and 31-36 of the Amended Particulars of Claim and in paragraphs 3(g), 3(h), 3(i)(i)-(iii), 3(j), 4(d), 4(i), 5, 8(a), 8(c), 11(b), 14(c), 19(b) and 22 of the Reply.  Responses 3, 5, 6, 7 and 8 are repeated.

**Statement of truth**

The Claimant believes that the facts stated in this Response to Request for Further Information are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ………………………………………………

Name: …… SIMON GOLDRING ……

Dated: …… 02/03/23 ……………

Served on 2 March 2023 by Maurice Turnor Gardner LLP of 15th Floor, Milton House, Milton Street, London EC2Y 9BH, solicitors for the Claimant.