IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23-mc-23186-KMM

*In re* Application of

MOUSSY SALEM,

                              Applicant,

FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM
BENO SALEM

**[CORRECTED] DECLARATION OF LAUREN TABAKSBLAT IN SUPPORT OF
MOUSSY SALEM'S APPLICATION FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM BENO SALEM**

I, LAUREN TABAKSBLAT, hereby declare under penalty of perjury as follows:

1.       I am a partner and co-Chair of the Litigation & Arbitration Practice Group at

Brown Rudnick, LLP, and lead counsel for Applicant Moussy Salem ("Moussy" or "Applicant")

in the above captioned matter.  I submit this declaration in support of Moussy's Application For

An Order To Take Discovery Pursuant To 28 U.S.C. § 1782 From Beno Salem (the

"Application").  I am knowledgeable about the matters described below, and the facts stated

herein are true and correct to the best of my knowledge and belief.

2.       This Application seeks the production of documents from Beno Salem ("Beno")

to support Moussy's claims in proceedings currently pending before the High Court of Justice,

Business & Property Courts of England and Wales, Business List (ChD), Claim No. BL-2022-

000926 (the "English Proceedings").

3.       In connection with his January 25, 2024, Opposition to Moussy's Application and

his January 26, 2024, Motion to Dismiss, Beno submitted an unexecuted and undated version of

a Settlement Deed between Moussy, Beno, Freddy Salem, and the trustees of various Salem family trusts.  Attached as **Exhibit 1** is the dated and executed version of the Settlement Deed. Page two of the Deed shows that it was entered into on April 15, 2016.  Page 23 of the Deed is Beno's signature page listing his address at "2139 E 14th Street, Brooklyn, NY 11229."

4.      Attached as **Exhibit 2** is a March 26, 2010, email from Beno to Moussy providing his address at "2111 East 2nd Street, Brooklyn, New York 11223."

5.      Attached as **Exhibit 3** is Beno's July 24, 2023, Memorandum of Law In Support of Motion to Quash in the action styled, *In re Petition of Moussy Salem For An Order To Take Discovery Pursuant To 28 U.S.C. § 1782 From Beno Salem* (E.D.N.Y. 2023) (the "New York Proceedings").

6.      Attached as **Exhibit 4** is the July 24, 2023, Declaration of Nathaniel J. Krizer in support of Beno's Motion to Quash in the New York Proceedings.

7.      Attached as **Exhibit 5** is the July 24, 2023, Declaration of Beno Salem in support of Beno's Motion to Quash in the New York Proceedings.

8.      Attached as **Exhibit 6** is the July 24, 2023, Declaration of Martin Davies in support of Beno's Motion to Quash in the New York Proceedings.

9.      Attached as **Exhibit 7** is the Declaration of Simon Goldring in support of Moussy's Application, filed in this proceeding as ECF 4-1, which sets forth the topics for party disclosure ordered by the English Court in the English Proceedings, as well as the Disclosure Review Document from the English Proceedings showing those topics as **Exhibit 8**.

I declare under penalty and perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 15, 2024
      New York, New York

_____
Lauren Tabaksblat

# EXHIBIT 1

**MOUSSA RAYMOND SALEM**

**MIREILLE RAYMOND SALEM**

**ROBERT DAVID SALEM**

**FREDDY MOUSSA SALEM**

**BENO MOUSSA SALEM**

**ROTHSCHILD SWITZERLAND (CI) TRUSTEES LIMITED**

**GUERNSEY GLOBAL TRUST LIMITED**

**ROTHSCHILD TRUST GUERNSEY LIMITED**

**ROTHSCHILD TRUST (SCHWEIZ) AG**

**RTB TRUSTEES AG**

---

**SETTLEMENT DEED**

---

**THIS DEED** is made on _____15 April_____ 2016

**BETWEEN:**

(1)  **MOUSSA RAYMOND SALEM** of 13 Ingram Avenue, London, NW11 6TG (**"Moussy"**);

(2)  **MIREILLE RAYMOND SALEM** of 19 Chalton Drive, London, N2 0QW (**"Mireille"**);

(3)  **ROBERT DAVID SALEM** of 5 Church Mount, London, N2 0RW (**"Robert"**);

(4)  **FREDDY MOUSSA SALEM** of 10 Gloucester Gate, London, NW1 4HG (**"Freddy"**);

(5)  **BENO MOUSSA SALEM** of 2111 East 2nd Street, Brooklyn, NY 11223 (**"Beno"**);

(6)  **ROTHSCHILD SWITZERLAND (CI) TRUSTEES LIMITED,** a private limited company incorporated in Guernsey (number 16617) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP, AND **GUERNSEY GLOBAL TRUST LIMITED,** a private limited company incorporated in Guernsey (number 39304) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP AND **ROTHSCHILD TRUST GUERNSEY LIMITED,** a private limited company incorporated in Guernsey (number 2154) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP **IN EACH CASE ACTING SOLELY IN ITS CAPACITY AS TRUSTEE OF THE R1 SETTLEMENT** (the **"R1 Trustees"** and each a **"R1 Trustee"**);

(7)  **ROTHSCHILD SWITZERLAND (CI) TRUSTEES LIMITED,** a private limited company incorporated in Guernsey (number 16617) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP, AND **GUERNSEY GLOBAL TRUST LIMITED,** a private limited company incorporated in Guernsey (number 39304) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP AND **ROTHSCHILD TRUST (SCHWEIZ) AG,** a private limited company incorporated in Switzerland (number CHE-103.200.027) whose registered office is Zollikerstrasse 181, 8034 Zurich, Switzerland **IN EACH CASE ACTING SOLELY IN ITS CAPACITY AS TRUSTEE OF THE F1 SETTLEMENT** (the **"F1 Trustees"** and each a **"F1 Trustee"**); and

(8)  **ROTHSCHILD SWITZERLAND (CI) TRUSTEES LIMITED,** a private limited company incorporated in Guernsey (number 16617) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP, AND **GUERNSEY GLOBAL TRUST LIMITED,** a private limited company incorporated in Guernsey (number 39304) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP AND **RTB TRUSTEES AG,** a private limited company incorporated in Switzerland (number CHE-352.895.323) whose registered office is Zollikerstrasse 181, 8034 Zurich, Switzerland **IN EACH CASE ACTING SOLELY IN ITS CAPACITY AS TRUSTEE OF THE B1 SETTLEMENT** (the **"B1 Trustees"** and each a **"B1 Trustee"**)

**INTRODUCTION:**

(A)     On 11 April 2014, the English Litigation was brought against the Defendants by the Claimants.

(B)     In the English Litigation the Claimants allege that elements of the African Business were carried on in partnership and that assets relating to that business which are now held in the R1 Settlement, the B1 Settlement and the F1 Settlement belong to and should be held for that partnership.

(C)     The Litigation Parties have agreed that the English Litigation, insofar as it relates to the Claims, will be stayed and that neither of the Claimants will seek to make any further allegations of whatever nature in relation to the Claims.

(D)     This Deed is further to the settlement deed dated 7 April 2016 between the Litigation Parties, Isaac Salem, Maurice Moussy Salem and Gaby Salem in relation to the Property Business.

## 1.     INTERPRETATION

1.1     In this Deed:

"**African Business**" means any business in Africa which has been carried on, at any time, by any member of the Salem Family or their Connected Parties and any assets held by, or arising or derived from, those businesses;

"**B1 Settlement**" means a settlement dated 2 April 2003 of which the B1 Trustees are the present trustees;

"**B2 Settlement**" means a settlement dated 28 March 2002 of which the B2 Trustees are the present trustees;

"**B2 Trustee**" means Guernsey Global Trust Limited in its capacity as the trustee of the B2 Settlement;

"**Beno and Freddy Parties**" (and each a "**Beno and Freddy Party**") means the B1 Trustees, the F1 Trustees, Freddy and Beno and their respective Connected Parties;

"**Business Day**" means a day other than a Saturday or Sunday on which banks generally are open for inter-bank business in London;

"**Children**" and "**Issue**" means any children and issue whether adopted or legitimate or illegitimate;

"**Claimants**" means Moussy and Mireille Salem;

"**Claims**" means:

(a)     in relation to claims against the Beno and Freddy Parties by the Raymond Parties, any and all claims relating to any and all Liabilities arising from or related to or in connection with (i) the English Litigation; (ii) the underlying facts and matters relating to the English Litigation, or otherwise arising out of or related to the facts and matters referred to in the English Litigation, including but not limited to, all claims and counterclaims made in the English Litigation; and (iii) any other matter arising out of or related to or connected with the relationships between the Parties, but only (in the

cases of each of (i), (ii) and (iii)), in so far as those Liabilities relate to the African Business or to SSF;

(b) in relation to claims against the Beno and Freddy Parties by the R1 Trustees and/or their Connected Parties, any and all claims relating to any and all Liabilities arising from or related to or in connection with (i) the English Litigation; (ii) the underlying facts and matters relating to the English Litigation, or otherwise arising out of or related to the facts and matters referred to in the English Litigation, including but not limited to, all claims and counterclaims made in the English Litigation; and (iii) any other matter arising out of or related to or connected with the relationships between the Parties, but only (in the cases of each of (i), (ii) and (iii)), in so far as those Liabilities arise from the allegations of partnership that have been raised by the Claimants in the English Litigation in respect of the African Business or relate to SSF;

(c) in relation to claims against the R1 Trustees by the Beno and Freddy Parties or the Raymond Parties, any and all claims relating to any and all Liabilities arising from or related to or in connection with (i) the English Litigation; (ii) the underlying facts and matters relating to the English Litigation, or otherwise arising out of or related to the facts and matters referred to in the English Litigation, including but not limited to, all claims and counterclaims made in the English Litigation; and (iii) any other matter arising out of or related to or connected with the relationships between the Parties, but only (in the cases of each of (i), (ii) and (iii)), in so far as those Liabilities arise from the allegations of partnership that have been raised by the Claimants in the English Litigation in respect of the African Business or relate to SSF;

(d) in relation to claims against the R2 Trustee, B2 Trustee, Sheba Trustee or Rabiu Trustees by the Beno and Freddy Parties, the Raymond Parties or the R1 Trustees, any and all claims relating to any and all Liabilities arising from or related to or in connection with (i) the English Litigation; (ii) the underlying facts and matters relating to the English Litigation, or otherwise arising out of or related to the facts and matters referred to in the English Litigation, including but not limited to, all claims and counterclaims made in the English Litigation; and (iii) any other matter arising out of or related to or connected with the relationships between the Parties, but only (in the cases of each of (i), (ii) and (iii)), in so far as those Liabilities arise from the allegations of partnership that have been raised by the Claimants in the English Litigation in respect of the African Business or relate to SSF;

(e) in relation to claims against the Raymond Parties by the Beno and Freddy Parties, any and all claims relating to any and all Liabilities arising from or related to or in connection with (i) the English Litigation; (ii) the underlying facts and matters relating to the English Litigation, or otherwise arising out of or related to the facts and matters referred to in the English Litigation, including but not limited to, all claims and counterclaims made in the English Litigation; and (iii) any other matter arising out of or related to or connected with the relationships between the Parties, but only (in the cases of each of (i), (ii) and (iii)), in so far as those Liabilities relate to the African Business or to SSF;

(f) in relation to claims against the Raymond Parties by the R1 Trustees and/or their Connected Parties, any and all claims relating to any and all Liabilities arising from or related to or in connection with (i) the English Litigation; (ii) the underlying facts and matters relating to the English

Litigation, or otherwise arising out of or related to the facts and matters referred to in the English Litigation, including but not limited to, all claims and counterclaims made in the English Litigation; and (iii) any other matter arising out of or related to or connected with the relationships between the Parties, but only (in the cases of each of (i), (ii) and (iii)), in so far as those Liabilities arise from the allegations of partnership that have been raised by the Claimants in the English Litigation in respect of the African Business or relate to SSF;

"**Conciliation Process**" means a process of dividing the African Business on the terms of the letter set out at Schedule 2;

"**Confidential Information**" means the terms of this Deed and the content of the negotiations leading to it;

"**Connected Party**" or "**Connected Parties**" means:

(a)    in relation to each of the R1, F1, B1, R2, B2, Sheba and Rabiu Trustees, their past and present administrators, advisors, affiliates, agents, assigns, attorneys, consultants, directors, employees, executors, members, officers, Parents, predecessors, principals, representatives, stockholders, Subsidiaries, successors, related or affiliated Persons (including protectors of their respective trusts), and any other Person over which any of them has control through a direct or indirect interest;

(b)    in relation to Mireille, her late husband Raymond, future spouse (or civil partner) or widower;

(c)    in relation to each of Moussy, Robert, Freddy, Beno and Isaac:

(i)     themselves;

(ii)    their spouse (or civil partner), widows or widowers;

(iii)   their Children and remoter Issue; and

(iv)    the spouse (or civil partner), widows and widowers of their Children and remoter Issue.

"**Control**" has the meaning given in sections 450 and 451 of the Corporation Tax Act 2010 and references to "**Controlled**" shall be construed accordingly;

"**Defendants**" means (1) Rothschild Switzerland (CI) Trustees Limited and Guernsey Global Trust Limited only in their capacities as trustees of the R1 Settlement; (2) Rothschild Switzerland (CI) Trustees Limited and Guernsey Global Trust Limited only in their capacities as trustees of the F1 Settlement; (3) Rothschild Switzerland (CI) Trustees Limited and Guernsey Global Trust Limited only in their capacities as trustees of the B1 Settlement; (4) Freddy and (5) Beno;

"**Defendant Released Parties**" and each a "**Defendant Released Party**" means Freddy, Beno, the R1 Trustees, the F1 Trustees, the B1 Trustees and their respective Connected Parties;

"**Dispute**" means any dispute arising from or connected with this Deed, including, without limitation, non-contractual disputes and disputes regarding the existence, validity or termination of this Deed or the consequences of its nullity;

"**English Litigation**" means the proceedings in the Chancery Division of the High Court of Justice in England under claim number HC14B01575/HC-2014-000788 which have been brought by the Claimants against the Defendants;

"**F1 Settlement**" means a settlement dated 2 April 2003 of which the F1 Trustees are the present trustees;

"**Isaac**" means Isaac Moussa Salem of Le Rocabella, 24 Avenue Princesse Grace, Apartment 17B, MC98000, Monaco;

"**Liability**" and "**Liabilities**" means any and all liabilities in respect of any existing (as at the date of this Settlement Deed) matter, fact, action or inaction giving rise to any demand, liability, obligation, complaint, claim, counterclaim, right of set-off, right to net, indemnity, right of contribution, cause of action (including, without limitation, in negligence), administrative or regulatory claim or infraction, petition, right or interest of any kind or nature whatsoever, whether in law or equity, direct or indirect, joint or several, foreseen or unforeseen, contingent or actual, accrued or unaccrued, liquidated or unliquidated, known or unknown, disclosed or undisclosed, suspected or unsuspected, howsoever arising in whatever capacity and jurisdiction;

"**Litigation Parties**" and each a "**Litigation Party**" means the Claimants, the Defendants and Robert;

"**Notice**" means a notice under or in connection with this Deed;

"**Parent**" means a person in respect of whom a company is a Subsidiary, and includes the Parent of a Parent, no matter how many times removed;

"**Party**" and "**Parties**" means a party and the parties to this Deed;

"**Patty**" means Patricia Ladow of 50 Acacia Road, London, NW8 6AL;

"**Person**" means any natural person or any entity, including a corporation, partnership, limited partnership, association, limited liability company, limited liability partnership, joint-stock company, joint venture, estate, legal representative, trust, unincorporated association, and any business or legal entity and their administrators, assignees, executors, heirs, predecessors, representatives, and successors;

"**Proceedings**" means any legal, arbitral, administrative, regulatory or other action or proceedings;

"**Property Business**" means any property investment businesses which may have been carried on, at any time, through Presi Inc or any of its Subsidiaries, and any funds that may have been received, or generated, by such businesses, and/or any assets held by, or arising or derived from, those businesses;

"**R Trust Parties**" and each a "**R Trust Party**" means the R1 Trustees, the Rabiu Trustees, the R2 Trustee and their respective Connected Parties;

"**R1 Settlement**" means a settlement dated 2 April 2003 of which the R1 Trustees are the present trustees;

"**R2 Settlement**" means a settlement dated 22 November 2004 of which the R2 Trustee is the present trustee;

"**R2 Trustee**" means Guernsey Global Trust Limited in its capacity as the trustee of the R2 Settlement;

"**Rabiu No. 1 Settlement**" means a settlement dated 30 June 1997 of which Rabiu 1 Trustee is the present trustee;

"**Rabiu 1 Trustee**" means Rothschild Trust Financial Services Limited (a private limited company incorporated in Guernsey (number 2313) whose registered office is St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP) in its capacity as trustee of the Rabiu No. 1 Settlement;

"**Rabiu No. 2 Settlement**" means a settlement dated 30 June 1997 of which Rabiu 2 Trustee is the present trustee;

"**Rabiu 2 Trustee**" means Rothschild Trust Guernsey Limited in its capacity as the trustee of the Rabiu No. 2 Settlement;

"**Rabiu Trustees**" and each a "**Rabiu Trustee**" means Rabiu 1 Trustee and Rabiu 2 Trustee;

"**Raymond Parties**" and each a "**Raymond Party**" means Moussy, Mireille and Robert and their respective Connected Parties;

"**Salem Family**" means Mireille, Moussy, Robert, Patty, Freddy, Beno, Isaac and their respective Connected Parties

"**Sheba Trust**" means a settlement dated 21 September 2000 of which the Sheba Trustee is the present trustee;

"**Sheba Trustee**" means Beeston Management Limited (a company organised and existing under the laws of the Isle of Man and whose registered office is situate at PO Box 237, Peregrine House, Peel Road, Douglas, Isle of Man IM99 ISU, British Isles) in its capacity as trustee of the Sheba Trust;

"**SSF**" means Société Salem Frères, a Société en Nom Collectif registered on 26 January 1973 at the Commercial Registry of Beirut under registration number 28496;

"**Subsidiary**" means a company

(a)     in which another person directly or indirectly holds or controls a majority of the voting rights,

(b)     in respect of which another person has the right to appoint or remove a majority of the directors, or

(c)     over which another person has the right to exercise a dominant influence by virtue of the company's constitution or a contract, or does in fact exercise a dominant influence,

(d)     and includes a Subsidiary of a Subsidiary, no matter how many times removed;

"**Third Party**" means any Person who is not a Party to this Deed or defined in this Deed; and

"**Tomlin Order**" means a Tomlin Order in the form of the agreed draft, the material provisions of which are attached at Schedule 1.

1.2     In this Deed, a reference to:

1.2.1   a statutory provision includes a reference to the statutory provision as modified or re-enacted or both from time to time whether before or after the date of this Deed and any subordinate legislation made or other thing done under the statutory provision whether before or after the date of this Deed;

1.2.2   a company includes a reference to a corporation, body corporate, trust and partnership;

1.2.3   the singular includes the plural and vice versa (unless the context otherwise requires);

1.2.4   a clause or schedule, unless the context otherwise requires, is a reference to a clause of or schedule to this Deed; and

1.2.5   this Deed includes this Deed as amended or varied in accordance with its terms.

