# EXHIBIT 5

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

Claim No. BL-2022-000926

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

B E T W E E N:

**MOUSSY SALEM**

Claimant

- and -

**(1) FREDDY SALEM**
**(2) MONLINE UK LIMITED**
**(3) IGAL LEVY**
**(as representative of the estate of Salim Levy (dec'd))**
**(4) EZRA AGHAI**

Defendants

---

**RE-AMENDED DEFENCE OF**
**THE FIRST DEFENDANT**

---

This Re-Amended Defence is filed on behalf of the First Defendant. References in this Re-Amended Defence to paragraphs are to the paragraphs of the Re-Amended Particulars of Claim and the same headings and definitions as used and defined in the Re-Amended Particulars of Claim are adopted for convenience save where appears to the contrary. Save as expressly admitted or not admitted in this Re-Amended Defence, the facts and matters alleged in the Re-Amended Particulars of Claim are denied.

**Substitution**

1. Paragraph 1, first sentence is admitted, and the second sentence is admitted as to the fact of the deed of assignment. Paragraph 1 is otherwise not admitted:

    a. By a deed of agreement and indemnity dated 4 October 2022, the Claimant and the liquidator of Monline BVI agreed terms including the payment of legal expenses (clause 3.1), a retention by the liquidator of dividends otherwise payable to the Claimant up to £66,000 (clause 3.2), and contingent payments on the success of the Claim (clause 3.3) ~~The First Defendant does not know what consideration, if any, was provided for the assignment of the Claim pursuant to the deed of assignment dated 4 October 2022~~.

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

    b.   The First Defendant's position as to the validity or propriety of the Claim and its assignment is reserved. In particular (but without limitation), the First Defendant reserves the following points: ~~that a liquidator has no power to make a gift of company property; and~~ that a liquidator should not assign a speculative claim; and that a liquidator should not profit from an assignment.

    c.   The First Defendant does not know whether or on what basis the Claimant is a creditor in the liquidation of the Company (**Monline BVI**), save in respect of the loan by the Claimant in the amount of £66,000 described in paragraph 4.e below.

    d.   The allegation of 'indirect loss' in the penultimate sentence of paragraph 1 is denied for the reasons set out herein. Further, the Claimant, as the discretionary beneficiary of a trust which indirectly held shares in Monline BVI, would have suffered no recoverable loss in his own name even if the Claim by Monline BVI were valid in fact and law.

**Monline BVI**

2. Paragraphs 2 and 3 are admitted.

3. Paragraphs 4 and 5 are admitted to the extent consistent with the following:

    a.   The Salem family is associated with businesses in Africa operated by local operating companies, predominantly owned by the F1, B1 and R1 trusts whose discretionary beneficiaries include members of the Salem family.

    b.   The First Defendant is a beneficiary of the F1 trust, and the Claimant and Mireille Salem are beneficiaries of the R1 trust.

    c.   At all relevant times, Morsgate was owned by five of the African trading companies (as to 20% each), and, as pleaded below, prior to 30 March 2016, Morsgate had sub-contracted with Parker for the supply of logistics services. It did so by a logistics agreement dated 14 March 2000 (the **Parker Logistics Agreement**). The terms of the Parker Logistics Agreement provided, inter alia:

        i.   that its initial term was three years, thereafter terminable by either party for convenience upon six months' written notice (clause 3.1);

        ii.   that annual estimates and descriptions of services to be provided by Parker, which were scheduled in a non-exhaustive list in Schedule 1 to that

<span style="color:red">Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023</span>
<span style="color:green">Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024</span>

      agreement, were to be drawn up (clause 6.1) and annual budgets for revenue and capex were to be prepared (clause 6.2);

   iii.  that Morsgate would reimburse Parker to the extent of budgeted costs or costs otherwise expressly approved in accordance with that agreement (clauses 8.1 and 12.3 and, relatedly, clause 9);

   iv.  that Morsgate shall pay Parker the services fee (plus VAT) in accordance with Schedule 2 thereto (clause 7.1), which provided:

> 'The Services Fee is the annual sum Morsgate will pay to Parker, in addition to reimbursing Parker for the costs of providing the Services as provided in the agreement.
>
> The Services Fee will be 15 per cent of the expenditure set out in the Management Accounts for each Management Account Period';

   v.  that each party might terminate the agreement immediately if, inter alia, the other ceases to carry on business or passes a resolution for winding up (clause 17.2.1 or 17.2.4); and

   vi.  that it was not assignable by one party without the prior written consent of the other party (clause 30.1).

