# EXHIBIT 8

**If this Transcript is to be reported or published, there is a requirement to ensure that no reporting restriction will be breached. This is particularly important in relation to any case involving a sexual offence, where the victim is guaranteed lifetime anonymity (Sexual Offences (Amendment) Act 1992), or where an order has been made in relation to a young person.**

**This Transcript is Crown Copyright. It may not be reproduced in whole or in part other than in accordance with relevant licence or with the express consent of the Authority. All rights are reserved.**

IN THE HIGH COURT OF JUSTICE                                    No. BL-2022-000926
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
BUSINESS LIST (ChD)

Rolls Building
Fetter Lane
London EC4A 1NL

Wednesday, 19 July 2023

Before:

DEPUTY CHANCERY MASTER SCHER

B E T W E E N :

MOUSSY SALEM                                                      Claimant

- and -

(1)  FREDDY SALEM
(2)  MONLINE UK LIMITED
(3)  SALIM LEVY
(4)  EZRA AGHAI                                                   Defendants

_____

MR M HUBBARD  (instructed by Maurice Turnor Gardner LLP) appeared on behalf of the
Claimant.

MR A AL-ATTAR  (instructed by Latham & Watkins LLP) appeared on behalf of the First
Defendant.

MR S McLOUGHLIN  (instructed by Ingram Winter Green LLP) appeared on behalf of the Second
to Fourth Defendants.

_____

**P R O C E E D I N G S**

**(Via Microsoft Teams)**

# **I N D E X**

<u>Page No</u>.

<u>HOUSEKEEPING MATTERS</u>      1

<u>SUBMISSIONS</u>

     As to directions      3
     As to list of issues and issues for disclosure      15

<u>SUBMISSIONS ON COSTS BUDGETS</u>

     Mr AL-ATTAR      48
     Mr HUBBARD      57

     (<u>For judgment, see separate transcript</u>)      61

<u>PROCEEDINGS AFTER JUDGMENT</u>      61

_____

<u>Wednesday, 19 July 2023</u>

**A**

THE DEPUTY MASTER:  Right, this is BL-2022-00926 *Salem v Salem and Others*.  I am Deputy Master Scher, sitting in the Business and Property Court, this hearing is at 10.30 on 19 July 2023.  As you will probably all know by now, this hearing is being recorded by His Majesty's Courts and Tribunal Service, you must not make any personal or private recording or publish any part of these proceedings or any part of this

**B**

hearing, including court communications.  It is a criminal offence to do so, and I can see that everyone except counsel, indeed the speaking counsel, has their microphones off.  That is great.  Let us keep it that way, please.

**C**

Now, Mr Hubbard, you are for the claimant?

MR HUBBARD:  That is right, Judge, and Mr Al-Attar is for the first defendant, and Mr McLoughlin for defendants two to four.

THE DEPUTY MASTER:  Good, thank you.

MR HUBBARD:  And Judge, this is the CCMC, first CMC in this claim.  Housekeeping

**D**

matters first, if I may.

THE DEPUTY MASTER:  Yes, please.

MR HUBBARD:  I hope the court has an updated bundle, which runs to 817 pages.

THE DEPUTY MASTER:  Yes, I have the PDF bundle, which is 817 pages, that is 817

**E**

electronic pages?

MR HUBBARD:  Thank you, Judge, and will you be working from an electronic copy?

THE DEPUTY MASTER:  Yes, I will, thank you.  The numbering is slightly off, is it not?

MR HUBBARD:  Yes, that was the point I was coming to.  I think we can probably mostly navigate adequately through the tabs, but there may be occasional points where we

**F**

need to look at individual pages, nevertheless.

In addition to the bundle, Judge, I hope you have the parties' skeleton arguments and authorities?

**G**

THE DEPUTY MASTER:  Yes, I have read the skeletons.

MR HUBBARD:  And last night a letter was sent to you, Judge, from my solicitors which enclosed a short schedule of disputes as to disclosure.

THE DEPUTY MASTER:  I do not have that.  Was it CE-filed last night, did you say?

MR HUBBARD:  I believe so, yes.

**H**

**A**

THE DEPUTY MASTER:  I am just going to the file now.  Letter to the court dated 19 July.  No, that is about forwarding the appointments for Mr Salem.  Is it a two page letter from IWG to MTG?

MR HUBBARD:  No, it should be a single page letter to the court from MTG, enclosing a schedule, disputes as to disclosure.

THE DEPUTY MASTER:  I do not have that.  Do I need it?

**B**

MR HUBBARD:  It is also behind a letter sent to IWG, and LW, which may also have been filed.  That is not in the bundle, I do not think.

THE DEPUTY MASTER:  Neither of those have got to the court file yet.  I think they need to be sent through the office.  Do I need those documents?

MR HUBBARD:  Strictly speaking, Judge, no.  I think we can - it was intended to be a helpful summary, but I can talk you through it.

**C**

THE DEPUTY MASTER:  If it appears on the court file while we do other things then great, if not, then we will have to do it the old-fashioned way.

MR HUBBARD:  Thank you, Judge.  So, Judge, subject to the court, I think everyone would propose that the agenda for this CMC be, first, directions generally, second, disclosure, and third, costs management.  I think we are all keenly aware that this has been listed for 90 minutes.

**D**

THE DEPUTY MASTER:  Yes, happily I am free all day.  If we do run on, does that place any of you in difficulty.

MR HUBBARD:  It does not place me in any difficulty, Judge, no.

MR AL-ATTAR:  Nor me, Judge.

**E**

THE DEPUTY MASTER:  Mr Al-Attar, thank you.  Mr McLoughlin?

MR McLOUGHLIN:  Not immediately, until one.  I might have to make some arrangements this afternoon if we run over.

**F**

THE DEPUTY MASTER:  We have got a clear run through the morning, and we will take stock at one if we need to.

MR McLOUGHLIN:  I am grateful.

THE DEPUTY MASTER:  Thank you.

**G**

MR HUBBARD:  And, Judge, maybe if I just flag at this point, there are likely to be matters left over in any event, one being costs budgets as to the disclosure phase, which, by agreement, have not yet been submitted.

THE DEPUTY MASTER:  Yes.

**H**

MR HUBBARD:  And the other is likely to be the question of key words, where I think the parties are agreed that they will try, subject to the orders made today and any steers that the court is able to give them, to make progress on agreeing key words.  The claimant is keen that those matters do - to the extent that those matters are left over that they do not drag on, and we have proposed some directions which perhaps we will come to at the end as to how those left over matters might be dealt with, and in summary that they be dealt with in the next two to three weeks and then by the court, if the court is willing to do so, on paper so that we do not find ourselves in a situation where disclosure, which is meant to be being done in October, or being completed in October, is put into difficulty by there being unresolved issues, particularly as to key words.

THE DEPUTY MASTER:  Yes, that all does sound sensible.  I hope very much that the parties will be able to agree key words, although I note, with a little bit of irritation, that there was not an agreed case summary in the bundle.

MR HUBBARD:  Judge, I apologise for that, and that is, unfortunately, somewhat symptomatic of some of the difficulties which the claimant has encountered.  I do not want to dwell on that, but I do apologise to the court that it is obviously inconvenient that the parties cannot agree a case summary, which is intended to be a neutral document.

THE DEPUTY MASTER:  Indeed, which means that it might be overly optimistic to think that the key words will not involve some sort of decision by the court as well.  So I would urge everyone to co-operate in making sure that we can have an effective case management process and an effective trial.

MR HUBBARD:  And again, Judge, I do not wish to make pious noises, but there are some indications perhaps in the skeleton arguments from some of the parties that the collaborative approach for the CCMC phase may have got slightly left behind in the urge to promote the parties' cases, but there we are.

THE DEPUTY MASTER:  Yes, well, let us collaborate through the course of this morning and I hope that brings a new window of collaboration in the future.

MR HUBBARD:  So, Judge, that probably does bring us to directions then.

THE DEPUTY MASTER:  Yes.

MR HUBBARD:  And those, to the extent agreed - the directions, as agreed, appear from tab 6, page 33 in the bundle, and those are directions for a seven day trial which has been listed I think next April.

**A**

THE DEPUTY MASTER:  Yes.  I am looking at a document headed "Claimant's draft directions".

MR HUBBARD:  Yes, those are all agreed as they stand.  Obviously, they are between all parties.  There are three points I should make.

**B**

THE DEPUTY MASTER:  Before you make those points, can you take me, please, to any previous orders made concerning case management.  I recall seeing allocation, for example, in a different order.  Where is that, or am I wrong?  Have there been any case management directions yet?

MR HUBBARD:  No, as far as I am aware, there has simply been an order listing the trial.

MR McLOUGHLIN:  Tab 31, if that is helpful.

THE DEPUTY MASTER:  It would be if I was using paper.

**C**

MR HUBBARD:  So that is page 251 electronically.  Thank you to my learned friend.  So there is the allocation order.

THE DEPUTY MASTER:  So allocation, so trial from April next year.  Why the - do you mind just explaining how this order came to be made, because if we are still arguing about disclosure and the parameters for it in July, is it realistic to have a trial in April next year?

**D**

MR HUBBARD:  I am not sure I can help you as to how the order came to be made, Judge.  It was made following a listing appointment in the usual way.  It is certainly right to say that there is not a lot of slack in the timetable, but I think the parties all currently expect to be able to be ready for trial by April 2024.  That is subject to being able to resolve any niggles on disclosure post the CCMC.

**E**

THE DEPUTY MASTER:  I suspect having a trial date will encourage the parties to co-operate, which is only a good thing.  Okay, so trial in April, and the case has been allocated to the multi-track and a case management track.  Fine, so time estimate, seven days?

**F**

MR HUBBARD:  Yes, Master, with a day pre-reading and an interval day, I think the intention is for the parties to be able to write closing submissions, or the court to consider the matter having heard the evidence.

**G**

THE DEPUTY MASTER:  I do not remember who raised the dispute, but somebody has said that they want to see the names of the other parties' witnesses, and somebody else has said that they were not sure whether seven days would be sufficient to have - I think the claimant wanted six witnesses, or somebody wanted six witnesses.  So talk me through that dispute, Mr Hubbard.

**H**

**A**

MR HUBBARD:  Yes, it is not exactly a dispute.  The concern that my client has is that we have a seven day trial with, effectively, three and a half days in the usual run of things in which the court will be dealing with witness evidence.  We are calling my client.  The second to fourth defendants are unsurprisingly calling the third and fourth defendants.  They have budgeted for an extra witness - we do not know who that is.  The first defendant did not identify any witnesses in his allocation questionnaire and is budgeting for three witnesses in his costs budget.  If we total that up we get to seven

**B**

potential witnesses of fact.  We actually only know who three of them are.  We assume that the first defendant will be giving evidence, but I think it would be helpful if we did know who all the witnesses are, and then consider whether that has any knock-on, or potential knock-on effects for the trial length.

**C**

THE DEPUTY MASTER:  Perhaps I should ask Mr McLoughlin, have you identified - I am not asking you to tell me now - your third witness?  Is it a known person or is it somebody that you might want to call potentially?

MR McLOUGHLIN:  Judge, good morning, it is a known person, but obviously until we

**D**

have seen disclosure from both sides, the three parties rather, and understood what documents require any explanation in particular, we are not in a position to confirm finally who that person is or whether they will be needed to be called, though we anticipate they will be, maybe for the fourth or fifth.  I do not think so, but one of the difficulties of identifying witnesses for sure now is that the parties are not necessarily in

**E**

a position to do that.

THE DEPUTY MASTER:  Thank you.  Mr Al-Attar?

MR AL-ATTAR:  It is a similar position.  You probably will not have had a look through the disclosure review documents because they are quite long, but if you look at our section 2, we have identified a number of potential statements - I think it adds up to about nine

**F**

- and depending upon the outcome of the disclosure process, to the extent they are willing to speak to us and have useful recollection, the number of witnesses could go up, but that is just a function of where we are in the proceedings.

**G**

We were surprised by the claimant's insistence at one time that they seek a direction that we name our witnesses now.  We have never seen a direction like that.  I think there is CPR power that you may identify witnesses.  That is about as far as CPR 32.2(3)(b) goes.  It is premature to make us name witnesses.  We have done our best,

**H**

but thinking about it now, I will have more to say on that in costs budgeting, but there

**A**

is the usual duty on the parties that if we think that the trial has been set down in haste, the trial estimate is too short after we have done disclosure appropriately, we will have to let the court know pretty quickly.  That is where we are, I cannot really see what more we can do now.

THE DEPUTY MASTER:  Yes, I understand.  It seems - and, Mr Hubbard, I will hear from you again on this - appropriate to stick with seven days as an estimate on the assumption that if there are seven witnesses they will get half a day each, and that should be enough, give or take, for most of them.

**B**

MR AL-ATTAR:  The way we have looked at this, Judge, so you know how the estimate has come about, is as pleaded the case is about, for the sake of brevity, what is called the "UK transfer" in respect of business and assets of Monline BVI, said to have been acquired, and there is a dispute about what assets were acquired and passed to Monline UK, and that is about whether Parker services defines that as a business or a corporate opportunity that is said to have been misappropriated.  If that is the claim, and it is an "if",  if that is what is pleaded, the trial should be within a fairly narrow compass and seven days is right.

**C**

**D**

So what you will have picked up, and the reason the case memorandum has not been agreed, it is not for want of co-operation, as has been insinuated, it is because the case memorandum is tendentious, because it strays heavily into the African businesses, which is actually the main point of dispute at this CCMC.  It infects the whole list of issues, the disclosure issues, and once a decision is reached on that point, a lot of the issues actually fall into line.  The thing that risks jeopardising the trial, and if you have had a look at my skeleton argument, and you have read about this case that is going on in the US against the other uncle.

**E**

**F**

MR HUBBARD:  I think Mr Al-Attar is getting away from the subject, he is  on the subject of effectively opening----

THE DEPUTY MASTER:  Okay, everyone quiet for a moment.

MR AL-ATTAR:  Just speaking----

**G**

THE DEPUTY MASTER:  Everyone quiet for the moment, Mr Al-Attar and Mr Hubbard. This kind of hearing will only ever work if one person speaks at a time.  I simply cannot have interruptions.  I understand, Mr Hubbard, but I asked Mr Al-Attar and he is diverting slightly.  I am sure he is going to finish very shortly, and I will come back to you, Mr Hubbard, but please, no more interruptions.  Thank you.  Mr Al-Attar?

**H**

MR AL-ATTAR:  Thank you, sir, I was not intending to digress unnecessarily.  The point that will cause the time estimate to have to be reviewed is if thus becomes a trial of the alleged ouster in 2013 from the family business in Africa.

THE DEPUTY MASTER:  Yes, okay.

MR AL-ATTAR:  That is the issue.

THE DEPUTY MASTER:  Yes, and that is relevant, because seven days will obviously not be enough for a trial of the entire wider family dispute, which nobody is asking me to direct.  But, Mr Al-Attar, I recognise that you are saying this is part of it by proxy.

Now, as I say, Mr Hubbard, seven days you say has been agreed as a provisional time estimate, and I note the wording in paragraph 1 in the draft directions, that is very sensible, so within four weeks of service of witness statements, having consulted, to notify the listing office of whether seven days should be varied.  Are costs budgets on that basis too, on the basis of a seven day trial, and you will have of course have to apply for the costs budgets to be varied.  You might not get permission for that.  You will have to make the application at the time.  Mr Hubbard, does that make good sense?  Shall we move on to paragraph 2?

MR HUBBARD:  Thank you, Judge, yes.  There are then agreed directions as to the disclosure process.  Obviously there are disputes, as you are aware, Judge, as to the content of that process to some extent.  Then it goes on in the usual way.

The only other point which I wanted to bring to the court's attention is the issue which D2 to D4 have raised about a point of BVI law.  As, Judge, you will be aware, the claimant sues as assignee of causes of action vested or formerly vested in what we call the company, Monline BVI, which is a BVI company, and therefore, to some extent, subject to BVI law.  In their defence the second to fourth defendants rely on section 31 of the Business and Companies Act 2004 of the BVI, which is about ostensible authority and being able to rely upon - the persons who deal with a company are entitled to assume that those who they deal with are duly authorised.  That is the thrust of it.  That section is subject to an express carve-out in relation to actual knowledge.  The reliance which is placed on it by D2 to D4 is relatively general.

The response in the amended reply from the claimant is equally fairly general, which is to say that it does not protect the second to fourth defendants because they had actual

**A**

knowledge that the first defendant was not acting in the interests of the company at the time.

We have been asked to agree - the second to fourth defendants have asked the claimant to agree what the effect of section 31 is, as far as we can see, more generally than that.

