# EXHIBIT 1

IN THE HIGH COURT OF JUSTICE          **Claim no.**

CHANCERY DIVISION

BETWEEN:

(1) ISAAC MOUSSA SALEM
(2) MIREILLE RAYMOND SALEM
(3) MOUSSA ("MOUSSY") SALEM

**Claimants**

-and-



(1) FARAJ ("FREDDY") MOUSSA SALEM
(2) BENO MOUSSA SALEM
(3) ROTHSCHILD SWITZERLAND (C.I.) TRUSTEES LIMITED
(4) GUERNSEY GLOBAL TRUST LIMITED

**Defendants**

---

**PARTICULARS OF CLAIM**

---

### The Claimants

1  The First Claimant ("Isaac") is the eldest of four brothers ("the Brothers"), the male children of the late Moussa Salem and his wife, Perla Salem (née Yael).

2  One of the Brothers, Raymond Moussa Salem ("Raymond"), died on 30 November 2002, leaving a widow ("Mireille"), who is the Second Claimant, and three adult children, namely "Moussy", "Robert", and "Patti". Moussy is the Third Claimant.

3  Pursuant to a grant of probate dated 29 August 2003, Mireille is the executrix of Raymond's estate. She brings this claim in that capacity as well as in her personal capacity as a beneficiary of his Will dated 17 November 1988. At the time of his death, Raymond was resident in the UK and domiciled in Lebanon.

### The Defendants

4  The First Defendant (Faraj, known as "Freddy") and the Second Defendant ("Beno") are the surviving brothers of Isaac.

5   The Third Defendant and the Fourth Defendant are the joint trustees of three trusts purportedly settled by Beno: the first trust was dated 2 April 2003 and is for the benefit of Raymond's children or remoter issue and his widow (or his children's widowed spouses) (the "R1 Settlement"); the second trust is for the benefit of Freddy's children or remoter issue and his spouse (the "F1 Settlement"); and the third trust is for the benefit of Beno's children or remoter issue and his spouse (the "B1 Settlement"). The dates of the F1 Settlement and the B1 Settlement are not known, but are believed to be around the same time as the R1 Settlement.

**The Family**

6   The Brothers were born in the Lebanon between about 1933 and 1951.

7   In or about 1975, after the outbreak of civil war, the Brothers left the Lebanon and moved to London with their then widowed mother, Perla.

8   Freddy and Raymond settled in England and became naturalised British citizens.

**The Partnership**

9   In the late 1950s Isaac started (or took over from his father) a money changing and foreign exchange business in Beirut. In or around 1966 Isaac began a large trading business in West Africa, which involved the distribution of food, tobacco and textiles in various countries, in particular Algeria, Benin, Ghana, Libya, Niger, Nigeria, Togo and Morocco ("the African Business").

10  While the Brothers were still living in the Lebanon, Isaac was joined in business by, first, Raymond and thereafter by the younger brothers, Freddy and Beno. Together the Brothers carried on business in partnership. The African Business became the Brothers' principal business activity.

11  On or about 26 January 1973 the Brothers formed Société Salem Frères ("SSF"), a Société en Nom Collectif, by registering it at the Commercial Registry of Beirut under registration number 28496. A Société en Nom Collectif is the equivalent under Lebanese law of an English law partnership (but differs in that it has corporate existence). The address of SSF was originally Bab Idriss, Kaboushiya Street, Kronfol and Daouk Building, 2nd Floor, Beirut, but was changed on 3 June 1974 to another address in Beirut.

12  From January 1973 the African Business was carried out through SSF and through various trading companies in Africa set up by Beno on behalf of the Brothers. The

