# EXHIBIT 3

Third Claimant
First Statement
Shlomo Hai Rechtschaffen
Exhibit "SHR1"
23 February 2024

**IN THE HIGH COURT OF JUSTICE**      **Claim No. HC-2014-000788**
**CHANCERY DIVISION**

**B E T W E E N :**

**(1) ISAAC MOUSSA SALEM[1]**

**(2) MIREILLE RAYMOND SALEM**

**(3) MOUSSA ("MOUSSY") SALEM**

<u>Claimants</u>

**- and -**

**(1) FARAJ ("FREDDY") MOUSSA SALEM**

**(2) BENO MOUSSA SALEM**

**(3) SEQUENT (C.I.) LIMITED**

**(FORMERLY ROTHSCHILD SWITZERLAND (C.I.) TRUSTEES LIMITED)**

**(4) GUERNSEY GLOBAL TRUST LIMITED**

<u>Defendants</u>

---

**FIRST WITNESS STATEMENT OF**
**SHLOMO HAI RECHTSCHAFFEN**

---

I, **SHLOMO HAI RECHTSCHAFFEN**, of Rechtschaffen Law Offices, 8a Green Walk, London, NW4 2AJ, **WILL SAY AS FOLLOWS**:

---

[1] Isaac passed away in March 2020. This does not change the remedy sought, as Isaac did not have an interest in the claims related to the African Business. His interest was in the Portfolio Business, and that aspect of the proceedings has been settled (see para. 14 below).

## I.   INTRODUCTION

1.   I am the solicitor of and have conduct of this matter on behalf of the Third Claimant ("Moussy"). I am authorised to make this witness statement on behalf of Moussy in support of his application to lift the stay of proceedings in order to enforce the terms of the Settlement Deed dated 15 April 2016 (pursuant to paragraph 1 of the Tomlin Order dated 19 April 2016).

2.   By way of summary, the Settlement Deed, inter alia, settled the claims brought by the Second Claimant ("Mireille") and Moussy in respect of their share of the "African Business" in return for certain commitments by the First Defendant ("Freddy") and Second Defendant ("Beno") (as well as other related parties). This included an express obligation to use reasonable endeavours to implement a process for binding expert determination to value and divide the "African Business" (see clause 6.5) and related implied obligations (see paragraph 21 below). Freddy and Beno have breached these obligations and in fact appear to have taken steps to conceal and obscure the value of the "African Business" so as to prejudice Moussy's entitlements. Moussy therefore seeks an Order (in the form of the draft attached hereto):

(1)   Declaring the parties have agreed to refer the valuation and division of the African Business (as defined in the Settlement Deed) to a process of binding expert determination.

(2)   Requiring that by a stipulated deadline, Freddy and Beno shall agree to the appointment of one of the following four experts hereby proposed by Moussy or insofar as they do not agree make alternative proposals (and insofar as necessary procure that the other parties to the Settlement Deed shall do the same). The individuals on the list prepared by Moussy are all independent experts with appropriate valuation/expert determination experience from reputable firms, who have confirmed their willingness and ability to act.  They are:

(a)   Philip Haberman (who now operates on his own);

(b)   Richard Indge (Ankura);

(c)   Christopher Clements (Deloitte);

(d)     Nikola Stambolic (Berkeley Research Group);

(3)     In the alternative, declaring that Freddy and Beno have breached the Settlement Deed and ordering an inquiry into damages owed by Freddy and Beno to Moussy.

3.     This statement has been prepared in conjunction with Moussy and his legal team having had face to face discussions and communications by telephone and email.

4.     The facts and matters in this witness statement are either within my knowledge and are true or are based upon information or documents which have been supplied to me, in which case the source is stated and the facts are true to the best of my knowledge and belief.

5.     I attach hereto a bundle of documents ("SHR1") to which I shall refer in the course of this witness statement. References in this witness statement to page numbers are to the numbered pages of SHR1.

## II.     THE PARTNERSHIP LITIGATION

6.     On 11 April 2014, the First Claimant ("Isaac") now deceased, Mireille and Moussy started a claim against Freddy, Beno, the Third Defendant ("Sequent (C.I.) Limited")[2] and the Fourth Defendant ("Guernsey Global Trust Limited") (the "Partnership Litigation").[3]

7.     Isaac, Mireille, Moussy, Freddy and Beno are all members of the Salem family. As to this:

(1)     Isaac is the eldest of four brothers ("the Brothers"), the male children of the late Moussa Salem and his wife, Perla Salem (née Yael).