1.3     Clause headings in this Deed are for ease of reference only and do not affect its construction.

2.      **SETTLEMENT**

This Deed is made in full and final settlement of the Claims which the Claimants or Robert or any of them has or may have against the Defendant Released Parties or any of them.

3.      **ACKNOWLEDGEMENT**

The Parties each acknowledge that there is not and never has been a partnership over or in relation to the African Business.

4.      **RELEASE**

4.1     The Claimants and Robert each agree that the Defendant Released Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee and the Rabiu Trustees (and their respective Connected Parties) are released and forever discharged from the Claims.

4.2     The R1 Trustees agree that the Raymond Parties, the Beno and Freddy Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee and the Rabiu Trustees (and their respective Connected Parties) are released and forever discharged from the Claims.

4.3     The Beno and Freddy Parties each agree that the Raymond Parties, the R Trust Parties, the B2 Trustee and the Sheba Trustee (and their respective Connected Parties) are released and forever discharged from the Claims.

5.      **COVENANT NOT TO SUE**

5.1     The Claimants and Robert each agree that they will not (and will procure that their respective Connected Parties will not) bring any Proceedings in England and Wales or in any other jurisdiction against a Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (or their respective Connected Parties) in relation to any Claims or otherwise assert a Claim against a Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (or their respective Connected Parties).

5.2     The R1 Trustees agree that they will not (and will procure that their respective Connected Parties will not) bring any Proceedings, in England and Wales or in any

other jurisdiction, against any of the Raymond Parties, the Beno and Freddy Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (or their respective Connected Parties) in relation to any Claim or otherwise assert a Claim against any of the Raymond Parties, the Beno and Freddy Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (or their respective Connected Parties).

5.3     The Beno and Freddy Parties each agree that they will not (and will procure that their respective Connected Parties will not) bring any Proceedings, in England and Wales or in any other jurisdiction, against any of the Raymond Parties or the R Trust Parties in relation to any Claim or otherwise assert a Claim against the Raymond Parties or the R Trust Parties.

5.4     Each of the Parties agrees that if any of the Raymond Parties issues Proceedings or asserts a Claim or Liability in breach of clause 5.1 above, damages are not an adequate remedy and, accordingly, that injunctive or other similar relief is appropriate to restrain that breach.

5.5     If, contrary to clause 5.1 above, any of the Raymond Parties brings Proceedings in relation to a Claim or otherwise asserts a Claim against any of the Defendant Released Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (or their respective Connected Parties), Moussy, Mireille or Robert (as the case may be) shall pay on demand to the Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee, or, if requested by the Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee, to the relevant Connected Party, a sum equal to the costs (including, without limitation, legal costs), losses, liabilities, expenses and payments incurred or made by the Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee or the relevant Connected Party in connection with or arising from the defence of, or otherwise responding to, that Claim, including, without limitation, any sum due on a judgment or award given against the Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee or the Connected Party and any payment made in settlement of that Claim. A certificate signed on behalf of the Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee (or, if payment is to be made directly to the Connected Party, the Connected Party) shall, except in the case of manifest error, be conclusive as to the amount of any costs, losses, liabilities, expenses and payments incurred or made in connection with or arising from the defence of, or otherwise responding to, that Claim.

5.6     Each of the Parties agrees that if any of the Defendant Released Parties issues Proceedings or asserts a Liability in breach of clauses 5.2 or 5.3 above, damages are not an adequate remedy and, accordingly, that injunctive or other similar relief is appropriate to restrain that breach.

5.7     If, contrary to clause 5.2 above, the R1 Trustees or their Connected Parties brings Proceedings in relation to a Claim or otherwise asserts a Claim against the Raymond Parties, the Beno and Freddy Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (and their respective Connected Parties), the R1 Trustees shall pay on demand to the Raymond Party, the Beno and Freddy Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee, or, if requested by the Raymond Party, the Beno and Freddy Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee, to the relevant Connected Party, a sum equal to the costs (including, without limitation, legal costs), losses, liabilities, expenses and payments incurred or made by the Raymond Party, the Beno and Freddy Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee or the relevant Connected Party in connection with or arising from the

defence of, or otherwise responding to, that Claim, including, without limitation, any sum due on a judgment or award given against the Raymond Party, the Beno and Freddy Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee or the Connected Party and any payment made in settlement of that Claim. A certificate signed on behalf of the Raymond Party, the Beno and Freddy Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustee (or, if payment is to be made directly to the Connected Party, the Connected Party) shall, except in the case of manifest error, be conclusive as to the amount of any costs, losses, liabilities, expenses and payments incurred or made in connection with or arising from the defence of, or otherwise responding to, that Claim.

5.8     If, contrary to clause 5.3 above, the Beno and Freddy Parties brings Proceedings in relation to a Claim or otherwise asserts a Claim against any of the Raymond Parties or the R Trust Parties, the F1 Trustees, the B1 Trustees, Freddy or Beno (as the case may be) shall pay on demand to the Raymond Party or the R Trust Party, or, if requested by the Raymond Party or the R Trust Party, to the relevant Connected Party, a sum equal to the costs (including, without limitation, legal costs), losses, liabilities, expenses and payments incurred or made by the Raymond Party or the R Trust Party or the relevant Connected Party in connection with or arising from the defence of, or otherwise responding to, that Claim, including, without limitation, any sum due on a judgment or award given against the Raymond Party or the R Trust Party or the Connected Party and any payment made in settlement of that Claim. A certificate signed on behalf of the Raymond Party or the R Trust Party (or, if payment is to be made directly to the Connected Party, the Connected Party) shall, except in the case of manifest error, be conclusive as to the amount of any costs, losses, liabilities, expenses and payments incurred or made in connection with or arising from the defence of, or otherwise responding to, that Claim.

5.9     Nothing in this Clause 5 applies, or should be construed such that it has the effect of applying, to any Proceedings brought in relation to a breach of this Deed or any future matter, fact, action or inaction.

6.      **DIVISION OF THE AFRICAN BUSINESS**

6.1     Freddy, Beno, Moussy, Robert and Mireille each agree to enter into the Conciliation Process with or without Patty (albeit which it is currently intended shall include Patty), and to execute and deliver to all other Parties a copy of the letter at Schedule 2, which is to be signed by each of Freddy, Beno, Moussy, Robert and Mireille.

6.2     The Parties each agree that the costs of the Conciliation Process shall be borne one third by Beno and the B1 Trustees, one third by Freddy and the F1 Trustees and one third by Moussy, Robert, Mireille and the R1 Trustees.

6.3     Freddy, Beno, Moussy, Robert and Mireille each agree that any determination or proposal for settlement put forward by Ezra Marcos as part of the Conciliation Process shall be put to the F1 Trustees, B1 Trustees and R1 Trustees for approval.

6.4     The F1 Trustees, B1 Trustees and R1 Trustees each agree to consider and, if considered by them in their absolute discretion to be appropriate, approve any determination or proposal for settlement put forward by Ezra Marcos as part of the Conciliation Process.

6.5     If the Conciliation Process does not result in an agreed division of the African Business approved and effected by the F1 Trustees, B1 Trustees and R1 Trustees by 1 January 2017, including if by reason of Ezra Marcos being unable to act or unable to reach a conclusion, then, unless an extension is agreed by the Parties in writing, by 1 February 2017 the Parties agree to use reasonable endeavours to agree a

binding process for an expert determination to value and divide the African Business. It is currently anticipated that such an agreement might include the following terms and steps:

6.5.1   to refer the division of the African Business to an independent expert;

6.5.2   the independent expert to be appointed jointly by the Parties;

6.5.3   in the event the identity of the expert cannot be agreed between the Parties, the expert to be appointed by the President of the Institute of Chartered Accountants in England and Wales;

6.5.4   each Party to be entitled to make written submissions to the expert if they so wish;

6.5.5   the expert to duly consider the written submissions and, to assist him in his deliberations, the Parties to provide such information as the expert reasonably requests;

6.5.6   once the expert has completed his deliberations it is envisaged that he would prepare a valuation of the African Business;

6.5.7   the Parties to then express whether they have a desire to purchase or sell each and any assets of the African Business;

6.5.8   if the Parties cannot agree to buy or sell the assets of the African Business between them then the Parties would put the African Business as a whole, or any part that is not sold between the Parties by agreement, up for sale on the open market; and

6.5.9   the costs of the expert to be borne one third by Beno and the B1 Trustees, one third by Freddy and the F1 Trustees and one third by Moussy, Robert, Mireille and the R1 Trustees.

## 7.   COMING INTO FORCE OF THIS DEED

The Parties each agree that this Deed will come into force immediately upon execution of this Deed.

## 8.   NO ADMISSION

This Deed is entered into in order to compromise the Claims. Nothing in this Deed or any related negotiations shall be represented, construed or used in evidence as an admission of any Liability whatsoever.

## 9.   CONFIDENTIALITY

9.1   Subject to clauses 9.2 and 9.3 below, each of the Parties agrees not to:

9.1.1   communicate or disclose to any Third Party any of the Confidential Information; or

9.1.2   permit others to do so,

without the express written consent of every other Party to this Deed.

9.2   A Party may disclose Confidential Information to the extent that:

9.2.1   disclosure is required by law, by a direction or order of a court or tribunal or governmental agency or regulatory body, or pursuant to stock exchange regulations or other rules, guidelines and regulations or practice, or for the purpose of pursuing or defending court proceedings;

9.2.2   disclosure is necessary to enable or facilitate the enforcement of this Deed;

9.2.3   disclosure is necessary to comply with audit, tax or regulatory requirements; or

9.2.4   the information in question was, at the date of this Deed, already in the public domain or later comes into the public domain through no fault of any of the Parties.

9.3   Nothing in this clause 9 or elsewhere shall operate to prevent any of the R1 Trustees, the F1 Trustees, the B1 Trustees, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees disclosing the Confidential Information to any court of competent jurisdiction in proceedings concerning the administration of their respective trusts and/or to any beneficiaries or protectors of their respective trusts.

## 10.   TOMLIN ORDER

10.1   Within 7 days of the coming into effect of this Deed, the Litigation Parties shall apply to the English court for the stay of the English Litigation on the terms as set out in the Tomlin Order appended at Schedule 1.

10.2   The Litigation Parties irrevocably authorise their respective legal advisers to sign the Tomlin Order.

## 11.   ENTIRE AGREEMENT

11.1   This Deed constitutes the entire agreement between the Parties relating to its subject matter, and supersedes and extinguishes any prior undertakings, representations, warranties, conditions and arrangements of any nature, whether in writing or oral, relating to that subject matter.

11.2   Each Party represents and warrants that it has conducted such enquiries and taken such advice as it considers necessary in order to enter into this Deed and that, in doing so, it has not relied on anything said or done, or not said or not done, by or on behalf of any other Party except to the extent that it is set out expressly in this Deed. Furthermore, except to the extent that it is set out expressly in this Deed, each Party acknowledges and agrees that it was not induced to enter into this Deed by any representation or statement made by any of the other Parties, and that it has not relied on any such representation or statement.  In particular, in the case of Robert, Moussy, Mireille, Freddy and Beno they each represent and warrant that they have received written legal advice from their respective legal advisers as to the effect of entering into this Deed; confirmation of such advice is exhibited at Schedule 3.

11.3   Each Party accepts that the other Parties and/or their Connected Parties may have information relevant to the Claims or this Deed that has not been disclosed and that neither the existence of such information nor any statement or representation made by any of the Parties gives any grounds to vitiate this Deed, to claim damages or to seek any other relief.

## 12.   THIRD PARTY RIGHTS

12.1   The Defendant Released Parties' Connected Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee and the Rabiu Trustees (and their respective Connected Parties) may enforce the terms of clauses 2, 4 and 5 of this Deed subject to and in accordance with this Deed and the provisions of the Contracts (Rights of Third Parties) Act 1999.  The Parties may by agreement entered into in accordance with clause 15 below rescind or vary this Deed without the consent of the Defendant Released Parties' Connected Parties, the R2 Trustee, the B2 Trustee, the Sheba Trustee and the Rabiu Trustees (and their respective Connected Parties).

12.2   Subject to clause 12.1, a person who is not a Party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 or otherwise to enforce any term of this Deed.

## 13.   GENERAL

13.1   The Parties represent and warrant to each other that they have the capacity, power and authority to enter into and perform this Deed, that each of those who executes this Deed on their behalf is duly authorised to do so, and that this Deed gives rise to legal, valid, binding and enforceable obligations on each Party.

13.2   The Parties each agree that:

13.2.1   In the case of Rothschild Switzerland (CI) Trustees Limited, Guernsey Global Trust Limited and Rothschild Trust Guernsey Limited, each acting in their capacity as trustees of the R1 Settlement, their liability in respect of any warranty or obligation under this Deed is limited to trust property of the R1 Settlement in their possession or under their control from time to time.

13.2.2   In the case of Rothschild Switzerland (CI) Trustees Limited, Guernsey Global Trust Limited and Rothschild Trust (Schweiz) AG, each acting in their capacity as trustees of the F1 Settlement, their liability in respect of any warranty or obligation under this Deed is limited to trust property of the F1 Settlement in their possession or under their control from time to time.

13.2.3   In the case of Rothschild Switzerland (CI) Trustees Limited, Guernsey Global Trust Limited and RTB Trustees AG, each acting in their capacity as trustees of the B1 Settlement, their liability in respect of any warranty or obligation under this Deed is limited to trust property of the B1 Settlement in their possession or under their control from time to time.

13.3   Each Litigation Party shall bear its own costs of the English Litigation and in relation to this Deed, and none of the Litigation Parties shall enforce any costs or other order made in their favour in the English Proceedings.

13.4   Time is of the essence with respect to all provisions of this Deed that specify a time for performance.

13.5   Each Litigation Party warrants to the other that, as at the date of this Deed, no Proceedings (other than the English Litigation) arising out of or connected with any Claims have been commenced, are pending or, to the best of its knowledge, are contemplated against any of the other Litigation Parties.

13.6   None of the Parties may assign, transfer, declare a trust of the benefit of or in any other way alienate any of its rights under this Deed, whether in whole or in part, without the prior written consent of the other Parties.

13.7 No failure to exercise, nor any delay in exercising, any right or remedy under this Deed shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.

14. **SEVERANCE**

14.1 The illegality, invalidity or unenforceability of any provision of this Deed under any law of any jurisdiction shall not affect or impair the legality, validity or enforceability of the rest of this Deed, nor the legality, validity or enforceability of that provision under the law of any other jurisdiction.

14.2 If any invalid, unenforceable or illegal provision would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the Parties.

15. **VARIATIONS**

No variation, waiver or other amendment of this Deed shall be effective or enforceable unless made in writing and signed by or on behalf of the Parties.

16. **NOTICES**

16.1 A Notice:

16.1.1 shall be in writing;

16.1.2 shall be in the English language; and

16.1.3 may be delivered personally or sent by first class post (and air mail if overseas) to the Party due to receive the Notice at the relevant address set out in clause 16.2 or to another address specified by that Party by not less than seven days' written notice to the other Party in substitution for one or more of those set out in clause 16.2.

16.2 The addresses referred to in clause 16.1.3 are:

16.2.1 in the case of Moussy, Mireille and Robert:

Address: Berwin Leighton Paisner LLP, Adelaide House, London Bridge, London, EC4R 9HA

Marked for the attention of Rupert Ticehurst/Simon Goldring;

16.2.2 in the case of the R1 Trustees:

Address: St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP

Marked for the attention of Tim Archard/Sharon Williams;

16.2.3 in the case of the F1 Trustees and the B1 Trustees:

Address: St Julian's Court, St Julian's Avenue, St Peter Port, Guernsey, GY1 3BP

Marked for the attention of Samantha Stevenson / Emma Roberts;

16.2.4 in the case of Freddy and Beno:

Address: Quinn Emanuel Urquhart & Sullivan UK LLP, One Fleet Place, London, EC4M 7RA

Marked for the attention of Martin Davies/Oliver Middleton.

16.3     A Notice shall be deemed to be given as set out below:

16.3.1    if delivered personally, when left at the address referred to in clause 16.2;

16.3.2    if sent by post, except air mail, two Business Days after posting it;

16.3.3    if sent by air mail, six Business Days after posting it;

provided always that if a Notice would otherwise be deemed to be given outside normal working hours or on a day that is not a Business Day, it shall instead by deemed to be given on the next Business Day.

## 17.    GOVERNING LAW

This Deed and all contractual or non-contractual obligations and other matters arising from or connected with it are governed by English law.

## 18.    JURISDICTION

18.1     The courts of England have exclusive jurisdiction to settle any Dispute.

18.2     The Parties agree that the courts of England are the most appropriate and convenient courts to settle any Dispute and, accordingly, that they will not argue to the contrary.

18.3     Documents that start any Proceedings and any other documents required to be served in relation to those Proceedings may be served in accordance with clause 16. These documents may, however, be served in any other manner allowed by law. This clause applies to Proceedings in England and to Proceedings elsewhere.

## 19.    COUNTERPARTS

19.1     This Deed may be executed in any number of counterparts, each of which is an original and all of which together evidence the same agreement.

19.2     Notwithstanding any contrary provision in this Deed, if this Deed is executed in counterpart, the Parties each agree that this Deed shall not come into effect until each Party has executed at least one counterpart.

**SCHEDULE 1**

**TOMLIN ORDER**

**IN THE HIGH COURT OF JUSTICE**                    **Claim no. HC-2014-000788**

**CHANCERY DIVISION**

**ROYAL COURTS OF JUSTICE**

**Before Master**

**Dated this day          of          2016**

B E T W E E N :

**(1) MOUSSY RAYMOND SALEM**

**(2) MIREILLE RAYMOND SALEM**

**Claimants**

**- and -**

**(1) ROTHSCHILD SWITZERLAND (CI) TRUSTEES LIMITED**

**(2) GUERNSEY GLOBAL TRUST LIMITED**

**(3) FARAJ MOUSSA SALEM**

**(4) BENO MOUSSA SALEM**

**Defendants**

---

**TOMLIN ORDER**

---

**UPON** the parties having agreed to the terms of the confidential settlement set out in a confidential Settlement Deed dated [          ] between the Claimants, the Defendants, Rothschild Trust Guernsey Limited, Rothschild Trust (Schweiz) AG, RTB Trustees AG and Robert David Salem (the **"Settlement Deed"**), the original of which has been kept by the Claimants' solicitors and copies of which have been kept by the Defendants' solicitors, which the parties have agreed to keep confidential

**AND UPON** the parties having agreed the terms of the Tomlin Order dated [8 April 2016] ("the Original Tomlin Order") which stayed elements of the proceedings and stayed the entire proceedings brought by Isaac Moussa Salem, and required the Claimants to file and serve amended Particulars of Claim which removed Isaac Moussa Salem as a party to the proceedings

**BY CONSENT IT IS ORDERED THAT**

1.      The proceedings are stayed except for the purposes of enforcing the terms of the Settlement Deed, for which purpose the parties have permission to apply.

2.      The Claimants' obligation to file and serve amended Particulars of Claim under paragraph 2 of the Original Tomlin Order is lifted.