d.  Parker's directors were the Claimant and the First Defendant, and the issued shares in Parker were held by the First Defendant as to 50% and by the Claimant and Mireille Salem as to 25% each.

e.  Monline BVI was owned by the F1, B1 and R1 trusts in equal shares via two intermediary companies, First Court Ltd (as to ~66.66%) and Second Court Ltd (as to ~33.33%).  It is denied that Monline BVI was beneficially owned by the First Defendant as to 50% and by the Claimant and/or Mireille Salem as to 50%.

f.  Morsgate had no contract with Monline BVI at any time for the supply of logistics services, and, from August 2016, Morsgate contracted with the Second Defendant (**Monline UK**), which was incorporated on 7 June 2016:

   i.  Morsgate received services from Monline UK by a logistics agreement dated 1 August 2016 (the **Monline UK Logistics Agreement**).  By its Schedule 2, that agreement provided that Monline UK was entitled to a services fee equal to 10% of expenditure incurred (in contrast to 15% which Parker had been entitled to, as to which see paragraph 3.c.iv above).

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

    ii. No contract was transferred by novation or otherwise from Monline BVI to Monline UK. Monline BVI had no contract transferred to it by Parker, and therefore no contract to transfer to Monline UK. The absence of the transfer of a contract by Parker to Monline BVI was known to the Claimant at the time of the transfer of certain other assets by Parker to Monline BVI, as pleaded further in paragraphs 4.f to 4.i below, in particular.

    iii. The former employees of Parker provided services to Morsgate following the winding up of Parker in the expectation that a contract would be agreed between Morsgate and Monline BVI, but no contract was agreed because Monline BVI was unable to open a bank account in the UK.

    iv. The profit of £7,288 of Monline BVI in the period 30 March 2016 to 6 June 2016 was an allocation to Monline BVI of the amount paid by Morsgate to Monline UK under the Monline UK Logistics Agreement. This amount was paid on the basis that Monline BVI should be paid for services in the period 30 March 2016 to 6 June 2016 in the anticipation of a contract with Morsgate that never materialised. £7,288 is approximately equal to 10% of Monline BVI's annual expenses for the year ended 31 December 2016 less corporation tax (i.e. £13,989 ($\approx$ 0.1 * £139,877) less £6,700.80 tax paid by Monline UK on behalf of Monline BVI).

    v. Neither Monline UK nor Parker was entitled to those monies, and it was just that they should be paid to Monline BVI as its profits, even though it had no contract with Morsgate.

4. Paragraphs 6 and 7 are denied, save as expressly admitted below:

    a. Monline BVI was dormant until approximately March 2016.

    b. In or around March 2016, Monline BVI acquired certain assets from Parker, but Monline BVI did not acquire any contract from Parker. The assets were acquired under an asset sale agreement dated 30 March 2016 (the **ASA**).

    c. Acting upon advice, the Claimant and the First Defendant had agreed to voluntarily wind up Parker on terms that would qualify for entrepreneurs' relief from capital gains tax. To qualify for relief, amongst other requirements, Parker had to be wound up by 5 April 2016 and there had to be no dealing in respect of the shares in Monline BVI that qualified as a relevant transaction in securities. The need to avoid a relevant transaction in

05810-00002A/14913114.1    4

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

securities (in order that the Claimant and the First Defendant qualify for entrepreneurs' relief, for which both have taken the benefit) precluded an effective duplication of the shareholding of Parker, directly or indirectly. The Claimant accordingly agreed to the transaction implemented in order to qualify for entrepreneurs' relief and, having so agreed and taken the benefit of the relief that transaction permitted, cannot assert that the shares in Monline BVI should be held other than as described in the first sentence of paragraph 3.e. above.

d. To that end, Parker entered members' voluntary liquidation by a duly passed special resolution on 30 March 2016.