**B**

We do not see that we need to, or if we do not it causes any difficulty, because what we say is, they rely upon the section, we have challenged reliance on the basis of actual knowledge.  As we understand it, they agree that if they have actual knowledge, as alleged, the section does not protect them.  So we are not quite sure where this point goes in terms of potentially - it seems to arise in the context of potential expert evidence as to BVI law, which is not built into the directions.  So we do not see that -

**C**

we certainly do not see that any BVI expert evidence is called for, and we do not really see that there is actually any issue between the parties in this case on the pleadings as to that section.

THE DEPUTY MASTER:  Thank you.  Where in the bundle is the proposed agreed effects of the BVI provision?

**D**

MR HUBBARD:  That is in an email from IWG of 13 July, I think, 54.

THE DEPUTY MASTER:  Tab 54.

MR HUBBARD:  Tab 54, which is page 482.

THE DEPUTY MASTER:  Yes, I am there.  Let me pause a moment to read this email.

**E**

(After a pause)  Okay, and section 31 itself has been filed, I think.  I will just pull that up.

MR McLOUGHLIN:  It should have been an attachment to my skeleton, Judge.

THE DEPUTY MASTER:  Yes, it was filed with the skeleton, I am just going to look at that now.  (After a pause)  Right.  Mr McLoughlin, what assistance would you get from this

**F**

agreement?

MR McLOUGHLIN:  Judge, the reason that confirmation has been sought is demonstrated by the way in which the issue was described to you just now by Mr Hubbard.  The Act, as you can see, is specific as to what matters the persons dealing with the company must

**G**

have actual knowledge of in order for them to be deprived of the benefit of the protection afforded by section 31(1), and that the unless provision towards the end of (e) in section 31(1).  It is actual knowledge of the matters in (a) to (e).  What the claimant describes is knowledge more generally that the first defendant was not acting

**H**

in the best interests of the company, and that, they say, in general terms, as Mr Hubbard

**A**

just said, somehow deprives us of protection under section 31(1).  If it is going to be said that actual knowledge of the defendant acting not in the interests of the company in addition to or rather than the specific matters in (a) to (e) deprives us of protection under section 31(1), then that is a matter on which we are likely to be apart.  I do not know whether that is what is being said.  It may be that Mr Hubbard is just conveniently summarising (a) to (e) and, if so, we really are not apart.  If he is saying -

**B**

we can go to the pleadings if we need to - that all he needs to show is that my clients had actual knowledge that the first defendant was not acting in the best interests of the company, that is not what section 31.1(1)(a) to (e) states.  There are specific instances of knowledge that will deprive me of that protection.  It may be a point of language only, but I would rather know now what case is being advanced than it arises later and there be a dispute about the extent to which s.31(1) operates one way or the other.

**C**

THE DEPUTY MASTER:  So section 31(1)(e) contains a semi-colon, then the word "unless".

MR McLOUGHLIN:  Exactly.

THE DEPUTY MASTER:  It looks to me like that might be better formatted if that were on a

**D**

separate line, referring backwards.  Am I right to understand that that proviso on your case, Mr McLoughlin, applies to the entirety of section 31(1)?

MR McLOUGHLIN:  That, I think, is the position, as we understand it.  I think that is common ground.

**E**

THE DEPUTY MASTER:  That is common ground, good, okay.  That is helpful.  It seems to me that the best way forward for this question is to continue corresponding and trying to work out whether you can agree a point of law, and, for what it is worth, as an indication only, I think it would be helpful to have a formal agreement as to what point of law you agree recorded in correspondence.  If you cannot agree it, then unless

**F**

somebody asks me, and nobody has asked me, to permit expert evidence in these directions, at the next hearing you can ask for permission to call an expert on BVI law, perhaps a jointly instructed expert.

**G**

It is probably unnecessary if you can agree it, and it sounds like you are pretty close to agreement, so I would urge you to continue corresponding and seeing whether you have common ground on that section.  If you do not, then you will need to apply for permission to call an expert.  I have said all of that on the basis that nobody is asking

**H**

me today to direct an expert in the BVI.  Am I right about that?

**A**

MR McLOUGHLIN:  Judge, we are content that if the parties cannot agree it that we come back.  I am sure everyone is keen to avoid costs if no costs need to be incurred and the parties simply do agree, but there is just a question of bottoming out the language they are using.

THE DEPUTY MASTER:  Yes, yes.  I think there is enough knowledge at the Bar here of company law and the similarities of BVI law, and this, notwithstanding the typographical thing, looks relatively clearly set out.  So it may well be that you have a common position.  So, moving on then----

**B**

MR McLOUGHLIN:  Judge, I am terribly sorry, but if I may just interject, so that there is no dispute about it later, is it worth - and I am sure the parties can agree between them - having some sort of recital or proviso in the directions concerning that point, so that at a later hearing there is no dispute over the entitlement to apply back for permission if it is necessary?

**C**

THE DEPUTY MASTER:  Yes, that is very helpful.  I would like to include direction, and, Mr Hubbard, I am assuming you have got carriage of this order and that you will keep a note of additions and subtractions, and so on?

**D**

MR HUBBARD:  I am happy to do that, yes.

THE DEPUTY MASTER:  Thank you.  So let us include that:

> "The parties shall seek to agree the effect of section 31 of the BVI Business Companies Act in its application to the matters in issue. If they cannot so agree, the parties have liberty to apply for permission to call and expert in BVI law, also to rely on expert evidence of BVI law."

**E**

Let us think about the timing for that.  We were going to include in these directions provision for the next steps, so could that be on the shopping of next steps, please?

**F**

MR HUBBARD: Yes, Judge.

THE DEPUTY MASTER:  Going back to the directions, disclosure timetable.  If the parties have agreed they can do it by 17 October then that is great.  That gives us three months between now and then to agree or decide on search terms and actually do the disclosure exercise.  Obviously, August approaches.  So in those final directions, next steps, there is going to be a tight timetable for that agreement applying in respect of key words, and so on.

**G**

Okay, evidence of facts?

**H**

**A**

MR AL-ATTAR:  Judge, Mr McLoughlin and I discussed this before the hearing.  We think, given the August date suggested by the claimants, that is going to be a little tricky given that it is a mid-August date.  We are aware of the issue of drift, and the disclosure deadline of 17 October, so we were thinking the week commencing 4 September would be the target for agreeing key words between the parties, because that seems a more realistic date for agreement whilst allowing sufficient time for any disagreement identified at that point to be resolved in time for the disclosure exercise to be undertaken.

**B**

We say this on the basis that if there is a disagreement at that stage, what normally happens is that people progress the disclosure exercise by reference to their own preferred terms, and then once the dispute gets resolved it gets tidied up, so it is not as if any disagreement is going to stop the process.

**C**

THE DEPUTY MASTER:  Yes, you will still be searching, but you may need some terms.  However, if one party considers that it is appropriate to search with lots of terms and the other party does not then one party might be put to more costs - there might be a risk of costs there.  If you are content that you can still do disclosure by 17 October, even if a decision on search terms is only made in early September then let us have those dates.  Mr Hubbard, does that work for you, a decision by early September?

**D**

MR HUBBARD:  Well, Judge, the latter part but not the former.  I think we would be concerned if we do not know whether we have agreed, or rather, whether there is potential for there to be a disagreement about key words which drags on to the first week of September, which the court would then have to resolve, and we are supposed to be completing disclosure in October.  I am afraid we do think that there are 12 months in the litigation year and, despite the fact that more people are likely to be away in August than at other times, we do not think that this is something which should be left to drag on for as long as the defendants would apparently like.  We would like this resolved within three weeks, so that if there is a disagreement the court is being asked to deal with it at the end of that three week period.

**E**

**F**

**G**

MR McLOUGHLIN:  Judge, might I----

MR AL-ATTAR:  Sorry, obviously - sorry, Mr McLoughlin.

THE DEPUTY MASTER:  Yes, cries of despair from the defendants there.  Mr McLoughlin, you first?

**H**

A

MR McLOUGHLIN:  I adopt gratefully what Mr Al-Attar has already said.  I would wish to dispel any myth that is being propagated that there is any dragging of feet here on behalf of the defendants.  It is not that at all.  There is a good practical reason, or reasons, why - and there are three reasons - what is being proposed in the course of early August is simply unworkable.  The first is that this key word process is almost necessarily iterative, and one has to collect data from custodians, run key words over that date, proposed or agreed, in order to either see whether they work or see whether they are likely to work, and then refine them.

B

What is being suggested is that those key words be finally agreed by early August, next week or in two weeks' time.  That simply is not practically possible and nor is it helpful, because the parties will end up agreeing words they do not fully understand the consequences of.  What Mr Al-Attar says running, testing and proposing a course can take into account competing searches by the parties, without necessarily agreeing that they are appropriate.  Indeed, you might have to run them in order to see why they are not appropriate.  The searches might be too broad resulting in thousands, unmanageable numbers of documents to review manually by the lawyers involved.  So you write back to the other side saying, "Look, we have run these searches, they do not work for these reasons, we have tried to narrow it down, it has not helped, we are going to have to think again."

C

D

E

So all of that can take place but some time has to be given to the parties to do that, so that if there is a dispute both the parties and the court are properly informed about why there is a dispute and the sense, proportionality and reasonableness of each party's position.  That simply cannot be achieved by trying to agree key words in a vacuum in 14 days from today.

THE DEPUTY MASTER:  I take your point there.  Mr Al-Attar, do you have anything to add to that?

MR AL-ATTAR:  A little.  I will not repeat it, but I adopt that point, it is (inaudible) of process.  If you go to page 49 of the bundle, you can have a glance at the claimant's proposed key search terms.  If you take, for example, issue 5, issue 9, issue 8, you will see a lot of names in there that you will not have seen from the pleadings.  That is because the names of the African companies have been listed out.

F

G

H

**A**

The two points I want to make are, if the African business issues are out, firstly, the scope of disagreement from the key words is likely to be much more manageable. So one is not going to get to see a (inaudible) position in September where there is going to be this great shuddering disagreement that disrupts the process.

**B**

Secondly, once the list of issues is bedded down today for disclosure, the parties will know what they have to do in terms of constructing tests, and that is Mr McLoughlin's point. So those have not been fully constructed yet, and it is an intricate process. We do not really know the corpus of documents we are running search terms over yet. So it does seem that two weeks is just far too tight.

THE DEPUTY MASTER: Yes, okay. Mr Hubbard, any response briefly?

**C**

MR HUBBARD: Well, Judge, the process should not be starting now. There has been a large degree of agreement as to what the disclosure issues are, and much of what has been said by the defendants is equally applicable to the process which they ought to have been getting on with to get to where we are at the CCMC. We are at the CCMC, we have a trial which everyone says is practicable next April, and we are concerned

**D**

that if we are still arguing about key words in September that this is not going to work.

THE DEPUTY MASTER: Yes, okay, thank you. I am going to adopt the approach suggested by the defendants that the summer be spent trying to agree the key word terms and refining them, and beginning the disclosure searches and processes as lots of

**E**

time could be profitably spent even before the key words are fully agreed. By the beginning of September, and we will work out the precise date later, the parties are to notify the court as to the extent of any disagreement between them. If there is any disagreement it will need to be dealt with at a hearing, and that may well be the same hearing as that which deals with the costs of disclosure and any expert evidence.

**F**

I am tempted to call it an adjournment of this CCMC, although it might be also termed a disclosure guidance hearing, which brings me to another point, which is, would you like me to deal with the adjournment of these decisions having read into the case

**G**

already? I am sitting in the week of 18 September, which might fit in quite nicely with this timetable. It might be that at the end of the hearing we can work out whether there is a date where all four of us, as in counsel and me, are free for a hearing and get one at least provisionally listed. I will need to talk to listings about it as well. We can

**H**

**A**

reconvene in that week, if that is convenient for counsel.  Anyway, let us park the
process until the end and continue through the main points of dispute.

MR HUBBARD:  Thank you, Judge, and certainly I think we would like this to stay with
you, if that is possible.

THE DEPUTY MASTER:  Okay.  Let us go back to the directions.  It is page 36, I think.

MR HUBBARD:  Well, Judge, you see what they are.  We have nothing particular that we
wanted to draw to the court's attention regarding them.  I am not sure whether any of

**B**

the defendants wish to address you on them.

THE DEPUTY MASTER:  No.  Is there enough time tor - yes, it is six weeks, three weeks,
for bundling.  That is looser than the standard directions I think, and that is a good
thing.  I think it is sometimes unrealistic to prepare trial bundles in one or two weeks.
So bundles, skeleton arguments.  Okay.  I approve the range of those directions.

**C**

Is it disclosure next?

MR HUBBARD:  Yes, Judge, and I think it might be convenient then to look at what is
termed the "Agreed section 1 DRD" at tab 7, page 36.

**D**

MR AL-ATTAR:  Judge, I hesitate to interrupt.  May I make a suggestion?  The list of issues
for trial is not agreed.  There are some disputes around that, and it may make more
sense to deal with the list of issues for trial and then the list of issues for disclosure.
I am, of course, content either way, but there is obviously a logical connection between

**E**

the two.

THE DEPUTY MASTER:  Yes, I do not think I am setting a list of issues for trial now,
I think that is going to refine itself and be agreed by the parties before the trial itself.
Have we listed a PTR?

MR AL-ATTAR:  Yes, Judge, my understanding is that the PTR is listed in a window

**F**

commencing on 4 March 2024.

THE DEPUTY MASTER:  Is that in the previous directions?

MR AL-ATTAR:  I think it has been fixed since, but I will double-check.  I will be corrected
if I am wrong about that, but I think that is when it is listed.

**G**

THE DEPUTY MASTER:  Good, okay.  I wonder whether it would be helpful to direct
everyone to try and agree a list of issues for trial before the PTR, given the issues in
preparing for the CCMC.  Mr Hubbard?

MR HUBBARD:  Adopting Mr Al-Attar's suggestion, it might, in fact, be helpful, Judge, if
we look at tab 63, page 788.

**H**

**A**

THE DEPUTY MASTER:  Yes, before we go there, Mr Hubbard, are you also content to include a provision that the parties seek to agree a list of issues for trial before the PTR?

MR HUBBARD:  Yes, of course.

THE DEPUTY MASTER:  Thank you, so please include that in the draft.  So list of issues?

MR HUBBARD:  It is tab 63, once again slightly euphemistically called "Agreed list of issues".  It is agreed except where it says it is not agreed, which is at tab 63, page 788.

THE DEPUTY MASTER:  Yes.

**B**

MR HUBBARD:  It might just be helpful, Judge, if you were to read through that list and then we will look at the disclosure issues which the parties contend do or do not follow from it, these being the issues as they are understood to be for the purposes of - as they are contended to be, or agreed to be, for the purposes of the CCMC.

**C**

THE DEPUTY MASTER:  How much of this is agreed?

MR HUBBARD:  All of it except----

THE DEPUTY MASTER:  Issue 9.

MR HUBBARD:  Well, it does----

MR AL-ATTAR:  All of it except the issues which are not agreed for disclosure.

**D**

MR HUBBARD:  The issues which are in issue are 5(b) and 5(c), and 8(d) to (f) and 9.

THE DEPUTY MASTER:  5(b), consideration?  Did you say 5(b)?

MR HUBBARD:  Well, yes.

THE DEPUTY MASTER:  Is there a dispute as to whether consideration is in issue?

**E**

MR AL-ATTAR:  No, I think it is 5(c) that is not agreed of the list of issues for trial.

MR HUBBARD:  Sorry, 5(c).

MR AL-ATTAR:  8(d) to (f) are not agreed on the list of issues for trial, and the whole of 9 is not agreed, and they do, almost verbatim, correspond to the unagreed list of disclosure issues, and then there are a few add-on issues.

**F**

THE DEPUTY MASTER:  I am slightly - mildly incredulous that the parties cannot agree what their pleadings say.

MR HUBBARD:  Well, yes.  The claimants would agree in that we are being told that things that we say are plainly on the pleadings are not in issue, but----

**G**

THE DEPUTY MASTER:  Let us start like this:  let us start with the person propounding the issue as an issue.  So that is you, Mr Hubbard, I think.  You are saying that who acted for the company D2 and Morsgate is in issue and the defendants are not.  So let us start by, Mr Hubbard, please could you take me to where in the pleadings it is put into issue

**H**

**A**

that the company D2 and Morsgate - sorry, the question of who acted for the D2 and Morsgate, where is that in the pleadings.  Where is 5(c) in the pleadings, please?

MR AL-ATTAR:  We could not find it either, Judge.

MR HUBBARD:  Judge, can I get back to you on that one particular point, which I had not anticipated we were going to address in this way?

THE DEPUTY MASTER:  Okay.  We were going to go through the list of issues for disclosure, is this in issue there as well?

**B**

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  Perhaps that would be a helpful reference to where it is in the issues, where it is in the pleadings, so let us go there.  That is the agreed section on----

MR HUBBARD:  That is tab 7, page 36.  The relevant issue is 5(c).  I think particularly it emerges out of our reply at 4(f), 4(h) and 14(c).