Legal.35204360.5/SGOL/34275.00001         2

|    | Brothers took all major decisions in relation to trading operations on a collective basis, the companies being vehicles for the partnership. |
|----|---|
| 13 | In or about 1975, as pleaded in paragraph 7 above, shortly after the outbreak of the civil war, the Brothers left the Lebanon and moved to London. |
| 14 | They continued to manage the African Business, principally from an office situated at 80 Grosvenor Street, London W1K 3JX ("the London Office"). |
| 15 | Although their drawings of profits from the underlying vehicles used to run the partnership varied from time to time, the Brothers were at all times entitled to share profits, and were liable for losses, equally. |
| 16 | On 31 January 1985, the Brothers caused to be incorporated a Panamanian Company, Presi Inc ("Presi") to hold partnership business interests in the UK. The shares in Presi were originally vested in Beno as trustee for the Brothers in equal shares. The respective beneficial shareholdings were recorded in a memorandum dated 2 April 1993 prepared by Nick Moss of Rothshchild Trust Guernsey Limited ("Rothschild"). |
| 17 | From about 3 February 1998 and at all material times since that date, 25% of the shares in Presi have been held by Isaac in his own name. The remaining 75% of the shares in Presi held by Beno on behalf of himself, Freddy and Raymond in equal proportions were after 3 February 1998 transferred into tax efficient vehicles, and are now held by the R1 Settlement, the F1 Settlement and the B1 Settlement in equal proportions (such that 25% of the shares in Presi were transferred into each of the three trusts). |
| 18 | The board of directors of Presi was and is made up of three corporate directors: First Board Limited, Second Board Limited, and Third Board Limited (the "Directors"). The Directors are companies owned by Rothschild and are administered by Rothschild on the instructions given by or on behalf of the Brothers. |
| 19 | The purpose of Presi was and is to hold a portfolio of properties situated, and from time to time held through vehicle companies, in the UK ("the Portfolio", which expression includes the cash and bank accounts from time to time representing the proceeds of sale of such properties). Presi itself was set up as a nominee for the Brothers, and its sole function is and at all material times has been to provide a corporate structure for holding the assets in the Portfolio. In practice the Brothers |

|  |  |
|---|---|
|  | treated Presi as a vehicle for conducting their UK business in the same way that they used SSF as a vehicle for the African Business. |
| 20 | Assets were vested in Presi and/or its subsidiaries that included, or were acquired using the proceeds of, assets that were earned by the Brothers in their capacity of partners in SSF or that rightfully belonged to SSF. |
| 21 | As at April 2012 the assets comprised in the Portfolio were as follows – |

    (a) 3-5 Norwich Street, London ECA

    (b) 64-70 South Audley Street, London W1

    (c) 79-81 Grosvenor Street, London W1

    (d) 13-26 Mount Street, London W1.

|  |  |
|---|---|
| 22 | The Portfolio is now vested in Forextra Developments Limited ("Forextra"), a wholly-owned subsidiary of Frelene Limited ("Frelene"). Previously the Portfolio had been vested in Frelene itself, but a restructuring in 2012 resulted in the ownership of the Portfolio being transferred to Forextra. Frelene is a wholly-owned subsidiary of Presi. Both Frelene and Forextra are companies registered in England. The corporate structure comprising Presi, Frelene and Forextra has at all material times functioned as a holding structure for the Portfolio. |
| 23 | At all material times the Brothers treated the property business held and operated through Presi and its subsidiary companies ("the Portfolio Business") as separate from the African Business. However, they were entitled to share the profits, and were liable for the losses of both businesses in the same way: that is to say, equally. |
| 24 | It was at all material times the intention of the Brothers that this equal entitlement to a share of the profits (and liability for the losses) should be correctly reflected by the manner in which the shareholdings in the companies holding the Portfolio were structured. This intention had not been correctly implemented, as Freddy and Mireille (as personal representative of Raymond) each held 7,500 of the 50,000 ordinary shares in Frelene, and Presi held only 35,000. It was therefore agreed in various meetings and exchanges between the parties and their advisers between September 2011 and July 2012 that Frelene would purchase Freddy's and Mireille's 15,000 shares so that the entirety of the ordinary share capital of Frelene was owned by Presi and equality was restored. This agreement was duly implemented in August 2012. |

25     The property assets comprised in the Portfolio were valued by Cluttons LLP for the purposes of the restructuring referred to above. According to that valuation, the open market value as at 3 April 2012 was £49,150,000.

26     In the premises –

(a) the African Business was as a matter of law –

    (i)     a continuation of the business of SSF governed by Lebanese law;

    (ii)     alternatively, a partnership between the Brothers governed by English law incorporating by implication terms equivalent to those of the Statutes of SSF as amended (mutatis mutandis);

    (iii)     alternatively, a partnership at will between the Brothers governed by English law;

(b) the Portfolio Business was as a matter of law –

    (i)     a partnership between the Brothers governed by English law incorporating by implication terms equivalent to those of the Statutes of SSF as amended (mutatis mutandis);

    (ii)     a partnership at will between the Brothers governed by English law.

**The 1993 Agreement**

27     In 1993 Isaac and his three brothers decided that it would be in their mutual best interests for Beno, Freddy and Raymond to purchase Isaac's share of the partnership business that was concerned with the African business.