(2)     One of the brothers, Raymond Moussa Salem ("Raymond"), died on 30 November 2002, leaving a widow, Mireille, and three adult children, namely Moussy, "Robert", and "Patti".

(3)     Freddy and Beno are the surviving brothers of Isaac.

---

[2] Formerly Rothschild Switzerland (C.I.) Trustees Limited.
[3] Pages 1-3.

8.  Sequent (C.I.) Limited and Guernsey Global Trust Limited were (at the time the Partnership Litigation was commenced) joint trustees of:

    (1)  The "R1 Trust" dated 2 April 2003 established for the benefit of Raymond's children or remoter issue and his widow (or his children's widowed spouses).

    (2)  The "F1 Trust" dated 2 April 2003 established for the benefit of Freddy's children or remoter issue and his spouse.

    (3)  The "B1 Trust" dated 2 April 2003 established for the benefit of Beno's children or remoter issue and his spouse.[4]

9.  The Claimants made allegations of partnership in respect of:

    (1)  The "African Business", which the Particulars of Claim stated Isaac began "[i]n or around 1966" and comprised "a large trading business in West Africa, which involved the distribution of food, tobacco and textiles in various countries, in particular Algeria, Benin, Ghana, Libya, Niger, Nigeria, Togo and Morocco…".[5] The African Business is a family business, but since around 2013 the R Branch's representative in the management of the African Business, Moussy, was cut out of the management of the African Business by his uncles, Freddy and Beno.[6]

    (2)  The "Portfolio Business", which the Particulars of Claim stated comprised "a portfolio of properties situated, and from time to time held through vehicle companies, in the UK".[7]

10.  In April 2014, in light of the Partnership Litigation, additional corporate trustees were appointed to the R1, F1 and B1 Trusts, such that:

    (1)  Sequent (Guernsey) Limited[8] became a further co-trustee of the R1 Trust.

    (2)  Sequent (Schweiz) AG[9] became a further co-trustee of the F1 Trust.

---

[4] The Trusts correspond to the "R Branch", "F Branch" (headed by Freddy) and "B Branch" (headed by Beno) of the Salem family. The "I Branch" of the Salem family is headed by Isaac.
[5] Para. 9, page 5.
[6] Para. 47, page 12.
[7] Para. 19, page 6.
[8] Formerly Rothschild Trust Guernsey Limited.
[9] Formerly Rothschild Trust (Schweiz) AG.

(3)    RTB Trustees AG became a further co-trustee of the B1 Trust.

11.    On 18 July 2014, Freddy and Beno filed a Defence and Counterclaim[10] and Sequent (C.I.) Limited and Guernsey Global Trust Limited filed Defences in their capacities as F1 and B1 Trustees[11] and R1 Trustee.[12]

12.    On 28 October 2014, the Claimants filed a Reply and Defence to Counterclaim (in response to Freddy and Beno)[13] and Replies to Defence (in response to Sequent (C.I.) Limited and Guernsey Global Trust Limited in both capacities).[14]

13.    On 7 April 2016, the parties to the Partnership Litigation executed a Settlement Deed in which the Claims (as defined in that Deed) in relation to the Portfolio Business were compromised. Maurice and Gaby Salem (Isaac's children) and Robert were also parties to this Deed.

14.    By a Tomlin Order dated 11 April 2016, the proceedings, insofar as they related to the Portfolio Business Claims, were stayed and the Claimants were required to file and serve amended Particulars of Claim removing those claims and removing Isaac as a party.[15]

15.    On 15 April 2016, the parties to the Partnership Litigation executed a Settlement Deed in which the Claims (as defined in that Deed) in relation to the African Business were compromised (the "African Settlement").[16] Isaac, Maurice and Gaby were not parties to this Deed as Isaac's claims in the Partnership Litigation were limited to allegations in respect of the Portfolio Business. Robert and the trustees set out in paragraph 10 above were also made parties to this Deed.

16.    By a Tomlin Order dated 19 April 2016, the proceedings were stayed except for the purposes of enforcing the Settlement Deed (i.e. the African Settlement), for which the parties were given permission to apply.[17] Moussy relies on that permission to apply for the purposes of the present application.

---

[10] Page 15.
[11] Page 51.
[12] Page 69.
[13] Page 100.
[14] Pages 121 and 131.
[15] Page 147.
[16] Page 163.
[17] Page 149.