3.      The Defendants' obligations to file and serve amended Defences and any Counterclaims under paragraph 3 of the Original Tomlin Order are lifted.

4.      The Claimants' obligation to file and serve amended Replies to the Defences and/or Defences to Counterclaim under paragraph 4 of the Original Tomlin Order are lifted.

5.      There shall be no order as to costs.

6.      This Order shall be served by the Claimants on the Defendants.

**Service of the order**

The Court has provided a sealed copy of this order to the serving party, Berwin Leighton Paisner LLP, the legal representative for the Claimants, of Adelaide House, London Bridge, London, EC4R 9HA. Telephone: 020 3400 1000. Ref: RTIC/SGOL/34957.2.

We hereby consent to an Order in the above terms.

Dated                                              2016

........................................................

Signed by **QUINN EMANUEL URQUHART & SULLIVAN LLP**

for and on behalf of **ROTHSCHILD SWITZERLAND (C.I.) TRUSTEES LIMITED, GUERNSEY GLOBAL TRUST LIMITED** and **ROTHSCHILD TRUST (SCHWEIZ) AG** in their capacities as trustee of the **F1 SETTLEMENT** AND **ROTHSCHILD SWITZERLAND (C.I.) TRUSTEES LIMITED, GUERNSEY GLOBAL TRUST LIMITED** and **RTB TRUSTEES** AG in their capacities as trustee of the **B1 SETTLEMENT** AND **FARAJ MOUSSA SALEM** AND **BENO MOUSSA SALEM**

........................................................

Signed by **BERWIN LEIGHTON PAISNER LLP**

for and on behalf of **MOUSSA RAYMOND SALEM** and **MIREILLE RAYMOND SALEM**

......................................................
Signed by **CLIFFORD CHANCE LLP**

for and on behalf of **ROTHSCHILD
SWITZERLAND (C.I.) TRUSTEES LIMITED,
GUERNSEY GLOBAL TRUST LIMITED** and
**ROTHSCHILD TRUST GUERNSEY LIMITED** in
their capacities as trustee of the **R1
SETTLEMENT**

**SCHEDULE 2**

**LETTER TO EZRA MARCOS**

2016

Mr Ezra Marcos
92, rue du Rhône
Case postale 3730
1211 Geneva 3, Switzerland

Without Prejudice

Dear Ezra,

Differences have arisen among us regarding several commonly held business interests and real estate in Africa, held through various companies and trusts. We have agreed to separate and divide these common business interests, but have not been able to agree on the terms and price.

Our confidence in your extensive international business experience, and the many years that we have all known each other, lead us to ask you to serve as conciliator to help us to reach an amicable settlement of our dispute. We undertake to cooperate in furnishing any documents or other information you feel would be helpful in giving you an understanding of our situation.

At any stage of the conciliation proceedings, you may make proposals for a settlement of the dispute. Such proposals need not be in writing and need not be accompanied by a statement of reasons. We understand that you will be guided by principles of fairness and justice, giving consideration to any relevant trade usages.

When you submit to us the terms of a possible settlement, we may put an end to the conciliation through an agreement in writing to the terms proposed. The conciliation may also be terminated by a written declaration either from you to us or from any of us to you, stating that further efforts at conciliation are no longer justified. All of us shall keep confidential any matters and documents relating to the conciliation proceedings, except as may be otherwise required by law. For the avoidance of doubt, we agree that information exchanged shall be subject to the without prejudice privilege and will not be the object of any further disclosure or discovery in legal or arbitral proceedings.

During the conciliation proceedings, we undertake not to initiate any arbitral or judicial proceedings in respect of our dispute, or to take any step in those proceedings currently underway.

We understand that you may be advised in this matter by counsel, including but not limited to Mr Philippe Neyroud of Geneva and Professor William W. Park of Boston.

We shall bear all costs of the proceedings, including fees and expenses of your advisers, to be funded as needed.

None of us shall call you or your advisers as a witness in any legal or arbitral proceedings, or require either you or your advisers to make available any of your papers relating to this conciliation.

We agree that you and your advisers shall not be liable to us for any act or omission in connection with this conciliation. We shall jointly and severally hold you and your advisers harmless with respect to any liability arising out of a suit by third parties related to this conciliation.

Yours truly,


_____                                   _____
Freddy Salem                                                     Beno Salem


_____                                   _____
Mireille Salem                                                   Moussy Salem


_____                                   _____
Robert Salem                                                     Patricia Ladow

**SCHEDULE 3**

**LEGAL ADVICE**

[address]

[*Date*]

Dear [            ]

**Africa Business**

We have been retained by [Moussy, Mireille and Robert Salem] [Beno and Freddy Salem] as their legal advisers to provide them with legal advice on the proposed settlement of the English Litigation in the manner and form as set out in the Settlement Deed and the effect of entering into the Settlement Deed.

We have carefully considered whether we can act for [Moussy, Mireille and Robert] [Beno and Freddy] in connection with the proposed settlement and the Settlement Deed and, in particular, whether to do so would be in their best interests. We have concluded that there is nothing which in any way prevents us from giving [Moussy, Mireille and Robert] [Beno and Freddy] independent advice on the proposed settlement and the effect of entering into the Settlement Deed, and that we can therefore properly act for them.

We are writing to you to confirm that:-

1. We have explained to [Moussy, Mireille and Robert] [Beno and Freddy] the nature and consequences (including practical consequences) of the proposed settlement[, with the assistance of relevant advice from other professional advisers].

2. We have also explained to them the effect of entering into the Settlement Deed.

3. We are satisfied that [Moussy, Mireille and Robert] [Beno and Freddy] understand the nature and consequences (including practical consequences) of the proposed settlement and the effect of entering into the Settlement Deed.

4. We are satisfied that [Moussy, Mireille and Robert] [Beno and Freddy]'s participation in the discussions and events regarding the proposed settlement, and their decision to enter into the Settlement Deed, has occurred after full, free and informed thought about it.

5. We are satisfied that we have received sufficient information about the proposed settlement and the Settlement Deed to enable us to give the foregoing explanations.

Yours sincerely

[Berwin Leighton Paisner LLP] [Quinn Emanuel Urquhart & Sullivan LLP]

Delivered as a deed on the date of this document and executed by the parties.

Signed as a Deed by **MOUSSY RAYMOND** )
**SALEM** in the presence of )

Name of witness: Poplawska E LIA

Signature of witness: Poplaska

Address: E7 9AR, Eulhlam Grove ghc, LONDON

Occupation: Employeol

Signed as a Deed by **MIREILLE**
**RAYMOND SALEM** in the presence of )

Name of witness: EL A Poplawska.

Signature of witness: Poplaska

Address: E7 9AR, Ealham Grove ghc, LONDON

Occupation: Selfeampleyed

Signed as a Deed by **ROBERT DAVID** )
**SALEM** in the presence of )

Name of witness:

Signature of witness:

Address:

Occupation:

Signed as a Deed by **FREDDY MOUSSA** )
**SALEM** in the presence of )

Name of witness:

Signature of witness:

Address:

Occupation:

**Delivered as a deed on the date of this document and executed by the parties.**

Signed as a Deed by **MOUSSY RAYMOND**   )
**SALEM** in the presence of   )

Name of witness:

Signature of witness:

Address:

Occupation:

Signed as a Deed by **MIREILLE**   )
**RAYMOND SALEM** in the presence of   )

Name of witness:

Signature of witness:

Address:

Occupation:

Signed as a Deed by **ROBERT DAVID**   )
**SALEM** in the presence of   )

Name of witness: Ioannis Tsaupaugiovanis

Signature of witness:

Address: Flat 3 8½ Chichele Road NW2 3AT

Occupation: Analyst

Signed as a Deed by **FREDDY MOUSSA**   )
**SALEM** in the presence of   )

Name of witness:

Signature of witness:

Address:

Occupation:

**Delivered as a deed on the date of this document and executed by the parties.**

Signed as a Deed by **MOUSSY RAYMOND**      )
**SALEM** in the presence of                           )

Name of witness:

Signature of witness:

Address:

Occupation:

Signed as a Deed by **MIREILLE**                )
**RAYMOND SALEM** in the presence of       )

Name of witness:

Signature of witness:

Address:

Occupation:

Signed as a Deed by **ROBERT DAVID**        )
**SALEM** in the presence of                           )

Name of witness:

Signature of witness:

Address:

Occupation:

Signed as a Deed by **FREDDY MOUSSA**      )
**SALEM** in the presence of                           )

Name of witness:  LAURA BLACKWELL.

Signature of witness:

Address:  53 PELHAM ROAD, LONDON, SW19 ISU.

Occupation:  PA.

Signed as a Deed by **BENO MOUSSA** )
**SALEM** in the presence of )

Name of witness: ISAAL NAHAMIAS

Signature of witness: ISAAC

Address: 2139 E 14TH Street, Brooklyn, NY 11229.

Occupation: SALESMAN

Executed as a deed by **ROTHSCHILD** )
**TRUST SWITZERLAND (CI) LIMITED** in )
its capacity as trustee of the **F1**
**SETTLEMENT** acting by

in the presence of

                                        Director

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **GUERNSEY** )
**GLOBAL TRUST LIMITED** in its capacity )
as trustee of the **F1 SETTLEMENT** acting
by

in the presence of

                                        Director

Name of witness:

Signature of witness:

Address:

Occupation:

Signed as a Deed by **BENO MOUSSA**    )
**SALEM** in the presence of    )

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **ROTHSCHILD**    )
**TRUST SWITZERLAND (CI) LIMITED** in  )
its capacity as trustee of the **F1**
**SETTLEMENT** acting by

in the presence of

~~Director~~ AUTHORISED SIGNATORIES

Name of witness: JOSEPHINE WALDRON

Signature of witness:

Address: C/O ROTHSCHILD TRUST GUERNSEY LIMITED, ST JULIANS COURT,
ST JULIANS AVENUE, GY1 6AX
Occupation: TRUST OFFICER.

Executed as a deed by **GUERNSEY**    )
**GLOBAL TRUST LIMITED** in its capacity  )
as trustee of the **F1 SETTLEMENT** acting
by

in the presence of

~~Director~~ AUTHORISED SIGNATORIES

Name of witness: JOSEPHINE WALDRON

Signature of witness:

Address: C/O ROTHSCHILD TRUST GUERNSEY LIMITED, ST JULIANS COURT,
ST JULIANS AVENUE, ST PETER PORT, GY1 6AX
Occupation: TRUST OFFICER.

Executed as a deed by **ROTHSCHILD**    )
**TRUST (SCHWEIZ) AG** in its capacity as    )
trustee of the **F1 SETTLEMENT** acting by

in the presence of

*J. Roos*

Director
AUTHORISED    SIGNATORIES

Name of witness: Jennifer Robinson

Signature of witness: RTS Geneva SA

Address:    3 rue du Commerce
    1204 Geneva
    Switzerland

Occupation: Deputy Administration

Executed as a deed by **ROTHSCHILD**    )
**TRUST SWITZERLAND (CI) LIMITED** in    ) .
its capacity as trustee of the **B1**
**SETTLEMENT** acting by

in the presence of

Director

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **ROTHSCHILD**                )
**TRUST (SCHWEIZ) AG** in its capacity as           )
trustee of the **F1 SETTLEMENT** acting by

in the presence of

~~Director~~ AUTHORISED SIGNATORIES

Name of witness: ~~Joscar~~ Lr

Signature of witness:

Address:

Occupation:


Executed as a deed by **ROTHSCHILD**               )
**TRUST SWITZERLAND (CI) LIMITED** in              )
its capacity as trustee of the **B1**
**SETTLEMENT** acting by

in the presence of

~~Director~~ AUTHORISED SIGNATORIES

Name of witness: JOSEPHINE WALDRON

Signature of witness:

Address: C/O ROTHSCHILD TRUST GUERNSEY LIMITED, ST JULIANS COURT,
ST JULIANS AVENUE, ST. PETER PORT, GY1 6AX

Occupation: TRUST OFFICER.

Executed as a deed by **GUERNSEY**
**GLOBAL TRUST LIMITED** in its capacity
as trustee of the **B1 SETTLEMENT** acting
by

in the presence of

~~Director~~ AUTHORISED SIGNATORIES

Name of witness:   JOSEPHINE WALDRON

Signature of witness:

Address:   c/o ROTHSCHILD TRUST, GUERNSEY. LIMITED, ST JULIANS COURT,
ST JULIANS AVENUE, ST-PETER PORT. G Y 1 6AX
Occupation:        TRUST OFFICER

Executed as a deed by **RTB TRUSTEES**
AG in its capacity as trustee of the **B1**
**SETTLEMENT** acting by

in the presence of

Director

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **ROTHSCHILD**
**TRUST SWITZERLAND (CI) LIMITED** in
its capacity as trustee of the **R1**
**SETTLEMENT** acting by

in the presence of

Director

Name of witness:

Signature of witness:

Address:

Occupation:

Legal.47765108.22/SGOL/34957.00002                25

Executed as a deed by **GUERNSEY**
**GLOBAL TRUST LIMITED** in its capacity
as trustee of the **B1 SETTLEMENT** acting
by

)
)

in the presence of

                         Director

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **RTB TRUSTEES**
**AG** in its capacity as trustee of the **B1**
**SETTLEMENT** acting by

)
)

*Authorised Signatory*

in the presence of

                         Director

Name of witness: *C. HRANIX*

Signature of witness:

Address: *ZOLLIKERSTRASSE 181, 8034 ZÜRICH, SWITZERLAND*

Occupation:
*SENIOR TRUST OFFICER*

Executed as a deed by **ROTHSCHILD**
**TRUST SWITZERLAND (CI) LIMITED** in
its capacity as trustee of the **R1**
**SETTLEMENT** acting by

)
)

in the presence of

                         Director

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **GUERNSEY**
**GLOBAL TRUST LIMITED** in its capacity
as trustee of the **B1 SETTLEMENT** acting
by

)
)

in the presence of

Director

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **RTB TRUSTEES**
AG in its capacity as trustee of the **B1**
**SETTLEMENT** acting by

)
)

in the presence of

Director

Name of witness:

Signature of witness:

Address:

Occupation:

Executed as a deed by **ROTHSCHILD**
**TRUST SWITZERLAND (CI) LIMITED** in
its capacity as trustee of the **R1**
**SETTLEMENT** acting by

)
)

in the presence of

Director

Name of witness: FELICITY YOUNG

Signature of witness: [signature]

Address: ST JULIANS AV . ST PETER PORT GUERNSEY

Occupation: TRUST OFFICER .

Executed as a deed by **GUERNSEY GLOBAL TRUST LIMITED** in its capacity as trustee of the **R1 SETTLEMENT** acting by )
)

in the presence of

Director

Name of witness: FELICITY YOUNG

Signature of witness:

Address: ST JULIANS AV. ST PETER PORT GUERNSEY

Occupation:  TRUST OFFICER.

Executed as a deed by **ROTHSCHILD TRUST GUERNSEY LIMITED** in its capacity of the **R1 SETTLEMENT** acting by )
)

in the presence of

Director    Authorised Signatories

Name of witness: FELICITY YOUNG

Signature of witness:

Address: ST JULIANS COURT, ST JULIANS AV, ST PETER PORT, GUERNSEY

Occupation: TRUST OFFICER.

# EXHIBIT 2

-----Original Message-----
From: beno salem <benosalem@yahoo.com>
Sent: Friday, March 26, 2010 7:20 PM
Subject: Change of address

Dear All
Please note our new address:
2111 East 2nd Street
Brooklyn,New York 11223
Best Regards
Beno +Daniella Salem
BENO SALEM
benosalem@yahoo.com
Sent via BlackBerry by AT&T

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

*In re* Petition of

MOUSSY SALEM,

FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM
BENO SALEM

Case No. 23-mc-01092-ENV

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>BENO SALEM'S MOTION TO QUASH</u>

STEPTOE & JOHNSON LLP

Nathaniel J. Kritzer
Jason E. Meade
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
nkritzer@steptoe.com
jmeade@steptoe.com

*Counsel for Movant Beno Salam*

Dated: July 24, 2023

Movant Beno Salem ("Movant") respectfully submits this memorandum of law in support of his motion to quash the subpoenas (the "Subpoenas")[1] issued by Respondent Moussy Salem ("Respondent"), pursuant to this Court's *ex parte* Order of May 1, 2023 (ECF No. 7) granting the Respondent's April 18, 2023 application for discovery pursuant to 28 U.S.C. § 1782 (ECF No. 2, the "Application").

## ARGUMENT

The Subpoenas should be quashed for three reasons, each of which is independently sufficient. First, the Application fails to satisfy the statutory requirements of Section 1782 because Movant does not reside and is not found in this district. Second, the Subpoenas are improper under Fed. R. Civ. P. 45(c) because they call for compliance at a place that is not within 100 miles of where Movant resides, is employed, or regularly transacts business in person. Third, without waiver of any of the foregoing objections to the jurisdiction of this Court or the place for compliance, the Subpoenas seek discovery that the court in the original foreign proceeding has denied and otherwise fail to meet the substantive requirements of Section 1782. Finally, the Application should be dismissed on forum non conveniens grounds.

## I.     Movant Neither Resides Nor is Found in This District

The Subpoenas should first be quashed and this petition dismissed because the Court lacks jurisdiction over the petition. Section 1782 provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). Accordingly, for a district court to have jurisdiction over a Section 1782 petition, "the person from whom discovery is sought" must "reside (or be found) in the district of

---

[1]     The Subpoenas are attached as Exhibits 1 and 2 to the accompanying Declaration of Nathaniel Kritzer ("Kritzer Decl.").

the district court to which the application is made." *Schmitz v. Bernstein Liebhard & Lifshitz*, 376 F.3d 79, 83 (2d Cir. 2004) (quotation omitted). That is not true here.

As set forth in the accompanying Declaration of Beno Salem ("Salem Decl."), Movant is a resident of Florida. Salem Decl. at ¶ 2. He resides in Sunny Isles Beach, Florida and intends to reside in Florida for all of the foreseeable future. *Id.* at ¶¶ 2-3. He is a member of a synagogue in Florida, he has a Florida driver's license, and he owns two personal vehicles which are registered in Florida under his current address in Florida. *Id.* at ¶¶ 3-5. He does not reside at either of the Brooklyn, New York addresses identified in Respondent's June 30, 2023 motion for alternative service (ECF No. 8-1), nor does he reside anywhere else within this district. Salem Decl. at ¶ 6.

The Application relies entirely on the mistaken premise that Movant is a resident of Brooklyn and thus resides in the Eastern District of New York. Petitioner does not argue, and has made no showing, that Mr. Salem was served in or can otherwise be "found" within the District. To the contrary, Petitioner admits that he tried unsuccessfully to serve Mr. Salem in Brooklyn. *See* ECF No. 8-1 at 2.