e. The Claimant and the First Defendant funded Monline BVI by informal loans of £66,000 each to acquire certain assets from Parker pursuant to the ASA for consideration of £132,000. The acquisition of assets included the assumption of £60,000 in HMRC corporation tax liabilities, and a TUPE transfer of Parker's employees' contracts of employment. The assets acquired pursuant to the ASA were:

   i. fixed assets (including motor vehicles) in the amount of £13,000;
   ii. VAT repayments from HMRC in the amount of £28,000;
   iii. staff loans in the amount of £46,000;
   iv. Forextra Developments Ltd in the amount of £20,000;
   v. PAYE and national insurance refunds from HMRC in the amount of £85,000;
   vi. office furniture and IT equipment at 80 Grosvenor Street (the **Company Premises**); and
   vii. an unexpired (periodic) tenancy associated with the lease at the Company Premises dated 25 March 2001 (the **Lease**), whose 15-year term had ended on 25 March 2016.

   The TUPE transfer of Parker's former employees' contracts was effective on the basis of the transfer of the above assets, and it did not require (and does not imply) a transfer of any contract between Parker and Morsgate to Monline BVI.

f. The Claimant knew as of (at least) 29 March 2016 that Monline BVI would not (and did not) acquire any contract from Parker:

   i. On 29 March 2016, the Claimant and the First Defendant were emailed by Mr David Rothenberg (with parenthesis in the original text):

   'As part of the transfer of business between the two companies, Monoline is purchasing the net assets [other than the Morsgate contract rights and cash] of Parker for a net ca. £134,000. That need to be funded and I suggest you loan this

<span style="color:red">Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023</span>
<span style="color:green">Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024</span>

      money to Monoline [in practice pay it to Richard Rendle as liquidator of Parker]. That will of course be part of the funds of Parker and come back immediately to you in the liquidation proceeds.

      When Monoline is itself in funds, it will repay your loans to it.'

  ii. The Claimant replied to Mr Rothenberg the same day:

      'Am happy to proceed as outlined below.'

g. In a letter dated 30 March 2016 purportedly sent by Morsgate to Monline BVI, Morsgate stated:

      'We wish to formally appoint Monline International Limited as the logistical agent to Morsgate and we look forward to receiving a copy of the formal contract for review, by return.'

h. The expression of intent to contract in that letter (*'We wish…'*) was necessarily subject to the agreement of a formal (written) contract that was to be provided by return and reviewed before its agreement (*'…a copy of the formal contract for review, by return.'*).  No contract of any kind was agreed.

i. Monline BVI was unable to open a bank account in the UK (because it is very difficult for a BVI company to open a bank account for operations outside the BVI).  As pleaded further below, Monline BVI was, in the event, not therefore a viable vehicle to commence any kind of contractual relationship with Morsgate.

j. It was in these circumstances that certain assets of Monline BVI, which had been transferred from Parker, were transferred to Monline UK.  That transfer was also undertaken to the knowledge of the Claimant at the time of that transfer.  No contract was transferred, and instead the provision of logistics services in anticipation of a contract being formed was terminated.

k. The above transfer of assets was to the benefit of Monline BVI because (without limitation):

  i. Monline BVI had no prospect of any contract with Morsgate because it did not have a UK bank account, and so Monline BVI could not provide services on a basis that would have entitled it to a fee on like terms to that previously earned by Parker under the Parker Logistics Agreement, or indeed any fee.

  ii. Monline BVI was freed of any obligations to the former employees of Parker, who were (and are) employed by Monline UK.

<span style="color:red">Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023</span>
<span style="color:green">Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024</span>

5. Paragraph 8 is not admitted:

    a. The First Defendant has no knowledge of any investigations by the Liquidators (save for knowledge of enquiries made of the First Defendant in correspondence). Paragraph 1 above is repeated as regards the assignment of the Claim.

    b. Further:

        i. The First Defendant had intended that Monline BVI should have been the subject of a solvent winding up because (as stated in his statement of affairs as a director of Monline BVI) Monline BVI was owed, amongst other amounts (including the amount of £7,288 pleaded in paragraph 3.f above), £125,000 by Parker. These amounts alone would have enabled the repayment of Monline BVI's debts of £66,000 each owed to the Claimant and the First Defendant. Monline BVI was also owed amounts in respect of fixed assets and loans to Parker's former employees.

        ii. The First Defendant avers that Monline BVI should not have been wound up on an insolvent basis, and that, in any event, the Liquidators should not have purported to assign the Claim (which is baseless) when there were sufficient assets to collect to pay all creditors of Monline BVI as at the date of its liquidation. There was an apparent surplus against creditors in the liquidation estate at the outset of the liquidation and, in those circumstances, creditors should have been paid and the decision as to whether to pursue any litigation made in consultation with the members of Monline BVI. It is inferred and averred that the Claimant knew that it was not in the best interests of Monline BVI's creditors or its members for the Claim to be assigned.