**C**

THE DEPUTY MASTER:  Sorry, the?

MR HUBBARD:  The reply, the claimant's amended reply at paragraphs 4(f), 4(h) and 14(c).

THE DEPUTY MASTER:  Okay, can I have a page reference, please.  Sorry, 4(f), did you say?

**D**

MR HUBBARD:  Yes.

MR AL-ATTAR:  It is on page 174 of the bundle.

THE DEPUTY MASTER:  Yes, I am there.

MR AL-ATTAR:  It is quite hard to spot the paragraph numbers, but at the bottom of the page there is 4(f)----

**E**

THE DEPUTY MASTER:  I am there.  Defence 1, paragraph 4(i).

MR AL-ATTAR:  We could not work out from those references why this was an issue.

THE DEPUTY MASTER:  Yes, nor can I.  Mr Hubbard?

MR HUBBARD:  Well, the----

**F**

MR AL-ATTAR:  It is common ground, Judge, that D1 was a director of Monline BVI, that is admitted.  It is also common ground that D3 and D4 were directors of Monline UK.  That is averred in their pleading.  Equally, it is not pleaded that Morsgate, which is issue 5(c)(iii), had anything to do with the UK transfer.  The UK transfer is defined as between Monline BVI and Monline UK, so why Morsgate is an aspect of issue 5(c) we

**G**

could not work out either.

THE DEPUTY MASTER:  I think 5(a) and 5(b) are going to be - I will let you argue about whether it is an issue for trial later.  You might be able to refine where you are looking in the pleadings, but I think in any event----

**H**

**A**

MR AL-ATTAR:  Sorry, did I misspeak and say 5(b)?  Sorry, I was meant to be talking about 5(c).

THE DEPUTY MASTER:  Sorry, that is what I am looking at as well.  Maybe I said it wrong.  5(a) and 5(b), surely the documents that are disclosed pertain to what dealings there were between the company, the parties, and Morsgate with respect to UK transfer, will also disclose who acted for the company, D2, and Morsgate.

**B**

MR AL-ATTAR:  That is exactly our point, Judge.  We say it is fair to (inaudible) some documents.  Say 5(a) compiles the disclosure of all dealings, because companies can only act through persons, that will answer the question.

THE DEPUTY MASTER:  Yes.  Mr Hubbard?

**C**

MR HUBBARD:  Well, Judge, we do not necessarily disagree with that, but all we say is that - well, our point on these issues is, what is being said is that these sub-issues are covered by wider issues.  We say, well, whether they are or whether they are not it is not unhelpful to direct the disclosure process in more specific ways, including as to who was actually doing what in relation to this.

**D**

THE DEPUTY MASTER:  Thank you, Mr Hubbard.  No, 5(c) does not appear to be on the pleadings in any clear way, and in any event is unnecessary given 5(a) and 5(b), so I am not going to order 5(c) as an issue for disclosure.  Is 5(d) an issue as well?

MR HUBBARD:  That comes into the same category.

THE DEPUTY MASTER:  I think it does, so 5(d) as well, thank you.  Is the next one 6?

**E**

I am not finding it particularly helpful to look at the list of issues for trial, that is going to be something which you need to refine between yourselves between now and trial. Looking at 6(a) on page 42, bottom right, 13 of the DRD itself, the company's UK bank accounts?

**F**

MR HUBBARD:  Yes, perhaps we could look at the reply at 4(f), Judge.

THE DEPUTY MASTER:  Is that page 78?

MR HUBBARD:  Yes, I think it is.

THE DEPUTY MASTER:  No, it is not.

MR AL-ATTAR:  Page 174 of the PDF, I think it is the paragraph we just read, Judge.

**G**

THE DEPUTY MASTER:  Okay.

MR AL-ATTAR:  It is the one that refers to the formation of the UK subsidiary but does not mention GBP account.

THE DEPUTY MASTER:  No, it says UK.

**H**

MR HUBBARD:  So our point here, Judge, is this:  it is said that the main reason, or the only reason, why there was a transcript to D2 from the company was that the company could not open a UK bank account.  We do not admit, because we do not know, whether or not it had, in fact, opened a UK bank account or had encountered any difficulty in doing so.  Nor do we admit that that alleged problem could not have been addressed in other ways.  We effectively say the most obvious way in which it could have been addressed is by opening a GBP bank account which was not a UK bank account.  So we would say that on the basis of our pleading, and on that basis, we are entitled to disclosure to see slightly more broadly than what the defendants say the problem was, whether there was really any problem.  That is why we say - we could have said there should be disclosure about attempts by the company to open bank accounts.  We are not saying it should be as broad as that, but we are saying that it should go wider than UK bank accounts.

THE DEPUTY MASTER:  But you have pleaded UK bank accounts?

MR HUBBARD:  Well, no, that is what the defendants pleaded.

THE DEPUTY MASTER:  Is the reply not yours?

MR HUBBARD:  Yes, indeed, but we are responding to a pleading that says, "The problem was that we could not open a UK bank account", and we are saying, "We don't accept that that is true", and we put them to proof of it, or that that was sufficiently causative, as it were, that that problem could not have been addressed in different ways.  One of the obvious different ways it could be dealt with would be opening a GB bank account offshore.

THE DEPUTY MASTER:  There are two things there.  You are challenging their narrative in a particular way, you are saying - this is my interpretation, Mr Hubbard, you are trying to get documents which show that they were not, in fact, trying to open a UK bank account because you do not believe that they were.

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  That is one aspect.  Are you challenging the existence of the problem which you say required them to open a bank account?

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  So is that broader denial, or non-admission, or whatever, included in your list of issues?

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  So you are challenging a specific in 6(a).  Where is the general?

**A**

MR HUBBARD:  We are only seeking disclosure on one broader basis than their UK bank account narrative, which is to say, "Well, we would like to see if they had opened, or tried to open, a GBP, any GBP bank account, not just a UK bank account."

THE DEPUTY MASTER:  With respect, that is more a cross-examination question.  What I am interested in is the class of document that you are looking for, the issue for disclosure which is more the existence of the problem in the first place.

MR HUBBARD:  Yes.

**B**

THE DEPUTY MASTER:  Where can I see that in the issues?  Is it in the issues?

MR AL-ATTAR:  Judge, I have read that as actually being within issue 5, because it is asking about the dealings in respect of the UK transfer.  So if one is asking about the reasons for the UK transfer, one would assume that would be picked up there, because it is the genesis of the defence case, "We cannot open a UK bank account, therefore we cannot do business, therefore transfer to a UK company."

**C**

MR HUBBARD:  Well, there is also 6(b), because the point in 6(b), which again we are being challenged on, is, well, we say we want disclosure of documents which show, or which are relevant to the issue as to whether the bank account issue was relevant.  We say that is a documents issue, because at the time the question is, are they saying to one another, D1, D3 and D4, "We cannot open a UK bank account and therefore we are going to have to make this transfer", or are the two things unrelated?

**D**

THE DEPUTY MASTER:  So should 5 include something about the purpose of the transfer?

**E**

MR HUBBARD:  It might helpfully, yes.  We had thought it was picked up - maybe all parties thought that was being picked up in 5(b).  We say there were different purposes for the transfer, of course, but the purpose of the transfer in a commercial sense, which is alleged by the defendant, is this problem with opening a bank account.

MR AL-ATTAR:  Judge, I----

**F**

THE DEPUTY MASTER:  Hang on, Mr Al-Attar, one second.  So 6 puts them to proof on the question of whether or not they truly were trying to open a UK bank account?

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  5 asks what happens and what was the effect, but it does not ask why on my reading.

**G**

MR HUBBARD:  Well, we would certainly think - I think it is, on anybody's case, relevant, why.

THE DEPUTY MASTER:  I think it is.  Mr Al-Attar?

**H**

**A**

MR AL-ATTAR:  I am sorry, Judge, I am just seeking instructions on the customary WhatsApp.  Whilst I wait for those, and speaking without them, we had intended that 5(a) pick up any documents that are relevant to the UK transfer.  To the extent that there is a desire to expand that 5(a) to make it clear that "dealings" should include the reason behind those dealings, we think that would be sensible.  It will probably end in the same (inaudible) as the documents, but if the desire is to assure the claimants that an appropriate search is undertaken, we are happy with that.

**B**

THE DEPUTY MASTER:  Yes.

MR AL-ATTAR:  And it avoids these granular issues that do not really add anything to the documentary search.

THE DEPUTY MASTER:  No.  Mr McLoughlin?

**C**

MR McLOUGHLIN:  Judge, subject to instructions, that all sounds sensible to me.

THE DEPUTY MASTER:  Yes.

MR McLOUGHLIN:  Yes, I have received instructions now, we are content with that.

MR AL-ATTAR:  So, Judge, I think what is being suggested and what we would agree with is that the substance of 6(b) in effect is re-cast into an issue 5 point as to the purpose of----

**D**

THE DEPUTY MASTER:  I do not want to do that, no.  I would like to delete "or GBP", because that is not in the pleadings.  I am happy to include 6(a) as a very particular, "You have said this, now prove it" type issue.  I think that is fair enough.  Let us include a new 5(c) along the lines of, and I am not drafting here, "What was the purpose of the above dealings?" or "the purpose of the dealings referred to in 5(a)?"  Or, "What was the intention of the parties in those dealings?"  I will direct it, just given the possibility that it does not get agreed.  So a new 5(c), "What was the intention of the parties in respect of the UK transfer?"  That is clear enough, is it not, "What was the intention of the parties in respect of the UK transfer?"

**E**

**F**

MR AL-ATTAR:  That makes sense to us, Judge.

THE DEPUTY MASTER:  Thank you.  I pause to note that I think with lists of issues for disclosure generally, the current trend is to make them less granular and bigger and broader, which also makes them easier to agree.  I think the broader they are, the more helpful they are, but that is something for another day perhaps.

**G**

So 6(a), it is without the "or GBP".  6(b), that is relevant, is it not, 6(b)?

**H**

MR HUBBARD:  Yes.

MR AL-ATTAR:  Well, 6(b) seems to be covered by the new 5(c) that you have just ordered.

THE DEPUTY MASTER:  Yes, I do not think 6(b) is problematic, I think let us leave it in. Mr McLoughlin, I should just say your video is frozen for me.  Is it frozen for anyone else?

MR HUBBARD:  Yes.

MR AL-ATTAR:  I was sitting very still, can you hear me at least?

THE DEPUTY MASTER:  I can hear you fine.  It looks like you are extraordinarily still!

MR AL-ATTAR:  Am I moving now?

THE DEPUTY MASTER:  No.

MR AL-ATTAR:  Oh, dear.  I shall leave my camera on.  If you can hear me, it is not affecting the bandwidth at least.

THE DEPUTY MASTER:  No, you just look a little bored, but I am going to assume you are not!

MR AL-ATTAR:  It is the right assumption, Judge!

THE DEPUTY MASTER:  So 6(b), we are leaving in.  So the next is 7(b) and 7(c)?

MR HUBBARD:  7(b) and 7(c), similar sorts of issues.  I think the distinction there is really between what the dealings were and what their results were, as per the documents.  So I think, although they could be said to be - I think they actually do perform different functions in relation to issue 7, and we would say they are all relevant.  It is not argued that the question of the ownership and control of D2, where we say it is owned, in fact, by D1, and the defendants say it is owned, in fact, by D3 and D4, is not a fairly central issue.

THE DEPUTY MASTER:  Yes, indeed.  Sorry, it is both you and Mr McLoughlin.  Why do you all say that 7(b) and 7(c) should not be in?

MR AL-ATTAR:  By a careful reading of 7(a).  7(a) is what dealings were there between natural persons on 4 June or thereafter regarding formation, ownership and control of D2.  Those dealings, as a documentary search, would seem to pick up the issues of whether there is a trust of nomineeship for the benefit of D1, and (c) seems to be a more specific instance of control, which is specifically referenced is 7(a).  That was the reason.  It was just a granular specification which seemed to us to complicate the documentary search.

THE DEPUTY MASTER:  Yes, indeed.  I do not think you need both 7(a) and 7(b) and (c), (b) and (c) would be adequate, as would 7(a).  Mr Hubbard, will it trouble you too

**A**

much to leave 7(b) and (c) out?  Do you think there would be documents which are not caught by 7(a), which would be caught by (b) and (c)?

MR HUBBARD:  Probably not.

THE DEPUTY MASTER:  All right, let us take out 7(b) and (c).  8(g)?

MR HUBBARD:  This is where we run into somewhat deeper waters, Judge.  These are the issues - well, I think they are different.  The point on these issues is disclosure as to the provision of logistic services, what we call Parker services, by D2 to persons other than Morsgate.  These issues have morphed somewhat in view of recent statements by D2 and D4 as to what D2 was actually doing and with whom.  It had been understood, or at least it had been stated in the defences, or we took from the defences, that the position was, or at least the defendant's position was, D2 contracted with Morsgate in August 2016, continued dealing with Morsgate and providing service to Morsgate until a date which the first defendant said was several years ago in his defence to December 2012, and that was basically the story.  D1 says in his defence that that trading was on the basis of a particular agreement between, that particular agreement, D2 and Morsgate, and when it ended it ended and it was not very profitable.

**B**

**C**

**D**

Last week D2 and D4 indicated that, in fact, or rather it is their case that the year after D2 began trading, so in 2017, it stopped providing services  to Morsgate and started providing the same services to a different company called Gestcom, which we say, and I am not sure there is any dispute about this, is part of the African business.  We say that the question of the provision of services and trading with parties other than Morsgate is part of our pleaded case in the amended particulars of claim in that it arises from our claims for relief and to trace assets and for accounts of profits.  And it certainly arises out of what the first defendant has said in his defence as to what the trading of D2 was from beginning to end, and the rather different matters which are now said to be - which now presumably represent D2, D4's case as to the fact that trading of D2 was only with Morsgate for a year, which, on the face of it, is not something one would have gleaned from the defences, but was with this other company Gestcom.  So we say that these issues were always live, and are now even more live and even more central as it has become clear that the story of what D2 was doing in the provision of the same, as we take it to be, logistic services to different entities in the African business is now a very different one, and we cannot be criticised for not having pleaded things we did not know.

**E**

**F**

**G**

**H**

A

THE DEPUTY MASTER:  Did you plead Gestcom?

MR HUBBARD:  We could not plead - no, we did not plead Gestcom, because, as I say, the fact that it was a trading partner of D2 emerged from a letter from IWG sent to us last week.  We plead that Gestcom is part of the African business, but we do not think it would be helpful to say - well, for a start, we say this is on the pleadings anyway, but it would certainly be unhelpful to say that there should not be disclosure in relation to these issues on the basis that we have not pleaded something we could not have pleaded.

B

THE DEPUTY MASTER:  Take me a step back for a moment.  I can see very clearly how the size and scope of the business opportunity which you say has been transferred away from the BVI company and then the claimant, and therefore the claimant's cause of action.  I can see how the extent of that business opportunity - to assess the extent of that business opportunity, an analysis would need to be made about what Parker services were being supplied and to whom.  I can see how that is relevant to, to put it broadly, quantum.

C

D

I am less clear as to how it is relevant to liability.  Before we look at that question, I am assuming - sorry, do you anticipate that in the seven day trial, that the judge will also perform any tracing exercise to which your client is entitled, or would that be an order directing a tracing exercise to take place?

E

MR HUBBARD:  Well, I think that would be quite difficult to predict.  It would rather depend upon what the evidence was.  If the story is a very straightforward and simple one, which to some extent is what D2 - it is not the story that you might have expected, but the story that D2 and D4 are now putting forward is that Parker services being provided to Morsgate for one year, Parker services then being provided to Gestcom for another four years, and then an alleged cessation, about which we have some suspicions of the provision of Parker services by D2, which leaves open the question of, well, who then is providing these services to the African business thereafter and on what basis, and is there, in truth, no connection between the business opportunity and business that we say was diverted from the company and whoever is today providing logistic services to the African business.  We say that it is pretty obvious somebody is doing it.

F

G

So, depending on how that evidence comes out and what the disclosure actually shows, we may or may not be inviting at the end of the trial to give effectively orders for

H

A

enquiries in relation to tracing, or we may elect to pursue other remedies, including damages.  We really could not predict, I think, Judge, at the moment where we would want to go on that.

THE DEPUTY MASTER:  And what about the question of liability?  Does the question of whether the second defendant supplied Parker services to persons other than Morsgate help you prove that they are obliged to account at all or whether you (inaudible) a cause of action at all?