28     Accordingly, on or about 14 April 1994 the Brothers agreed to terminate the relationship between them as regarded the African Business, and pursuant to a Deed of Acknowledgment of No Claims and of Confidentiality dated 14 April 1994 ("the 1994 Deed"). Under the 1994 Deed the Brothers recited that –

> "there is not and never has been (in any jurisdiction) a partnership or any other form of association giving rise to obligations between them or between any of them and any company in which any of them have or have had an interest, relating to the trading of good in Africa of the financing of such trade (save for the shipment of goods to Africa by Société Salem Frères, a

Société en nom collectif established under the laws of Lebanon which ceased trading in or about 1985)."

29. The said recital was (as the Brothers well knew) untrue and misleading. On or about 2 June 1993 Freddy, Raymond and Beno took advice from Charles Purle QC ("Counsel", as he then was) as to (*inter alia*) the legal status of the relationship between the Brothers. A further consultation with Counsel took place on or about 11 June 1993. The advice given by Counsel referred to "existing partnership assets", and the advice was given "on the assumption that the brothers have been compromised (*sic*) and a partnership at will exists in England..."

30. Further, according to a Note of the Conference on 11 June 1993, "DPHB [Mr Burgess, a partner at Messrs Gouldens] wished to know whether it would be possible to argue that any partnership was a continuity of the Lebanese partnership and therefore Article 13 [of the Statutes of SSF] could be imported into the arrangements. Counsel confirmed that this was a possibility."

31. Furthermore, SSF was still in existence as at May 1993, and was and remains on the register at the Commercial Registry of Beirut in the Lebanon. In or about June 1993 Messrs Gouldens prepared (on the instructions of the Brothers) a draft notice terminating SSF, but this notice was never served. No steps were taken to produce final accounts, and its assets were never distributed.

32. Pursuant to the 1994 Deed and the agreement reached between the Brothers, Isaac received a payment which he understood reflected his 25% interest in the African Business.

33. However, the Brothers expressly excluded Isaac's 25% interest in the Portfolio Business held through Presi from this buy-out. This exclusion was reflected in clause 2 of the 1994 Deed.

34. After 14 April 1994, therefore, the Portfolio Business held through Presi continued to be run as a partnership between the Brothers on the same terms as before. Alternatively, a new partnership between the Brothers was created from that date on the same terms but limited to the Portfolio Business.

35. The African Business continued to be operated by Freddy, Raymond and Beno using SSF as their vehicle, or alternatively in partnership together on the basis pleaded in paragraph 26 above.

**The death of Raymond**

36  In about February 1997, Raymond suffered a stroke, which left him in a coma from which he did not recover.

37  On Raymond's death on 30 November 2002 (or alternatively upon his incapacity in 1997) there was a technical dissolution pursuant to section 33(1) of the Partnership Act 1890 of (i) the African Business and (ii) the Portfolio Business (on the footing that the partnerships under which those businesses then operated were governed by English law). Thereafter, Raymond's share of the partnership assets vested in his estate. However, the affairs of the partnerships were not wound up, and the surviving Brothers continued to trade together with the addition of Raymond's son, Moussy, in place of Raymond in the case of the Portfolio Business, and, in the case of the African Business, the partnership continued with Moussy taking over his father Raymond's share and role in the conduct of the business. This continuation was consistent with the Jewish Lebanese tradition where the heir/s of a deceased partner take over the rights of the deceased and the Brothers agreed by conduct to act accordingly in the present case.

38  Alternatively, from about 30 November 2002 (or February 1997) the partnership relating to the Portfolio Business comprised Freddy, Beno and Moussy, with Isaac remaining entitled to, and the partners remaining accountable to him for, a 25% share in the Portfolio and the profits of the business by virtue of his shareholding in Presi. Between about 2003 and 2009, Isaac provided or arranged the provision of a series of bank guarantees in favour of HSBC Republic Bank (UK) Ltd in respect of the debts of Frelene. The provision of such guarantees reflected Isaac's continuing status of a partner in the Portfolio Business.

39  In the further alternative, under Lebanese law Raymond's heirs became entitled to Raymond's share of SSF, and Mireille is entitled to represent their interest as executor of Raymond's estate.

40  On 3 April 1997 Moussy became the company secretary of both Forextra and Frelene (in the case of Frelene until 11 September 2003). Moussy also became a director of Forextra and Frelene on 15 April 2003 and 13 December 2000 respectively and continues in those directorships.

**Conduct of the continuing partnership**

41  At all material times since the death (or incapacity) of Raymond, the management of both, the Portfolio Business and of the African Business, has continued to be run from the London Office.