### III.   THE AFRICAN SETTLEMENT

17.   Inter alia and in summary, the "Claims" compromised by the African Settlement were defined as follows:[18]

> *in relation to claims against the Beno and Freddy Parties by the Raymond Parties, any and all claims relating to any and all Liabilities arising from or related to or in connection with (i) the English Litigation; (ii) the underlying facts and matters relating to the English Litigation, or otherwise arising out of or related to the facts and matters referred to in the English Litigation, including but not limited to, all claims and counterclaims made in the English Litigation; and (iii) any other matter arising out of or related to or connected with the relationships between the Parties, but only (in the cases of each of (i), (ii) and (iii)), in so far as those Liabilities relate to the African Business or to SSF …*

18.   The "African Business" was defined as follows:[19]

> *… any business in Africa which has been carried on, at any time, by any member of the Salem Family or their Connected Parties and any assets held by, or arising or derived from, those businesses;*

19.   The cornerstone of the African Settlement – and the reason Moussy was prepared to settle his valuable claims in the Partnership Litigation – was the establishment of a process for the valuation and division of the African Business between the R1, F1 and B1 Branches. This is set out in section 6, which provided as follows:[20]

> #### 6. DIVISION OF THE AFRICAN BUSINESS
>
> *6.1 Freddy, Beno, Moussy, Robert and Mireille each agree to enter into the Conciliation Process with or without Patty (albeit which it is currently intended shall include Patty), and to execute and deliver to all other Parties a copy of the letter at Schedule 2, which is to be signed by each of Freddy, Beno, Moussy, Robert and Mireille.*
>
> *6.2 The Parties each agree that the costs of the Conciliation Process shall be borne one third by Beno and the B1 Trustees, one third by Freddy and the F1 Trustees and one third by Moussy, Robert, Mireille and the R1 Trustees.*
>
> *6.3 Freddy, Beno, Moussy, Robert and Mireille each agree that any determination or proposal for settlement put forward by Ezra Marcos as part of the Conciliation Process shall be put to the F1 Trustees, B1 Trustees and R1 Trustees for approval.*
>
> *6.4 The F1 Trustees, B1 Trustees and R1 Trustees each agree to consider and, if considered by them in their absolute discretion to be appropriate, approve any*

---

[18] There were in fact six categories of "Claims", each with a similar structure but a different combination of parties. For the full definition, see pages 165-166.
[19] Page 165.
[20] Pages 172-173.

*determination or proposal for settlement put forward by Ezra Marcos as part of the Conciliation Process.*

*6.5 If the Conciliation Process does not result in an agreed division of the African Business approved and effected by the F1 Trustees, B1 Trustees and R1 Trustees by 1 January 2017, including if by reason of Ezra Marcos being unable to act or unable to reach a conclusion, then, unless an extension is agreed by the Parties in writing, by 1 February 2017 the Parties agree to use reasonable endeavours to agree a binding process for an expert determination to value and divide the African Business. It is currently anticipated that such an agreement might include the following terms and steps:*

> *6.5.1 to refer the division of the African Business to an independent expert;*

> *6.5.2 the independent expert to be appointed jointly by the Parties;*

> *6.5.3 in the event the identity of the expert cannot be agreed between the Parties, the expert to be appointed by the President of the Institute of Chartered Accountants in England and Wales;*

> *6.5.4 each Party to be entitled to make written submissions to the expert if they so wish;*

> *6.5.5 the expert to duly consider the written submissions and, to assist him in his deliberations, the Parties to provide such information as the expert reasonably requests;*

> *6.5.6 once the expert has completed his deliberations it is envisaged that he would prepare a valuation of the African Business;*

> *6.5.7 the Parties to then express whether they have a desire to purchase or sell each and any assets of the African Business;*

> *6.5.8 if the Parties cannot agree to buy or sell the assets of the African Business between them then the Parties would put the African Business as a whole, or any part that is not sold between the Parties by agreement, up for sale on the open market; and*

> *6.5.9 the costs of the expert to be borne one third by Beno and the B1 Trustees, one third by Freddy and the F1 Trustees and one third by Moussy, Robert, Mireille and the R1 Trustees.*

20.  Schedule 2 was a letter to Ezra Marcos ("Mr Marcos"). Inter alia and in summary this provided as follows:[21]

> *... Differences have arisen among us regarding several commonly held business interests and real estate in Africa, held through various companies and trusts. We have*

---

[21] Page 181.