Because Respondent has not satisfied the statutory jurisdictional requirements of Section 1782, the Subpoenas must be quashed. *See in re del Valle Ruiz*, 939 F.3d at 534 (affirming denial of Section 1782 application target did not reside and was not found in the district); *In re Klein*, No. 20-MC-203 (PKC), 2022 WL 1567584, at *6 (S.D.N.Y. May 18, 2022) (quashing Section 1782 subpoena where target did not reside and was not found in the district); *Matter of Hranov*, No. 21-MC-751 (PKC), 2022 WL 1261827, at *5-6 (S.D.N.Y. Apr. 28, 2022) (same); *Australia and New Zealand Banking Group Ltd. v. APR Energy Holding Ltd.*, No. 17-MC-216 (VEC), 2017 WL 3841874, at *5 (S.D.N.Y. Sep. 1, 2017) (same).

## II.     The Subpoenas Call for Compliance Beyond the Geographical Limits of Rule 45(c)

The Subpoenas should also be quashed because they call for compliance beyond the

geographic limits of Rule 45 of the Federal Rules of Civil Procedure.

Under Rule 45, a subpoena may require attendance at a deposition or the production of

documents "only . . . within 100 miles of where the person resides, is employed, or regularly

transacts business in person." Fed. R. Civ. P. 45(c). A court "*must* quash or modify a subpoena

that … requires a person to comply beyond the geographical limits specified in Rule 45(c)." Fed.

R. Civ. P. 45(d)(3) (emphasis added). The Subpoenas specify 1251 Avenue of the Americas,

New York, New York as the place for compliance.[2] Because Movant does not reside, is not

employed, and does not regularly transact business within 100 miles of that address, the

Subpoenas should be quashed.

Movant resides in Sunny Isles Beach, Florida, which is more than 1,200 miles from the

place of compliance. *See* Salem Decl. at ¶ 2. "[R]esidence" is determined by whether the

recipient of the subpoena, at the time of the requested discovery, "had remained in [the place of

compliance] for some length of time with a genuine intent to make [that place] his residence with

some degree of regularity." *In re Application of Yukos Hydrocarbons Investments Ltd.*, No. 9-

MC-78 (NAM)(DEP), 2009 WL 5216951, at *5-6 (N.D.N.Y. Dec. 30, 2009) (quashing

subpoena, notwithstanding "significant contacts" with the district, including ownership of

property in New York with a corresponding telephone listing, because the target's "clear intent"

was "not to remain within this district with any permanency").

Movant is not employed within 100 miles of New York, *see* Salem Decl. at ¶ 7, nor does

he "regularly transact business in person" within 100 miles of New York. As an initial matter,

---

[2]         *See* Kritzer Decl. Exs. 1, 2.

because "one must be doing business 'in person' in a given location," any "business transactions that [Movant] conducted via telephone, email and fax" with New York would "not demonstrate that New York is a place where he regularly transacts business." *M'Baye v. New Jersey Sports Production, Inc.*, 246 F.R.D. 2015, 207 (S.D.N.Y. 2007). Movant visits New York only a few times each year, typically during the Jewish High Holy Days and primarily for the purpose of meeting with family *See* Salem Decl. at ¶ 8. This does not qualify as "regularly transact[ing] business" there. It is well-established that, "[o]ccasional or sporadic visits to New York are not sufficient." *City of Almaty, Kazakhstan v. Sater*, No. 19-CV-2645 (JGK)(KHP), 2023 WL 2088173, at * (S.D.N.Y. Feb. 16, 2023); *see, e.g., M'Baye*, 246 F.R.D. at 208 (quashing subpoena because "traveling to an area within a 100-mile radius for fourteen to eighteen days in two years is insufficient to render a person amenable to subpoena").

The Subpoenas thus do not comply with the geographical limitations of Rule 45(c), which provides a separate and independent basis for quashing them. *See, e.g., Yukos Hydrocarbons*, 2009 WL 5216951, at *6 (quashing Section 1782 subpoena because the witness did not reside within 100 miles of the location for compliance); *Great Lakes Reinsurance (UK) SE v. Herzig*, No. 16-CV-9848 (PGG), 2023 WL 4406149, at *3 (S.D.N.Y. July 7, 2023) (subpoena requiring compliance outside of 100 miles "may be quashed for that reason alone") (cleaned up); *Hermitage Global Partners LP v. Prevezon Holdings Ltd.*, No. 14-MC-318 (TPG), 2015 WL 728463, at *4 (S.D.N.Y. Feb. 19, 2015) (quashing subpoena without addressing minimum contacts analysis because failure to comply with the 100-mile rule "alone is enough to quash the [subpoena] on Rule 45 grounds").

### III. The Subpoenas Seek Discovery That Has Been Denied in the English Proceeding

Finally, the Subpoenas should be quashed because their purpose is to seek discovery that has been outright denied in the underlying foreign proceeding (the "English Proceeding").

Petitioner recently sought, in the English Proceeding, the same broad-ranging discovery into the "African Businesses" that he seeks here. *See* Martin Decl. at ¶¶ 6, 9. At a case management conference held on July 19, 2023, the English court outright denied these requests, ruling that the discovery sought was not relevant to the underlying dispute. *See id.* at ¶ 7.

It is well-settled that a 28 U.S.C. 1782 petition cannot be used "to circumvent foreign proof-gathering restrictions." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 265 (2004); *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018). Here, that is exactly what Petitioners seek to do. The English court has outright rejected discovery into the African Businesses that are the subject of many of Petitioner's overbroad requests. For this reason alone, the Subpoenas should be quashed and the petition dismissed.

Other common factors that courts consider in ruling on Section 1782 requests also support this result. As the Supreme Court held in the *Intel* case, Courts may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." 542 U.S. at 265. Here, the foreign tribunal is an English court that is highly capable of determining for itself what discovery should be permitted. And the English court has determined that the character of the proceedings underway abroad does not make them amenable to the broad-ranging discovery regarding the "African Businesses" that Petitioner seek. For that same reason, the foreign court would clearly not be receptive to a U.S. federal court mandating discovery it expressly denied, in the guise of lending "assistance."

Courts may also consider whether the requested discovery is "unduly intrusive or burdensome." *See Intel*, 542 U.S. at 265. That is true here, in spades. The Subpoenas start by defining the "African Businesses" to include *84 distinct business entities* from around the globe.

5

*See* Kritzer Decl. Ex. 1, Schedule A. The Subpoenas then proceed to make broad, unbounded requests for ***"[a]ll documents***" concerning ***each*** of these 84 entities. *See* Kritzer Decl. Ex. 1. Further, both Subpoenas seek overly broad and unduly burdensome productions of documents regarding Monline UK Limited, including all documents and communications regarding its creation, business dealings, operations, asset transfers, or liquidation. *See id.*

These requests vastly exceed the scope of permissible discovery, they are overly broad, and they are unduly burdensome. They have been rejected in the very proceeding in which Petitioner purports to seek assistance of this Court. They should be denied here as well.

## IV. The Application Should Be Dismissed for Forum Non Conveniens

Even if this Court concluded that the statutory requirements of Section 1782 had been satisfied here and that the Subpoenas were in technical compliance with the requirements of Rule 45, the Court should exercise its discretion to quash the Subpoenas and dismiss the Application on forum non conveniens grounds.

"[A] court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute, based on the convenience of the parties and the interests of justice." *In re Air Crash Near Peioxoto De Avezada, Brazil, on September 29, 2006*, 574 F.Supp.2d 272, 278 (E.D.N.Y. 2007) (cleaned up). The Second Circuit has set forth a three-step process for analyzing forum non conveniens issues:

> [F]irst, a court determines the degree of deference properly accorded the plaintiff's choice of forum; second, the court considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and third, the court balances the private and public interests implicated in the choice of forum. At bottom, the central focus of the forum-non-conveniens inquiry is convenience.

*Kingstown Capital Management, L.P. v. Vitek,* No. 20-3406, 2022 WL 3970920, at *2 (2d Cir. Sep. 1, 2022) (cleaned up).

In this case, Respondent's choice of forum is entitled to "diminished deference," if any. *Kingstown*, 2022 WL 3970920, at *3. Respondent (a UK citizen) seeks documents pertaining to actions allegedly taken by Movant and other individuals (none of whom live in New York) to restructure various "African Businesses" (none of which are based in New York), purportedly so that Respondent can then use them in an English proceeding. Respondent apparently filed the Application in the Eastern District of New York on the mistaken assumption that Movant resides in Brooklyn, which he does not.

It is clear that the Southern District of Florida, where Movant actually resides, is an adequate forum for this dispute. "An alternative forum is adequate if (1) the defendant[] is amenable to service of process there, that is, subject to the jurisdiction of that other forum's courts; and (2) the alternative forum permits litigation of the subject matter of the dispute." *Kingstown*, 2022 WL 3970920, at *3. Movant can be served in the Southern District of Florida, which is certainly capable of resolving issues relating to the Application.

Finally, the balancing of interests weighs in favor of dismissal on forum non conveniens grounds. The relevant public interests are: "the administrative difficulties flowing from court congestion; the local interest in having controversies decided at home; the interest in having the trial in a forum that is familiar with the law governing the action; the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Murray v. British Broadcasting Corp.*, 81 F.3d 287, 293 (2d Cir. 1996). These public interests are scarcely implicated by the Application, much

less better served by resolving the issues concerning the Application in this District rather than in the Southern District of Florida.

And the relevant private interests clearly show that the Southern District of Florida would be a more convenient forum. Those interests are "the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; and all other practical problems that make trial of a case easy, expeditious, and inexpensive—or the opposite." *Id.* at 294. Movant is a Florida resident who lives more than 1,200 miles away from the place of compliance called for by the Subpoenas. The sole purpose of the Application and the Subpoenas is to seek discovery from Movant; there is no reason to require that Movant travel to provide any such discovery.

Accordingly, in the event that this Court concludes that it could exercise jurisdiction over Movant in this matter, this Court should nonetheless exercise its discretion to dismiss the Application and quash the Subpoenas on forum non conveniens grounds.

## CONCLUSION

The Application failed to comply with the statutory requirements of Section 1782 because Movant does not reside and is not found in this district. Separately, the Subpoenas failed to comply with the requirements of Rule 45(c) because the designated place of compliance is more than 100 miles from any place where Movant resides, is employed, or regularly transacts business in person. The Subpoenas also failed to meet the substantive requirements of Section 1782 because they seek discovery that has been denied in the English Proceedings. Lastly, the Application should be dismissed on forum non conveniens grounds. Thus, Movant respectfully requests that the Subpoenas be quashed in their entirety and that the Application be dismissed.

Dated: July 24, 2023                     STEPTOE & JOHNSON LLP
New York, New York

By: */s/ Nathaniel J. Kritzer*

Nathaniel J. Kritzer
Jason E. Meade
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
nkritzer@steptoe.com
jmeade@steptoe.com

*Counsel for Movant Beno Salam*

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

*In re* Petition of

MOUSSY SALEM,

FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM
BENO SALEM

Case No. 23-mc-01092-ENV

## DECLARATION OF NATHANIEL J. KRITZER

1.      I am a partner at the law firm of Steptoe & Johnson LLP ("Steptoe"), counsel for

the Movant, Beno Salem. I am duly admitted to practice before the United States District Court

for the Eastern District of New York.

2.      I respectfully submit this declaration in support of Movant's motion to quash, and

attach true and correct copies of the following documents:

| Exhibit | Document |
|---------|----------|
| 1 | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, dated June 30, 2023. |
| 2 | Subpoena to Testify at a Deposition in a Civil Action, dated June 30, 2023. |

I declare under penalty of perjury of the laws of the United States of America that the

foregoing is true and correct.

Dated: New York, New York
       July 24, 2023

/s/ Nathaniel J. Kritzer
Nathaniel J. Kritzer

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

*In re* Petition of

MOUSSY SALEM,

FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM
BENO SALEM

Case No. 23-mc-01092-ENV

## DECLARATION OF BENO SALEM PURSUANT TO 28 U.S.C. § 1746

Beno Salem, being duly sworn, deposes and says under penalty of perjury:

1. I submit this declaration in response to a motion filed in this Court by Moussy Salem. I am over the age of eighteen and competent to testify to all matters stated herein.

2. I am a resident of the State of Florida. I currently reside in Sunny Isles Beach, Florida. I do not reside in New York.

3. Florida is my home and I intend to reside in Florida for all of the foreseeable future. My residential home is in Florida and I am a member of a synagogue in Florida.

4. I have a Florida driver's license. A copy of my driver's license is attached to this declaration as Exhibit A, with certain personal data identifiers redacted.

5. I own two personal vehicles that are both registered in the State of Florida under my current address. A copy of the registrations for those vehicles is attached to this declaration as Exhibit B, with certain personal data identifiers redacted.

6. I do not reside at 2111 East 2nd Street, Brooklyn, New York, at 2259 East 4th Street, Brooklyn, New York, or at any other address in New York State.

7. I am not employed within 100 miles of New York City.

8.      I visit New York state only a few times each year, typically during the Jewish High Holy Days and primarily for the purpose of meeting with family.

Dated:      July 24, 2023

_____

Beno Salem

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

*In re* Petition of

MOUSSY SALEM,

FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM
BENO SALEM

Case No. 23-mc-01092-ENV

**DECLARATION OF MARTIN DAVIES PURSUANT TO 28 U.S.C. § 1746**

1.      I am an English solicitor and partner at the law firm of Latham & Watkins LLP in London. I represent the first defendant Freddy Salem (there are three other defendants separately represented, Monline UK Limited, Salim Levy, and Ezra Aghai) in connection with court proceedings before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD) (the "**English Court**"), Claim No. BL-2022-000926 (the "**English Proceedings**").

2.      I respectfully submit this declaration in support of Beno Salem's motion to quash certain subpoenas issued in the United States (the "**Subpoenas**") by Moussy Salem ("**Moussy**").

3.      I am knowledgeable about the matters described below, and the facts stated herein are true and correct to the best of my knowledge and belief.

4.      I understand that the disclosure sought by the Subpoenas is purportedly "for use" in the English Proceedings. However, many of the requests contained in the Subpoenas relate to subjects that the English Court has recently ruled are not appropriate for disclosure.

5.      On 19 July 2023, the English Court ruled on disputed disclosure requests by Moussy Salem. The English Court rejected Moussy Salem's attempt to widen disclosure to

include the "African Business," as Petitioners have defined it in these proceedings, focusing disclosure more narrowly on issues actually pleaded and in dispute.

6.     Specifically, Moussy Salem had made the following extended disclosure requests in the English Proceedings concerning the African Business:

> a.     What was the composition of the trading business in Africa associated with the Salem family (African Business) from 2013 onwards and how did it operate?
>
> b.     What role did Morsgate play in the African Business from 2013 onwards?
>
> c.     What role did Parker play in the African Business from 2013 until 30 March 2016?
>
> d.     What role did C, D1, D3 and D4 play in the African Business, Morsgate, Parker and D2 from 2013 onwards?[1]
>
> e.     What role did D2 play in the African Business from 7 June 2016?

7.     In a 19 July 2023 ruling, the English Court rejected entirely the extended disclosure requests set forth as (a) through (e) above, on the grounds that the subject matter of the requests was not relevant to the issues in dispute.

8.     The disclosure requests in the Subpoenas relating to the African Business concern the same subject matter that the English Court has ruled are not relevant to the issues in dispute in the English Proceedings. They contain a scope (i.e., "All documents" concerning the "African Business") that is even broader than the requests the English Court already rejected. Given the

---

[1] In the English Proceedings, Moussy Salem is sometimes referred to as "C," Freddy Salem is sometimes referred to as "D1," Monline UK Limited is sometimes referred to as "D2," Salim Levy is sometimes referred to as "D3," and Ezra Aghai is sometimes referred to as "D4."

English Court's ruling, ordering this discovery through United States courts would be contrary to the rules of disclosure that have been applied in the English Proceeding.

9.     In particular, the English Court has rejected disclosure in the English Proceedings that concerns the same subject matter as the following requests in the Subpoenas:

a.     Request No. 1.  All documents, such as, account statements, management account statements, business statements, or share registers from 2013 to present evidencing or concerning each of the African Businesses, including but not limited to:

(a)  All documents evidencing or concerning the operations, value, and assets of Société Cobexim SARL;

(b)  All documents evidencing or concerning the present shareholding in Société Cobexim SARL, including inter alia, whether the original shareholders, Beno Salem and Halidou Daouda, continue to hold shares as nominees.

(c)  To the extent that Beno Salem and/or Halidou Daouda continue to hold shares as nominees, all documents evidencing or concerning who or what these shares are held for.

b.     Request No. 5.  All communications (whoever they were sent by) between the African Businesses with Morsgate International Limited from 2013 to present concerning the Morsgate Agreement.

c.     Request No. 6.  All communications (whoever they were sent by) between the African Businesses with Parker Logistics Limited from 2013 to 2016 concerning the Morsgate Agreement.

     d.     Request No. 7.  All communications (whoever they were sent by) between the African Businesses and Monline UK Limited from March 16, 2016, to present, concerning the Morsgate Agreement.

10.     In addition to the problems with the discovery relating to the African Business, certain of the disclosure requests in the Subpoenas call for subject matter that Moussy Salem has not even sought in the English Proceedings, namely:

     a.     Request No. 12.  All documents evidencing or concerning the liquidation of Monline International Limited.

     b.     Request No. 13.  All communications concerning the liquidation of Monline International Limited.

11.     These subjects are outside the scope of the requested disclosure in the English Proceedings, and it would be difficult to see how these subjects would be relevant to the English Proceedings at all. Accordingly, the English Court would be unlikely to permit extended disclosure regarding these subjects.  This would be consistent with its rulings to date which I have described above.

12.     Because the English Court has not authorized disclosure (and, in the case of Requests Nos. 1, 5, 6, and 7, has expressly rejected disclosure) concerning these subjects, it is my expectation that the English Court would not accept the introduction of any such evidence into the English Proceedings.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on July 24, 2023

**Martin Davies**

# EXHIBIT 7

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| *In re* Application of | Civil Action No. |
| MOUSSY SALEM, | |
| Applicant, | **Declaration of Simon Goldring in Support of Application for an Order Pursuant to Take Discovery Pursuant to 28 U.S.C. § 1782 From Beno Salem** |
| FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 FROM BENO SALEM | |

I, SIMON GOLDRING, hereby declare under penalty of perjury as follows:

1.      I am a lawyer qualified to practice in England & Wales and am a Partner at Maurice Turnor Gardner LLP.  My firm acts as solicitors for Moussy Salem ("**Applicant**") in connection with court proceedings ("**English Proceedings**") before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD) (the "**English Court**"), Claim No. BL-2022-000926, against Freddy Salem, Monline UK Limited ("**Monline UK**"), Salim Levy, and Ezra Aghai.

2.      I am submitting this declaration in support of Applicant's Application for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782 (the "**Application**").

3.      I am knowledgeable about the matters described below, and the facts stated herein are true and correct to the best of my knowledge and belief.

4.      Applicant took over prosecution of the claims at issue in the English Proceedings on October 4, 2022.

5.      On November 2, 2022, Applicant submitted an Amended Particulars of Claim.  A true and correct copy of Applicant's Amended Particulars of Claim is attached hereto as **Exhibit A**.

1

6.     On January 17, 2023, Applicant submitted his Reply responding to the defenses raised by the defendants.  That Reply was subsequently amended on March 21, 2023. A true and correct copy of Applicant's Amended Reply is attached hereto as **Exhibit B**.