**The First Defendant**

6. Paragraphs 9 and 10 are admitted. In addition:

    a. As a director of Monline BVI, the First Defendant is entitled to indemnification under article 76 of Monline BVI's articles of association, to the extent enforcement is in accordance with BCA, s.132.

    b. If assigned to the Claimant, the Claim, its assignment being subject to equities, is subject to equitable set off against the First Defendant's claim pursuant to that indemnity.

**The Second, Third and Fourth Defendants**

7. Paragraph 11 is admitted <span style="color:green">inclusive of new paragraph 11(c)</span>. In addition:

<span style="color:red">Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023</span>
<span style="color:green">Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024</span>

   a. The Third and Fourth Defendants had been employees of Parker for nearly 20 years at the time Parker was wound up.

   b. The Claimant and the First Defendant had intended that Monline BVI should take up the function of Parker as a provider of logistics services to Morsgate and, to that end, enter into a contract with Morsgate.

   c. However, as pleaded in paragraph 4 above, Monline BVI was unable to open a bank account in the UK and no contract was made between Monline BVI and Morsgate.

   d. In these circumstances, and the Claimant having failed to take any interest in the operations of Monline BVI, the First Defendant agreed with the Third and Fourth Defendants that they should become directors and shareholders of Monline UK to supply logistics services to Morsgate.

   e. The assertion in the Claim that the above arrangement was a means of divesting Monline BVI (and ultimately its beneficial shareholders) of a valuable business is misplaced:

      i. The Monline UK Logistics Agreement provides for cost indemnification by Morsgate for the services provided plus 10% (which is less than the mark-up of 15% charged by Parker).

      ii. In addition, the costs-base carried forward after the winding up of Parker was much smaller. For instance, it did not include director salaries and consultancy fees of approximately £1m per annum formerly part of the costs-base under the Parker Logistics Agreement.

      iii. Monline UK accordingly earned a small revenue and made modest profits. For the year ended 31 March 2020 and the period ended 30 September 2021 its retained earnings were, respectively, £186,934 and £197,329. No dividends were paid by Monline UK in the period 7 June 2016 to 30 September 2021.

      iv. Morsgate no longer trades and has not done so for several years.

**Duties owed by the First Defendant to Monline BVI**

8. Paragraphs 12 and 13 are admitted as a general summary and paraphrase of the duties owed by the First Defendant as a director of Monline BVI.

9. Paragraph 14 is denied insofar as the obligations under BCA, ss.98 and 102 are imposed on the company (i.e. Monline BVI).

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

**The transfer of Monline BVI's assets to the Second Defendant**

10. Paragraphs 15(a) to 15(c) are admitted.  Paragraph 15(d) as re-amended is denied.  As briefly pleaded in paragraph 3.c above, Morsgate was owned in equal shares (20%) by:

    a. Great Brands (Nigeria) Ltd, which was ultimately owned by the F1, B1 and R1 trusts in equal shares;

    b. Blue Arrow TSW Ltd, which was ultimately owned by the F1, B1 and R1 trusts in equal shares;

    c. Cobexim Sarl, which was owned by two nominees for the F1, B1 and R1 trusts;

    d. Forewin (Ghana) Ltd, which was ultimately owned by the Rabiu 1 and 2 trusts (in effect, the three family branches in equal shares) in equal shares; and

    e. Societe Samex, which was ultimately owned by the Rabiu 1 and 2 trusts (as to 95%) and Maurice Salem (of a different and unrelated Salem family) (as to 5%).

10A. Morsgate was not '*beneficially owned by various members of the Salem family*', and paragraph 15(d) as originally pleaded and as re-amended is wrong in this regard.  As to the further assertion that Morsgate '*played an important role in the administration of a large trading business based in Africa ultimately owned and controlled by or on behalf of members of the family ("African Business")*', save as stated in paragraph 3.a. above the First Defendant does not plead to the structure or ultimate beneficial ownership of any businesses trading in Africa, which are matters irrelevant to the claim and defence in these proceedings.  Morsgate provided logistical services which it sub-contracted to Parker for a time and, in the circumstances described herein, to Monline UK for a time also.