B

MR HUBBARD:  Well, again, it depends which cause of action it is.  It would be relevant to what we say about who owns D2, and hence what was going on when there was the UK transfer in 2016.  Obviously, if one sees a pattern of D2 being used at the direction of D1 to do various things in the African business, well that does support our case that D1 is the beneficial owner of D2, and always has been.  So to that extent, if you take beneficial ownership of D2 as being a liability issue, we would say that the fading history of D2 is relevant to that.

C

THE DEPUTY MASTER:  So you would infer provision to certain aspect of the African business and not others that it was owned by certain family members and not by D3 and D4 - is that the----

D

MR HUBBARD:  Yes, and how, for example, the change of commercial relationship from D2 to Morsgate, D2 to Gestcom actually came about, who directed it?

THE DEPUTY MASTER:  I can see the relevance to your case generally.  Where is it pleaded?

E

MR HUBBARD:  Well----

THE DEPUTY MASTER:  You told me it is not pleaded because you only heard about Gestcom----

MR HUBBARD:  We have not pleaded specific allegations in relation to Gestcom, because we could not, because we did not know that that is what had happened until last week. We plead the heads of relief we seek and we say they are relevant to those heads of relief.  We also say that it is directly to what D1 says in his defence about effectively the commercial history of D2.  So it is----

F

G

THE DEPUTY MASTER:  Can you take me to that?

MR HUBBARD:  Yes, that is in the defence, I think, at paragraph 7(e), and that is tab 20, page 161.

THE DEPUTY MASTER:  Let me read that.

H

A

B

C

D

E

F

G

H

MR HUBBARD:  (After a pause)  So what the first defendant is saying there, as we understand it, is this is a general defence to the allegation that the effect of the UK transfer was to transfer a valuable business, which is fairly central to our case.  He says that the UK, Monline UK logistics agreement - that is the D2 Morsgate agreement of August 2016, had certain terms, which were less advantageous than the agreement that Parker had had.  He then makes an allegation about the costs base, noting we say relevantly to the question of value that Parker was actually supporting £1 million of costs from its income.  Then it says that Monline UK, which is D2, "accordingly earned a small revenue and made modest profits", which appears to be an allegation that what it was doing is trading with Gestcom throughout on the basis of the Monline UK logistics agreement, which is a D2 / Gestcom agreement.  Then it concludes at (iv) that Morsgate no longer trades and has not done so for several years.  Now, we would say we are entitled to disclosure on those allegations, particularly as it would appear that that is not the same picture as is now being painted by D2 to D4 about the same issue, because what D2 to D4 are now saying is, on the face of it, the trading under that agreement took place for a year, and from 2017 to January 2021, in fact what D2 was doing was trading with Gestcom.

THE DEPUTY MASTER:  And you reply to that on page 180 or 177 in the PDF.

MR HUBBARD:  I am sorry?

THE DEPUTY MASTER:  I am looking at your reply to that point.

MR HUBBARD:  Yes, 9(c) and 9(d).

THE DEPUTY MASTER:  No admissions made.

MR HUBBARD:  As I say, we were not in a position until last week to directly challenge those allegations, but we are now.

THE DEPUTY MASTER:  You have required them to prove----

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  -- benefits that they have received from the supply of Parker services under the 2016 agreement or otherwise----

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  -- to other companies within the African business----

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  -- or from other trading activities of the second defendant?

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  You have required them to prove what they have said in their defence, which is that it is small fry.

**A**

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  Let us go back to the list of issues for disclosure.  Bearing in mind that you have required them to prove the source of income for the business that they did.  I can see how (h) directly reflects your requirement for proof of that point.

MR HUBBARD:  Yes, and (g) is really the companion piece to that, because (g) is directed to identifying who the trading partners were, and (h) is directed to identifying what the results were, so we would say those are squarely issues which are on the pleadings----

**B**

THE DEPUTY MASTER:  Yes.

MR HUBBARD:  -- and which, in view of recent disclosures by D2 and D4 are all the more significant to the outcome of the case.

**C**

THE DEPUTY MASTER:  Thank you.  Now, who is objecting to this?  Mr Al-Attar, Mr McLoughlin, who is the key objector?

MR AL-ATTAR:  I am not sure either of us is a key objector, because as I understand it - the reason I say, "as I understand it", Gestcom came to our attention as a legal team last week.  It is one of the reasons a case memorandum has not been agreed, because the claimant has revised the case memorandum to include details of that.  It is not pleaded.  We have not had time to assess it before the CCMC.  I will leave Mr McLoughlin to speak to this.  His client has made proposal to disclose its QuickBooks and its payments received.

**D**

**E**

Sir, if I may, I think the disagreement between the parties on issue 8 is not so much as to 8(g) and (h) is as to the disclosure model, as to whether one requires a search as opposed to model (b).  I think that is the difference between the parties.

**F**

THE DEPUTY MASTER:  That is very helpful, thank you.  I can see what the (inaudible) for model (d), and I think I can understand why.  Has anyone suggested - I know it has all come about last week.  Has anyone suggested any search terms or classes of documents other than QuickBooks?  Mr McLoughlin?

**G**

MR McLOUGHLIN:  Judge, Mr Al-Attar is broadly right.  Whilst I am not sure I necessarily adopt Mr Hubbard's narrative of how things change, so to speak, we have, of course, responded to the case pleaded against us, and when asked a direct question about who we provided services to in the correspondence we quite candidly provided the answer, and that included Gestcom.  In light of that and in light of what Mr Hubbard pleaded in

**H**

**A**

his reply by way of non-admissions, we had proposed - we hoped and thought proportionately - that in so far as his case involves a question of quantum of any loss of business opportunity, that that was dealt with more than adequately by the provision of my client's accounting records that shows what payments were received, when and from whom.

THE DEPUTY MASTER:  But not the terms on which the agreements were made - not on what terms and in what circumstances, and also the question of what services were provided, whether or not they were Parker services might not be very clear from QuickBooks?

**B**

MR McLOUGHLIN:  Well, Judge, I am not sure for my part that is necessarily an issue on the face of the pleadings.  I can see the quantum, the question of - if one goes back to Mr Hubbard's reply at - forgive me, I have lost my reference - 9(c) and (d) on page 180, pagination, and in my bundle it is 188 PDF.

**C**

THE DEPUTY MASTER:  Which page, sorry?

MR McLOUGHLIN:  It is internal page 9 of the reply, amended reply, page 180, bottom right pagination, and in my PDF bundle it is page 187 of the PDF.

THE DEPUTY MASTER:  Thank you, and which paragraph?

**D**

MR McLOUGHLIN:  I thought he was in paragraphs (c) and (d), and no admissions are made as to the gross or net benefit received by the second defendant or by its officers or shareholders directly or indirectly by the first defendant from the supply of Parker services under the 2016 logistics agreement, or otherwise, or from the supply of logistic services to other companies.  The point here is one of quantum, is it not?  "We say", says the claimant, "you transferred away or had transferred away, to D2 a valuable opportunity and we want to know what that was worth".  We say that is adequately dealt with by the disclosure of our accounting records.

**E**

**F**

MR AL-ATTAR:  Judge, if I can add to that, I did not realise - what I am about to say now overlaps a little bit on what I want to say on issue 9.  Going back to your question, Judge, about how this declaration of trust arose, because I think you were interested in the question of liability versus quantum, if you go to page 138 of the bundle and look at paragraph 23 of the particulars of claim, that is where one gets the pleading of a trust coming in.  It is simply said, "In the premises above D2 to D3 hold the shares on trust".  It then appears in the prayer at 37 on page 140 of the PDF, and you get two types of trust pleaded.  The first at 37(a) is not a constructive trust.  The second one, 37(b) is a constructive trust.  The way we had read the pleading is that there was a UK transfer

**G**

**H**

**A**

said to be in breach of fiduciary duty, there is something of a trust or nomineeship agreed with D3 to D4, and also there is knowing receipt and constructive trust liability both by (inaudible) receipt.  So we did not see these issues as going to liability, we saw them as going to quantum.

**B**

On the issue of quantum, Judge, you may have picked up if you looked at the particulars of claim and defence in detail, that the way the logistics agreements worked is effectively cost plus price.  So it is expenditure by Parker, reimbursed following a 50 per cent uplift, and that is Parker's (inaudible).  Monline UK is different, it is 10 per cent, and the cost basis is (inaudible).  That is the point that Mr Hubbard took you to in defence one.  Now, what this goes to, is it accepted that the claimant's case has a definite case of trust and equitable obligation crystallising on the UK transfer, Mr Hubbard has a point about essentially similar fact evidence bolstering those findings, but everything else really goes to quantum.

**C**

**D**

If one is looking at the definition of Parker services in relation to an agreement that was a costs plus basis, and Monline UK has the same structure, with a slightly different percentage, what Mr McLoughlin says about the adequacy of the QuickBooks disclosure should be a good starting point.  The point I wanted to make really bearing on the disclosure model, a lot of what is said about what may have happened in relation to the Gestcom, which is not pleaded and the parties have not, themselves, got to the bottom of, is essentially seeking to justify a line of enquiry description.  Whilst the issues - one can see the reason why wants 8(f) and (g) in there, the disclosure model is a little too wide.

**E**

**F**

THE DEPUTY MASTER:  Thank you.

MR HUBBARD:  Master, if proposals had been about what model D would give us that the QuickBooks would not, and that is in our letter at page 480 in the bundle----

THE DEPUTY MASTER:  Which 480, internal or?

MR HUBBARD:  It is the electronic 480, bottom right, 483.

**G**

THE DEPUTY MASTER:  Okay.

MR HUBBARD:  It is the paragraph beginning, "We anticipate".

THE DEPUTY MASTER:  I am going to order model D searches in respect of those two issues.  It is, I think, not merely a question of quantum.  The question of what services were provided will not necessarily be disclosed by model C disclosure of QuickBooks,

**H**

**A**   and nor would the question of terms and circumstances, which is effectively agreed as an issue for disclosure.  The QuickBooks may well be the end points of model D disclosure, but if there are more documents it seems to me to be right to direct the parties to search for them in a model D sense, which is obviously limited to reasonable and proportionate.  So model D searches for 8(g) and (h).

**B**   The African business I am going to come to in a moment.  (After a pause)  The African business:  this is obviously an important dispute between you.  Mr Hubbard, do you want to start?

MR HUBBARD:  Thank you, Judge.  The relevance of the African business is a separate disclosure issue.  We say really this is about the relationship between - for the purposes of this case it is about the relationship between D1 and D3 and D4.  We say - and we were asked RFIs about this and we explained what we meant in some detail - that D3 and D4 are trusted associates of D1 and they have throughout worked together in the African business, and this is a relevant question when determining what we say is an issue of liability, who really owns D2, what was really going on at the time of the UK transfer, who was directing what and on what basis?  We say it goes further than that, because we also say that there was a live relationship between D4 and Morsgate and D1 and Morsgate.

**C**

**D**

THE DEPUTY MASTER:  Mr Hubbard, if I could just cut you off, just to say the relevant question when determining who owns D2, I just want to check, that is already in the list of issues?

**E**   MR HUBBARD:  Yes.

THE DEPUTY MASTER:  What was going on at the time of the UK transfer, that is as well?

MR HUBBARD:  Yes.

**F**   THE DEPUTY MASTER:  And who is directing what?

MR HUBBARD:  Yes, but we say----

THE DEPUTY MASTER:  Just for my own comprehension, that is all covered.  It is your next point that is most important, please carry on?

**G**   MR HUBBARD:  We say that you cannot establish those things in isolation without also considering how these individuals related to each other in the African business, which is what issue 9 is about.  In order to understand that relationship, you have to understand what the African business is.  We have made allegations as to what we say it is.  We say we are entitled to disclosure to make out those allegations.  There have

**H**

A   been no admissions.  In particular, (b), (c) and (d), how Morsgate's role actually worked in the African business, and I think this is also going to play into the question of how Gestcom worked, because this tells you how D2 operated in practice, and through whom and why.  So that is why we  say these are relevant issues, and they do, we say, appear on the face of the pleadings.  They have been the subject of - where they appear in the pleadings has been helpfully extracted by D2 to D4 when asking us RFIs,

B   to which we responded, and I can take you to those.

So we say these are issues on which there should be model D disclosure.  It should not be much of a problem for D2 to D4 to give that disclosure, given what they say their roles were, or given their case.  D1 says it is a big problem for him because he has a

C   much broader relationship with the African and is relevant to this case.  That may be true, but that does not mean that he should not give disclosure in relation to issues which are in this case which do relate to the African business, not the whole of the African business, but only in so far as is relevant to the allegations about D3 and D4's role, which we say support our allegations as to who controlled and owned D2 at the

D   relevant times.

So in the responses to the RFIs, there is tab 23, beginning at page 190 of the electronic, and 193 of the hard copy of the bottom right numbering.  We get as far as 195, we were

E   asked to provide particulars of allegations about the management of Morsgate and its relationship with Parker was in practice in the hands of the fourth defendant, and this is an allegation which we rely upon.  This is not a case - and I am not even sure that anyone pretends that it is - where the various persons who interacted, or the companies who interacted with the company in D2, were unconnected, unrelated and acting

F   entirely at arm's length but are, in fact, all acting to a degree and in one way or another as part of what could broadly be called the African business.  We are saying that this is specifically that the fourth defendant was heavily involved in Morsgate, and obviously that is relevant now to the question not only of how the contractual arrangements

G   between D2 and Morsgate were formed, but it is also going to be relevant to how the arrangements, which we do not know much about yet, between D2 and Gestcom were formed, because it seems unlikely that Morsgate simply stepped out of the picture without there being documents covering how that worked.  We have dealt with that in

H   considerable detail in our reply because we were asked to give particulars of it.

Perhaps next more relevantly at 199, we are asked particulars of the allegation that:

> "... the third and fourth defendants allegedly held positions of responsibility in the African business, and in those positions they reported, and continue to report directly and only to the first defendant."

So we rely upon that allegation and we say that we are entitled to model D disclosure to establish that allegation, whether that allegation is true, and we have explained in detail in response to a request made of us what our case is about that. We cannot really be criticised for giving particulars of allegations we have been asked to give particulars of.

THE DEPUTY MASTER: I am conscious that issue for disclosure in the practice direction means only those key issues in disputes. There are key (inaudible). I am not yet convinced, Mr Hubbard, and I would like to hear from you further about why the issues in your African business section are truly key issues in the disputes.

MR HUBBARD: Perhaps if I continue in the same document in response to request 8, if I may, Judge, just briefly. In request 8 we are asked what do we rely upon as being facts and matters supporting the allegation that the second defendant is held by the third and fourth defendants on bare trust or as nominees of the first defendant, which is a fairly central allegation. In our response at 8(c) and 8(d), we rely upon:

> "... African business allegations that the third and fourth defendants were otherwise employees of and agents for the African business and specifically persons who reported directly to the first defendant who had no interest in that business or its profits, and that both the first defendant and the third and fourth defendants were accustomed to the use of nominees and bare trustees to hold particular companies as and when circumstances made (inaudible) the African business."

So that is really it.

THE DEPUTY MASTER: Where are those two very particular raised in the list of issues for disclosure? I am going from 202 to page 42 again. I just do not see how you can expect model D disclosure for the composition of the African business from 2013 onwards and how it operated. Is that not just an extraordinarily large quantity of documents that you are asking for? I am just looking at the sheer number of company names there and little else, the number of different interests and countries, and so on.

MR HUBBARD: Unfortunately, that to some extent is usually the nature of the African business.

**A**

THE DEPUTY MASTER:  You want to use a model D disclosure search on that?

MR HUBBARD:  If one is to understand, I think, even logically what D3 and D4's role in the African business was one has to understand what the African business was is the probably the way that works.

THE DEPUTY MASTER:  I disagree - sorry, I agree you need to understand what the African business, but that is not the test for whether you get model D disclosure on it, or any disclosure on it.  I can see how on that pleading you might be entitled to documents relating to D3 and D4's function in the African business, and their relationship with D1, I can see how that might be - I can see how you might get that from your 9(d) and (e), and obviously I have not heard from Mr McLoughlin and Mr Al-Attar yet.

**B**

**C**

MR HUBBARD:  Judge, I think we would be content if the disclosure issues were tailored more carefully than they have been to date to those 9(d), 9(e) issues.

THE DEPUTY MASTER:  Okay.  I will hear from Mr Al-Attar next.

MR AL-ATTAR:  Judge, we have set out in our skeleton argument the principles, with which I am sure you are familiar, and those principles, to remind you, starting at paragraph 12 of my written submissions rely on the *Curtis* case from His Honour Judge Keyser KC to infer the general proposition - there is one other authority that appears not to have been followed - that issues for disclosure must follow the pleadings.  That is the standard approach and that is the approach you have taken so far in relation to disclosure.  There is also the, as it were, role (inaudible) that disclosure is about the real issues, and that is a cultural change.  All the submissions that have been made to you on issue 9 by my learned friend have relied heavily on the responses to a request for further information, not on the main body of the pleadings.