42  From about 1995 Moussy began learning the family business. He started work in a training capacity at Forextra Ltd, meeting suppliers, researching products and travelling to Africa to help with the local companies. When he was not travelling, he attended the London Office, sitting with and shadowing the other people who worked there. After Raymond's stroke, Moussy started to take a more active role, and by the date of Raymond's death, Moussy was participating in the management of the African Business and the Portfolio Business, attending important meetings with suppliers such as British American Tobacco and Phillip Morris in his father's place.

43  From about 2002/2003, Moussy was treated as an equal partner with Freddy and Beno. They shared a single, open-plan office, and took decisions on a majority basis (adopting the practice, mutatis mutandis, of New Article 7 of the Statutes of SSF, as amended). In practice, however, major decisions were taken unanimously.

**Current value of the Portfolio**

44  Since the date of the Cluttons valuation referred to in paragraph 25 above, 3-4 Norwich Street has been sold, and net sale proceeds of £12.54 million are now held on account, together with cash of £2.5-3 million. South Audley Street was swapped for nil consideration with the Grosvenor Estate in exchange for extensions on the leases for Mount Street and Grosvenor Street.

45  According to a valuation by Knight Frank dated 27 March 2014, 79-81 Grosvenor Street is currently worth £19.7 million, and 13-26 Mount Street is worth £79.4 million. Accordingly, the Portfolio Business currently holds assets worth approximately £115 million, against a current bank debt to HSBC of £20 million, giving it a net value of approximately £95 million.

**Dissolution of the Partnership**

46  Isaac has been wrongfully excluded from participating in the management and profits of the Portfolio Business (although between 2003 and 2009 he provided or caused to there to be provided guarantees in favour of HSBC to provide collateral

for Frelene's debts). By the service of this Claim, he hereby exercises his right to terminate the said partnership.

47  Since about 2012/2013 Moussy has been wrongfully excluded from participating in the management and profits of the African Business and the Portfolio Business. By the service of this Claim he exercises his right to terminate (a) the partnership relating to the African Business and (b) the partnership relating to the Portfolio Business.

**AND the Claimants claim –**

(1) A declaration that SSF has not been wound up under Lebanese law;
(2) A declaration that the Brothers (and, in the case of Raymond, his executor Mireille) remain bound by, and entitled to enforce, the Statutes of SSF;
(3) Alternatively, in relation to the African Business –
  (i) A declaration that the partnership relating to the African Business has been dissolved;
  (ii) An order that the affairs of the said partnership be wound up;
  (iii) An order that all necessary accounts and enquiries be taken and made;
  (iv) The appointment of a Receiver over the assets and business of the said partnership;
  (v) That all necessary vesting orders and other orders may be made;
(4) In any event in relation to the Portfolio Business –
  (i) A declaration that the Portfolio of assets held by Presi and its subsidiaries Frelene and Forextra are held as assets of the partnership;
  (ii) A declaration that the partnership relating to the Portfolio Business has been dissolved;
  (iii) An order that the affairs of the said partnership be wound up;
  (iv) An enquiry as to the extent to which the assets of the Portfolio Business were acquired using assets of SSF;
  (v) An order that all necessary accounts and enquiries be taken and made;
  (vi) The appointment of a Receiver over the assets and business of the said partnership;
(5) That all necessary vesting orders and other orders may be made;
(6) Such further or other relief as the Court shall consider appropriate;
(7) Costs.

BARBARA DOHMANN QC<br>
GILEAD COOPER QC

**Statement of Truth**

The Claimants believe that the facts stated in these particulars of claim are true.

Signed _____

Claimants' Solicitor

Dated the 11 day of April 2014

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>CHANCERY DIVISION</u>

<u>Claim No.</u>

B E T W E E N:

(1) ISAAC MOUSSA SALEM
(2) MIREILLE RAYMOND SALEM
(3) MOUSSA ("MOUSSY") SALEM

<u>Claimants</u>

-and-

(1) FARAJ ("FREDDY") MOUSSA SALEM
(2) BENO MOUSSA SALEM
(3) ROTHSCHILD SWITZERLAND (C.I.) TRUSTEES LIMITED
(4) GUERNSEY GLOBAL TRUST LIMITED

<u>Defendants</u>

---

**PARTICULARS OF CLAIM**

---



Berwin Leighton Paisner LLP
Adelaide House London Bridge London EC4R 9HA
Tel +44 (0)20 3400 1000  Fax +44 (0)20 3400 1111