*agreed to separate and divide these common business interests, but have not been able to agree on the terms and price.*

*Our confidence in your extensive international business experience, and the many years that we have all known each other, lead us to ask you to serve as conciliator to help us to reach an amicable settlement of our dispute. We undertake to cooperate in furnishing any documents or other information you feel would be helpful in giving you an understanding of our situation. ...*

21. In addition to the express obligation pursuant to clause 6.5, if the Conciliation Process failed, to use reasonable endeavours to agree an expert determination process, Moussy contends that the African Settlement also contained implied obligations to cooperate to provide up to date and accurate information as to the entities or assets constituting the African Business and not to conceal, hide or obscure those entities or assets.

22. These implied obligations are necessary to give business efficacy to the Settlement Deed and are so obvious as to go without saying. As to this:

    (1) The entire purpose and function of the Settlement Deed was to compromise the proceedings which Isaac, Mireille and Moussy had started in April 2011 insofar as it concerned the African Business. Mireille and Moussy's entitlement to the African Business by virtue of a partnership, as articulated in those proceedings, was extremely valuable. It would make no commercial sense for Mireille and Moussy to give up this claim unless, in return, they had a means of obtaining their share of the African Business through alternative means – namely, a binding process of expert determination in the event that agreement could not be reached through the Conciliation Process.

    (2) The definition of the African Business in the Settlement Deed is extremely broad. It is not limited to specific entities or corporate vehicles, but "any business in Africa carried on at any time by any member of the Salem Family" (amongst other things). This is only workable if the members of the Salem family are subject to an obligation to cooperate in order to accurately identify the assets and entities caught by that definition. Further, it is an implicit recognition of the breadth of the entitlements of the R, F and B Branches.

(3)   The letter to Mr Marcos, which Freddy, Beno, Moussy, Robert and Mireille signed, is premised on the existence of the implied terms set out above.[22] In particular:

(a)   The letter states, "Differences have arisen among us regarding <u>several commonly</u> held business interest and real estate in Africa, held through various companies and trusts" (<u>emphasis</u> added). This is a clear acknowledgment that the African Business is 'commonly held' and Freddy, Beno, Moussy, Robert and Mireille all have an entitlement to it.

(b)   The letter states, "We <u>have agreed</u> to separate and divide these common business interests, but have not been able to agree on the terms and price" (<u>emphasis</u> added). The agreement to separate and divide the African Business – and the fact it is a common business interest – is expressed as a concluded agreement.

(c)   The letter states, "<u>We undertake to cooperate in furnishing any documents or other information</u> you feel would be helpful in giving you an understanding of our situation" (<u>emphasis</u> added). This clearly acknowledges the implied disclosure obligations.

## IV.   CONDUCT INCONSISTENT WITH THE AFRICAN SETTLEMENT

23.   Unfortunately, the F and B Branches, and Freddy and Beno, have behaved in a manner entirely inconsistent with the letter and spirit of the Settlement Deed.

24.   While the African Business has continued to operate highly successfully, it appears it has been managed by Freddy and Beno in a manner that has prejudiced the R Branch (as described below) and has resulted in the diversion to the F and B Branches exclusively of the profits earned since 2012. Moreover, this process has been obscured by the use of complex corporate infrastructures to move the business away from the vehicles with which Moussy and the R Branch are familiar.

### A.   <u>Background: Cessation of payment of profits from the African Business in 2013</u>

---

[22] Pages 195-198.

25.   Before 2013 Moussy managed the African Business (in place of his father Raymond) with his uncles Freddy and Beno.

26.   In 2013 Moussy was excluded from the management of the African Business by Freddy and Beno. At that point his personal and business relationship with Freddy and Beno completely broke down. Since then:

   (1)   Freddy and Beno and members of Freddy's family (particularly Freddy's son Philip) have operated the African Business without input from Moussy or other members of the R Branch.

   (2)   Very little (and progressively less) information regarding the operations or profits of the African Business has been provided to Moussy or other members of the R Branch.

27.   From 2003 until in or around 2013, profits generated by the African Business were paid up to the R1, F1 and B1 Trusts. By 2007 that process involved payments being made on an annual or more frequent basis from the trading companies up to Morsgate International Limited ("Morsgate") and from Morsgate to Glynfield Finance Limited ("Glynfield") and Transglobe ("Transglobe"). Glynfield and Transglobe in turn made equal payments to the R1, F1 and B1 Trusts. Payments in respect of the profits of the African Business for a particular accounting year were usually received by the Trusts over the course of the following year or two accounting years. The net effect of this was that each year the R1 Trust received or should have received a third of the profits made in the African Business over the previous year or two years.