7.     Applicant further set forth the basis of his claims in his Response to the Second and Fourth Defendants' Request for Further Information, dated March 2, 2023.  A true and correct copy of Applicant's Response to the Second and Fourth Defendants' Request for Further Information is attached hereto as **Exhibit C**.

8.     As alleged in the Response to the Second and Fourth Defendants' Request for Further Information, Beno Salem is a member of the Salem Family and serves as the head of what is known as the "B Branch" of the Salem Family.  **Exhibit C**, pages 6-8.  Applicant believes that Beno Salem assisted in the exclusion of Applicant from the operational activities associated with running a substantial trading business in West Africa operated by the Salem Family (the "**African Businesses**").  **Exhibit C**, pages 6-8.  As part of this exclusion, Applicant had no access to the email systems or physical offices used to run the affairs of the African Businesses, such systems owned and office occupied by Parker Logistics Limited ("**Parker Logistics**"), Monline International Limited ("**Monline International**") and then Monline UK.

9.     Applicant has further alleged that he has been wrongfully excluded from benefiting from the profits of the African Businesses by certain members of the Salem Family, including Beno Salem.  **Exhibit C**, page 7.

10.     The key issue in dispute in the English Proceedings is the provision of logistics services to the African Businesses, such services as are defined in the English Proceedings as the "**Parker Services**".  The Parker Services were originally provided by Parker Logistics to Morsgate International Limited (a company which acts or acted, *inter alia*, as a treasury company to the

African Businesses, "**Morsgate**").  In March 2016, the provision of the Parker Services was transferred to Monline International.  Then, in or around August 2016, the provision of the Parker Services was transferred, on the Applicant's case without consideration and as part of an unlawful means conspiracy, to Monline UK.  Subsequently in July 2017, Monline UK ceased providing the Parker Services to Morsgate and instead provided them to a Lebanese company, Gestcom International Trading Offshore SAL/Gee Trading (Offshore) SAL ("**Gestcom**") which the Applicant alleges is the successor to Morsgate in the African Businesses.  It is the transfers of the provision of the Parker Services to Monline UK and the receipt of the Parker Services to Gestcom, which are the subject of dispute in the English Proceedings.

11.     The Applicant's claim in the English Proceedings alleges that Monline UK may also have provided the Parker Services to unknown third parties (**Exhibit C**, page 9).  On July 11, 2023 and August 2, 2023, Defendants in the English Proceedings admitted that Gestcom replaced Morsgate as the recipient of the Parker Services in or around July 2017.  The Defendants further admitted that in or around March 2021, Monline UK ceased to provide the Parker Services entirely.  The provision of the Parker Services after July 2017 remains an ongoing line of inquiry in the English Proceedings.

12.     The Applicant also seeks equitable compensation for the business lost to Monline International.  **Exhibit C**, page 8.  In order to assess that compensation, evidence of, *inter alia*, the activities of the African Businesses (including as to the operations and expenditure of those businesses) will be relevant, as the fees for the Parker Services were calculated by reference to a percentage of the expenditure incurred to provide the Parker Services.  Such evidence will also be necessary to assess whether the compensation paid (if any) for the transfer of the business of Monline International to Monline UK was adequate.

13.     I understand that Beno Salem has declared under oath that he is a Florida-domiciled individual.  He therefore would not ordinarily be subject to the jurisdiction of the English Court.  Thus, this Application is the most suitable method of obtaining documents and information from Beno Salem.

14.     The English Proceedings are still at a relatively early stage, and the parties to those proceedings were provided the opportunity to proffer submissions on the appropriate scope of topics for disclosure.  On July 19, 2023, the English Court issued an order setting of the relevant issues for disclosure at this stage of the English Proceedings.  This order was issued after Applicant filed its first application for discovery from Beno Salem pursuant to 28 U.S.C. § 1782 in the United States Court for the Eastern District of New York.  The order sets the topics for disclosure as the following:

a.     the winding up of Parker Logistics,

b.     the sale of Parker Logistics' business (*i.e.*, the provision of the Parker Services) to Monline International,

c.     the beneficial ownership of Monline UK,

d.     the transfer of Monline International's operations (*i.e.*, the provision of the Parker Services) and assets to Monline UK,

e.     Monline International's UK bank account (or lack thereof),

f.     the control of Monline UK,

g.     what services were provided to Morsgate, what payments were made for those services and to whom and what role did First and Fourth Defendants in the English Proceedings play in the management or affairs of Morsgate,

h.     whether Monline UK provided the Parker Services (or similar) to any entity other than Morsgate (including without limitation Gestcom),

i.     what became of assets transferred to Monline UK,

j.     whether there should be set-off of payments made by Monline UK to Moussy, and

4

k.    the assignment of the claim in the English Proceedings to Moussy Salem.

15.    In light of the English Court's order, Applicant's current Application limits the discovery sought to the "Salem Businesses," which are a subset of the African Businesses that are connected to Morsgate, or that have been involved in the provision of the Parker Services. They include, in addition to Parker Logistics, Monline, Monline UK and Morsgate:

a.    Great Brands Nigeria Limited, Blue Arrow TSW Limited, Société Cobexim Sarl ("**Cobexim**"), Forewin (Ghana) Limited, and Lewadis FZ Limited, which each own a share of Morsgate;

b.    Glynfield Finance Limited and Transglobe Logistics Management Limited, which had a key role in invoicing arrangements within the African Business, such invoicing being a part of the Parker Services; and

c.    Gestcom, which was the recipient of the Parker Services from at least 2017 to 2021 and BS Gestcom Holdings Corp., a shareholder in Gestcom of which the Respondent is a shareholder.

16.    Applicant further understands that Beno directly owns 40% of Cobexim, although whether that is for his own benefit or for the benefit of the R, F and B Branches of the Salem Family is a subject in dispute.

17.    Applicant has neither requested, nor been denied, the discovery sought through this Application in the English Proceedings.

18.    As of the filing of this Application, the English Proceedings remain pending before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:        London, England
              August 2 1, 2023

_____
Simon Goldring

5

# Exhibit A

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS & PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

BETWEEN:

(1) MOUSSY SALEM

**Claimant**

and

(1) FREDDY SALEM
(2) MONLINE UK LIMITED
(3) SALIM LEVY
(4) EZRA AGHAI

**Defendants**

_____

**AMENDED PARTICULARS OF CLAIM**

_____

**Substitution**

1.    This claim (the "**Claim**") was originally issued by Monline International Limited (a company in liquidation in the BVI, the "**Company**"). On 4 October 2022, the Claimant and the Company entered into a deed of assignment, in which the Company legally and absolutely assigned its right, title and interest in the Claim to the Claimant. The Claimant is a creditor in the liquidation of the Company and also suffered indirect loss as a result of the actions pleaded in the Claim. The Claimant now purses the Claim in the place of the Company.

**The Company**

2.    The Company was incorporated in the British Virgin Islands ("**BVI**") on 23 September 2005.

3.    On 12 October 2020, the BVI Court ordered the Company to be wound up and appointed Mr Matthew Richardson and Mr Michael Leeds as the company's liquidators ("**the Liquidators**").

4.    The Company is one of a number of companies associated with the Salem family, of which the Claimant is a member, which runs a substantial trading business in Africa.

5.    To the best of the Claimant's knowledge and belief, at all material times the shares in the Company have been: (i) legally owned by a number of corporate entities (with association with

Salem family trusts and/or the First Defendant and/or Claimant) and (ii) beneficially owned by the First Defendant as to 50% and by Claimant and/or Mireille Salem as to 50%.

6.      The Company was dormant until approximately March 2016 when it took over the business of an English company, Parker Logistics Limited (in members' voluntary liquidation) ("**Parker**").

7.      The Company, however, only traded for a short period of time as the First Defendant caused and/or procured the transfer of its assets and business to the Second Defendant on or around 7 June 2016.

8.      The Liquidators investigated the affairs of the Company and have identified claims against each of the Defendants.  Those claims have been assigned to, and are being pursued by, the Claimant.

**The First Defendant**

9.      The First Defendant is resident in England and was appointed a director of the Company on 16 February 2016.

10.     Further:

(a)      the First Defendant is the uncle of the Claimant;

(b)      Mireille Salem is the mother of the Claimant;

(c)      the First Defendant has been in dispute with the Claimant and Mireille Salem in relation to the Salem family's business interests since at least 2014;

(d)      the First Defendant, the Claimant and Mireille Salem are resident in England.

**The Second, Third and Fourth Defendants**

11.     The Second Defendant is a company incorporated in England on 7 June 2016. According to Companies House Records:

(a)      The Third and Fourth Defendants were appointed directors of the Second Defendant on incorporation.

(b)      The Third and Fourth Defendants have held 50% each of the issued shares in the Second Defendant since incorporation.

**Duties owed by the First Defendant to the Company**

2

12.     As a matter of BVI law, the First Defendant owed fiduciary duties (at common law and/or in equity) to the Company including duties:

(a)      to act in good faith and in the best interests of the Company;

(b)      to exercise his powers only for proper purposes and not for any collateral purpose;

(c)      not to misappropriate, misapply, divert or misuse the Company's funds, assets or opportunities;

(d)      to exercise independent judgement; and

(e)      to avoid situations in which he had, or could have, a direct or indirect interest that conflicted, or might conflict, with the interests of the Company.

13.     Further, in his capacity as a director of the Company, the First Defendant owed the duties set out at sections 120 to 125 of the BVI Business Companies Act 2004 ("**the BCA**") at the time when he was a director of the Company, including duties:

(a)      to act honestly and in good faith and in what he believed to be the best interests of the company (s. 120(1) BCA);

(b)      to exercise his powers as a director for a proper purpose and not to act, or agree to any company acting, in a manner that contravened the BCA or the memorandum and articles of the company (s. 121 BCA); and

(c)      to exercise reasonable care, diligence and skill (s. 122 BCA).

14.     Further, as a director for the Company, the First Defendant was required to keep, or to cause to keep:

(a)      books and records sufficient to show and explain that company's transactions, at common law and/or pursuant to s. 98 BCA); and

(b)      copies of minutes of all meetings and resolutions of directors or members (or committees of directors or members), at common law and/or pursuant to s.102 BCA.

**The transfer of the Company's business and assets to the Second Defendant**

15.     At all material times prior to 30 March 2016:

(a)      The First Defendant and the Claimant were the registered directors of Parker;

3

(b)     Parker was legally and beneficially owned by the First Defendant as to 50%, the Claimant as to 25% and Mireille Salem as to 25%;

(c)     The sole business of Parker was the provision of services to Morsgate International Limited ("**Morsgate**") pursuant to a Logistics Agreement dated 14 March 2000;

(d)     Morsgate was beneficially owned by various members of the Salem family;

(e)     Parker was a profitable business. Parker's draft Annual Report and Accounts for the year ended 31 March 2014 record that Parker's retained profits were £2.3 million in 2013 and £2.4 million in 2014.

16.     In or around 2016, a decision was taken to transfer the business and assets of Parker to the Company. The Claimant understood this was consequential to a wider settlement reached between members of the Salem family and for tax reasons. Subsequently:

(a)     On 16 February 2016 the Company opened a first UK establishment which was registered at Companies House on 7 March 2016.

(b)     On 30 March 2016:

(i)     the business and assets of Parker were transferred to the Company pursuant to an Asset Sale Agreement of the same date ("**the ASA**");

(ii)    Parker entered members' voluntary liquidation in England;

(iii)   Morsgate confirmed in writing that it wished to appoint the Company to provide logistical services in place of Parker.

17.     Under the ASA, the Company agreed to pay Parker a total consideration of £132,000. This consideration was apportioned to the fixed assets of Parker (listed in Schedule 1 to the ASA) and did not include any consideration for the value of the business and goodwill being transferred.

18.     As above set out, the Second Defendant was incorporated on 7 June 2016. At or around the same time, the entire business and assets of the Company were transferred to the Second Defendant ("**the UK Transfer**").

19.     The Claimant's position is that:

(a)     In 2016 he was asked by a representative of the First Defendant to agree the transfer of the Company's business and assets to a newly incorporated UK company because the Company was not able to open a UK bank account by reason of its BVI domicile;

(b)     He was only prepared to agree to a transfer the Company's business and assets to a newly incorporated UK company if he and the First Defendant were both appointed directors of the new company and their beneficial interests mirrored their interests in the shares in the Company as above set out; and

(c)     He was not informed about the UK Transfer and did not give his consent to the UK Transfer in his capacity as a director or beneficial shareholder of the Company or in any other capacity.

20.     To the best of the Claimant's current knowledge and belief:

(a)     The Third and Fourth Defendants are former employees of Parker and the Company and have never held (directly or indirectly) any shareholding interest in Parker or the Company;

(b)     There is no written agreement or any other contemporaneous documents recording the reasons for, and the terms of, the UK Transfer;

(c)     No directors' or shareholders' meetings were held to approve the UK Transfer and no resolutions approving the transfer were passed in breach of the Company's Articles of Association;

(d)     No consideration was paid by the Second Defendant to the Company in relation to the UK Transfer at the time the UK Transfer was made.

21.     On or about 9 December 2020 the First Defendant in his capacity as sole director of the Company swore a statement of affairs pursuant to section 255 of the BVI Insolvency Act 2003 which stated that the Second Defendant owed the Company the sum of £66,288 being in respect of fixed assets in the sum of £13,000, staff loans in the sum of £46,000 and profits earned by the Company during the period end of March 2016 to end of May 2016 inclusive in the sum of £7,288.

22.     On or about 25 May 2022 the Second Defendant paid the sum of £50,000 into the bank account of the Joint Liquidators and on or about 26 May 2022 the Second Defendant paid the sum of £16,288 into the bank account of the Joint Liquidators which together total the sum of £66,288

and was accepted by the Joint Liquidators solely on the basis that the sum of £66,288 was not in full and final settlement of the Company's claim against the Second Defendant

23. In the premises, there was no consideration, or alternatively no adequate or valuable consideration, for the UK Transfer and it is to be inferred that the UK Transfer was not entered into for any good commercial reason and/or for the sole benefit of the First Defendant and/or that the Third and Fourth Defendants hold their shares in the Second Defendant on trust for the First Defendant. The UK Transfer constituted, either wholly or in part, a gratuitous transfer to the Second Defendant and therefore a misapplication of the Company's assets at a time when the First Defendant was in dispute with the Claimant and Mireille Salem as to the ownership of various Salem family business interests.

24. Further or alternatively, if and to the extent that the First Defendant became the beneficial owner of the Second Defendant, the UK Transfer was an unlawful distribution of capital and/or *ultra vires* the Company under the BCA.

**Breaches of Duty by the First Defendant**

25. In causing and/or procuring and/or permitting the UK Transfer, the First Defendant:

(a) diverted the business of the Company and/or a corporate opportunity of the Company (namely the provision of services to Morsgate) to the Second Defendant;

(b) misapplied the Company's assets; and/or

(c) caused and/or procured and/or permitted the Company to make unlawful distributions of capital to one of its shareholders; and/or

(d) exercised his powers for an improper purpose and/or failed to have regard, or sufficient regard, to the interests of the Company and/or the interests of the Company's shareholders and/or creditors; and/or

(e) preferred his own interests and/or those of the Second Defendant and/or those of the Third and Fourth Defendants over the interests of the Company; and/or

(f) failed to obtain the approval of the other shareholders and directors for the UK Transfer; and/or

(g) acted to the detriment of the Company.

26.     Further the First Defendant failed to keep or to cause the Company to keep proper books and records, including (but not limited to) records and explanations in relation to the UK Transfer.

27.     In the premises, the First Defendant breached his duties to the Company as set out in paragraphs 12 to 14 above.

**Gratuitous transfer and knowing receipt**

28.     The UK Transfer constituted, either wholly or in part, a gratuitous transfer to the Second Defendant and a misapplication of the Company's assets.

29.     The Company is accordingly entitled to the return of such assets as were misappropriated or their traceable proceeds, as may have been received (directly or indirectly) and retained by the Defendants.

30.     Further or alternatively, the First Defendant's knowledge is to be attributed to the Second Defendant. Accordingly, the Second Defendant knew (or reasonably ought to have known) that the UK Transfer represented misappropriations of the Company's assets and/or were made in breach of the First Defendant's duties to the Company. In all the circumstances it would be unconscionable for the Second Defendant to retain the benefit of the assets transferred pursuant to the UK Transfer and is liable to pay equitable compensation to the Company in relation to said transfer.

**Conspiracy**

31.     It is to be inferred that the UK Transfer was the product of concerted action in accordance with a combination, understanding or agreements reached in or around 2016 between at least the First and Second Defendants.

32.     The First and Second Defendants knew that the purpose of the UK Transfer was to divest the Company of all its assets for no consideration or at an undervalue with the purpose of putting those assets out of the reach of the other shareholders of the Company.

33.     The First and Second Defendants entered into the combination, understanding or agreement referred to at paragraph 28 above with the intention of causing loss to the Company (or, alternatively with the intention that the rights of its shareholders would be prejudiced).

34.     Pursuant to the combination, understanding or agreement, each of the First and Second Defendants participated in the UK Transfer.

35. The concerted action involved the use of unlawful means in that by causing and/or procuring the Company to enter into the UK Transfer, the First Defendant acted in breach of his duties to the Company.

36. The Company suffered loss as a result of the abovementioned conspiracy .

**Relief to be claimed**

37. In the circumstances, the Claimant (having been assigned the Claim by the Company) is entitled to at least the following relief:

    (a) a declaration that the Third and Fourth Defendants hold their shares in the Second Defendant on trust for the First Defendant; and/or

    (b) a declaration that the First Defendant held his interest in the Second Defendant on constructive trust for the Company and now holds that interest for the Claimant pursuant to the assignment; and/or

    (c) an order that the Third and Fourth Defendants transfer the shares in the Second Defendant to the Claimant (as assignee of the Claim from the Company); and/or

    (d) equitable compensation and/or damages from the First Defendant in relation to his breaches of duty to the Company as above set out; and/or

    (e) equitable compensation and/or damages in respect of the assets transferred pursuant to the UK Transfer from the Second Defendant; and/or

    (f) the return of the assets transferred pursuant to the UK Transfer or their traceable proceeds, as may have been received (directly or indirectly) and retained by any of the Defendants; and/or

    (g) an account of profits in respect of the assets received (directly or indirectly) by the Defendants from the Company pursuant to the UK Transfer and any benefit received therefrom;

    (h) damages against the First and Second Defendants for unlawful means conspiracy.

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in these particulars of claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Full name: SIMON GOLDRING

Dated: 2 November 2022

Address for receiving documents:

Maurice Turnor Gardner LLP
15th Floor Milton House
Milton Street
London
EC2Y 9BH

Solicitors for the Claimant

# Exhibit B

Claim No. BL-2022-000926

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
BUSINESS LIST (ChD)

B E T W E E N :

MOUSSY SALEM

Claimant

- and –

(1)    FREDDY SALEM
(2)    MONLINE UK LIMITED
(3)    SALIM LEVY
(4)    EZRA AGHAI

Defendants

**AMENDED REPLY**

1. The Claimant joins issue with the First Defendant on his Amended Defence ('Def1') and with the Second to Fourth Defendants on their separate Defence ('Def2'). References below to the paragraphs of the Claimant's Amended Particulars of Claim ('APTC') are in the form 'APTC para[s] #' and references to the paragraphs of the Defendants' Defences are in the form '[Def1 OR Def2] para[s] #'. The Claimant adopts the terms defined in APTC and certain terms defined in Def1.