11. Paragraph 15(e) is admitted as to its first sentence, and the retained profit figures in the second sentence.  The annual profits in the years ended 31 March 2013 and 31 March 2014 were, respectively, £268,827 and £157,091.

12. Paragraphs 16 to 21 are denied based on the facts stated in paragraphs 4 and 7 above, save to the extent expressly admitted in those same paragraphs.  Further:

    a. Paragraph 19 is specifically denied because:

        i. The Claimant knew of, and acquiesced in, the transfer of Monline BVI's assets to Monline UK after it had become apparent in or around May 2016 that Monline BVI would not be able to open a UK bank account.

<div style="color:red">Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023</div>
<div style="color:green">Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024</div>

    ii. The Claimant and the First Defendant provided funding for Monline UK's operations in the period between Monline UK's incorporation on 7 June 2016 and when it opened a bank account on or around 15 July 2016.

    iii. <span style="color:red">The Claimant agreed to a transaction that would qualify for entrepreneurs' relief, as pleaded in paragraph 4.c. above, and, having so agreed and having taken the benefit of the relief that that transaction permitted, the Claimant cannot assert the shares in Monline BVI should be held other than as described in paragraph 3.e. above, or that the shares in Monline UK should be held (on trust) for him.</span>

  b. In relation to paragraph 20(c), the First Defendant was not a shareholder in Monline BVI and therefore is not aware of whether Monline BVI's shareholders held a meeting in relation to the transfer of Monline BVI's assets to Monline UK.

  c. Paragraph 21 is admitted. The profit of £7,288 is explained in paragraph 3.f above.

13. Paragraph 22 is admitted.

14. Paragraphs 23 and 24 are denied:

  a. In circumstances in which Monline BVI could not open a UK bank account, it was in the best interests of Monline BVI to transfer its limited assets to Monline UK in exchange for Monline BVI being freed of a number of its obligations, as pleaded in paragraph 4 above.

  b. No contract was made between Monline BVI and Morsgate. The Claim is therefore wrong in its assertion that Monline BVI acquired any business from Parker or had any business of its own.

  c. Further, the First Defendant has no legal, beneficial or right to acquire ownership in Monline UK. There was therefore no unlawful or ultra vires distribution of capital to the First Defendant.

15. Further:

  a. In all the circumstances, the First Defendant at all times acted honestly and reasonably as a director of Monline BVI.

  b. As pleaded in paragraph 12.a above, the Claimant knew of, and acquiesced in, the transfer of Monline BVI's assets to Monline UK, and funded Monline UK's operations for several weeks following Monline UK's incorporation.

05810-00002A/14913114.1    10

<span style="color:red">Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023</span>
<span style="color:green">Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024</span>

    c. The Claimant is accordingly to be taken to have consented to that transfer and / or to have ratified the same or any breach of duty by the First Defendant in that regard or any breach of Monline BVI's articles of association.

**Alleged breaches of duty by the First Defendant**

16. Paragraphs 25 to 27 are denied. For the reasons stated above, the First Defendant acted in what he believed to be the best interests of Monline BVI and its stakeholders, whether its members or its creditors. In summary:

    a. Monline BVI could not trade without a UK bank account, and it never made a contract with Morsgate nor received a transfer of Parker's contract with Morsgate. Monline BVI had limited assets, and it had liabilities. It had no means to service the same, and so it was in its and its stakeholders' best interests for those assets to be transferred to Monline UK on the basis that Monline UK would be able to assume those liabilities which it could satisfy because it could enter into a contractual relationship with Morsgate.

    b. At the time of transfer of certain assets by Monline BVI to Monline UK, the Claimant was taking no active part in the limited operations of Monline BVI and had ceased to take any active part in the operations of Parker as of December 2015. The First Defendant's acquiescence in the incorporation of Monline UK by two long-term former employees of Parker as its directors and shareholders was reasonable.

    c. <span style="color:red">Further, the Claimant agreed to a transaction that would qualify for entrepreneurs' relief, as pleaded in paragraph 4.c. above, and, having so agreed and having taken the benefit of the relief that that transaction permitted, the Claimant cannot assert the loss of any corporate opportunity or any action contrary to the best interests of the shareholders of Monline BVI in respect of the transfer of certain assets by Monline BVI to Monline UK, which was a further transaction (following Monline BVI's failure to open a UK bank account) that conformed to the agreed requirement to qualify for entrepreneurs' relief.</span>

**Alleged gratuitous transfer and knowing receipt**

17. Paragraphs 28 and 29 are denied. The transfer of Monline BVI's limited assets to Monline UK was of benefit to Monline BVI for the reasons stated above. Those assets had little or no realisable value and Monline BVI had no means to trade with those assets in order to satisfy its liabilities.