**D**

**E**

THE DEPUTY MASTER:  But they are pleadings, are they not, Mr Al-Attar, they are statements of case?

**F**

MR AL-ATTAR:  They are pleadings, and what I have just said is in part forensic, because if you were to look for the key issues you would look to the main pleadings rather than a request for further particulars of an issue.  What I would like to take you to, Judge, very quickly, is the main body of the pleadings.  I can tell from the questions you have asked you have read them, so I do not need to do this at length, but what I want to show you is the African businesses are not key issues in dispute, not (inaudible) for the issues we have issues 9(a) to 9(e).  I think you were perhaps more sympathetic to 9(d) and 9(e), but main submission will be that, on a fair reading of the pleadings, including the

**G**

**H**

**A**

requests for further information and the responses, these are not the key issues for disclosure.  I will make my submissions as briefly and constructively as I can.

THE DEPUTY MASTER:  Let me just ask you this, Mr Al-Attar, is the question "What was the Parker Business", for examine, is that in the list of issues for disclosure.  The capital B, Parker Business?

**B**

MR AL-ATTAR:  No, this is one of the points I want to speak about in about ten seconds, because it is pleaded by the claimant as to what the Parker Business was, and that it was its own business.  If I may, Judge, it will----

THE DEPUTY MASTER:  Yes, go on then.

MR AL-ATTAR:  If we go to the pleadings at page 134 of the bundle, the PDF numbering.  Paragraphs 6 and 7, Monline BVI was a dormant company prior to March 2016, and it traded for a short period of time after that - that is 6 and 7.

**C**

THE DEPUTY MASTER:  Yes.

MR AL-ATTAR:  At 15(c) on page 136 of the bundle, it is pleading that the sole business of Parker - this is the claimant's case - was the supply of what it later defines as the Parker services to Morsgate.  In case, Judge, you want the reference, it is at 171 of the bundle, paragraph 3(h) of the reply is where the claimant finds it convenient to introduce the definition of Parker services, and that is defined as the terms of the supply of services to Morsgate, and that is the sole business of Parker.

**D**

So if we return back to the particulars of claim at page 138, the basic case, paragraph 23, is a transfer, a UK transfer, for no consideration.

**E**

THE DEPUTY MASTER:  Just pause for a moment, Mr Al-Attar, I am conscious that from the pleadings I have very little idea of what Morsgate does or what the Parker services were.  "Logistics" is a very general word.  Can you just give me ten or 20 seconds on that, as just points of fact?

**F**

MR AL-ATTAR:  Yes, in so far as I am able to assist, because we do not actually have direct evidence of it that I can take you to.

THE DEPUTY MASTER:  No.

**G**

MR AL-ATTAR:  From what I have read generally, there are a lot of businesses in Africa and different nations of different varieties, and they, five of them, as pleaded, own Morsgate.

THE DEPUTY MASTER:  Companies own Morsgate?

**H**

MR AL-ATTAR:  Yes, it is in our pleadings, there are five African companies that own Morsgate, 20 per cent each.

THE DEPUTY MASTER:  And what does Morsgate then do being part of those five companies?

MR AL-ATTAR:  I think it does a variety of things.  The answer is I cannot give evidence (inaudible).

THE DEPUTY MASTER:  No.

MR AL-ATTAR:  I think one of the businesses, from what I have read, supplies cigarettes.  So I would imagine - and this is why I am very hesitant to say to say Morsgate will perform a function.  The claimant says it is a Treasury contract, I do not know whether that is right or not, but Morsgate appears to sub-contract, or sub-contract through Parker, for certain services.  The (inaudible) services, as the word suggests, can be arranging for the transit of goods, for example.

THE DEPUTY MASTER:  In one sense it might not matter too much, in that if these services have a value and it was transferred without consideration then that is all one needs.  It is difficult for me to picture what services were without knowing slightly more.

MR AL-ATTAR:  The answer to that in a way is you look to Parker's disclosure, in so far as we have got documents from Parker, to see what it did.  We look to what Monline UK did to see what it did thereafter and that is seeing what businesses are likely to be valued by reason of what income was earned.

THE DEPUTY MASTER:  And do those documents come out in the list of issues as currently drafted?

MR AL-ATTAR:  Yes, and in the light of what----

THE DEPUTY MASTER:  Can you show me where?

MR AL-ATTAR:  In the light of what you have ordered on issues 8(g) and (h), you have ordered model D disclosure of D2's dealings with Morsgate and also with Gestcom----

THE DEPUTY MASTER:  Yes, it is 8(b), is it not, what services did Parker supply----

MR AL-ATTAR:  Exactly.

THE DEPUTY MASTER:  -- to Morsgate?  So that should - what (inaudible) in fairness to Mr Hubbard is that there is some clear picture of what actually happened on the ground, because without that it is very difficult for a decision to be made and the evidence to be understood.  So the very broad background of 9(a) fulfils a function in Mr Hubbard's case, but I want to make sure that that function is still filled by some kind of documentary evidence, and it seems to me that that function will be filled by the

documents that come out in respect of 8(b), so what services were supplied to Morsgate.

**A**

MR AL-ATTAR:  What I was going to say, Judge, is that issue 8, as crystallised, covers the ground.  Issue 9 seeks things that are not pleaded and not key.  That is the basic point I am going to make.

THE DEPUTY MASTER:  Yes, you need not persuade me much about 9(a).  The issues 9(a),

**B**

(b) and (c) sort of zoom in slightly more and more, and I have slightly more and more sympathy as we zoom in.  So without dwelling too much on 9(a), please do continue, Mr Al-Attar.

MR AL-ATTAR:  So where I was at page 138 of the pleading, this is where you get the allegation of no consideration, and on page 139, paragraph 31, there is the inference of

**C**

the combination that is a conspiracy, and it is in and/or around 2016.  Before we leave this document, one point that implicit in all of this and in the allegation of conspiracy is that the wrongdoing occurred in 2016.  One major problem with the entirety of issue 9 is that the date is from 2013.  Those have no logical connection with the wrongful events pleaded in the claim.

**D**

Moving on then, if I may, if one goes to the defence, this is defence 1 at page 155, at paragraph 3(a), this is the reference to the African businesses.  So you have got in 3(a), it is associated with businesses in Africa operated by local operating companies.  They

**E**

are owned by the discretionary trusts.  If one goes to paragraph 10 at page 162, that is where one gets the entry of Morsgate, that it happens to be owned by certain African companies.  Morsgate itself is not an African company.  It is certainly not an operating company, as pleaded.

**F**

At paragraph 3(c) - I am sorry I am sorry around a little bit - at page 155 you have got the description of the Parker Logistics agreement, and this is what gets picked up in issue 8(b), what did Parker actually do, and you will see the terms set out, termination for convenience, termination on a winding up immediately, which is what happened.

**G**

Then you have got this annual budget which is set.  The budget is for what it is going to do.  It is going to set a budget and it is for revenue and capital expenditure.  It is going to be reimbursed by them and there is a 50 per cent on top.  So that would give you the granularity as to what the Parker services were.

**H**

**A**

At page 156, paragraph 3(f), we have the next logistic agreement. This is the Monline UK agreement. It works in a similar way but with a different percentage. So again, the granular disclosure will come in that respect. One does not need to understand how the African businesses are operating or what role D1, D3 and D4 played in relation to the operation of those African businesses. One needs to understand what Parker did for the Parker services, what Monline BVI was doing for a brief time without a contract, we would say, and what Monline UK did either facing Morsgate or, as D2 to D4 now

**B**

suggest, facing Gestcom. One does not, as it were, cross the line of service provision sub-contracting into understanding what particular *actus* who happen to be defendants in these proceedings did in relation to the African businesses. One does not actually need to understand what they did in relation to Morsgate, because one is valuing the

**C**

services that D2 provided to Morsgate or to Gestcom. One does not need to understand what was going on in the business of Morsgate. That is an important point, which I think begins to address my Lord's curiosity about issues 9(c) to 9(e). At the moment we cannot see why that line needs to be crossed.

**D**

THE DEPUTY MASTER: Yes. I think to understand the logistic services provided you have got to understand what the business you are providing to does. You cannot say, you know, trucking something from A to B without saying what the something is. I think that is covered, in my view, by 8(b) already, so----

**E**

MR AL-ATTAR: At the risk of a little repetition, Judge, if one focuses on paragraph 3(c) and the way we plead out the Parker contract, the way that contract worked is that they had to agree annual estimates and descriptions of the services to be provided, and there were budgets to be agreed. Then there was a reimbursement according to budgets. So, in a sense, services contracted for will be replicated in budgets and then claims against those budgets.

**F**

THE DEPUTY MASTER: Is the thrust of the case not that those services, the same services, were provided to other parties, the same services were then provided---- Sorry, just to get this right: is not the thrust of the case that effectively the Monline UK logistics agreement was providing the same services as the Parker logistics agreement?

**G**

MR AL-ATTAR: Yes, that is right. As we understand the case, they say Parker was providing one business, a sole business, to Morsgate. That was transferred to Monline BVI, for the reasons which I have outlined are disputed between the parties. We say it is to do with entrepreneurs' relief the defendant's position is less clear. We say there was then a problem with the UK bank account and it was transferred to Monline UK.

**H**

**A**

The claimant's position is that was always the same business.  We do not accept that necessarily because there is a dispute about the contract.

Be that as it may, looking at the claimant's case, they say essentially there is a smooth transition from Parker through to Monline UK always providing Morsgate until the date at which, according to D2 to D4, the switch happened to Gestcom.  That is not pleaded,

**B**

that has come out in correspondence in the past week.  Essentially, Parker services are the constant, and so if one looks to what D2, whether it faces Morsgate or Gestcom, based on the model D disclosure you have ordered on issue 8 that should provide the defendants with what they need for liability and quantum.

THE DEPUTY MASTER:  The claimant?

**C**

MR AL-ATTAR:  Sorry, exactly.

THE DEPUTY MASTER:  The claimant.  Yes, so long as the - they will obviously need to prove that it was Parker services that were provided to Morsgate.  They would still need to know what - they would need to look at the services that were in fact provided throughout the time.  I think we are on the same page there.  Show me paragraph 3 in

**D**

your defence.

MR AL-ATTAR:  I have shown you the defence, I have shown you the bit of the reply I wanted to on Parker services.  I will come back to that in a moment, if I may, but taking stock, if you are asking me to define key issues in dispute, this case is about the

**E**

misappropriation of a business or a corporate, namely the supply of corporate services.  That is what the claim is about.  The other claim is knowing receipt, conspiracy, the allegations all relate to that central dispute.  This is not a claim about the African businesses, what they do, who owns them, who is entitled to the benefit of them, or who is entitled to participate in their management.

**F**

THE DEPUTY MASTER:  Yes.

MR AL-ATTAR:  We have highlighted the 17.82 application against the claimant's other uncle, Benny, in the United States.  I do not want to spend too much time on this.  The only reason I want to highlight it----

**G**

THE DEPUTY MASTER:  I have not looked at the US thing, I do not find it that helpful.  I recognise your allegation that the claimant is looking for information about the African business.  All I need to decide is whether it is a key issue in this case or not.

MR AL-ATTAR:  Exactly, you only need to decide the question of relevance, you do not need to decide the issue of collateral purpose and subjective intent, I entirely accept.

**H**

A

All I wanted to do in relation to the 17.82 application, and I will make the point. We can go to the document if we need to, but you have read what I say about it in my skeleton. The case in this court, as described to the US court is inaccurate. We have highlighted the quotations and what they say is that there is a conspiracy about ouster from 2013.

THE DEPUTY MASTER: As I say, Mr Al-Attar, that is not for me to decide and we are running short on time. You can take that up with the American courts if you want.

B

MR AL-ATTAR: No, no, the only reason I highlight it, I just need one sentence to make the point, it is a counterpoint to what is relevant. What is relevant is in relation to the misappropriation of the Parker services business opportunity. Issue 9, if one were to ask the question with the emphasis what is it relevant to, it is relevant to a case of ouster from the African businesses in 2013 that the claimant describes in the US. That is a point of emphasis to underline the irrelevance of issue 9 to these proceedings.

C

THE DEPUTY MASTER: Okay, so issue 9(a), I have heard plenty on. Issues 9(b) and 9(c), I think are sufficiently covered by 8(b). What about (d) and (e), Mr Al-Attar?

D

MR AL-ATTAR: The answer is the same one I have been giving. Take, for example, D1, as mentioned in issue 9: why do you need to know, to resolve the issues as pleaded in the claim, what D1 did in relation to any number of African companies, or Morsgate, for that matter? Why is that relevant at all, certainly for----

THE DEPUTY MASTER: Perhaps it is more - it was more D3 and D4 that Mr Hubbard was focusing on. He wants to understand what their role was in the African businesses to show that they are not true owners, but proxies, I think.

E

MR AL-ATTAR: Yes, he wants to show that they are loyal lieutenants, and it is common ground on our pleadings that they have been employees now for 20 years. That is what is said in our case. I think what they are looking around for is something to see that these people were involved and therefore more likely to act and declare themselves nominees. I think that is the case that is put.

F

THE DEPUTY MASTER: If, for example, they were shareholders in a lot of the African business corporate entities, that may be relevant as to whether they are more or less likely to be nominee shareholders or true shareholders.

G

MR AL-ATTAR: Well, if they were just working in the African businesses - and unfortunately 9(d) goes far beyond share ownership and parallels one might wish to draw for share ownership. Just ask what roles - it could be asked which contracts did they make, which companies were they directors of, what did they do as directors?

H

**A**

None of that is a real issue in dispute in these pleadings for which disclosure is required, and yet 9(d) would seem to capture that.

THE DEPUTY MASTER:  Yes.  It seems to me that the best way to address D3 and D4's involvement in the African businesses is by looking at 7(b) again and considering whether that is sufficient to throw up documents surrounding their involvement in the African business which would provide what might be similar fact evidence about nomineeship here, or indeed sort of low level employee type evidence.  I say this, I am

**B**

very aware that there are lots of people off the screen, as it were, I am making no decisions whatsoever about their involvement.  They may well be true shareholders, I am absolutely not deciding any point like that now, and I do not want to give the impression that I am.  The question of whether they are potentially nominees might be

**C**

covered by 7(b).

MR AL-ATTAR:  May I just home in on that point a little bit, I do not want to detain this hearing longer than necessary.  If you go to page 172 of the bundle, and this is the reply, and one looks at 3(j), this is a point I have made in my skeleton argument at paragraph 20.1.  This is where it gets sort of crowbarred into the reply.  It says:

**D**

"It is further averred ..."

and this is the plea, the particular, it also overlaps exactly with the response to the RFI, and the plea is:

**E**

"... that at all material times the management of Morsgate and its relationship with Parker was an *actus* in the hands of the first defendant and / or ..."

and this is where the fourth defendant comes in -

**F**

"... as the point of contact between the professional directors of Morsgate and the members of the family involved in the management of the African businesses."

So one is looking on the pleadings for what D4 did as a point of contact between two sets of people.  All of that is not a key issue and it is incredibly broad, so if I may,

**G**

Judge, your suggestion that 7(b) focus on documents relevant to the questions or nomineeship is a more pertinent suggestion that we would adopt.

THE DEPUTY MASTER:  Well, I am wondering whether model D is sufficiently broad to capture this and whether something broader might be appropriate - for example, model

**H**

**A**

D, including narrative documents in respect of D3 and D4's role in this case, in this nomineeship.

MR AL-ATTAR:  I am glad you said that, Judge, because I thought you might be about to suggest model E, which would not be appropriate, but I understand the suggestion of narrative documents.

**B**

THE DEPUTY MASTER:  It crossed my mind, but it might well be too broad.  Okay, so I have heard from you about 9 at some length, and I am also very conscious of the time. Is there anything more, Mr Al-Attar, you need to say about issue 9?

MR AL-ATTAR:  I think you have points on 9(e), which is that one needs to look at the Parker services, and one will get that from D2's disclosure.  One does not need to know what it did in relation to African companies generally.

**C**

THE DEPUTY MASTER:  Mr McLoughlin, you are not included in footnote on page 45 at the bottom right.  What is your position about section 9, are you neutral?

MR McLOUGHLIN:  I am not neutral, I support the first defendant's position, not least because of the burden it would place on all the parties from a costs perspective, but obviously on my clients acting for them in particular.  The position we have locked up it seems to me is only supported by what you have decided, Judge, on ordering issues 8(g) and (h) to be included on a model D basis, because those pick up the more relevant questions for these proceedings about what my client, D2, was doing in connection with both Morsgate and other entities.

**D**

**E**

THE DEPUTY MASTER:  Yes, okay.  Mr Hubbard, any brief reply there?