28.   From 2013, those annual payments abruptly and completely ceased. After several years of realising annual net profits in excess of USD 50 million, in their 2013 trading year (following Moussy's exclusion from the management of the African Business by Freddy and Beno) Glynfield and Transglobe realised an aggregate loss of USD 0.7 million.

   **B.**   **The Kroll Reports**

29.   In view of the above, Moussy has understandably been very concerned. It was hoped that after the African Settlement, Freddy and Beno would cease from any conduct prejudicial to the R Branch and there would be a frank exchange of information to enable valuation

and division. However, that has not been the case and it has remained very difficult for Moussy to obtain the information needed to explain the cessation of profits to the R Branch.

30.   In 2021, Moussy instructed Kroll Associates UK Limited ("Kroll"), a division of Duff & Phelps specialising in business intelligence, to investigate these concerns. Kroll's investigations show that since 2013 Freddy and Beno have made or procured various changes to the corporate structure of the African Business.  These appear to be intended to divert the profits of the African Business away from the R Branch and/or wrongfully deprive the R Branch of the benefit of the growth of the African Business after 2013 through the establishment of new companies and/or structures.

31.   This is explored in detail in two reports dated 23 March 2021 (the "Kroll Report") and 7 May 2021 (the "Kroll Addendum"), which I exhibit at pages 199-377 and 378-426 respectively. In the following sections, I summarise some of the main findings of these reports.[23]

   i.   Network of sub-distributors

32.   Great Brands Nigeria Limited ("GBNL"), at the time of Moussy's departure in 2013, was the largest of the companies within the African Business and in some years contributed upwards of 80% of the total revenue.[24] Freddy and Beno claim that the regional sub-distributors through which GBNL conducts its business are fully independent of both GBNL and the wider African Business and so should not form part of the African Business' value.[25]

33.   However, the Kroll Report found that "… it is reasonable to conclude that the Pre-2013 Sub-Distributors were not independent from GBNL. The documentation we have been provided coupled with our open source research appears to suggest that GBNL and its

---

[23] For the avoidance of doubt, Moussy relies on Kroll's analysis in full. This summary of some (but not all) of the key findings is without prejudice to the other examples contained therein.
[24] Kroll Report, para. 38, page 237.
[25] Kroll Report, para. 41, page 238.

sub-distributors are in fact one cohesive business, with the sub-distributors being owned by nominees, including Ibrahim, on behalf of GBNL."[26]

34.   In 2013, a number of new sub-distributors were established, replacing three of the existing companies in the sub-distribution network.[27] The Kroll Report stated:

(1)   "The incorporation dates of Big Bowl, Afro Ocean and Ultra Trade (2013) coincide with Moussy Salem's exclusion from the operations of the African Business in 2013. It appears, therefore, that this was not coincidental but rather a deliberate attempt by the F and B Branches to further distance the African Business from Moussy Salem, who had detailed knowledge of the day-to-day operations thereof.".[28]

(2)   "… it is unlikely that GBNL would have changed its approach when the sub-distributors were replaced post 2013. This is supported by the continued use of a common corporate identity (Inter Distribution) and the existence of the nominee agreements which show that, for certain of the new sub-distributors, express agreements were in place recording that the individuals had agreed to allow their names to be used on corporate documents in exchange for a monthly allowance."[29]

ii.   Profitability

35.   Freddy and Beno have explained the decline in the value of money being paid up to the R Branch via the Trusts as the result of a decrease in the trading activity of GBNL.[30]

36.   On the contrary, Kroll found that:

(1)   Freddy and Beno's explanations "appear to be inconsistent with both internal reporting, and the relative performance of BATN within Nigeria."[31] As to the performance of BATN (British American Tobacco Nigeria), GBNL was appointed as the exclusive distributor for BATN in 2001 and the relationship was intended to continue until at least 2021. BATN's performance is therefore indicative of GBNL's

---

[26] Kroll Report, para. 240, page 301.
[27] Kroll Report, para. 178, page 284.
[28] Kroll Report, para. 179, page 284.
[29] Kroll Report, para. 241, page 301.
[30] Kroll Report, para. 121, page 260.
[31] Kroll Report, para. 242, page 301.

performance in the region too.[32] However, while BATN may have suffered reduced profits from 2012 to 2015, since 2016 it would likely have enjoyed increased profits. This contradicts the explanation given by Freddy and Beno that the Nigerian tobacco market had substantively changed post-2013 to the extent that profitability was significantly reduced.[33]

(2)   According to Kroll's estimates, GBNL potentially generated profits in the range of USD 194 million to USD 223 million between 2013 and 2020.[34]