**A.   Reply to Def1**

2. Def1 para 1 is embarrassing and should be struck out, except where it consists of admissions, as:

   a. it fails to admit, not-admit or deny the validity of the assignment from the Company to the Claimant referred to in APTC para 1; and

   b. it consists of comment and/or references to irrelevant matters.

3. Def1 para 3 is embarrassing in so far as it fails to admit, not-admit or deny APTC paras 4 and 5 and accordingly should be struck out, except where it consists of admissions. Subject to that:

   a. Def1 paras 3.a to 3.d are admitted save that it is averred that the Rabiu 1 and Rabiu 2 Trusts also held substantial interests in the African Business, so that it was entirely owned or alternatively almost entirely owned for the benefit of members of the Salem Family by the R1 Trust, F1 Trust, B1 Trust, Rabiu 1 Trust and Rabiu 2 Trust ('R/F/B Trusts');

   b. Def1 para 3.e is denied, save that it is admitted or averred that the shares in the Company

were held at all material times in the names of First Court Ltd and Second Court Ltd, professional nominees within what is now the Sequent Group ('the Nominees') and in the proportions alleged;

c.   it is averred that the Company had originally been formed or purchased from a formation agent as a company owned by one or more of the R/F/B Trusts and that by 16 March 2016:

   i.   the corporate professional trustees and suppliers of trust and corporate services within what is now the Sequent Group, who then acted among other things as trustees of the R/F/B Trusts ('the Trustees') had been asked by or on behalf of the Claimant and the First Defendant to provide a suitable offshore corporate vehicle for use as the intended transferee of the business and assets of Parker, prior to the intended voluntary liquidation of that company;

   ii.   the Company was dormant, had no assets or liabilities and was surplus to the requirements of the Trustees for whom until about that date the Company's shares had been held by the Nominees on bare trust, and accordingly the Company had been put forward by the Trustees in response to the Claimant and the First Defendant's request as a suitable vehicle and on the express basis that, when used in that intended role, the Company would be held for the benefit of the same persons and in the same proportions as Parker;

   iii.   it was accordingly agreed or understood and/or it remained thereafter the common intention between the Trustees, the Claimant, the First Defendant and the Nominees that the beneficial ownership of the Company, if  or when used as the transferee of the business and assets of Parker, would be the same as the beneficial ownership of Parker which (as is admitted at Def1 para 10) was 25% Mireille, 25% the Claimant, and 50% the First Defendant and that the Company's shares would be transferred by the Nominees to those beneficial owners in those proportions or as they might direct, on request;

   iv.   this was the basis on which the Claimant, the First Defendant and Parker proceeded when Parker entered into the ASA with the Company;

   v.   accordingly, Mireille, the Claimant and the First Defendant became and remained the beneficial owners of the Company in those proportions and/or the First Defendant is estopped from denying the same;

2

d. Def1 para 3.f.i is admitted, save that it is denied, for the reasons set out below, that the Company did not have a contractual relationship with Morsgate;

e. the agreement between the Second Defendant and Morsgate dated 1 August 2016 referred to at Def1 para 3.f is referred to below (to avoid confusion) as the '2016 Logistics Agreement' ;

f. Def1 para 3.f.ii is denied for the reasons given below;

g. alternatively, if as is denied, the benefit of any contract for the supply of Parker Services (as defined below) subsisting between the Company and Morsgate as at 6 June 2016 was not assigned by the Company to the Second Defendant and/or the Company did not agree with Morsgate and the Second Defendant expressly or by conduct to novate that contract, so that it became a contract between the Second Defendant and Morsgate on the same terms, it is averred that:

   i. nevertheless, on or after 7 June 2016 (immediately on the Second Defendant's incorporation) with the knowledge and approval of the First Defendant, the Third Defendant and the Fourth Defendant and by agreement between the Defendants and Morsgate, the Second Defendant wrongfully supplanted the Company and thereafter supplied the Parker Services (as defined below) to Morsgate in place of the Company;

   ii. the Defendants thereby wrongfully diverted the benefit and value of the Company's business and goodwill (acquired by the Company for value from Parker under the ASA) to the Second Defendant and/or deprived the Company of the opportunity to contract with Morsgate, as alleged at APTC para 23 and below;

h. Def1 para 3.f.iii is denied for the reasons given above and below, save that it is admitted or averred that the former employees of Parker provided services to Morsgate on behalf of the Company that (as the Second Defendant to Fourth Defendants admit at Def2 para 7) were substantially the same as had been supplied to Morsgate by Parker ('Parker Services') and it is averred that following the ASA and the voluntary winding up of Parker on 30 March 2016 and down to 6 June 2016 they did so pursuant to a contract between the Company and Morsgate or alternatively on the basis of a mutual understanding between the Company and Morsgatre that a contract was to be entered between them for the continued provision of the Parker Services as set out in paragraph 5 below;

3

i.  Def1 paras 3.f.iv and 3.f.v are denied for the reasons given above and below, save that it is admitted or averred that:

    i.  Parker Services were supplied by the Company to Morsgate for reward from 30 March 2016 to 6 June 2016;

    ii.  in that period Parker Services were provided to Morsgate on the Company's behalf by its employees, the former employees of Parker (including the Third Defendant and the Fourth Defendant);

    iii.  further or in any event, all sums due with respect to the supply of Parker Services were properly due to the Company and that (as is admitted at Def1 para 3.f.iv) this was recognised by the Second Defendant and Morsgate at all material times;

    iv.  the unaudited accounts of the Company for the year ended 31 December 2016 ('Company 2016 Accounts') prepared in or about October 2017 on the instructions of the First Defendant and signed by the First Defendant (the accuracy of which is not admitted) recorded fees receivable, earned by the Company with respect to Parker Services in that initial 10 week period, of £153,886, equivalent to £15,386 per week and to £800,207 per year;

    v.  accordingly, it is averred that £800,207 is the minimum amount that would have been receivable by the Company from Morsgate for the continuing supply of Parker Services in the 12 months to 30 March 2017 and annually thereafter but for the wrongful actions of the Defendants set out in the APTC and that the true amount is likely to have been substantially higher;

    vi.  the Company 2016 Accounts record (consistently with the Claimant's case) that "the Company commenced trading on 30 March 2016 when it acquired the trade and assets of [Parker] and ceased trading on 6 June 2016 when it transferred its trade and assets to [the Second Defendant]."

    vii.  the Company 2016 Accounts recorded a net profit for the year of £7,591 indicating that the Company's trading from the supply of the Parker Services to Morsgate had been profitable;

j.  further, it is averred that at all material times the management of Morsgate and in particular the management of Morsgate's relationship with Parker and later with the Company as supplier of Parker Services was in practice in the hands of the First Defendant and/or

Fourth Defendant, acting as the point of contact between the professional directors of Morsgate and members of the Salem family involved in the management of the African Business but not, after 2013, the Claimant or other members of the R Branch,  for example on 30 March 2016 Morsgate's letter to the Company of that date referred to in Def1 para 4.g ('Morsgate Letter') and at paragraph 4.d below was sent by email to the First Defendant by the administrator of Morsgate (Trident Trust) and then forwarded by email on the same date by the First Defendant to the Claimant and the Fourth Defendant.

4.   As to Def1 para 4:

    a.   Def1 paras 4.b to 4e are admitted, save that:

        i.   it is denied, as alleged in Def1 para 4.b that the Company did not acquire the benefit of contracts from Parker, including the benefit of the Parker Logistics Agreement, under the terms of the ASA;

        ii.   it is denied as or in so far as is alleged in Def1 paras 4.c and 4.d that the Claimant's agreement to the winding up of Parker was made on the basis of alleged advice as to or on the basis of the alleged tax considerations or so as to produce any particular tax effect;

        iii.   it is averred that in any event as the First Defendant was aware at the time, the Claimant's agreement was made on the basis of and was conditional upon any transfer of Parker's assets or business pre-liquidation being made to a company with the same ownership as Parker and paragraph 3.c above is repeated;

        iv.   it is further averred in answer to Def1 para 4.c that :

            a.   the Claimant brings these proceedings as assignee of the Company's claims and asserts no personal claim;

            b.   the Company is not (and is not alleged to be) unable to assert the true facts concerning its ownership (set out in paragraph 3 above) by reason of an alleged agreement between the Claimant and the Defendant to which it was not and is not alleged to have been party;

            c.   the allegation that the Claimant personally claimed Entrepreneurs' Relief on the liquidation of Parker is irrelevant to

<span style="color:red">the Company's claims and is not pleaded to;</span>

<span style="color:red">d.   in any event paragraph 4.a.ii above is repeated.</span>

b.   further, it is averred that:

i.   the express purpose of the ASA was for the Company to purchase all Parker's business assets prior to its voluntary liquidation (as recorded by recital B to the ASA);

ii.   as provided by clause 2.1.f of the ASA, the assets purchased by the Company expressly included all Parker's contracts and in any event, as provided by clause 2.1.i of the ASA, included all Parker's property not specifically listed in clauses 2.a to 2.h;

iii.   the benefit of the Parker Logistics Agreement was not among the only assets excluded from the sale pursuant to clause 2.2 of the ASA;

iv.   accordingly, the benefit of the Parker Logistics Agreement was included in the Assets sold to the Company, as defined in the ASA;  and

v.   the ASA was entered into to enable the Company to stand in Parker's shoes so as to continue to provide Parker Services to Morsgate under the terms of the Parker Logistics Agreement;

c.   Def1 para 4.f is denied, save that Def1 paras 4.f.i and 4.fii are admitted;

d.   Def1 para 4.g is admitted and it is averred (if the same is denied or not admitted) that the Morsgate Letter was sent by Morsgate and received by the Company on or about 30 March 2016 (as to which paragraph 3.j above is repeated) and that the Morsgate Letter confirms that the purpose of the transfer of Parker's assets to the Company and the TUPE transfer of the employment of Parker's employees to the Company on the same date was and was known to Morsgate at the time to be to allow the Company to supply Parker Services to Morsgate from 30 March 2016 in place of Parker;

e.   Def1 para 4.h is denied;

f.   Def1 para 4.i is denied, save that it is not admitted that by 6 June 2016 the Company had not yet opened a UK bank account or that it had encountered any substantial difficulty in doing so and averred that, on the face of it, any problem that there may have been in the Company opening a UK bank account could readily have been addressed without causing prejudice to the Company, including by the formation of a wholly owned UK subsidiary of the Company;

g. Def1 para 4.j is denied and APTC para 19 is repeated;

h. Def1 para 4.k.i is denied;

i. Def1 para 4.k.ii is denied, save that it is admitted or averred that an effect of the UK Transfer was that as from 7 June 2016 (the date of the Second Defendant's incorporation) all of the Company's employees became the employees or officers of the Second Defendant and continued to perform the same duties they had performed as employees of the Company, so that the Second Defendant thereafter wrongfully supplied the Parker Services to Morsgate in place of the Company.

5. It is averred that, from 30 March 2016 to 6 June 2016, the Company supplied Parker Services to Morsgate pursuant to the Parker Logistics Agreement, as Parker's assignee under the ASA:

a. alternatively, substantially on the terms of the Parker Logistics Agreement, under a new contract arising between the Company and Morsgate from the provision of Parker Services by the Company for reward after 30 March 2016 and on the basis it was mutual understanding of the Company and Morsgate at the time that these services were supplied on that basis, pending any subsequent agreement between them to vary the terms of the Parker Logistics Agreement or to enter into a new agreement;

b. alternatively, substantially on the terms of the 2016 Logistics Agreement, which would have been formalised and recorded in writing as a new contract between the Company and Morsgate (or as a variation of the Parker Logistics Agreement), with effect from 30 March 2016, on or before 1 August 2016 but for the wrongful acts of the Defendants set out in the APTC;

c. alternatively, if, as is denied, there was no contract between the Company and Morsgate as at 6 June 2016, those wrongful acts deprived the Company of the opportunity of contracting with Morsgate on the substantially the same terms as the Parker Logistics Agreement or the 2016 Logistics Agreement, which it is averred Morsgate would have done on or before 1 August 2016 and with effect from 30 March 2016 (as indicated among other things by the Morsgate Lettee); and

d. it is averred, in further support of the above, that at all material times after 6 June 2016 Morsgate continued to require Parker Services and, but for those wrongful acts of the Defendants, the Company would have remained the only person or the best person in a position to provide those services.

6. As to Def1 para 5:

    a. the non-admission as to APTC para 8 in the first sentence of Def1 para 5 is noted;

    b. the Claimant does not reply to the remainder of Def1 para 5 on the basis that it is irrelevant to the Claimant's claim or to any pleaded defence to it, or is comment and/or alternatively is inconsistent with Def1 para 1 and in the premises are embarrassing and should be struck out.

7. Def1 para 6 is denied save in so far as it consists of admissions. It is denied that the indemnity offered by Art. 76 of the Company's Articles provides any protection to the First Defendant, in that it is denied that the First Defendant believed the UK Transfer to be in the best interests of the Company within the meaning of BCA, ss.132(2), such that BCA, s.132(5) applies and that accordingly that indemnity is void and of no effect.

8. As to Def1 paras 7.a to 7.d :

    a. Def1 para 7.a. and 7.b are admitted and it is averred that at all material times the Third Defendant and the Fourth Defendant held and continue to hold other positions of responsibility in the African Business and that in all of those positions they reported and continue to report directly and only to the First Defendant;

    b. Def1 para 7.c is denied and paragraph 4.f above is repeated, save that no admissions are made as to whether the Company did open a UK bank account;

    c. Def1 para 7.d is denied save that is admitted and averred that:

        i. between 30 March 2016 and 6 June 2016 the First Defendant and the Second Defendant agreed and combined with the Third Defendant and the Fourth Defendant that the Third Defendant and the Fourth Defendant (who were then employees of the Company engaged in supplying Parker Services on behalf of the Company to Morsgate) that the Third Defendant and the Fourth Defendant would terminate their employment by the Company and would become employees and/or directors of and shareholders in the Second Defendant (holding their shares on bare trust for or as nominees for the First Defendant) and thereupon would continue to provide Parker Services to Morsgate on behalf of the Second Defendant; and

        ii. on or about 6 and 7 June 2016, pursuant to that agreement, the Third Defendant

and the Fourth Defendant terminated their employment with the Company without notice and on 7 June 2016 were appointed directors of the Second Defendant and registered as the shareholders of the Second Defendant and thereafter provided or procured the provision of the Parker Services to Morsgate on behalf of the Second Defendant.

9. Def1 para 7.e is not replied to in so far as it consists of comment, it is otherwise denied save that:

   a. it is admitted that the 2016 Logistics Agreement provided on its face for a Service Fee of 10% ('Service Fee'), it is not admitted that the level of Service Fee or other payments received by the Second Defendant from Morsgate for the Parker Services was limited to 10%;

   b. it is admitted and averred that :

      i. the Parker Logistics Agreement had provided for a Service Fee of 15%;

      ii. although dated 1 August 2016, the 2016 Logistics Agreement was made with effect from 7 June 2016, further confirming that from that date and from incorporation the Second Defendant wrongfully took the Company's place in supplying Parker Services to Morsgate;

      iii. the benefit to Parker of the Parker Logistics Agreement was sufficient to support the payment by Parker of directors remuneration and consultancy fees of at least £1 million per year and averred that this reflects (in part) the level of benefit that the Company would and should have received from the continued supply of Parker Services to Morsgate after 6 June 2016 but for the wrongful actions of the Defendants and APTC para 15(e) is repeated;

   c. no admissions are made as to the gross or net benefit received by the Second Defendant or by its officers or shareholders or directly or indirectly by the First Defendant from the supply of Parker Services under the 2016 Logistics Agreement or otherwise or from the supply of logistics services to other companies within the African Business or from any other trading activities of the Second Defendant from 7 June 2016 to date or as to the Second Defendant's true turnover or gross or net profits in that period, save that:

      i. it is admitted that as at 30 September 2021 the Second Defendant had retained earnings of at least £197,329 and that those retained earnings had increased as against retained earnings as at 21 March 2020;

ii. it is averred that the minimum level of fees receivable by the Second Defendant under the 2016 Logistics Agreement was £800,207 per year and was likely to be substantially higher and paragraph 3.i above is repeated;

d. no admissions are made as to whether or, if so, when Morsgate ceased to trade or as to any arrangements made for the transfer of Morsgate's trade to other companies or the continuance of that trade by other companies in place of Morsgate or as to the arrangements that may have been put in place between the Second Defendant and those transferees or continuers or others, or by which the Second Defendant continued to supply logistical services with respect to the same on terms similar to the 2016 Logistics Agreement or otherwise;

10. It is admitted that the shares in Morsgate were owned directly and indirectly as set out in Def1 para 10, save that it is denied that Maurice Salem held or holds any interest or any beneficial interest in Societe Samex and averred that Societe Samex was owned or beneficially owned 100% by the R/F/B Trusts and averred that the ultimate ownership of Morsgate by the R/F/B Trusts, in the manner admitted or averred, of which various members of the Salem family are the beneficiaries, is consistent with APTC para 15.d.

11. As to Def1 para 12 :

a. Def1 para 12.a.i is denied;

b. Def1 para 12.a.ii is denied save that it is admitted or averred that, as the Defendants knew, funds the Claimant had advanced as loans to and for the benefit of the Company were used after 6 June 2016 for the benefit of D2, of whose existence the Claimant was unaware at the time, without the Claimant's knowledge or consent;

c. Def1 para 12.a.iii is denied and paragraph 4.a above is repeated. In any event:

i. the Claimant brings these proceedings as assignee of the Company's claims and alleges that the shares in the Second Defendant are or should be held on trust for him in that capacity and on the basis of those claims only;

ii. the agreement between the Claimant and the First Defendant alleged at Def1 para 4.c regarding Parker and the First Defendant's allegations as to the beneficial ownership of the Company are irrelevant to the Company's claims against the Defendants based upon the UK Transfer.

d. Def1 para 12.b is embarrassing and should be struck out in that :

10

    i.  the First Defendant has wrongly failed to admit that, as alleged at APTC para 20(c), there was no meeting or resolution of the members of the Company in relation to the UK Transfer;

    ii.  it is averred that that at all material times after 30 March 2016 the Company's members (the Nominees) would have met only at the request of and with the knowledge of the beneficial owners of the Company, including the First Defendant, and with the knowledge of the directors of the Company, including the First Defendant, and that accordingly or in any event any alleged meeting or resolution of the Company's members relating to the UK Transfer would be within the First Defendant's knowledge; and

    iii.  at Def1 para 12.b the First Defendant admits that, to the best of his knowledge, there was no such meeting or resolution.