05810-00002A/14913114.1     11

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

18. Paragraph 30 is denied. The First Defendant is not a director or shareholder of Monline UK, nor otherwise has any legal, beneficial or right to acquire ownership in Monline UK. As such, his knowledge is not to be attributed to Monline UK. Further, even if the First Defendant is held to have breached his duties as a director of Monline BVI, he acted honestly and reasonably and there are no circumstances amounting to unconscionability. Further, having regard to the value, or net value, of the assets transferred and the benefit to Monline BVI as a result of that transfer, equitable compensation would fall to be assessed at nil.

**Alleged conspiracy**

19. Paragraphs 31 to 36 are denied including paragraph 32 as re-amended:

    a. The Defendants did not combine together in any way with a view to injuring Monline BVI (or the Claimant) by the use of unlawful means, whether as pleaded by the Claimant or at all.

    b. The Defendants at all times intended to act lawfully, in particular, in the honest belief that Monline BVI had and made no contract with Morsgate and that Monline BVI could not trade because it could not open a UK bank account. Further, the First Defendant acted in accordance with the agreement with the Claimant to effect a transaction that qualified for entrepreneurs' relief.

    c. No unlawful means were used, or were intended to be used. The unlawful means alleged in paragraph 35 are denied for the reasons stated in paragraphs 1 to 15 above.

    d. The Defendants also had no intention to injure Monline BVI (or the Claimant), whether by unlawful means or otherwise, because they believed that Monline BVI had no business or no viable business and no or no substantial realisable assets. To the contrary, the Defendants believed Monline BVI had liabilities that it could not discharge, in particular, to Parker's former employees.

19A. Paragraph 36A is denied save as to the particular facts admitted and not admitted in the sub-paragraphs below:

    a. There was no continuity in the supply of 'Parker Services' in the inaccurate and general sense asserted by the Claimant. As pleaded above, Parker was liquidated in circumstances in which its contract with Morsgate was not transferred to Monline BVI. Monline BVI made no new contract with Morsgate, and the contract made between Monline UK and Morsgate was on different terms to that between Parker and Morsgate. The latter contract had a materially different cost-plus pricing model, and it had a

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

      different cost base, notably the absence of remuneration and fees formerly charged by the Claimant and the First Defendant to Parker.

  b.  There was a provision of logistical services by Parker to Morsgate, and by Monline UK to Morsgate.  Monline BVI acted for a limited period to supply logistical services to Morsgate (30 March 2016 to 6 June 2016).

  c.  Monline UK ceased to supply logistical services to Morsgate in about July 2017 and from that date supplied logistical services to Gee Trading Offshore SAL (formerly Gestcom International Trading (Offshore) SAL) (**Gee**).

  d.  Paragraph 36A(c) is not admitted.  The First Defendant is not a director or employee of Gee, a direct or indirect shareholder of Gee, and he has (and has had) no role in its affairs.  The inference in paragraph 36A(c) is unsupported and unsound because logistical services need not be contracted-out to Gee (just as they need not have been contracted-out to Morsgate), or sub-contracted by Gee (just as they need not have been sub-contracted by Morsgate to Parker or Monline UK or another).

19B.  Paragraph 36B is denied.  The UK Transfer did not cause Monline BVI to lose any contract, business or business opportunity.  Further, any opportunity Monline BVI might have had (assuming, contrary to the facts, that Monline BVI could have operated as a UK tax resident sub-contractor of logistical services) was inherently limited by the freedom of contract of Morsgate (to sub-contract) and of Morsgate's counterparties to contract out the supply of logistical services.