MR HUBBARD:  Judge, we are only, despite what others may think, after relevant documents, and I submitted to the court, the relevance as we see it to the African business allegations is primarily to establish the relationship to the African business of D3 and D4, and hence the support we would draw in respect of our allegation that they are nominees in relation to D2 for D1.  That is the issue which is directly addressed in 7(b), as, Judge, you mentioned.  If the court considers that that is a more proportionate way of getting at the same documents, and we would support the court's suggestion of model D with narrative documents in relation to that, then that probably does go as far as we need to go at this stage.

**F**

**G**

THE DEPUTY MASTER:  Okay, thank you.  I am not going to direct issue 9(a) to (e) to be part of the list of issues for disclosure.  They can all go.  The reason is that I do not consider the broad issues of the African business to be a key issue in these proceedings. I note that there is evidence of a wider family dispute in which these documents may be

**H**

**A**

relevant but my decision is not based on the allegation of collateral purpose, it is based on relevance.  I have looked closely at the pleadings; I have been taken to the relevant passages by counsel and I have listened to what counsel have said.  It seems to me that the main relevance of the African business is the third and fourth defendants' role in it.  To put the Parker services in context, I have considered that carefully and I have decided that the Parker services are sufficiently contextualised by issue 8(b), which is what services did Parker supply to Morsgate pursuant to the Parker Logistics

**B**

agreement, and the remainder of the other issues in 8, including 8(g), which we kept in?  Mr Hubbard, did we keep 8(g) in?

MR HUBBARD:  Yes, we did.

THE DEPUTY MASTER:  Yes, we did, indeed, so that is sufficiently covered.  As for the

**C**

third and fourth defendants' role in the Africa business, I consider that to be sufficiently covered by 7(a), subject to one point which is a broadening of the model for extended disclosure to model D plus narrative documents, or with narrative documents.  That should give the claimants sufficient material to consider to properly understand D3 and D4's role in the African business.  Have I got the issue wrong, Mr McLoughlin, you

**D**

look concerned there, did I mislabel it?

MR McLOUGHLIN:  I wondered whether, either before or just now, the court intended to refer to 7(a) or 7(b), both were the subject of----

THE DEPUTY MASTER:  It was 7(b), was it not?  Forgive me, thank you.

**E**

MR McLOUGHLIN:  I only say that because I think that is the reference used earlier, but that might have been the wrong reference, not your current one.

MR AL-ATTAR:  I think it is 7(b) being nomineeship and trusteeship, the narrative.

THE DEPUTY MASTER:  Yes, it is 7(b), thank you for identifying that point.  So no to issue

**F**

9(a) to (e), and I have given my reasons for that.  The final question is 12, assignment, the terms of the assignment, the defendants want model B in respect of that.  Is it an issue what the terms of the assignment were?

MR AL-ATTAR:  I think this is my application to make, Judge.  If one goes to p.162 of the bundle.

**G**

THE DEPUTY MASTER:  Page 160.

MR AL-ATTAR:  Page 162, at 5(b)(ii), in particular in the last sentence:

> "It is inferred and (inaudible) that the claimant knew that it was not in the best interests of Monline BVI's creditors and members for the claimant to be assigned."

**H**

**A**

That is a positive case on our part.  In order to assess whether the claimant knew that it was not in the interests of the company and it came to be assigned, we do need to know the terms of the assignment.  The argument against us, as I understand it, was dealt with in paragraph 38 of my skeleton argument, the claimant opposes disclosure of the terms on the basis that a distinction is to be drawn between the liquidator's decision to assign the claim and the terms of the assignment, to which we say that they cannot be separated because one decides to assign on terms.  So, depending upon the terms of the

**B**

assignment, that may affect the court's assessment of what (inaudible) considered in terms of the propriety of the assignment.

THE DEPUTY MASTER:  Yes.  Mr Hubbard?

MR HUBBARD:  We find that slightly hard to follow.  The terms of the assignment are not

**C**

disputed.  There is no allegation that the assignment was invalid.  What they seem to be asking for disclosure of is the reasons behind the assignment, which are not in issue. The assignment is the assignment, it is a document, they have seen it.

THE DEPUTY MASTER:  Where is this taking us, Mr Al-Attar?

MR AL-ATTAR:  It is part in paragraph 1 of the reply, because following complete

**D**

information we have not - we have reserved our position as to the propriety of the assignment, and so it is in paragraph form B, because we have not been told what the terms of the assignment are, particular as to its consideration.  There are points we can take.  So, in a sense, by not providing disclosure the claimant is almost suppressing us

**E**

taking the point.

THE DEPUTY MASTER:  And what about the point that you are supposed to include in the witness statements of case?  Any contract relied on in it?  Am I misremembering section 14?

MR AL-ATTAR:  This is about the mention of the terms.  We have seen the deed of

**F**

assignment but the consideration seems to be kept separate from it.

THE DEPUTY MASTER:  Have you RFId this, Mr Al-Attar?

MR AL-ATTAR:  No, but it looks like we may have to.  I cannot remember whether we have.  I think we might have done.  If you give me a moment I will try and find it.

MR McLOUGHLIN:  Judge, in the meantime, might I just draw to your attention a further

**G**

point on this topic?

THE DEPUTY MASTER:  Yes, Mr McLoughlin.

MR McLOUGHLIN:  Both the first defendant and the second to fourth defendants do not

**H**

admit the propriety of this assignment, and indeed when the claimant took over these

**A**

proceedings from Monline BVI, it did so on terms that are set out in tab 29, and there is a recital, the third recital, the second substantive recital, that expressly preserved on the basis they had agreed to challenge the terms of, or the propriety and validity of the assignment in the language used there, and its consequences, and his entitlement to pursue the action at all.  So this has been squarely in issue, this frankly fundamental point in these proceedings.  I would just add that it is curious, you might think, that the claimant is so resistant to providing the disclosure of the documents that would make

**B**

good that *locus*.

THE DEPUTY MASTER:  Yes, that is very clear.  Mr Hubbard?

MR HUBBARD:  Well, again, despite the fact that the ability to challenge the validity of the assignment was reserved, it has not been done.  There is no challenge to the validity of

**C**

the assignment in the defences.

THE DEPUTY MASTER:  Well, it is not admitted.  Is it admitted?

MR HUBBARD:  Well, it is an interesting question as to what a reservation of position amounts to.

THE DEPUTY MASTER:  Forgive me, can you take me back to it, please, Mr Hubbard?

**D**

MR HUBBARD:  Well, the first defendant----

THE DEPUTY MASTER:  Yes, it is not admitted, which means you are required to prove it, and so I think issue for disclosure number 12 is absolutely fine.

MR HUBBARD:  Thank you, Judge, there is one further point and one question on disclosure

**E**

issues, if I may?

THE DEPUTY MASTER:  Yes.

MR HUBBARD:  The question is, I think, when we were looking at 7 the first time, the court was not minded to include 7(b) as a disclosure issue.

THE DEPUTY MASTER:  Oh, it should be.  It should certainly be a disclosure issue.

**F**

MR HUBBARD:  So it is understood to be restored with narrative, effectively instead of 9?

THE DEPUTY MASTER:  Yes, as Mr McLoughlin pointed out, there was some confusion as to whether (a) would cover (b) and (c) as well, and there is some overlap between them. No, I think with (b), it is very clear that (b) should be in now, and (b) should have

**G**

model D narrative, so it is distinguished from (a) in that sense.

MR McLOUGHLIN:  Yes, and (c) remains out, I think, does it not, for completeness?  It is simply (a), (d) and 7(b) with narrative?

THE DEPUTY MASTER:  Yes, (c) falls sufficiently within (a) and we do not need to have

**H**

wider narrative disclosure there.  Yes, and what is the other one?

**A**

MR HUBBARD:  There is one small point, which is a defendants' point, which I might just briefly cover.  In 2(b), this is the issue as to whether Parker sold the benefit of its Morsgate contract under the terms of the asset sale agreement, and disclosure as to whether - certainly 2(b) is not framed as a disclosure issue should be framed, in my submission.  The question is, what did the claimant know about the terms of the ASA, effectively.  We say that is actually irrelevant and documents on that subject will be inadmissible because it is trite law that if the question is, what does the ASA mean,

**B**

what people thought it meant subjectively is not relevant.

THE DEPUTY MASTER:  I am a little lost here.  Firstly, did we skip over 2(b) by accident before?

MR AL-ATTAR:  Yes, I think we did, Judge.

**C**

THE DEPUTY MASTER:  Let me just read it more carefully then.  (After a pause)  Is this not an issue as whether or not the company did acquire Parker's contracts?  Is that the point you are making, Mr Hubbard?  You are muted.

MR HUBBARD:  The issue is, did the company acquire the contracts?  We say, well, that is what ASA says.  There is an issue raised about whether or not this contract was

**D**

transferred or whether it was not, it being common ground that the transfer took place pursuant to the terms of the ASA.

THE DEPUTY MASTER:  So if the wording is changed to what did the claimant know about whether the company would or would not acquire Parker's contracts, something along those lines?

**E**

MR HUBBARD:  Then we say that it is not a disclosure because that is irrelevant, because it is not admissible.  Evidence on that subject would not be admissible at trial.

THE DEPUTY MASTER:  Right, okay.  Mr Al-Attar?

MR AL-ATTAR:  Can I ask you to go to page 174 of the bundle.  We are looking at

**F**

paragraph 4(c) - I am just checking I have not given you a bad reference?

THE DEPUTY MASTER:  Defendant paragraph 4(f) is denied, right.

MR AL-ATTAR:  No, I have given you a bad reference.  Sorry, it is the common intention wording that you should see.  My PDF is playing up, sorry about this.

**G**

THE DEPUTY MASTER:  That is all right.  Maybe just the broad point, why is it a key issue in dispute as to what the claimant's knowledge of the effect of the ASA was?

MR AL-ATTAR:  Sorry, if you go to page 170 of the bundle.

THE DEPUTY MASTER:  170.

**H**

**A**

MR AL-ATTAR:  Yes, and (iii), and there is pleading of common intention between the trustees, the claimant and first defendant as to the transfer between Parker and Monline BVI.  So there is a positive pleading of what they intended, and it is also pleaded in (iv) following that this being the common intention of the claimant and the first defendant was the basis upon which they entered into the asset sale agreement.  So the claimant's intention is relevant on the claimant's (inaudible).  Also if one goes to page 405 of the

**B**

bundle you can see the signature page of the asset sale agreement and it is signed for both Parker and Monline BVI by the claimant and the first defendant.  We say, firstly, on the claimant's case the common intention brings into play the claimant's knowledge and intention of what is to be sold, but also the answer that they give which is that if one is looking at the construction of the relevant agreement, subject to the intention is

**C**

not relevant to construction.  Firstly, we are not quite sure that that is right where it is the common directors of a company and the relevant background as to what they agreed.  That is relevant and that is a debate to be had after disclosure.  Also this is a case in which it is alleged that the first defendant was essentially acting pursuant to a conspiracy.  So to test the credibility of that allegation it is relevant to know what C

**D**

knew and intended about the assets transferred.  It is quite a big point against the claimant if the claimant understood that the contract with Morsgate would not be transferred.

THE DEPUTY MASTER:  Okay.

**E**

MR AL-ATTAR:  To the extent that you have picked it up from the defence, we have certainly found one document which rather suggests that the claimant knew that the contract would not be transferred, and that is pleaded by reference to an email exchange on page 158 of the bundle between the claimant and one of the advisers at the time.  So page 158, (f)(i), it is pleaded - and this is a plea that is disputed, so it definitely is in

**F**

dispute.  It is a slightly strange email, because there are square brackets that say "[other than the contract]", the Morsgate contract rights and cash are actually in the original email.

THE DEPUTY MASTER:  So Mr Rothenberg said----

**G**

MR AL-ATTAR:  To the claimant.

THE DEPUTY MASTER:  -- (inaudible) transfer the business, the assets being transferred, and which of you is saying that it is only the assets that were transferred, not the business?

**H**

MR AL-ATTAR:  Sorry, can you repeat the question?

THE DEPUTY MASTER:  Is one of your positions that only the assets were transferred and not the business?

MR AL-ATTAR:  Yes, we say the contract was not transferred.

THE DEPUTY MASTER:  So this is a document which goes against you on that?

MR AL-ATTAR:  No, because it says as part of the transfer between Monline is "purchasing the net assets [other than the Morsgate contract rights and cash]."

THE DEPUTY MASTER:  Oh, I see, okay, the square brackets (inaudible).

MR AL-ATTAR:  It is an unusual email, the brackets are in the original email.  It is slightly odd looking at square brackets, I know.

THE DEPUTY MASTER:  Would that not be caught by other disclosure issues, that kind of question?

MR AL-ATTAR:  There may be other documents.  One cannot assume that the parties have symmetrical documents, and we do highlight this as a particular issue.  I have shown you the plea on common intention, I have shown the pleading now which is disputed, and I have shown you the signature parts.

THE DEPUTY MASTER:  I see, so 2(b), having heard you all I think there should be something like 2(b) in, but it needs to be more neutral, "What was the state of the claimant's knowledge as to whether or not the company would the company would acquire Parker's contract with Morsgate."

It is now one o'clock.  I am going to take stock in two ways.  Firstly, I want to go through the issue for disclosure and just make sure that I have got a note of all the amendments that we have made and that we are all on the same pages.  This might take five minutes, and I hope it is okay to move five minutes into lunch.  Then let us talk about how to do the CCMC, the costs management aspect this afternoon.  Mr Hubbard, I know you might be in difficulties, we will discuss that too.

So going through it, 1 is unchanged - is that right?

MR HUBBARD:  Yes.

THE DEPUTY MASTER:  What change did we make to 2?  I just dictated something but did not keep a note of it myself.

MR AL-ATTAR:  I think you said it should be more neutral, so what is the claimant's knowledge as to whether Monline BVI, the company, would acquire Parker's contract with Morsgate.

**A**

THE DEPUTY MASTER:  Okay.  What is the next change, and that should be model obviously.  The next change was in, was it 5(c)?

MR AL-ATTAR:  5(c) and (d) as?

MR McLOUGHLIN:  They come out.

MR AL-ATTAR:  They come out as they are, but there is also a new 5(c) that you suggested to account for a purpose.  So 5(c) and (d) as drafted are out.  I have noted down, "What was the intent / purpose of the UK transfer", was a new 5(c).

**B**

THE DEPUTY MASTER:  Yes.

MR AL-ATTAR:  Then 6(a), excise the words "or GBP".

THE DEPUTY MASTER:  Hold on, please.

MR AL-ATTAR:  6(b) was in.  7(c) is out, 7(b) is in, but with narrative----

**C**

THE DEPUTY MASTER:  Sorry, you are going too fast for me, I am afraid.  6(b), GBP was out?

MR AL-ATTAR:  Yes.  6(b) was in.

THE DEPUTY MASTER:  7(b) was model D plus narrative?

MR AL-ATTAR:  Yes, and then 7(c) was out.

**D**

THE DEPUTY MASTER:  And then 8(g) was in?

MR AL-ATTAR:  8(g) and (h) were in, both with model D.

THE DEPUTY MASTER:  And 9 was out.

MR AL-ATTAR:  9 was out.

**E**

THE DEPUTY MASTER:  And 12 was in?

MR AL-ATTAR:  Yes.

THE DEPUTY MASTER:  Thank you for that.  That was helpful.  Now, as I say, Mr Hubbard, you have conduct of these documents, I am afraid, thank you very much for that, and the draft directions to.

**F**

Now, costs management, I assume you have not narrowed the issue any more?

MR HUBBARD:  No, unfortunately not.

THE DEPUTY MASTER:  So we have got the first defendant's budgets to manage, and that will realistically take more than a few minutes, will it not?

**G**

MR HUBBARD:  Yes, unfortunately.

THE DEPUTY MASTER:  Mr Hubbard, how significant are your difficulties if we come back at two?

**H**

MR HUBBARD:  I think, Judge, it was Mr McLoughlin who had difficulties, not me.

**A**

THE DEPUTY MASTER:  Forgive me, Mr McLoughlin, how about you?

MR McLOUGHLIN:  I have some professional commitments but they are not court based, so I shall have to make some arrangements.  I will see whether I can make some arrangements, if I may, over lunch to attend at two o'clock.

THE DEPUTY MASTER:  What  time do they start, your commitments?

MR McLOUGHLIN:  It is the rest of the afternoon.  I say, frankly, that I may be able to do something about that.

**B**

THE DEPUTY MASTER:  Yes, okay.  Thank you for that, Mr McLoughlin, I am afraid we do need to come back at two.  I hope it was clear relatively early on that this might take more than an hour and a half.  Let us pause until two o'clock then.  Thank you very much to you all.  I am going to leave my Teams link on but with camera and

**C**

microphone off.  I would suggest we all do the same, but please do be careful not to leave your microphone on when you are eating your sandwiches or whatever.  So thank you, see you at two o'clock.