37.   Separately, the F and B Branches have informed the R1 Trustees that the Ghanaian operations of the African Business do not generate profits and, as a result, do not distribute monies to the Trusts. In valuations commissioned by the R1 Trustees, the value attributed to Forewin Ghana Limited, a company in the African Business which distributes a large number of consumer brands in Ghana (such as Red Bull and Mars), was nil.[35]

38.   On the contrary, Kroll found that:

(1)   The position that Forewin is not profitable appears to be contradicted by a December 2011 email chain, where Joe Saab (GBNL Internal Finance) provides Freddy Salem with an excel attachment showing the profit and loss figures for "*4 [four] countr[ies] for 2007, 2008, 2009 and 2010 and forecast 2011.*" The profit after tax shown in the internal reporting schedule appears to be significantly larger than the profit after tax declared in Forewin's financial statements.[36] Further, the position was not consistent with "comments made by Yared in the public domain, and Yared's reported wealth".[37] Yared is Forewin's CEO and Chairman.[38]

(2)   According to Kroll's estimates, Forewin potentially generated USD 101 million in profit between 2013 and 2020.[39]

---

[32] Kroll Report, para. 125, page 262
[33] Kroll Report, para. 127, page 262
[34] Kroll Report, para. 242, page 301.
[35] Kroll Report, para. 51, page 240.
[36] Kroll Report, paras. 274-275, page 315.
[37] Kroll Report, para. 344, page 333.
[38] Kroll Report, para. 276, page 315.
[39] Kroll Report, paras. 279-280, page 316.

39.  In light of these and other examples, Kroll concluded the "actual profits therefore may have been misrepresented by the F and B Branches and/or may have been diverted or misappropriated by the F and B Branches away from the R Branch".[40]

      iii.   'Pheonix companies'

40.  The Kroll Report identified a "pattern of behaviour whereby companies – together with their operations – have been replaced by new entities with either the same or similar names".[41] The following are some examples of this pattern.

41.  Blue Arrow TSW Nigeria ("Blue Arrow"):

(1)  Blue Arrow was incorporated in 2002 to manage the consumer products operations of the African Business. It is common ground that it forms part of the African Business.[42]

(2)  It appears that Blue Arrow's operations have been taken over by Saharan Distillers Limited ("Saharan Distillers") and BA Nigeria Distribution Limited ("BA Distribution") in 2015 and 2016 respectively.[43] Similarities between the public profiles and business of the companies and connectivity between their internet infrastructures indicates that Saharan Distillers took over Blue Arrow's wine sales business while BA Distribution took over Blue Arrow's consumer products business.[44]

(3)  Further, given that the internet infrastructure connects both BA Distribution and Saharan Distillers to Parker Logistics Limited ("Parker Logistics")[45] and to GBNL, both of which remained under the control of the F and B Branches, it is reasonable to infer that BA Distribution and Saharan Distillers were likely established at the direction of the F and B Branches.[46]

---

[40] Kroll Summary, para. 1, page 202.
[41] Kroll Summary, para. 1, page 203.
[42] Kroll Report, para. 43, page 238.
[43] Kroll Report, paras. 44 and 266, pages 239 and 312.
[44] Kroll Report, para. 266, page 312.
[45] Parker Logistics was incorporated on 27 January 1999. It historically formed an integral part of the operations of the African Business. See Kroll Report, paras. 26-33, pages 233-235.
[46] Kroll Report, para. 267, page 312.

(4)    Saharan Distillers and BA Distribution have not been included in any valuation of the African Business.[47] It is to be inferred that they were set up so as to take Blue Arrow's place in the African Business, thereby replacing a valuable business in which the Trusts held interests (and to whose profits they were entitled) with one which the R Branch is not familiar.

42.    Gestcom International (Offshore) SAL ("OldCo"):

(1)    OldCo has been part of the African Business since 1999.[48] A company with a similar name, Gestcom International Trading (Offshore) SAL[49] ("NewCo"), was incorporated in 2017.[50]

(2)    There are several links between NewCo and OldCo and the wider African Business, including a shared address, common shareholders, common directors/managers and similarities in their business activities and brand partners.[51] On registration, Beno owned 49.49 per cent of the shares in NewCo, although these were later assigned to BS Gestcom.[52]

(3)    Despite the fact that NewCo was only registered in 2017, it had sizeable after-tax profits of USD 8.4 million, USD 29 million and USD 28million in 2017, 2018 and 2019 respectively.[53] It also paid substantial dividends to shareholders, including Beno and Philip (or companies controlled by them)[54] and made transfers of about USD 46 million Mount Capital Funds, investment companies of which Mark Salem (Freddy's son) is a director.[55]