12. Paragraphs 3 to 5 and 8 above are repeated in reply to Def1 para 14.

13. As to Def1 para 15 :

    a.  Def1 para 15.a is denied in so far as it is alleged that the misconduct of the First Defendant as a director of the Company complained of was reasonable;

    b.  Def1 para 15.b is denied and paragraph 11 above is repeated; and

    c.  Def1 para 15.c is denied, the First Defendant was and is the beneficial owner of the Second Defendant.

14. As to Def1 para 16 :

    a.  Def1 para 16 is denied in so far as it consists of positive averments and save in so far as it consists of admissions;

    b.  the last line of Def1 para 16.b is relied upon as an admission of the breach of the First Defendant's duties as a director of the Company;

    c.  as to Def1 para 16.a it is averred that as at 6 June 2016 the Company was perfectly able to continue to supply Parker Services to Morsgate and but for the wrongful acts of the Defendants would have continued to trade profitably as a result, as the First Defendant admits the Company had done in the period 30 March 2016 to 6 June 2016;

    d.  it is denied, as alleged at Def1 para 16.b, that the Claimant was taking no active part in the operations of the Company or of Parker and averred that these allegations are in any

event inconsistent with the First Defendant's case as to the Claimant's alleged involvement in and knowledge of the affairs of the Company and of Parker at Def1 paras 4.e, 4.f, 7.b and 12.a and should accordingly be struck out;

e. further or alternatively, it is denied in any event that the degree to which the Claimant as a director of Parker or of the Company was or was not actively taking part in its management or did or did not acquiesce in the UK Transfer (which it is averred the Claimant did not) could or did provide a reasonable excuse for the First Defendant to breach his duties to the Company as a director by allowing or procuring the Second Defendant, the Third Defendant and the Fourth Defendant to act together to supplant the Company as the provider of services to Morsgate and by causing, allowing or procuring the UK Transfer, as alleged in APTC paras 20 to 34;

f. as to paragraph 16.c :

    i. paragraphs 4.a and 11.c above are repeated;

    ii. even on the First Defendant's own case (in so far as it is understood) there is no apparent connection between:

        1. the agreement regarding Parker alleged at Def1 para 4.c and the First Defendant's allegation at Def1 para 3.e that ultimate beneficial ownership of the Company was the same as the ownership of the African Business generally (and so not the same as Parker) on the one hand; and

        2. the UK Transfer, involving (on the Defendants' cases) the unconnected transfer of the Company's business to a company owned legally and beneficially by the Third and Fourth Defendants on the other;

    iii. in the premises, Def1 para 16.c is embarrassing and should be struck out.

15. Def1 para 17 is denied in so far as it consists of positive averments.

16. Def1 para 18 is denied in so far as it consists of positive averments and paragraph 8 above is repeated. At all material times the Second Defendant was and now is under the de facto control of the First Defendant (the beneficial owner of the Second Defendant) and the First Defendant was and is now the controlling mind or (with the Third Defendant and the Fourth Defendant) part of the controlling mind of the Second Defendant.

17. Def1 para 19 is denied in so far as it consists of positive averments.

**B. Reply to Def2**

18. As to the denials contained in Def2 paras 8, 25, 30 and 33(a) concerning the UK Transfer, paragraphs 3 to 5 above are repeated.

19. Def2 paras 11, 15(b), 17, 19, 26, 27 and 29 are embarrassing and should be struck out in so far as they consist of non-admissions, in that the matters not admitted are within the knowledge of:

    a. the First Defendant, the beneficial owner and controlling mind or part of the controlling mind of the Second Defendant, as to which paragraph 16 above is repeated;

    b. the Third and Fourth Defendants, who are and have been at all material times close and trusted associates of the First Defendant (and paragraph 8.a above it repeated) and of other members of F and B branches of the Salem family (headed by the First Defendant and his brother Beno Salem respectively) and who at all material times, through acting in formal and informal capacities in the African Business and in the family's financial affairs more generally, had:

        i. extensive and detailed knowledge of the nature and extent of the dispute and of attempts to settle that dispute and as to how that dispute and those settlement attempts related to and affected the African Business as at March to August 2016;

        ii. extensive and detailed knowledge of the structure of the African Business in 2016 and later, including for these purposes the ownership structures of Parker, the Company, Morsgate and of the operations of Morsgate in 2016 and thereafter; and

        iii. full knowledge of the reasons for the ASA, Parker's liquidation, and the intended role of the Company as the supplier of Parker Services to Morsgate;

    c. the Second Defendant, for the reasons given in this paragraph.

20. As to Def2 para 18, it is admitted and averred that Parker's statutory accounts for the year ended 31 March 2013 showed shareholders funds of £2,309,425 and for the year ended 31 March 2014 showed shareholders funds of £2,446,516.

21. As to the denials contained in Def2 paras 21, 24, 25 and 33(a) concerning the scope and effect of the ASA, paragraphs 3 to 5 above are repeated.

22. As to Def2 para 23, paragraph 3.j above is repeated and relied upon to show that all Defendants were aware of the Morsgate Letter at all material times (in the case of the Second Defendant at all material times after 7 June 2016).

23. As to the last sentence of Def2 para 33(d) and as to Def2 paras 33(e) and 34, paragraph 8 above is repeated.

24. Def2 paras 35(b) and 35(c) are denied, in that at all material times the Second to Fourth Defendants knew that the First Defendant was not acting in the interests of the Company when he caused, procured or allowed the UK Transfer to the Second Defendant but was instead acting in breach of duty, as alleged at APTC paras 20 to 25. Paragraph 19 above is repeated.

25. Def2 para 42 is denied, save that:

    a. is it admitted that on or about 4 November 2016 the Claimant received a payment of £80,365.05 from the Second Defendant;

    b. no admission is made that the payment was made by mistake as alleged or for the reasons alleged in Def2 paras 42(a) and 42(b); and

    c. Def2 para 42(c) is admitted.

26. It is averred that no sum is due to the Second Defendant from the Claimant as alleged or at all.

MARK HUBBARD

MARK HUBBARD

Statement of truth

The Claimant believes that the facts stated in this Reply are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ………………………………………………………………..

Full name: SIMON GOLDRING

~~Dated: 17 January 2023~~

Statement of truth

The Claimant believes that the facts stated in this Amended Reply are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ......................................................

Full name: ...... SIMON GOLDRING ...............

Dated: ...... 21/03/23 ...............

# Exhibit C

**Claim No. BL-2022-000926**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**BUSINESS LIST**

**BETWEEN**

**MOUSSY SALEM**

**Claimant**

**and**

**(1) FREDDY SALEM**
**(2) MONLINE UK LIMITED**
**(3) SALIM LEVY**
**(4) EZRA AGHAI**

**Defendants**

---

**CLAIMANT'S RESPONSE TO THE SECOND TO FOURTH DEFENDANTS' REQUEST FOR FURTHER INFORMATION DATED 16 FEBRUARY 2023**

---

This is the response of the Claimant to the Second to Fourth Defendants' Request for Further Information dated 16 February 2023 made pursuant to CPR Part 18 in respect of the case stated by the Claimant in his Reply dated 17 January 2023.

CPR rule 18.1(1) provides that the court may at any time order a party to (a) clarify any matter which is in dispute in the proceedings, or (b) give additional information in relation to any such matter, whether or not the matter is contained or referred to in a statement of case.

CPR PD18 paragraph 1.2 provides that a Request for Further Information should be confined to matters which are reasonably necessary and proportionate to enable the requesting party to prepare his own case or to understand the case he has to meet.

Pursuant to CPR rule 2.3(1) this Response to Request for Further Information comprises one of the statements of case in these proceedings.

Unless otherwise stated, references to paragraph numbers are to the paragraphs of the Reply. The Claimant adopts the defined terms used in the Amended Particulars of Claim dated 2 November 2022 and in the Reply.

**Under paragraph 3(h)**

Of: "it is averred… that the former employees of Parker provided services to Morsgate on behalf of the Company that…were substantially the same as had been supplied to Morsgate by Parker ('Parker Services') and it is averred that following the ASA and the voluntary winding up of Parker on 30 March 2016 and down to 6 June 2016 they did so pursuant to a contract between the Company and Morsgate or alternatively on the basis of a mutual understanding between the Company and Morsgate that a contract was to be entered between them for the continued provision of the Parker Services as out in paragraph 5 below."

**And under paragraph 5**

Of: "…the Company supplied Parker Services to Morsgate pursuant to the Parker Logistics Agreement, as Parker's assignee under the ASA:
a. alternatively, substantially on the terms of the Parker Logistics Agreement, under a new contract arising between the Company and Morsgate [for] the provision of Parker Services by the Company for reward after 30 March 2016 and on the basis it was [the] mutual understanding of the Company and Morsgate at the time that these services were supplied on that basis, pending any subsequent agreement between them to vary the terms of the Parker Logistics Agreement or to enter into a new agreement."

Request

1. Please confirm that the contract relied on by the Claimant is (i) a contract arising by conduct and (ii) that the conduct relied on is the provision by the Company to Morsgate of Parker services for reward after 30 March 2016.

Response

1. The Claimant's case is adequately set out in paragraphs 5 and 5(a).

Request

2. Please provide particulars of the facts and matters relied on in support of the alleged mutual understanding, including:

2.1 The natural persons alleged to have been party to the understanding on behalf of each of the Company and Morsgate;

2.2 The facts and matters relied on in support of any allegation that any natural person's understanding or knowledge is attributable to the Company or Morsgate (as applicable).

<u>Response</u>

2.1 The mutual understanding was shared by at least the Claimant and the First, Third and Fourth defendants.

2.2 The basis on which the knowledge of the Claimant and First, Third and Fourth Defendants is to be attributed to the Company and the basis on which the knowledge of the First and Fourth Defendants is to be attributed to Morsgate is as stated in the Reply and in respect to the Fourth Defendant in Response 3 below.

**Under paragraph 3(j)**

Of: the whole paragraph.

<u>Request</u>

3. Please provide particulars of the facts and matters relied on in support of the allegations that:

3.1 The management of Morsgate and its relationship with Parker (and later the Company) as supplier of Parker Services "was in practice in the hands of" the Fourth Defendant;

3.2 The Fourth Defendant was the "point of contact" between the professional directors of Morsgate and the members of the Salem family involved in the management of the African Business.

Response

3. The Claimant relies upon the following facts and matters:

(a) The Claimant's case, as set out in paragraph 3(j) of the Reply, is that the management of Morsgate (and in particular the management of Morsgate's relationship with Parker and later the Company as supplier of Parker Services) was in practice in the hands of the First Defendant and/or Fourth Defendant, acting as the point of contact between the professional directors of Morsgate and members of the Salem family involved in the management of the African Business (as defined below) but not, after 2013, the Claimant or other members of the R Branch (being the wife and children of Raymond Salem).

(b) The Claimant refers to response 5 below, which sets out his understanding as to the nature and composition of the African Business, including as to how this was, and is, operated as a single unit.

(c) Until 30 March 2016 Parker (and its employees, including the Third and Fourth Defendants) played an important role in managing and directing the operations of the African Business. This included matters such as distribution, banking, IT, training, managing and overseeing employees, recruitment, interface with suppliers, shipping, transportation and forwarding, warehousing, logistics, and purchasing. Parker was often presented to existing and potential suppliers of consumer goods as the 'face' of the African Business, especially in the context of negotiations relating to supply and pricing. The African Business was, as a result, sometimes referred to as the 'Parker Logistics group of companies'.

(d) Morsgate operated as a treasury company for various entities within the African Business, and formed part of a corporate structure by which profits earned by trading companies operating in West Africa (including Great Brands (Nigeria) Ltd, Blue Arrow TSW Ltd, Cobexim Sarl, Forewin (Ghana) Ltd and Societe Samex, often referred to, with their subsidiaries and affiliates as the West African Trading Companies or "**WATCs**") were transferred up to the Salem family trusts as the ultimate beneficial owners of the African Business (albeit that after August 2013 these profits began to be wrongfully diverted away from the R Branch). In outline the corporate structure as at August 2013 and for several years thereafter involved revenue generated by the WATCs being paid to and held by Morsgate. Upstream companies, including Glynfield Finance Limited ("**Glynfield**") and Transglobe Logistics Limited ("**Transglobe**"),

4

invoiced the WATCs for services relating, for example, to finance and insurance. These invoices were satisfied by payments made by Morsgate to Glynfield and Transglobe. Glynfield and Transglobe then made payments to the Salem family trusts (albeit, after 2013, these payments began to be wrongfully diverted away from the R Branch).

(e) As set out in Response 4 below, the First Defendant has at all material times been one of the senior members of the Salem family who managed the African Business at the highest level, including the corporate structure described above.

(f) As pleaded by the First Defendant in paragraph 7(a) of his Defence (and admitted in paragraph 8(a) of the Reply), the Third and Fourth Defendants had been employees of Parker for nearly 20 years at the time Parker was wound up. Whilst employed by Parker and its successor companies, and particularly given the role of Parker within the African Business, in practice the Third and Fourth Defendants have worked in the wider African Business for many years, reporting directly to the First Defendant. The Third and Fourth Defendants' role in the African Business (including as employees of Parker and its successor companies) included managing the corporate structure described above and in particular the movement of funds through Morsgate.

(g) For example, on 13 June 2013 the Fourth Defendant sent to Rothschild (a corporate group acting as supplier of trust and corporate services to the Salem Trusts and the African Business and as trustee of the Salem family trusts) by email excel spreadsheets setting out calculations of sums to be invoiced by Glynfield or Transglobe to entities operating in Africa in respect of shipments of goods between October 2011 and December 2011. Rothschild, as the administrator of Glynfield and Transglobe, generated invoices from Glynfield and Transglobe in accordance with the Fourth Defendant's calculations, and sent these to Morsgate's bank, together with a request for payment. These invoices were settled by Morsgate (via its bank) on behalf of the entities operating in Africa, demonstrating that the Fourth Defendant's formal and informal positions in relation to Parker and the wider African Business were such that he was able in practice to direct the timing and amounts of payments to be made by Morsgate.

(h) By way of further example, on 13 July 2010 the Fourth Defendant sent email instructions for two wire payments to be made to Wafco Inc ("**Wafco**") in relation to the supply of Nokia mobile phone handsets. On 21 July 2010 a "Form M" import form relating to the import of mobile phone handsets into Nigeria by Blue Arrow TSW Limited for the benefit of Wafco was emailed to the Third and Fourth Defendants by an Umar

Ibrahim. The Claimant infers that the payments made to Wafco were 'cleared' by being closely followed by payments out to Morsgate. The Claimant also infers (given the Fourth Defendant's involvement at the earlier stages of the process) that the payments from Wafco to Morsgate were done by or under the direction of the Fourth Defendant.

(i) By way of yet further example, between 1 June 2009 and 30 July 2010 the Fourth Defendant sent almost daily emails to, amongst others, the Claimant, the First Defendant, and Beno Salem (another senior family member charged with managing the African Business at the highest level at the time as indicated below), reporting on the foreign currency transactions which had been effected in Nigeria by or for WATCs, and at what rate. The Claimant understands that the purchased currency (USD) was in due course remitted to Morsgate.

(j) By way of yet further example, on 24 March 2006 the Fourth Defendant was sent an email from one of the directors of Morsgate requesting that the Fourth Defendant explain the "rationale behind the activities" of Morsgate and particularly the reasons for payments made to and from Morsgate and requesting explanations of the relationships between paying entities. The email also states that the Fourth Defendant maintains "detailed records of the funds received and invoices paid on behalf of the five shareholders" of Morsgate.

<u>Request</u>

4. Please provide particulars of the members of the Salem family referred to in paragraph 3(j).

<u>Response</u>

4. The Claimant's response is as follows:

(a) Until 1993/1994 the African Business was run by four brothers, Isaac Salem ("**Isaac**"), the late Raymond Salem ("**Raymond**") who was the Claimant's father and Mireille Salem's ("**Mireille**") husband and head of what is known as  the R branch of the Salem family, the First Defendant, head of what is known as the F branch of the Salem family, and Beno Salem ("**Beno**"), head of what is known as the B branch of the Salem family.

(b) At that point (1993/4) agreements were reached between the brothers under which Isaac and his branch of the Salem family ceased to have any interest in the African Business and  (as later reflected or intended to be reflected in the structuring of the

6

Salem family trusts) that the R Branch, the F Branch and the B branch were to hold equal interests in the African Business and have equal entitlements to the profits derived from that business.  This remains the position to this day, albeit that, as indicated below, since 2013 the R Branch have in substance not received the benefit of their share in the African Business, the profits of which appear to have been wrongfully diverted to the F branch and the B branch.

(c) Between 1993/1994 and 1997 the African Business was run by Raymond, the First Defendant and Beno on the basis indicated above.

(d) In 1997 Raymond suffered a stroke and was incapacitated for the remainder of his life. The Claimant took over his father's role and from 1997 to 2013 ran the African Business with his uncles, the First Defendant and Beno, on the basis indicated above.

(e) In or by 2004 the First Defendant's son, Philip Salem ("**Philip**"), also took on a senior operational role.

(f) In 2013 the Claimant was excluded from operational activities associated with the running of the African Business which from then onwards has been under the control of the First Defendant, Philip and Beno.

(g) Since 2013 the members of the R Branch (including the Claimant) have been wrongfully excluded from benefiting from the profits of the African Business, principally by the actions of or directed by the First Defendant, Philip and Beno.

**Under paragraph 8(a)**

Of: "…it is averred that at all material times the Third Defendant and the Fourth Defendant held and continue to hold other positions of responsibility in the African Business and that in all of those positions they reported and continue to report directly and only to the First Defendant"

Request

5. Please explain what the Claimant means by 'African Business' (which is not defined in the Reply (or otherwise in the statements of case served as at the date hereof)), including the entities to which the Claimant is referring (if any).

7

<u>Response</u>

5. The Claimant's response is as follows:

(a) Paragraph 4 of the Amended Particulars of Claim (admitted and averred by the First Defendant in paragraph 3(a) of his Defence) refers to the African Business as a substantial trading business in Africa associated with the Salem family.

(b) The Third and Fourth Defendants are in any event well aware of what is meant by the African Business, which they have worked in and helped to manage, primarily under the direction of the First Defendant, for many years and continue to do so now.

(c) The operations of the African Business are extensive and include the import and distribution of consumer products including pharmaceuticals, tobacco products (including the exclusive right to distribute and retail British American Tobacco tobacco products in a number of countries), personal care, food, alcoholic and non-alcoholic beverages and confectionary. The countries of operation as at 2013 and thereafter include Nigeria, Benin, Ghana and Togo.