**No entitlement to relief claimed**

20.  Paragraph 37 is denied.  The Claimant is not entitled to any of the relief claimed for the reasons stated above.

21.  Paragraph 37 is also denied because the Claimant is barred from the pursuit of this Claim by the terms of the settlement deed between the Claimant and the First Defendant (amongst other parties) executed on 15 April 2016 (the **Settlement Deed**):

  a.  If, contrary to the First Defendant's denial of paragraph 15(d), Morsgate is an important part of the administration of the African Business and Parker, Monline BVI, Monline UK and Gee are part of that business also (as is the Claimant's case), then all claims by the Claimant against the First Defendant to or in relation to that business were settled and released by the terms of the Settlement Deed.

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

b. The First Defendant relies (in particular, but without limitation) on clauses 2, 4 and 5 of the Settlement Deed which impose on the Claimant a settlement, release and covenant not to sue in relation to '*Claims*' and '*Liabilities*' as defined in the Settlement Deed.

c. The First Defendant avers that the Claimant's claim in these proceedings is not excepted from the Settlement Deed on the ground that the facts asserted in respect of the Claimant's claim occurred after the date of the Settlement Agreement:

   i. The Claimant's case is that the First Defendant acted in concert with others to transfer the business of Parker first to Monline BVI and then to Monline UK as part of a pre-agreed strategy decided upon prior to the execution of the Settlement Deed.

   ii. In his email of 25 January 2017, the Claimant wrote to Samantha Stevenson (of Rothschild Trust):

   > 'You are aware that the issue of 'Africa' was 'serviced' through Parker Logistics, and for tax purposes, so I was told, Parker Logistics had to be placed into liquidation.
   >
   > In short, Monline International was to be a commercial vehicle to purchase the assets and goodwill of Parker Logistics.
   >
   > What has happened is that Monline UK, a separate entity to Monline International, has taken over the assets and goodwill of Parker Logistics, and Mireille, and I have been manoeuvred out of the equation to be directly or indirectly involved, with no financial recompense.
   >
   > The chain of events was supposed to go as follows:
   >
   > 1. Parker Logistics enters members' voluntary liquidation;
   > 2. An entity owned by Freddy, Mireille and I, would purchase the assets of Parker Logistics for £132,000;
   > 3. The contract between Morsgate and Parker be terminated;
   > 4. Morsgate offer the new entity a contract on the same terms as previously with Parker;
   > 5. The employees of Parker transfer over to the new entity via TUPE; and
   > 6. All profits remaining in Parker Logistics to be distributed to Freddy, Mireille, and I upon liquidation.
   >
   > However, it appears Monline UK, was used as purchaser rather than an entity owned by Freddy, Mireille and I. My understanding is that the commercial vehicle to effect the above chain of events, was to take place through Monline International.

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

> **However, the names are so similar, that I cannot help feeling that it was done purposely to confuse you as well as everyone else involved**. **Rather than jointly as envisaged and agreed,** with a member of each trust being involved in the new commercial entity taking over from Parker Logistics. Solly Levy and Ezra Aghai has **mysteriously** obtained a contract with Morsgate, on their own merit.' (Emphasis added.)

iii. On 21 February 2017, the Claimant wrote to the voluntary liquidator of Parker, Richard Rendle referring to a draft liquidation step plan which referred to the termination of the '*Monline/Morsgate contract*' in August 2016 and enquiring as to why that was the case. The implication of the question (in line with the above email to Rothschild Trust) is that the UK Transfer was pre-planned prior to the liquidation of Parker.

iv. In reports instructed by the Claimant and produced by Kroll for the Claimant in March 2021, Kroll narrated (at paragraphs 30 to 33) that, following the Claimant's alleged exclusion from the business and affairs of the African Business in 2013, '*[i]n an apparent effort to further distance Moussy Salem from the operations of the African Business, we understand that the roles and responsibilities of Parker Logistics were transferred to other entities including Monline UK Limited*'.

v. The Claimant's case in relation to this Claim is accordingly that the UK Transfer was a pre-planned and deliberate breach of fiduciary duty intended to divert the business of supplying '*Parker Services*'. The Claimant's Claim is denied for the reasons stated in this Defence. It is also barred by terms of the Settlement Deed and should be struck out.