MR AL-ATTAR:  Thank you, Judge.

MR McLOUGHLIN:  I am grateful, Judge.

**D**

(Adjourned for a short time)

THE DEPUTY MASTER:  Good afternoon.

MR HUBBARD:  Good afternoon, Judge.

THE DEPUTY MASTER:  Costs budgeting.  Mr Al-Attar, do you want to start by taking me to your budget that you are seeking?

**E**

MR AL-ATTAR:  Yes, it is at page 93 of the PDF, and the total is explained on the following pages.  We are concerned with estimated costs, rather than incurred, although the claimant is going to invite you make comment on some of the incurred costs to date, and I will be resisting that on the basis that it is an exercise of limited utility.  Of the

**F**

estimated costs, the division is £370,000 incurred, and £897,000 estimated, and that is split between five parts.  Disclosure is (inaudible).  It is £221,800 for witness statements, £60,000 odd for the PTR, £368,000 for trial preparation, £178,750 for the trial, and I think £80,000 for ADR.

**G**

THE DEPUTY MASTER:  Yes.

MR AL-ATTAR:  Before I turn to the particular stages, I would like to make several general points which I think apply across them all.

**H**

A

THE DEPUTY MASTER:  I would also like to ask, Mr Al-Attar, what is the value of this claim?  I have seen that it is more than £200,000 and I have seen that it is not specified anywhere.

MR AL-ATTAR:  It is not specified.

THE DEPUTY MASTER:  Are you able to give me, and I ask Mr Hubbard this as well, an idea of what a bad day would look like for you at the end of the trial, and also what a good day would look like for Mr Hubbard.  You have muted yourself, Mr Al-Attar.

B

Shall I ask Mr Hubbard first.  Mr Hubbard, what is a good day for you at the end of a trial?

MR HUBBARD:  Judge, we are not trying to be difficult about this, and we understand that proportionality is obviously something that the court has to consider.  We really do not know, and that is because we do not have visibility as to what D2 has done since the

C

transfer.  So we are in some difficulty, we will say it was a substantial claim.  We would be disappointed if the value of the claim ultimately were under £1 million.  We would probably be pleased if it was several million, but that is without really having anything very particular to go on, other than a few indications scattered amongst the

D

financials that we have got.

THE DEPUTY MASTER:  No, that is very helpful, Mr Hubbard, thank you.  Mr Al-Attar, what does bad day look like for you?  You are muted again.

MR AL-ATTAR:  Sorry, we are unsure as to what a bad day looks like for us.  They are

E

seeking an account, and as you have heard this morning, depending on how they, I suppose, how far they treat Parker services, or what they claim to be Parker services, that claim will be bigger or smaller.  That is the quandary we are in.

F

At the moment, if you were to take our version of events, we do think this is a low value claim, but that is because we understood it to be a claim in respect of the Parker services supplied to Morsgate.  So the defence we have pleaded is that Monline UK was not very profitable, modestly profitable, and did not trade for long.  So we have pleaded a defence which means it is a small claim.  So even if we are wrong on

G

liability, but right on our footing, it is a small claim.

THE DEPUTY MASTER:  And if you are wrong on that, Mr Al-Attar?

MR AL-ATTAR:  If we are wrong on that, there is a potential for it to be a larger claim, but I am not in a position to gauge how far on the information I have.

H

THE DEPUTY MASTER:  Mr McLoughlin?

MR McLOUGHLIN:  Judge, I am seeking instructions on that.  I shall continue to wait for them.

THE DEPUTY MASTER:  All right.  I recognise that this is not always easy to do in a case, but it would be helpful to have something to compare proportionality against in terms of the value of the case.  There are other questions of proportionality listed in the rules, and so we can look at those as well, to consider this against the benchmark of proportionality.  Mr Al-Attar, why do you not give me your opening points then on costs budgeting?

MR AL-ATTAR:  Yes.  The general points, firstly, is on hourly rates.  I must accept that Latham & Watkins' hourly rates are in excess of the guideline rates.  That is a function of the guideline rates being different from commercial rates.  To some extent, I must accept that D1's choice of law firm will impact on the budget that the court is going to approve.

What I would resist is a simple crowning down of the first defendant's budget by reference to the hourly rates because there are reasons for the retention of Latham & Watkins.  I summarise in paragraph 54.2 of my skeleton argument.  The matter partner has been a long term adviser to the first defendant.  At his previous firm, Quinn Emanuel, he dealt with the previous settlement family dispute.  So Latham & Watkins' retention is a saving of a sort compared to a new firm having to get up to speed.  That is one point.

The other point, and it is a point that you have touched on, Judge, is that in a sense we do not really know how big this claim is.  What we do know is that it is one that alleges serious allegations against the first defendant, and I will come on to that point in a moment, but this could be a large claim, and also the claimant is not really conducting it like a small claim.  We have already seen one aspect of related litigation in the USA.  The 1782 application will not be CPR costs, but that is a slightly unusual feature of what is supposed to be a small claim, that one has already satellite litigation in the US.  So the first defendant's choice of an American law firm to represent him based on past experience is something that is, we say, reasonable, and so I am resisting the, as it were, automatic discount to the defendant's budget based on the higher hourly rates.  That is the first point I wanted to make.

**A**

The second of the general points is to compare the hours at each stage at the firm's hourly rate, so one has something of a like for like comparison. These figures are not in evidence, but I have done some working out, so let me communicate these, if I can. For witness statements, Latham & Watkins' hours equate to about 215 hours. MTG's hours, their hourly is about 74 hours. IWG is about 207 hours.

THE DEPUTY MASTER: Sorry, Mr Al-Attar, forgive me, could you tell me then again, but tell me which party rather than which firm, that would be more helpful.

**B**

MR AL-ATTAR: Certainly. So D1 for witness statements is 215.

THE DEPUTY MASTER: 215.

MR AL-ATTAR: Claimant, 74, other defendants, 207.

THE DEPUTY MASTER: Okay.

**C**

MR AL-ATTAR: For trial preparation for D1, it is 380. For C, it is 121, for the other defendants it is 110.

THE DEPUTY MASTER: 380, did you say, Mr Al-Attar?

MR AL-ATTAR: Yes.

THE DEPUTY MASTER: And the claimant, it is 121, and the second to fourth defendants 110?

**D**

MR AL-ATTAR: Yes. For the trial in the same order, it is 200, 137 and 126.

THE DEPUTY MASTER: Right.

MR AL-ATTAR: For the PTR it is 72, 35 and 22.

**E**

THE DEPUTY MASTER: Yes.

MR AL-ATTAR: And for ADR it is 65, 40 and 78.

THE DEPUTY MASTER: So with the sole exception of witness statements and ADR, yours is much, much more than the others in terms of the number of hours?

**F**

MR AL-ATTAR: Yes, I can give you total figures so that you can make an overall comparison.

THE DEPUTY MASTER: Go on.

MR AL-ATTAR: For my client it is 932 hours, for the claimant it is 406 hours and for the other defendants it is 543 hours.

**G**

THE DEPUTY MASTER: Okay.

MR AL-ATTAR: And so our hours are almost double the work of the claimants.

THE DEPUTY MASTER: This seems to be a point that is going to be taken against you rather than for you.

**H**

MR AL-ATTAR: It is a point I have to explain, so that is what I am going to do.

**A**

THE DEPUTY MASTER:  Yes.

MR AL-ATTAR:  I am taking a point against myself and I am going to give you the justification.  I know the burden is on me.

THE DEPUTY MASTER:  Absolutely.

MR AL-ATTAR:  And so I have to discharge that.

THE DEPUTY MASTER:  Thank you.

**B**

MR AL-ATTAR:  I cannot fight it.  The question is why is D1 doing so much more work than the claimant and also the other defendants?  This is my third point.  There are several justifications, and you will have seen from the claimant's criticisms that they say that we should have about 10 per cent more than what they are offering at most, and they say that is arbitrarily the limits of reasonableness.  We say one has to look at the

**C**

general shape of the case and what it is the claimant avers, and will be doing in preparation for that trial, and what the defendants say.  We have gone over the pleadings to that, we do not need to go back over them.

**D**

The claimant says that the UK was done against his will in the sense that he was prepared to consent to a particular form of transfer with a particular form of beneficial ownership, but he was ignorant of the transfer that happened at the time.  So, in a sense, the claimant has relatively minimal work to do because he says he did not know.  He says he was (inaudible) company whose claim he has purchased was the victim of a

**E**

conspiracy of which he was ignorant, and so his own witness evidence at trial should, on his pleading, be limited.  There may be background matters that he wants to speak to, but as to his direct evidence bearing on the dispute, it is a relatively narrow case.

**F**

If you contrast that with that of the first defendant, he is accused of breach of fiduciary duty and conspiracy.  They are serious allegations, and a natural response of any defendant in that position is to explain as candidly as they are able to what happened to correct the misunderstanding and suspicion on the part of the claimant.  What that comes to at a general level is you need to look, because these transactions were

**G**

advanced, so one has to look at the advice given in the transactions, who was involved, how they were executed.  The reason that is a natural response is because when one is saying there is a breach of fiduciary duty, an unlawful means conspiracy, as a defendant who has had the benefit of professional advice or wants to look carefully at what that

**H**

advice was, get the recollections of the adviser, because the wider one draws people into the conspiracy the more implausible it becomes.

To put this in more concrete terms, if you go to page 46 of the bundle - I have given you a bad reference, I want to show you our DRD, it was the right reference - let us start with the claimant.  At page 4 of the DRD, and you have heard it this morning, the claimant has essentially one custodian and one witness.  That is what the claimant is planning.  So their hours, which are half our hours, are based on one witness only.  If you compare that to page 59 of the bundle, this is annex A of the first defendant's DRD, and it is the custodians.  So we have up to nine potential custodians, a number of whom are advisers.  I said this morning we are uncertain as to how many witnesses we will be calling, but I want to give the court a sense of why there is no symmetry between the figures.  It is because the burden of explanation is on the defendants.  The burden of explaining both the Parker winding up, the transfer to Monline BVI, why that did not work, the transfer to Monline UK, and what happened subsequently, all that is work that the defendants have to do.  The claimant simply asks the question.  So in terms of assessing the proportionality of the work done, it is natural that the defendants should estimate far more in terms of work they have to do than the claimant.

With those points in mind, can I turn to address the stages, Judge?  On witness statements there is 215 hours of solicitor time and £55,000 of counsel time.  Let me start with the solicitor time.  If one assumes eight hours----

THE DEPUTY MASTER:  This is for three witnesses, Mr Al-Attar?

MR AL-ATTAR:  Sorry?

THE DEPUTY MASTER:  This is for three witnesses?

MR AL-ATTAR:  We do not know if it is three witnesses at the moment.  It is roughly worked out by the people we are probably going to call with an eye to the custodians we may call.  The number of witnesses may increase.

THE DEPUTY MASTER:  You have got assumptions in your budget.  What is the assumption on which this is----

MR AL-ATTAR:  You are right.  The hard assumption is the three witnesses we named at the time that this budget was prepared, but I think one has to think about it more broadly, because the custodians I have just shown you may be additional witnesses.

**A**

THE DEPUTY MASTER:  I am going to budget this on the basis of the assumptions that you have given me.  If the assumptions change, that is when to apply to vary the budget.

MR AL-ATTAR:  Understood.

THE DEPUTY MASTER:  This has got to the basis.  So on the assumption that you are serving three witness statements----

**B**

MR AL-ATTAR:  If you take eight hours billable per day, and divide 215 by that, you have got 26 days worth of work to prepare the three witness statements in the bundle. Obviously that would be weighted towards the first defendant.  That is going to work out at roughly about nine days per witness, in terms of several proofing sessions, filing the documents, and the burden is really - the new practice direction requires us to be very careful about getting unaided recollections in so far as possible from the witness.

**C**

That tends to make the process relatively intense.  The number of hours is high.  It is cautious because one is at an early stage, but it is not, in my submission, an unreasonable estimate given the burden on the defendants.

**D**

As to my own time, that is estimated on the basis of roughly ten days of work for counsel, and I think what that envisages is a more modern process where, rather than counsel just reading a draft witness statement cold, counsel is more involved in listening in on the proofing sessions and working with the team.  I think that is the reason for the fee there.

**E**

That is all I wanted to say on witness statements.  In terms of trial preparation, it is 380 hours.  Again, assuming eight hours billable per day, you have got a team of three solicitors----

**F**

THE DEPUTY MASTER:  Mr Al-Attar, could you do PTR next, please?

MR AL-ATTAR:  Yes, certainly.  The PTR is 72 hours.  That is nine days worth of work, and I recognise that is a lot for a PTR.  I think the reason for that is because PTRs can be elastic.  This has been budgeted, because the budget is obviously subject to assessment, at the upper end of what a contested PTR can be.  PTRs can be very minimal or they can be very heavy.  The assumptions have been very conservative to justify that much work for a PTR.

**G**

**H**

THE DEPUTY MASTER:  They have not.  The PTR assumption is that it is no longer than half a day.  If there are major applications to be made they will come with their own costs decisions.

THE DEPUTY MASTER:  I think there have been some crossed wires.  I understand that a PTR is normally very short, but that is my explanation as to why there is a mismatch in terms of hours of work in a half day hearing.

THE DEPUTY MASTER:  Okay.

MR AL-ATTAR:  On to trial preparation, if I may, Judge?

THE DEPUTY MASTER:  Yes, please.

MR AL-ATTAR:  That is at 380 hours.  Again, assuming eight billable hours per day, that is about 47 days work.  That is divided between a three solicitor team, and that work will involve preparing and agreeing the factual chronology----

THE DEPUTY MASTER:  Do you have carriage of that?

MR AL-ATTAR:  Counsel is involved, but I do not normally have----

THE DEPUTY MASTER:  No, it would normally be the claimants who do the first draft of that, would it not?

MR AL-ATTAR:  Well, I think it is the work agreeing it, so I would put stress on that.  You are right, the claimant does the first draft, but it has got to be agreed by the defendant.  So it is relevant, the case summary.  Skeleton argument is obviously primarily the role of counsel, but in modern practice solicitors are involved very heavily as a team reviewing and working on submissions for a court.  There will be pre-trial conferences.  There will be further engagement with witnesses, because statements on one thing, things always come up before trial that require further enquiries to be made of witnesses.  There will be a lot of----

THE DEPUTY MASTER:  Sorry, Mr Al-Attar, I am going to pause you again.  I have just noticed your assumption is that there is no significant disagreement between the parties about bundles, chronologies, etc, *dramatis personae*, reading lists for other documents.  So I think agreement chronology has got to be very minimal there, and case summary.  Skeleton, obviously you need to do your skeleton and your solicitors need to consider it carefully.  So chronology and case summary minimal.  Skeleton, fine, pre-trial conference, is that not included in the previous band, the PTR includes a half day conference with the first defendant.

MR AL-ATTAR:  I think that is meant to be for PTR issues rather than a conference on, for example, the merits of the case.

THE DEPUTY MASTER:  Okay, so (inaudible)?

MR AL-ATTAR:  Just the one.  Despite the fact that a substantial disagreement is not anticipated, it is usual not to have a substantial disagreement on things like the

A

chronology, they still require substantial work.  That would be my answer to that.  In terms of justifications for this estimate, there is going to be lots of correspondence.  That forms part of the budget.  The trial preparation will include a review of the trial bundles.  They have to be very carefully agreed, because obviously everything in the trial bundle is proof of its content.  Then there is a review of the skeleton arguments on which solicitors are not massive.  So in terms of estimate, it has been put together in response to a conspiracy claim.  General experience shows these types of claims require

B

substantial work to deal with, and at this stage it does appear generous but we suggest it is not unreasonable for a budget.

C

In terms of my own fee, I am not sure that is heavily contested on the part of the claimant, but for what it is worth it has been prepared by the standard two to three, or thereabouts, multiple of the hearing, number of days in my hourly rate with the usual negotiated element for a commitment in counsel's diary in case the case settles.

D

That is all I have to say on trial preparation.

THE DEPUTY MASTER:  Yes.  And for the trial itself?

MR AL-ATTAR:  For the trial itself, there is 200 hours put down for the trial.  This is a seven day trial.  There are three solicitors at Latham & Watkins on the team.  The team is appropriately staffed between a partner, a senior associate and a junior associate.  If

E

one does seven days at eight hours per day, that is 147 hours.  In reality, trial days are much longer than eight hours per day.  So I suggest that 200 hours is about right for a seven day trial.  That is all I was going to say on the trial.

THE DEPUTY MASTER:  Yes, and is that six refreshers on your line, or seven days?

MR AL-ATTAR:  I think it is six refreshers?

F

THE DEPUTY MASTER:  Seven refreshers, including the judgment day?