(4)    Kroll said the information it reviewed "appears to demonstrate that NewCo has not only taken over the role of OldCo, but also those of various other entities in the African Business - on a consolidated basis - including Morsgate, Parker Logistics, Glynfield and Transglobe. As a result, rather than merely being a 'phoenix'

---

[47] Kroll Report, paras. 45 and 48, page 239.
[48] Kroll Addendum, para. 27, page 391.
[49] In 2019, NewCo changed its name GEE Trading (Offshore) SAL. This "may be interpreted as an attempt to further distance NewCo and its operations from that of OldCo". Kroll Addendum, paras. 33-34, page 394.
[50] Kroll Addendum, para. 32, page 393.
[51] Kroll Addendum, paras. 46-58, page 397-402.
[52] Kroll Addendum, paras. 35-37, page 394-395.
[53] Kroll Addendum, para. 92, page 413.
[54] Kroll Addendum, paras. 99-100, page 415.
[55] Kroll Addendum, paras. 16, 101, 105-107, pages 387, 416, 418.

company of OldCo, NewCo appears to be a reincarnation of the entire fund flow system of the African Business."[56]

43. The Kroll Report refers to a number of other entities which it may be inferred have been created to divert assets away from the R Branch or to create new business within the African Business for the benefit of the F and B Branches only. These include:

(1) In respect of the Ghanian operations of the African Business:

(a) The formation of HMD Forewin Limited in 2013 and its shareholder or former shareholder Maiddat MI Limited (in which only the F1 and B1 Trusts are said to have interests);[57]

(b) The formation or acquisition of other companies or interest in companies trading as the Forewin group.[58]

(2) From 2018 onwards the Maon group of companies have been formed to supply ecommerce platforms (including "Oda Merchant") and other services in Nigeria and elsewhere potentially using funds or assets of the African Business in order to do so.[59]

## C.   Conclusion

44. In light of the above, and the analysis in the Kroll Report and Kroll Addendum generally, it is respectfully submitted that the F and B Branches, and Freddy and Beno, have clearly breached the terms of the African Settlement. Not only have they failed to progress the expert determination process (as to which see **section V** below) but they appear to have engaged in a pattern of behaviour designed to undermine that process by concealing the true profits and value of the business. Evidently, this has caused significant prejudice to Moussy and the R Branch, including but not limited to the fact that since 2013 the R

---

[56] Kroll Addendum, para. 114, page 422.

[57] Kroll Report, paras. 52-54, 102-104, 295-296, pages 240-241, 252-253, 321-322.

[58] A business unit active in Ghana involving Forewin (Ghana) Limited, HMD Forewin Limited and other companies. See Kroll Report, paras. 290-343, pages 320-333.

[59] The Maon group includes: Maon Technology Ltd (incorporated 8 May 2018); Maon Services Limited (incorporated 4 May 2018); and Maon Alpha Alliance Limited (incorporated 4 May 2018). See Kroll Report, paras. 105-107, 200-205 and 440, pages 253, 292-293 and 363-364.

Branch has received little or no monies from the African Business in contrast to the significant revenue flows that occurred prior to 2013.

## V.   FAILURE TO SET UP AN EXPERT DETERMINATION PROCESS

45.   At the same time as the behaviour outlined above, no expert determination process has been constituted. Freddy and Beno and the F and B Branches have not used reasonable endeavours to set up such a process. Instead, they have tried to persuade the R1 Trustees to sell the R Branch's share of the African Business at a price of the F and B Branches' choosing which (in Moussy's view) drastically undervalues the African Business. Certainly, it is not based on the determination of an independent expert as required by the African Settlement and Moussy contends that the R Branch's share of that value would be very substantially higher than anything thus far proposed by Freddy and Beno.

### A.   In respect of the Conciliation Process

46.   The Settlement Deed provided for Freddy, Beno, Moussy, Robert and Mireille to enter into a "Conciliation Process". If the Conciliation Process resulted in the agreed division of the African Business approved and effected by the F1, B1 and R1 Trustees by 1 January 2017, there would have been no need for the expert determination.