(d) To the best of the Claimant's knowledge, the entities set out below form part of or have formed part of the African Business, which at all material times has operated and still operates as a single business and since 2013 has done so under the direction of the First Defendant, Philip and Beno, albeit that others act and have acted as nominees for them or for other entities within the African Business or at their direction in respect of particular companies from time to time:

<u>Belgium</u>
Africa International Group

<u>Benin</u>
Cobetrac
Madison Sarl
Societe Cobexim SARL

<u>BVI</u>
The Company (Monline International Limited)
Boulder Finance Limited

Crownwell Trading Corp

Fernbridge International Limited

Glynfield Finance Limited

Great Brands (Holdings) Limited

Metrocom Holdings Inc

Nartnett Limited

Tabcom SA

Transglobe Logistics Management Limited

Universal Metrocom Limited

Velaire Limited

Westco Export Trading

<u>Ghana</u>

Bargain R Us

Comfu

Diplo FZ Limited

First Rec Ltd

Forewin (Ghana) Limited

HMD Africa Limited

HMD Africa Services Limited

HMD Forewin Limited

Lewadis FZ Limited

Mabani Seven Company Ltd

Mabani Six Company Limited

Mass Industries Limited

Star Games

Zoobashop Limited

<u>Guernsey</u>

Bracknell Investments Limited

Framwell Investments Limited

<u>Jersey</u>

Morsgate International Ltd

<u>Lebanon</u>

Chakras (Holding) SAL

Gestcom International Offshore SAL

Gestcom International Trading Offshore SAL/Gee Trading (Offshore) SAL

Globest Services Offshore SAL


<u>Luxembourg</u>

Conchee Holdings Sarl

Gateacre Holdings Sarl


<u>Mauritius</u>

Great Brands (Holdings) Limited

Mabani FBR Holding Mauritius Limited

Mabani Holdings Ghana Limited

Mabani Real Estate & Management Services (MI) Limited

Maiddat MI Ltd

Marchari Investments Ltd


<u>Nigeria</u>

Afro Ocean Bridge Nigeria Ltd

BA Nigeria Distribution Ltd

Best Tobacco Company Ltd

Big Bowl Company Nigeria Ltd

Blue Arrow TSW Limited

Dynabuy Nigeria Company Limited

Grand Concept Ltd

Great Brands Nigeria Limited

IDF Trading Company Ltd

Inter Market Distribution Company Ltd

Inter Trade Worldwide Distribution Company Ltd

Inter-Food Distribution Company Ltd

Mabani Five Nigeria

Mabani Four Nigeria

Mabani Real Estate Nigeria Limited

Mabani Three Nigeria

Mabani Two Nigeria

Maon Alpha Alliance Ltd

Maon Holdings Ltd

Maon Services Ltd

Maon Technology Ltd

Saharan Distillers Ltd

Ultra Trade Company Nigeria Ltd

Panama

Perron Trading Inc

Richon Trading Co Ltd

Simpex Limited

Wafco Inc

Spain

Royal Beverages Espana SL

Togo

Societe Samex Sarl

Togo Trading & Disribution SARL

United Kingdom

The Second Defendant (Monline UK Limited)

Parker (Parker Logistics Limited)

USA

Blue Arrow Warehousing & Logistics LLC

Bonita Warehouse LLC

BS Gestcom Holdings Corp

BS Global Holdings Corp

BS and DS Holding Corp

Renis Warehousing LLC

Request

6. Please provide particulars of the "positions of responsibility" it is alleged that each of the Third Defendant and Fourth Defendant held and continue to hold, including (i) the offices or roles and (ii) at or for the benefit of which entity or entities those offices or roles were (or continue to be) held.

Response

6. Response 3 is repeated.

**Under paragraph 8(c)(i)**

Of: "…between 30 March 2016 and 6 June 2016 the First Defendant and the Second Defendant agreed and combined with the Third Defendant and the Fourth Defendant that the Third Defendant and Fourth Defendant…would become…shareholders in the Second Defendant (holding their shares on bare trust for or as nominees for the First Defendant)…"

Request

7. Please provide particulars of the alleged agreement, including (i) if it was oral, when and where the agreement was concluded and (ii) the natural person who concluded the agreement on behalf of the Second Defendant.

Response

7. The Claimant's case as to the agreement in question is adequately set out in the Reply. The Claimant also relies on paragraph 7(d) of the First Defendant's Defence, which states: "…the First Defendant agreed with the Third and Fourth Defendants that they should become directors and shareholders of Monline UK to supply logistics services to Morsgate."

Request

8. To the extent it is the Claimant's case that the Third and Fourth Defendants hold their shares in the Second Defendant on bare trust or as nominees for the First Defendant, please provide particulars of the facts and matters relied on in support of that allegation.

Response

8. The Claimant relies on the following facts and matters in support of its clearly stated case in paragraphs 23 and 37(a) of the Amended Particulars of Claim and in paragraph 8(c)(i) of the Reply that the Third and Fourth Defendants hold their shares in the Second Defendant on bare trust for or as nominees for the First Defendant:

12

(a) Both Parker and the Company were owned as to 50% by the Claimant and/or Mireille, and as to 50% by the First Defendant. The Third and Fourth Defendants had no ownership interest in Parker or the Company.

(b) As the First Defendant alleges in paragraph 7(d) of his Defence, he agreed with the Third and Fourth Defendants that they should become directors and shareholders of the Second Defendant. The First Defendant also alleges in paragraph 16(b) of his Defence that he acquiesced in the incorporation of the Second Defendant by the Third and Fourth Defendants as its directors and shareholders.

(c) The Third and Fourth Defendants were otherwise employees of and agents for the African Business and specifically persons who reported directly to the First Defendant but who had no interest in that business or its profits of their own.

(d) Both the First Defendant and the Third and Fourth Defendants were accustomed to the use of nominees and bare trustees to hold particular companies (as and when circumstances made this convenient or advisable) in the African Business.

(e) It is not alleged that any consideration passed to the First Defendant from the Third and Fourth Defendants for his agreement or suggested why (if the basis of this agreement was not as it is alleged to have been by the Claimant) the creation of the Second Defendant as a company of which the Third and Fourth Defendants were to be the shareholders and directors required the agreement or acquiescence of the First Defendant at all.

(f) It is to be inferred in the circumstances that the First Defendant would not have and did not agree that the Second Defendant should be formed and that the business and undertaking of the Company should be transferred to and/or continued by the Second Defendant (or acquiesce in respect to the same) on any other basis than that:

    a. the Second Defendant would be beneficially owned by and controlled by the First Defendant so that the shares in the Second Defendant would be held for him by the Third and Fourth Defendants on bare trust for him or as his nominees; and

    b. such that the First Defendant would be able to benefit from the net income stream derived from the African Business which had previously been available to the directors and shareholders of Parker and of the Company, to the exclusion of the Claimant and/or Mireille.

**Under paragraph 11(b)**

Of: "it is averred that, as the Defendants knew, funds the Claimant had advanced as loans to and for the benefit of the Company were used after 6 June 2016 for the benefit of D2, of whose existence the Claimant was unaware at the time, without the Claimant's knowledge or consent."

Request

9. Please confirm whether it is the Claimant's case that the Second, Third and Fourth Defendants (or any of them) knew that (i) the Claimant was unaware of the existence of the Second Defendant and/or (ii) that the funds loaned by the Claimant to the Company were used for the benefit of the Second Defendant without the Claimant's knowledge or consent.

Response

9. The Claimant's case is adequately pleaded.

Request

10. To the extent that is the Claimant's case, please provide particulars of each of the Second Defendant's, Third Defendant's and Fourth Defendant's knowledge of the facts alleged.

Response

10. The Claimant's case where knowledge is expressly alleged is adequately pleaded and a general request for particulars of knowledge such as this is neither reasonable or proportionate.

**Under paragraph 16**

Of: "At all material times the Second Defendant was and now is under the de facto control of the First Defendant (the beneficial owner of the Second Defendant) and the First Defendant was and is now the controlling mind or (with the Third Defendant and the Fourth Defendant) part of the controlling mind of the Second Defendant.

14

**And under paragraph 19(a)**

Of: "…the First Defendant, the beneficial owner and controlling mind or part of the controlling mind of the Second Defendant…"

Request

11. Please provide particulars of the facts and matters relied on in support of the allegations that:

> 11.1 The First Defendant is the beneficial owner of the Second Defendant.

> 11.2 The First Defendant was and now is the controlling mind (or part of the controlling mind) of the Second Defendant.

Response

11. The Claimant repeats Response 8.

**Under paragraph 19(b)**

Of: the whole paragraph

Requests

12. Please (i) explain what the Claimant means by its allegation that "The Third and Fourth Defendant… have been at all material times close and trusted associates of the First Defendant" (if and to the extent what is alleged extends beyond an allegation that the Third and Fourth Defendants were prior to June 2016 employees of Parker and subsequently the Company) and (ii) provide particulars of the facts and matters relied on in support of that allegation.

13. Please explain what the Claimant means by its allegation that "The Third and Fourth Defendant…are…close and trusted associates of the First Defendant" and provide particulars of the facts and matters relied on in support of that allegation.

Responses

12. and 13. The meaning of the words is clear and no further explanation is required. The Claimant repeats Responses 3, 5, 6, 7 and 8.

Requests

14. Please explain what the Claimant means by its allegation that "The Third and Fourth Defendant…have been at all material times close and trusted associates of…other members of the F and B branches of the Salem Family" and provide particulars of the facts and matters relied on in support of that allegation, including particulars of the family members referred to.

15. Please explain what the Claimant means by its allegation that "The Third and Fourth Defendant…are…close and trusted associates of…other members of the F and B branches of the Salem Family" and provide particulars of the facts and matters relied on in support of that allegation, including particulars of the family members referred to.

Response

14. and 15. The Claimant repeats Responses 12 and 13 above. The family members referred to are Philip Salem and Beno Salem.

Request

16. Please provide particulars of the following allegations:

16.1 That the Third Defendant and Fourth Defendant "act[ed] in formal and informal capacities in the African Business…", including (i) when and (ii) for whom (or what entity) it is alleged the Third Defendant and Fourth Defendant each acted.

16.2 That the Third Defendant and Fourth Defendant "act[ed] in formal and informal capacities…in the family's financial affairs more generally…", including (i) when (ii) for whom (or what entity) and (iii) in relation to what "financial affairs" it is alleged the Third Defendant and Fourth Defendant each acted.

<u>Response</u>

16. The Claimant repeats Responses 3, 5, 6, 7 and 8.

<u>Request</u>

17. Please provide particulars of how the capacities in which it is alleged the Third Defendant and Fourth Defendant each acted provided them with the following:

17.1 "extensive and detailed knowledge of the nature and extent of the dispute [between the Claimant and the First Defendant] and of attempts to settle that dispute";

17.2 "extensive and detailed knowledge of … how that dispute [between the Claimant and the First Defendant] and those settlement attempts relate to and affected the African Business as at March to August 2016";

17.3 "extensive and detailed knowledge of … the structure of the African Business in 2016 …"

17.4 "extensive and detailed knowledge of … the ownership of Parker, the Company, Morsgate and the operations of Morsgate in 2016 and thereafter";

17.5 "full knowledge of the reasons for the ASA, Parker's liquidation, and the intended role of the Company as the supplier of Parker Services to Morsgate".

<u>Response</u>

17. The Claimant's case is as set out in paragraphs 3(j), 8(a) and 19(b).  Responses 3, 5, 6, 7 and 8 are repeated.

**Under paragraph 24**

Of: "…at all material times the Second to Fourth Defendants knew that the First Defendant was not acting in the interests of the Company when he caused, procured or allowed the UK Transfer to the Second Defendant but was acting in breach of duty…"

Request

18. Please provide particulars of the Second Defendant's, Third Defendant's and Fourth Defendant's knowledge of the facts alleged.

Response

18. The Claimant's case is as set out in in paragraphs 11, 20, 23, 24, 28, 30 and 31-36 of the Amended Particulars of Claim and in paragraphs 3(g), 3(h), 3(i)(i)-(iii), 3(j), 4(d), 4(i), 5, 8(a), 8(c), 11(b), 14(c), 19(b) and 22 of the Reply.  Responses 3, 5, 6, 7 and 8 are repeated.

**Statement of truth**

The Claimant believes that the facts stated in this Response to Request for Further Information are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ………………………………………………

Name: …… SIMON GOLDRING……

Dated: …… 02/03/23 ……………

Served on 2 March 2023 by Maurice Turnor Gardner LLP of 15th Floor, Milton House, Milton Street, London EC2Y 9BH, solicitors for the Claimant.

18

# EXHIBIT 8

**SALEM v SALEM & ORS**
Claim No. BL-2022-000926

**DISCLOSURE REVIEW DOCUMENT (ISSUES AND MODES MODE OF DISCLOSURE) APPROVED BY THE MASTER ON 19th JULY 2023**

| | Brief description of the Issue for Disclosure | Reference to statement of case | Model of Extended Disclosure (A – E) | |
|---|---|---|---|---|
| | | | By Claimant | By Defendants |
| 1. | **Winding up of Parker**<br><br>(a) Why was Parker wound up by means of a members' voluntary liquidation?<br><br>(b) What tax advice was taken in relation to the winding up of Parker, in particular, as regards entrepreneurs' relief?<br><br>(c) Did the Claimant and / or the First Defendant know that Parker was to be wound up in order that its members qualify for entrepreneurs' relief?  Did they agree to its winding up on this basis?<br><br>(d) What tax benefit was claimed and received by the Claimant, the First Defendant and others in relation to the winding up of Parker? | Def1 4(c)<br><br>Reply 4(a)(iv), 11(c)(ii) | Model D | D1: Model D<br><br>D2-4: Model B |
| | | | | |
| 2. | **Sale to the Company (Monline BVI)** | Def1 3(f)(ii), 4(e), 4(f), 4(j) | Model B for 2a | Model B for 2a |

| Brief description of the Issue for Disclosure | | Model of Extended Disclosure (A – E) | |
| --- | --- | --- | --- |
| | Reference to statement of case | By Claimant | By Defendants |
| | (a) What assets were sold by Parker to the Company? (b) What was the state of the Claimant's knowledge as to whether or not the Company would acquire Parker's contract with Morsgate? | Reply 4(c) | Model D for 2b | Model D for 2b |
| | | | | |
| 3. | **Beneficial ownership of the Company** Who were the beneficial owners of the shares in the Company as at 16 March 2016 and/or thereafter? | PoC 5 Def1 3(e) Def2 6 Reply 3(c), 4(a)(iii) | Model D | D1: Model D D2-4: Model B |
| | | | | |
| 4. | **The Company's supply of Parker Services to Morsgate** On what basis did the Company supply Parker Services to Morsgate from 30 March 2016 to 6/7 June 2016? | PoC 16 Def1 3(f), 4, 12, 16(a) Def2 21, 23 | Model D | Model D |

| Brief description of the Issue for Disclosure | | Reference to statement of case | Model of Extended Disclosure (A – E) | |
|---|---|---|---|---|
| | | | By Claimant | By Defendants |
| | | Reply 4(a)(i), 4(b), 5 | | |
| | | | | |
| 5. | **UK Transfer**<br><br>(a) What dealings were there between (i) the Company (ii) the parties and (iii) Morsgate with respect to the UK Transfer and/or the supply of Parker Services in the period 16 March 2016 to 1 August 2016?<br><br>(b) What was the practical effect of the UK Transfer as between the Company, D2 and/or Morsgate (i) in the period from 6/7 June 2016 to 1 August 2016 and (ii) thereafter?<br><br>(c) What was the intention of the parties in respect of the UK Transfer? | PoC 7, 18, 20, 23, 25, 26, 28, 32<br><br>Def1 3(f), 4(j), 4(k), 12, 14, 19<br><br>Def2 8(a), 25(b) 25(c), 29, 30, 33, 35<br><br>Reply 3(f), 3(g), 4(g), 5(c)<br><br>RRFI 2, 18 | Model D | Model D |
| | | | | |
| 6. | **The Company's UK bank account** | Def1 3(f)(iii), 4(i), 4(k)(i), | Model D | Model D |

| Brief description of the Issue for Disclosure | | Model of Extended Disclosure (A – E) | |
| --- | --- | --- | --- |
| | Reference to statement of case | By Claimant | By Defendants |
| (a) What steps were made by or on behalf of the Company to open a UK bank account prior to 6 June 2016, when, by whom and with what result? (b) Was the Company's alleged failure or inability to open a UK bank account by 6 June 2016 relevant to the UK Transfer and if so, how? | 16(a), 19(b), 19(d) Def2 33(b) Reply 4(f), 4(h), 14(c) | | |
| | | | |
| 7. **Ownership and control of D2** (a) What dealings were there between D1, D3 and D4 on or before 6/7 June 2016 or thereafter regarding the formation, ownership and control of D2? (b) Do D3 and D4 hold their shares in D2 on trust for or as nominees for D1? | PoC 23, 37(a) Def1 7(d), 16(b), 18 Def2 33(b), 33(d), 33(e), 34 Reply 8(c), 16 RRFI 8, 11 | Model D for 7a Model D including searching for and disclosure of narrative documents for 7b | Model D for 7a Model D including searching for and disclosure of narrative documents for 7b |
| | | | |

| Brief description of the Issue for Disclosure | | Model of Extended Disclosure (A – E) | |
|---|---|---|---|
| | Reference to statement of case | By Claimant | By Defendants |
| 8. **Morsgate**<br><br>a) What role (if any) did D1 or D4 play in the management or affairs of Morsgate from 2013 onwards?<br><br>b) What services did Parker supply to Morsgate pursuant to the 'Parker Logistics Agreement' dated 14 March 2000 from 2013 until 30 March 2016?<br><br>c) What services were provided to Morsgate by the Company after 30 March 2016?<br><br>d) What payments were made to or for the benefit of D2 by Morsgate from 7 June 2016 to date and on what basis?<br><br>e) What became of those payments?<br><br>f) Did D2 cease to supply Parker Services to Morsgate after 1 August 2016 and if so when and in what circumstances?<br><br>g) Has D2 supplied Parker Services or other services to persons other than Morsgate and if so when, on what terms and in what circumstances? | PoC 15(c), 15(e), 37(d)-(h)<br><br>Def1 3(c), 3(f), 7(e)<br><br>Reply 3, 5(d), 9<br><br>RRFI 3 | Model B for 8a<br><br>Model D for 8b to 8h | Model B for 8a<br><br>Model D for 8b to 8h |

| Brief description of the Issue for Disclosure | | Model of Extended Disclosure (A – E) | |
|---|---|---|---|
| | Reference to statement of case | By Claimant | By Defendants |
| h)  What payments has D2 received since 7 June 2016 from persons other than Morsgate and what has become of them? | | | |
| | | | |
| 10.  **Return of assets / tracing**<br><br>(a)  Of what does D2's business and assets currently consist?<br><br>(b) What has become of any assets transferred to D2 from the Company at the time of the UK Transfer or of any assets derived from them? | PoC 29, 37(f)<br><br>Def1 7(e)(iv) | Model D | Model D |
| | | | |
| 11.  **Set off**<br><br>a)  In what circumstances did D2 pay £80,365.05 to C on 4 November 2016?<br><br>b)  Was that payment in excess of what was due to C from D2 at the time and if so by how much? | Def2 42<br><br>Reply 25 | Model D | Model D |

| Brief description of the Issue for Disclosure | | Model of Extended Disclosure (A – E) | | |
| --- | --- | --- | --- | --- |
| | | Reference to statement of case | By Claimant | By Defendants |
| | | | | |
| 12. | **Assignment**<br><br>On what terms did the Claimant purport to acquire the claim in this action including as to consideration agreed? | Def1   1(a), 1(b), 5(b)(ii) | Model B | N/A |