d. For the avoidance of doubt, the Claimant's assertion that the First Defendant acted in concert with others to transfer the business of Parker first to Monline BVI and then to Monline UK as part of a pre-agreed strategy decided upon prior to the execution of the Settlement Deed is denied by the First Defendant the reasons above, as are the assertions that Morsgate is an important part of the administration of the African Business and Parker, Monline BVI, Monline UK and Gee are (on the Claimant's case) part of that business also. If, however, those assertions should be upheld contrary to the First Defendant's case, the Claimant's claim is released by the Settlement Deed and the Claimant is in breach of that deed in pursuing this Claim, which he is bound not to pursue. It is irrelevant to the covenant not to sue in clause 5.1 of the Settlement Deed that the Claimant is the purported assignee of the Claim of Monline BVI. The definitions of '*Claim*' and '*Liability*' apply to any claim or liability '*in whatever capacity*'.

05810-00002A/14913114.1   15

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

22. On 19 March 2024, the Claimant provided his response to the First Defendant's request for further information dated 12 March 2024 (the **RRFI**), which response is treated as the Claimant's further and better particularisation of his claimed relief in paragraphs 37(d) to 37(h). In addition to the denial of the Claimant's entitlement to that relief, the First Defendant denies the quantum claimed, if liability should be established:

   a. The Parker Services Fee Basis is denied as an appropriate basis to quantify any claim for account, damages or equitable compensation. As pleaded in paragraphs 7.e. and 19A.a. above, Parker had a different cost-based and different cost-plus pricing to Monline UK, and those differences would have been true of any agreement between Monline BVI and Morsgate had a contract been concluded for the supply of logistical services. Paragraph 2.3.2 of the RRFI is wrong to suggest that the contrary would have been '*likely*', and the calculation in Schedule 2 is not appropriate.

   b. The same criticisms are made of the Alternative Bases of Calculations in Schedule 2, in particular, by the inclusion of salary for the Claimant and the First Defendant and consultancy fees for Beno Salem and related tax and inflation adjustments. Further, the appropriateness of inflation adjustments is not admitted, nor are the inflation adjustments applied. The appropriate inflation rate, and the appropriate means to project income and expenses beyond the date that the Second Defendant ceased to trade, is a matter for expert evidence and the First Defendant will rely on the same at trial to dispute the Claimant's quantification of its claims for account, damages and equitable compensation.

   c. The First Defendant avers that the value of the UK Transfer or any business or business opportunity thereby diverted is to be valued by reference to what a third party would pay for that business either (i) at the time of the UK Transfer or (ii) at the time of assessment at trial. As pleaded at paragraph 18 above, the value of the assets transferred by the UK Transfer was nil. The First Defendant will rely on expert evidence at trial to establish the value of any diverted business or business opportunity. The First Defendant avers that value will be low in view of the modest total profits earned by the Second Defendant (£226,227).

**ADAM AL-ATTAR KC**

Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023
Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024

**STATEMENT OF TRUTH**

The First Defendant believes that the facts stated in this Defence are true. The First Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am authorised to sign this Statement of Truth on behalf of the First Defendant.

Signed:

Name: Martin Stuart Davies

Position: Partner, Latham & Watkins (London) LLP

Date: 9 December 2022


Served on 9 December 2022 by Latham & Watkins, 99 Bishopsgate, London, EC2M 3XF, Solicitors for the First Defendant.

**STATEMENT OF TRUTH**

The First Defendant believes that the facts stated in this Amended Defence are true. The First Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am authorised to sign this Statement of Truth on behalf of the First Defendant.

Signed:

Name: Martin Stuart Davies

Position: Partner, Latham & Watkins (London) LLP

Date: 7 March 2023

<div style="color:red; text-align:center">Amended Defence pursuant to CPR 17.1(2)(a) dated 7 March 2023</div>
<div style="color:green; text-align:center">Re-Amended Defence pursuant to CPR 17.1(2)(a) dated 14 May 2024</div>

~~Served on 7 March 2023 by Latham & Watkins, 99 Bishopsgate, London, EC2M 3XF, Solicitors for the First Defendant.~~

**STATEMENT OF TRUTH**

I believe that the facts stated in this Re-Amended Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: *[signature]*

Name:   Freddy Salem

Position:   First Defendant

Date:   14 May 2024

Served on 14 May 2024 by Quinn Emanuel Urquhart & Sullivan UK LLP, 90 High Holborn, London, WC1V 6LJ, Solicitors for the First Defendant.