MR AL-ATTAR:  I had forgotten that.  I had, in my head, thought it was six refreshers, there or thereabouts.

THE DEPUTY MASTER:  Thank you.  Other disbursements, what is that for?

G

MR AL-ATTAR:  Is it for the transcriber, transcription service.

THE DEPUTY MASTER:  Okay.

MR AL-ATTAR:  As to ADR, it is 65 hours of work.  Again, by my same hourly rate assumption that is about eight days worth of work, so if one is going to have position

H

papers for a mediation, work in preparation for the mediation, then usually a day long

A

mediation, that is not an unreasonable amount of time, especially as it will include the drawing up of a settlement agreement which can itself take time if the parties reach a commercial solution.

THE DEPUTY MASTER:  Okay.

MR AL-ATTAR:  I do not know whether you want me to deal with it pre-emptively, but finally, Judge, the claimants have required that the court comment on the incurred costs to date.

B

THE DEPUTY MASTER:  Yes, why do you not tell me what your position is now, so we do not do too much ping pong.

MR AL-ATTAR:  Sorry, I did not hear that?

THE DEPUTY MASTER:  Please tell me what your position is now so we do not have too much back and forth.

C

MR AL-ATTAR:  We resist the court commenting on the incurred costs to date for these reasons:  the costs have to be----

THE DEPUTY MASTER:  What are the incurred costs?  Is it £320,000, including today?

MR AL-ATTAR:  Yes.  The incurred costs will be the subject of an assessment if not agreed.

D

Passing comment on those costs now is, in my respectful submission, an exercise of limited utility given the time and information the court has had.  It has not had the kind of breakdown appropriate even to a summary assessment.  To the extent that the court has had time to read the pleadings and the correspondence, I would submit that the

E

*prima facie* assessment is that the incurred costs have been incurred by work done reasonably in good faith in the progress of the case.  I acknowledge the costs are high. In large part that is because of the higher hourly rates.  That is a matter, in itself, that does not call for comment because it is apparent from the comparison between the hourly rates themselves and guidelines.  That is something to which added comment is,

F

as I say, of limited utility.

THE DEPUTY MASTER:  Thank you.  Yes.  Thank you very much, Mr Al-Attar.

Mr Hubbard?  Mr Hubbard, you are muted.

MR HUBBARD:  Sorry, Judge, I am just checking with those instructing me on a couple of

G

points arising from what my learned friend was just saying.  Looking at the first defendant's general points about his budget, most of them might have some merit if it was the second to four defendants who were making the same points.  As the court knows, the second to fourth defendants' budget is about £10,000 more than ours at 420,

H

and they might reasonably say, "Well, we have more work to do, we are actually

running the second defendant on our case from June 2016 through to the end, and so we have a slightly larger task to do."

On his own case, the first defendant's involvement in this case ends at the transfer.  He says he is not a director of D2, he says he is not a shareholder in D2.  He does not say that he had anything to do with D2 after 7 June 2016, and his role in these proceedings, on his case, focuses, or is largely limited to a period March 2016 to June 2016.  Yes, there may have been one advised transaction, we are not aware that the UK transfer was alleged to have an advised transactions, but they are in one advised transaction, which is the transfer from Parker to the company.  We say that does not really explain how it is said that the task that the first defendant faces is substantially greater in extent or in difficulty than the one which faces, for example, the second to the fourth defendants, who can get the job done for roughly the same price that we can.  So we do not think there is really anything in those arguments in themselves.

The hourly rate argument, the hourly rates that Latham & Watkins have applied are, as they admit, very high.  They are, and you will see the annex to my submissions, multiples of the guidelines in most cases, not exceeding them by a degree, but, for example, their grade A is 202 per cent of guideline grade A.  The rates they have actually applied in relation to their grade Cs, range from 165 to 363 per cent of guideline rates.  So this is not a question of marginally higher rates, but of massively higher rates, which unsurprisingly, when added to very large amounts of time, produce very, very high costs.  All of this has to be seen, we say, in the context of costs budgets from both the claimant and the second to fourth defendants, which, in the result, are roughly the same at about £400,000, whereas the result of the first defendant's budget is up to about £1.2 million.

So there are broad issues, which I am sure the court is keenly aware of, as to how this can be said to be reasonable and proportionate, and the argument that somehow continuing to use Latham & Watkins on this case has saved money in comparison to using another firm seems to be rather difficult to follow on the basis that, as far as I am aware at least, IWG had no prior knowledge of the Salem family or any of these issues, and their budget is, as I have said, £420,000.  So it cannot really be said, we say, that there is any justification for causing other parties to pay, and that is really what this

**A**

boils down to, for services supplied Latham & Watkins at these rates, or anything like these rates when, we say, reasonableness, and to the extent the court is able to assess it, proportionality, suggests that the job can be done and should be done for much, much less.

**B**

It is not just a question of the hourly rates, but also the hours.  As you commented, Judge, in almost every phase the first defendant's hours are roughly double, if not more, than the hours of other parties.  We do not agree specifically that the 207 hours that second to fourth defendants had put in their costs budget for witness statements was a reasonable about.  We say that each party has to review the other's witness statements.

**C**

Each of the defendant parties has budgeted on the assumption of three witnesses.  It is hard  to see how, on those assumptions, there should be such massively different amounts of work required reasonably and proportionality to prepare witness statements. We say it is not reasonable, for example, for counsel to sit in for ten days while witnesses are proofed.  It is not reasonable to spend 215 hours proofing three witnesses,

**D**

even paying the most careful attention to the guidance in the practice direction on witness statements.

**E**

Judge, you will have got a flavour of the landscape of this dispute, and the kinds of allegations and facts that are in issue and their scope, and this is what witnesses are going to be talking about.  So far the first defendant has only identified himself as a witness.  So we do not know quite what the other witnesses are going to be, or what they might be adding to his primary witness statements.  So we are really looking at a case where there are going to be four primary witnesses, and possibly a couple of

**F**

additional witnesses whose evidence is going to be limited in scope, who have not yet been identified, and we say that none of that justifies the assumptions.  Overall, there is a consistent combination on the part of the first defendant of very high budgets for each phase, and very conservative assumptions in the sense of assuming that no costs need to be incurred, several of which, Judge, you have commented upon.

**G**

So we say that the court, standing back and looking at this, and looking at each phase on a broad brush basis, needs to consider where the line can be drawn as to proportionality and reasonableness, and we says that the first defendant's budget from end to end is very far to the wrong side of that line, which is why we have taken the

**H**

**A**

slightly unusual course of offering a 10 per cent addition on each phase, because that still takes each phase to an excess over ours - sorry, 10 per cent over our costs of each phase I should say.  We say that the starting point in this case is not what the first defendant has put in its budget, but should, in fact, be what both the claimant and the second to fourth defendants have, in broad terms, put in their budgets.

**B**

So looking at the phases, witness statements, Judge, you have commented on what the assumptions are.  The budget figure the first defendants have used is more than six times, 633 per cent, of the claimant's budget.  Even allowing for there being some more

**C**

work to do and possibly a couple of additional witnesses whose evidence might need to be obtained, it really cannot justify this level of disparity which, as you will have seen, is a combination of using hourly rates, or applying hourly rates at what Latham & Watkins charge out which is, as we have said, multiples of  guideline, and in most cases roughly double what the claimant's solicitors are charging out, and very high numbers

**D**

of hours comparatively.  So this produces, unsurprisingly, a huge figure for what is not, from what the court has seen, a particularly heavy, particularly complex, or particularly valuable dispute.

**E**

It may be a dispute of some importance to the parties, but then, in a sense, all disputes are.  And there may be serious allegations made, but that is not unusual.  The second to fourth defendants are particularly capable, it would seem, of dealing with the serious allegations against them within a budget of £420,000 all in.

**F**

So, Judge, I do not know how much more assistance I can be.  If you would like me to go through each of the phases in turn, but we make similar criticisms of each.  The phases where the disparities are particularly striking are self-evidently witness statements and trial preparation.  We struggle to think of any - well, we can see how the figures are derived, but we cannot see how it could possibly be said to be reasonable or proportionate to expect the claimant to pay those costs generated in that way.

**G**

THE DEPUTY MASTER:  And what about commenting on incurred costs, Mr Hubbard, you ask me to do that?

MR HUBBARD:  I do.  Again, they have incurred three times our costs, despite being defendants, and the only actual noticeable product of that £300,000 is a relatively short defence that you have been taken to, and that is, we say, worthy of comment.  For what

**H**

**A**

it may be worth, the court should express a view that expending, for example, £233,094.67 on the issue of statements of case where the claimants incurred £39,000 is, on the face of it, neither reasonable nor proportionate.

THE DEPUTY MASTER:  What is the test that I am supposed to apply when considering whether to make a comment like that?  It is in rule 3. what?

MR HUBBARD:  Rule 3.15(4).

THE DEPUTY MASTER:  Thank you.

**B**

MR AL-ATTAR:  We have highlighted certain guidance, Judge, in footnote 4 of our skeleton argument referring to the 2023 White Book, at 3.12.5, and that is a summary of - there is a trio of cases, you may be familiar with them.  In general, the court is cautious about commenting upon incurred costs given the limited information and evidence.  The point that is really being driven home to you by Mr Hubbard is the hourly rates.  As I say, that is apparent from a comparison with the guidelines.

**C**

THE DEPUTY MASTER:  Yes, okay, thank you.  Mr Al-Attar, is there anything you need to come back on to Mr Hubbard?  Thank you.  Mr McLoughlin, are you broadly neutral on all this?

**D**

MR McLOUGHLIN:  Yes.

THE DEPUTY MASTER:  Thank you.  I am going to turn my microphone and camera for a few moments while I do some number crunching and come back to you very shortly, probably in about five minutes, so please do not go too far from your desks.  So five minutes.

**E**

(Short break)

(For judgment, see separate transcript)

THE DEPUTY MASTER:  Did those figures come through?

MR AL-ATTAR:  They did, thank you, Judge.

MR HUBBARD:  Thank you, Judge.

**F**

MR HUBBARD:  Unless any of my learned friends have any questions as to that, I think the only other outstanding matter is the directions for matters carried over, which we discussed this morning.  I do not know whether those need to be refined slightly.

I think where we got to is that the time allowed to attempt to deal with those issues by agreement would be until the first week of September, with the possibility of a further hearing before you, Judge, in the week of 18 September.

**G**

THE DEPUTY MASTER:  Yes.

**H**

MR HUBBARD:  As I have carriage of the order, is there more to be said on that?

A

THE DEPUTY MASTER:  I do not think so.  It is key words, and so on, so sections for the DRD.  Costs budgeting for the disclosure phase, and any application for permission for expert witnesses.

There is one more thing.  I would like us to take stock then to consider whether a trial to be listed in April remains achievable and realistic, and whether it needs to be pushed off.  The last thing anyone wants is a last minute adjournment.

B

MR HUBBARD:  Thank you, Judge.

THE DEPUTY MASTER:  So, Mr Hubbard, you have got the carriage of the order.

MR McLOUGHLIN:  Judge, forgive me, can I seek clarification on the direction on key words, costs budgeting and any application for permission to rely on expert evidence.  Am I to understand that that is to be agreed or otherwise the court notified of the position by 8 September, that being the end of the first week of September?

C

THE DEPUTY MASTER:  I thought it was the 4th, but I am relaxed either way.

MR McLOUGHLIN:  The 4th is the first day of that week.  It is the first Monday after August.  I just wonder whether, in the circumstances, the 8th might be prudent.  The whole point is that people are away at various times during August.  I am conscious that those instructing me are the two fee earners who have been involved in this matter, and obviously it is a matter that requires continuity, are themselves away leading up to and indeed in that first week.  So it would certainly help us if it was the 8th rather than the 4th.

D

E

THE DEPUTY MASTER:  I am happy with the 8th.  Mr Hubbard and Mr Al-Attar?

MR AL-ATTAR:  I do not think we have any difficulty with that, as long as we have, as it were, a firm end date in the shape of a hearing before you in the week of the 18th, Judge, then I think we are content that it can be the 8th.

F

MR McLOUGHLIN:  Forgive me, that is what I had in mind, we have that date anyway.

MR AL-ATTAR:  I am just checking my diary now, Judge, I think that will be - it looks like I have got a hearing on the 21st.

THE DEPUTY MASTER:  Is the 8th okay as a deadline for coming to an agreement about the key words, and so on?

G

MR AL-ATTAR:  Yes.

THE DEPUTY MASTER:  Let us have that fixed then.  So parties to seek to agree by 8 September all remaining matters in dispute, but I will leave it to the DRD, all remaining matters in respect of disclosure, in respect of the DRD, and to notify the

H

**A**

court of the state of agreement.  Then I will suggest is that the following you spend putting together any application or court documents, or whatever, that is the week of the 11th, and then the week of the 18th is when I am sitting.  Counsel, what are you availabilities in the week of the 18th?

MR AL-ATTAR:  At the moment I have a hearing on the 21st.

THE DEPUTY MASTER:  Let us go one at a time.  Mr Hubbard first?

MR HUBBARD:  I can do any day that week at the moment, Judge, yes.

**B**

THE DEPUTY MASTER:  Okay.  Mr Al-Attar?

MR AL-ATTAR:  Any day apart from the Thursday.

THE DEPUTY MASTER:  Mr McLoughlin?

MR McLOUGHLIN:  Any day apart from the Monday or the Tuesday, so I think that leaves us the Wednesday and the Friday.

**C**

THE DEPUTY MASTER:  Let us go for the Wednesday.  I am going to say that, and perhaps, Mr Hubbard, you could leave this in square brackets, we will try and list it for a hearing on 20 September at 10.30, but this is very much subject to approval by the court office in terms of availability of a room, and so on.

**D**

I am assuming remote is convenient, but with key words, and so on, it might be more straightforward for us all to be in the same room.  Is that convenient for everyone?  Is anyone summering in Scotland?

**E**

MR HUBBARD:  It is certainly convenient for me to have an in person hearing.

THE DEPUTY MASTER:  Mr McLoughlin?

MR McLOUGHLIN:  I agree.

THE DEPUTY MASTER:  Mr Al-Attar?

**F**

MR AL-ATTAR:  It is no bother.  I normally live in the west of England, but I can do my usual thing of coming into London.

THE DEPUTY MASTER:  Okay, is 10.30 convenient for you, Mr Al-Attar?

MR AL-ATTAR:  Yes.

THE DEPUTY MASTER:  Okay, so let us say 10.30 on Wednesday, 20 September, in

**G**

person.  I will ask the court staff.  If that does create any problems, there is plenty of time to sort it out.

MR HUBBARD:  Judge, one final point, on the costs budgeting, are we to understand that you declined to make any comment on the incurred costs?

**H**

**A**

THE DEPUTY MASTER:  Thank you for asking.  Yes, I say that I do think they are very high indeed, but I think it is for a costs judge, not me, to make any formal comment on them.  There might be a reason why they are very high indeed, and that is not for me to decide.  So I am not going to make any comment on the order as to the incurred costs.  So I am neither approving the very high nature of them, nor commenting on them in any formal way.

MR HUBBARD:  Thank you, Judge.

**B**

MR McLOUGHLIN:  Judge, can I - I am so sorry, Mr Hubbard.

THE DEPUTY MASTER:  Yes, Mr McLoughlin.

MR McLOUGHLIN:  Judge, one last point on matters carried over:  are you content for the parties, if they cannot agree - I suspect this is principally the claimant and my clients - if they cannot agree that they are agreed on questions of BVI law, that they file at the

**C**

same time as their disclosure phase any costs estimate for dealing with expert evidence?

THE DEPUTY MASTER:  Yes, good point, that is fine, a good idea.  So budgeting in that sort of adjournment of the CMC will include costs budgeting for disclosure and any expert evidence.  It is so ordered.

**D**

MR McLOUGHLIN:  I am grateful.

THE DEPUTY MASTER:  Great, thank you.  Are you able to agree an order relatively soon?

MR HUBBARD:  I certainly hope so, Judge, before everyone is about to disappear.

THE DEPUTY MASTER:  Thank you very much indeed.  Unless there is anything else?

**E**

MR HUBBARD:  No, thank you, Judge.

MR AL-ATTAR:  No, thank you, Judge, thank you for staying with the hearing.

THE DEPUTY MASTER:  Thank you very much all of you.

_____

**F**

**G**

**H**

A

**CERTIFICATE**

Opus 2 International Limited hereby certifies that the above is an accurate and
complete record of the Proceedings or part thereof.

B

*Transcribed by **Opus 2 International Limited***
*Official Court Reporters and Audio Transcribers*
***5 New Street Square, London EC4A 3BF***
***Tel:  020 7831 5627    Fax:  020 7831 7737***
***civil@opus2.digital***

C

D

E

F

G

H