47.   By an email dated 8 December 2016, Andrew Penny ("Mr Penney") stated that Freddy and Beno wanted Robert and Moussy to agree to "heads of terms" including accepting:[60]

(1)   the value Glynfield and Transglobe were to receive reflected "reduced commissions from the West African Trading Companies … for the period from 1 January 2008 to 31 December 2012 … [as a result of] margin compression by BAT and other suppliers";

(2)   valuation of the West African Trading Companies in local currency as at 31 December 2012;

(3)   valuation of the Mabani real estate business in local currency as at December 2016.

48.   The Settlement Deed does not contemplate "heads of terms" or making the Conciliation Process contingent upon upfront concessions by the R Branch. Moreover, in light of the

---

[60] Pages 430-431.

findings I have summarised in **section IV** above, these concessions appear designed to significantly undervalue the African Business, requiring the R Branch to proceed on the (incorrect) premise that the African Business had seen a downturn in profitability (see paragraphs 35 to 39 above) and depriving them of profits earned since around 2012/2013.

49. By an email dated 23 December 2016, Robert stated that he "spoke … again to Beno and he now tells me the reason he told me and [Mr Penney] to hold off is … simply him being kind as the local market is not good and suggests to wait".[61]  Robert said that he explained this would not work for the R1 beneficiaries and Beno was willing to "move forward" in "early January".[62]

50. In the event, there was no Conciliation Process prior to 1 January 2017 or at all. It is respectfully submitted that trying to make the Conciliation Process contingent upon unwarranted concessions by the R Branch and/or "holding off" (even if it were right Beno thought it "kind" to do so) is not consistent with the African Settlement. Given the lack of progress, on 1 February 2017, Robert wrote to Mr Penny asking him to "communicate with the parties to prepare for formal mediation/arbitration as stipulated in the signed agreement in 2016".[63]

### B.   In respect of expert determination

51. Following the deadline for the Conciliation Process on 1 January 2017, Freddy and Beno have consistently failed (and continue to fail) to use reasonable endeavors to agree a binding process for expert determination as required by clause 6.5 of the Settlement Deed. In this regard, Moussy relies on the actions set out in the Kroll reports (see **section IV** above) and the fact that, despite the exchange of significant correspondence, no progress towards the expert process has been achieved.

52. Moussy in particular highlights the following:

---

[61] Page 427.
[62] Page 427.
[63] Pages 432-433. The email appears to refer to the "Presi agreement" in error. In the context, the intended reference is clearly the African Settlement. See further Mr Penney's response at page 432.

(1)   On 23 October 2017, the F and B Branches, through solicitors Latham & Watkins, made a unilateral offer on behalf of Philip and Beno Salem to the R1 Trustees to purchase the R Trusts' interests in the African Business for USD 32 million.[64]

(2)   However, as explained in **section IV** above, the R Branch's interest in the African Business was worth in October 2017 and at all material times thereafter and is now worth very substantially more than USD 32 million. For example – contrary to assertions that have been made by the F and B Branches that the business was failing – Kroll estimates that GBNL alone potentially generated profits of around USD 200 million between 2013 and 2020 (see paragraph 36(2) above). The F and B Branches would have been aware of this. In seeking to circumvent the process of expert determination set out in the African Settlement and purchase the R Branch's interest at a significant discount, Freddy and Beno were acting inconsistently with the African Settlement.

(3)   The F and B Branches have thereafter continued to misrepresent the value of the African Business and/or failed to engage, for example:

(a)   In September 2019, Beno and Philip Salem made the following claims to the R1 Trust via Mr Penney:[65]

(i)   The decline in the profitability of the African Business was the result of a decline in the oil price and the Nigerian currency. "If that does not explain the decline in the profits of the [West African Trading Companies] [Beno and Philip] are unable to see how they can explain it".[66]

(ii)   Going forward Beno and Philip intended to close the African Business because the profits achievable did not justify the cost and effort. "If R1 sells its shares to [Beno and Philip], they intend to put ALL the shares of ALL the WATCs share into a local charitable entity to benefit Nigerian good causes and once there the business will be wound down

---

[64] Page 436.
[65] Page 435.
[66] Page 435.

and the remaining stock sold off with the liquidation proceeds donated to charitable causes."

(b)     In June 2023, there was a limited exchange of correspondence directly between Moussy and Beno. Moussy stated he believed their differences were only a matter of valuation and that he was willing to speak in any destination of Beno's choosing. However, no progress was made.[67]

## VI.   CONCLUSION

53.    For the reasons set out above, the Court is respectfully invited to allow Moussy's application and make an order in the form of the draft attached hereto.

## STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name: ………Shlomo Rechtschaffen ………………

Signed: ………………………………………………

Date: ……………23.2.24……………………………

---

[67] Pages 436-438.