**DECLARATION OF NICHOLAS MARSH PURSUANT TO 28 U.S.C. § 1746**

1. I am a solicitor admitted in England and Wales and a Partner of Quinn Emanuel Urquhart & Sullivan UK LLP. I represent Freddy Salem in proceedings (Claim No. BL-2022-000926) (the "**Monline Proceedings**") brought by Applicant, Moussy Salem, in the High Court of Justice, Business and Property Courts of England and Wales, Business List (ChD) (the "**English High Court**"). There are three other defendants to the English Proceedings (Monline UK Limited ("**Monline UK**"), Salim Levy and Ezra Aghai). Monline UK and Ezra Aghai are jointly represented by a different firm of solicitors. Following Salim Levy's death in December 2023, he was substituted as a defendant by an executor of his estate, Igal Levy, who is represented by another different firm of solicitors.

2. I respectfully submit this declaration in response to the Court's request for any documents on which the parties intend to rely at the hearing on July 8, 2024 concerning Beno Salem's motion to quash a an application for a subpoena, issued by Moussy Salem (the "**1782 Application**").

3. I am knowledgeable about the matters described below, and the facts stated herein are true and correct to the best of my knowledge and belief. Nothing in this declaration is intended to be or should be construed as a waiver of legal privilege or of the confidentiality of the Settlement Deed and the issues in dispute before the English Court in the Intervening Action. I understand that this declaration will be the subject of a motion to seal, in order to preserve confidentiality over its contents (including reference to the contents of the Settlement Deed, to which I must necessarily refer in order to address the Court's questions).

4. I understand that Judge Elfenbein has ordered that the parties be prepared to answer questions regarding the interplay between the English Proceedings and the 1782 Application, and the "Intervening Action", which (as set out in further detail below) was brought by Moussy Salem in 2024 against both Freddy and Beno Salem..

***The impact, if any, of the Settlement Agreement's forum-selection and choice-of-law-clauses on this Court's analysis***

5. I am only able to give evidence in my capacity as an English solicitor as to what the English Court would likely consider the effect of the forum-selection and choice-of-law clauses to be.

6. Clause 17 of the Settlement Agreement confirms that "*this Deed and all contractual and non-contractual obligations and other matters arising from or connected with it are governed by English law*". In my opinion the English Court would therefore determine that it is English law which governs how section 5 of the Settlement Agreement is to be construed.

7. Clauses 18.1 and 18.2 of the Settlement Agreement provide that: "*[t]he courts of England had exclusive jurisdiction to settle any Dispute*" and "*[t]he Parties agree that the courts of England are the most appropriate and convenient courts to settle and Dispute and, accordingly, that they will not argue to the contrary*".

8. A "Dispute" is defined in the Settlement Deed as "*any dispute arising from or connected with this Deed, including, without limitation, non-contractual disputes and disputes regarding the existence, validity or termination of this Deed or the consequences of its nullity*".

9. In my opinion, the English Court would consider that it has jurisdiction to determine any dispute over the construction of section 5 of the Settlement Agreement, including whether Moussy Salem bringing the 1782 Application is in breach of the Settlement Agreement

10. In my view, English case law has established that where the parties have agreed an exclusive jurisdiction clause, the view taken in England is that judicial comity is best served by giving effect to the parties' agreement and that the grant of an anti-suit injunction in an appropriate case is a proper means of doing so: *AIG Europe SA v John Wood Group Plc* [2022] EWCA Civ 781 at paragraph [8] (attached hereto as **Exhibit A**). However, in my opinion it is also clear from the English case law that the English Court regards an anti-suit injunction as a personal remedy against the party which is continuing with proceedings in breach of the exclusive jurisdiction clause. The injunction is not directed to a foreign court: *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871 at page 892 (attached hereto as **Exhibit B**).

11. Therefore, in my opinion the English Court would not take the view that this Court has no jurisdiction to quash the 1782 Application. It would respect any order that this Court makes on Beno Salem's motion to quash. Rather, it would take the view that Moussy Salem bringing the 1782 Application in the first place was a breach of the exclusive jurisdiction clause, which the English Court has (were that breach to continue) jurisdiction to restrain.

### *How the English Court would interpret section 5 of the Settlement Agreement*

12. The principles governing contractual interpretation in English law are similar to US federal law. In the most recent exposition of the relevant principles, the UK Supreme Court's judgment of *Wood v Capita Insurance Services Limited* [2017] AC 1173 (attached hereto as **Exhibit C**), it was explained as follows (at paragraph 10):

"*The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning.*"

13. The Settlement Agreement is a detailed contract which was the result of negotiation between lawyers acting for each of the parties, and is expressed in formal terms. Accordingly, in my opinion the English Court will likely consider that the primary focus of the contractual interpretation exercise should be the text of clause 5 and the relevant definitions, in the context of the contract as a whole.

14. Clause 5.1 of the Settlement Agreement states as follows (with certain emphases):

> *The Claimants and Robert each agree that they will not (and will procure that their respective Connected Parties will not) bring <u>any Proceedings</u> in England and Wales <u>or in any other jurisdiction</u> against a Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (or their respective Connected Parties) <u>in relation to any Claims</u> or otherwise assert a Claim against a Defendant Released Party, the R2 Trustee, the B2 Trustee, the Sheba Trustee or the Rabiu Trustees (or their respective Connected Parties).*

15. The "Claimants" is defined to include Moussy Salem. "Proceedings" is defined as "*any legal, arbitral, administrative, regulatory or other action or proceedings*". The "Defendant Released Parties" is defined to include both Freddy Salem and Beno Salem.

16. In my opinion, the English Court would likely consider that the 1782 Application comes within the definition of "Proceedings" for the purpose of clause 5.1. The next question is whether the 1782 Application is a "Claim" or "*in relation to any Claims*".

17. Freddy Salem has pleaded in the Monline Proceedings that if, contrary to his defence, the facts as alleged by Moussy Salem in the Monline Proceedings are true, then the Monline Proceedings fall within the definition of a "Claim" against a "Defendant Released Party" under the Settlement Deed. See paragraph 21 of Freddy Salem's Re-Amended Defence (attached hereto as **Exhibit D**).

18. The English Court is therefore seised of the issue of whether Moussy Salem's claim in the Monline Proceedings is barred by the Settlement Deed. As the 1782 Application is ancillary to the Monline Proceedings, in my opinion it follows that if the English Court were to decide that the Monline Proceedings are a "Claim", it would very likely decide that the 1782 Application is either "*in relation to any Claims*" or itself also a "Claim".

19. Finally, I note that in Moussy Salem's brief opposing Beno Salem's motion to dismiss, his attorneys assert that because there is no Claim against <u>Beno Salem</u> in the Monline Proceedings, the 1782 Application is not barred by the Settlement Deed. In my opinion, the English Court would likely regard that as a misreading of Clause 5.1 of the Settlement Agreement. That is for at least two reasons:

    a. having decided that the Monline Proceedings are a "Claim", the English Court is likely to decide that the 1782 Application is also a "Claim" being brought against a Defendant Released Party (namely, Beno Salem); and

    b. further and in any event, Moussy Salem covenanted not to bring <u>any</u> Proceedings in relation to <u>any</u> Claims against a Defendant Released Party. If the Monline Proceedings are a "Claim" against Freddy Salem, a Defendant Released Party, then <u>any</u> Proceedings in relation to that Claim are barred by the Settlement Deed. The Settlement Agreement does not require that the barred Proceedings "in relation to any Claim" also be against the same Defendant Released Party; the English Court is likely to consider that if that had been the intention, the parties would have expressly said so in Clause 5.1. Rather,

05810-00002/15053595.4   3

the parties intentionally agreed a wide covenant not to sue preventing all ancillary Proceedings in relation to any Claim.

### *Whether the Monline Claims existed as of the date of the Settlement Agreement*

20. While Freddy Salem denies Moussy Salem's claim, the English Court is seised of the question of whether the claim in the Monline Proceedings existed as of the date of the Settlement Agreement. Pursuant to what I have said previously in this affidavit, in light of the forum-selection clause in my opinion the English Court will likely consider that it has exclusive jurisdiction to determine this question.

21. Specifically, Freddy Salem has pleaded in his Re-Amended Defence in the Monline Proceedings (at paragraph 21(c)) that Moussy Salem's claim is not excepted from the Settlement Agreement simply because some of the facts asserted in respect of his claim only occurred after the date of the Settlement Agreement. In summary, Freddy Salem pleads that the correct characterisation of Moussy Salem's claim is that Freddy Salem acted in concert with others to transfer the business of Parker first to Monline BVI and then to Monline UK as part of a pre-agreed strategy decided upon prior to the execution of the Settlement Agreement. Accordingly, it is Freddy Salem's case that any claims which arise existed as of the date of the Settlement Agreement and are therefore barred by the Settlement Agreement.

### *The Intervening Action*

**A. When, by whom, and against whom it was filed.**

**B. The claims it asserts.**

**C. When and why it was stayed.**

22. It is convenient to address these questions together. On 11 April 2014, proceedings were filed by Isaac Salem (Moussy Salem's uncle, now deceased), Mireille Salem (Moussy Salem's mother), and Moussy Salem against Freddy Salem, Beno Salem, Sequent (C.I.) Limited and Guernsey Global Trust Limited (the latter entities being corporate trustees of certain trusts for the benefit of Freddy Salem, Beno Salem, Raymond Salem (Moussy Salem's father, now deceased) and their issue) (the "**2014 Proceedings**"). In summary, the 2014 Proceedings included:

    a. Claims by Isaac that a property business carried on by Presi Inc. and/or Presi's subsidiaries (referred to as the "**Property Business**") was carried on in partnership and that assets relating to that business, which were held by Isaac or subject to trusts for the benefit of the branch of the Salem family formerly headed by Raymond Salem (the "**R1 Trust**"), Freddy Salem's branch of the family (the "**F1 Trust**"), or Beno Salem's branch of the family (the "**B1 Trust**"), belonged to and should be held for that partnership.

    b. Claims by all three Claimants that elements of the so-called "**African Business**" (a term used in the Settlement Deed to mean "*any business in Africa which has been carried on, at any time, by any member of the Salem Family or their Connected Parties and any assets held by, or arising or derived from, those businesses*") were carried on in partnership and that assets relating to that business, which were held in the R1, F1 and B1 Trusts, belonged to and should be held for that partnership.

23. There were two Settlement Agreements which settled the 2014 Proceedings. A "Presi" Settlement Agreement settled the claims by Isaac in relation to the Property Business, and an "Africa" Settlement Agreement settled the claims by all three of Isaac Salem, Mireille Salem and Moussy Salem in relation to the African Business. The Settlement Agreement at issue in this 1782 Application is the "Africa" Settlement Agreement. It includes a specific acknowledgement by all of the parties (see clause 3 of the Settlement Deed) that there was not and never had been a partnership over or in relation to the African Business. Pursuant to the terms of the two Settlement Agreements, the 2014 Proceedings were stayed by two Orders of the English Court dated 11 April 2016 and 19 April 2016 (attached hereto as **Exhibit E**).

24. On February 24, 2024, Moussy Salem filed an application in the 2014 Proceedings against Freddy Salem and Beno Salem to lift the stay imposed by the English Court and for certain other relief (the "**English Settlement Deed Application**"). My firm acts for Freddy Salem and Beno Salem in the English Settlement Deed Application. I understand that either this or the 2014 Proceedings themselves are what this Court is referring to by the "Intervening Action". In summary, Moussy Salem alleges that Freddy Salem and Beno Salem have breached an alleged obligation to engage in "*reasonable endeavours*" to agree a binding process for an expert determination to value and divide the African Business, contrary to clause 6.5 of the Settlement Agreement.

**D. Whether the stay has been lifted because of Applicant's March 2024 request, or, if it has not yet been lifted, when Applicant expects the English Court to rule on the request to lift the stay**

25. I am not aware of any request that Moussy Salem has made in March 2024 which is relevant to the lifting of the stay in the 2014 Proceedings. I believe that Moussy Salem's attorneys were likely referring to the English Settlement Deed Application (which, as noted, was filed on February 24, 2024).

26. However, in any event, my firm has noted in correspondence with the solicitors acting for Moussy Salem that no lifting of the stay is required at all for the English Settlement Deed Application and Moussy Salem's request to do so is misconceived. That is because the English Court's Orders of 11 April 2016 and 19 April 2016 expressly state that the 2014 Proceedings are stayed "*except for the purposes of enforcing the terms of the Settlement Deed, for which purpose the parties have permission to apply*". Moussy Salem seeks relief to directly enforce clause 6.5 of the Settlement Deed. No lifting of the stay of the 2014 Proceedings is therefore required to do this.

27. To be clear, Moussy Salem's English Settlement Deed Application is proceeding. Freddy and Beno Salem have recently indicated that they will move to dismiss the application and have filed evidence in support of that position. Moussy Salem has accepted that the evidence indicates that it would be appropriate for a hearing to be listed to determine whether the English Settlement Deed Application should be dismissed because (in simple terms) it discloses no cause of action. Based on the English Court's current diary, I anticipate that this will be heard by the English Court on the first available date after October 21, 2024.

**E. The information Applicant believes will be exchanged if the stay has been or is later lifted.**

28. Moussy Salem has not at this stage made any request for discovery in the English Settlement Deed Application, although it is possible he may do so at a later stage if the application is not dismissed. Otherwise I am not aware of what "exchange of information" his attorneys are referring to.

29. However, the English Court would have power to order that disclosure (i.e. discovery) be given if Moussy applied for it, insofar as relevant to the issue in the English Settlement Deed Application.

**F. How the exchanged information compares to the discovery Applicant seeks in the Application (i.e., is the scope of the exchanged information broader or narrower than the discovery requested in the Application? Is it overinclusive or underinclusive?).**

30. Given that Moussy Salem has not yet made a request for disclosure or information in his English Settlement Deed Application, it is not possible at present to compare the potential "exchanged information" with the Application in this Court.

31. However, the English Court would have power to consider an application for disclosure of all the documents that Moussy Salem is seeking in the 1782 Application before this Court. That is because Beno Salem is a party to the English Settlement Deed Application and is bound by the exclusive jurisdiction of the English Court in the Settlement Deed.

***The English Court's July 19, 2023 Discovery Order, including Respondent's assertion that the English Court "rejected" Applicant's attempt to get discovery about the African Businesses, or found discovery about the African Businesses was "not relevant to the issues in dispute in the English Proceedings."***

32. Under relevant court rules in the English High Court, disclosure is given against specific "issues for disclosure" which are agreed between the parties or determined by the Court. The issues must arise from the pleaded cases of the parties.

33. Prior to my firm's instruction in the Monline Proceedings, on July 19, 2023, the English Court ruled on disputed disclosure requests by Moussy Salem and rejected his attempt to widen disclosure to include the so-called "African Businesses", focusing disclosure more narrowly on issues actually pleaded and in dispute in the English Proceedings.

34. A true and correct copy of a proposed draft "Issues for Disclosure and proposed Disclosure Models" is attached hereto at **Exhibit F**. This was the document included in the bundle provided for the Court at the hearing on July 19, 2023 which recorded the areas where the parties had agreed on relevant issues for disclosure, and where they disagreed. At page 7 of the document, going over to page 8 (pages 45-6 according to the numbering at the bottom right of the page), issue 9 is recorded and appears in green text, which indicates that it was proposed by Moussy Salem but opposed by all the defendants. The disclosure requests in the English Proceedings under issue 9 were as follows:

    a. What was the composition of the trading businesses in Africa associated with the Salem family (African Business) from 2013 onwards and how did it operate?

    b. What role did Morsgate play in the African Business from 2013 onwards?

    c. What role did Parker play in the African Business from 2013 until 30 March 2016?

    d. What role did C, D1, D3 and D4 play in the African Business, Morsgate, Parker and D2 from 2013 onwards?[1]

    e. What role did D2 play in the African Business from 7 June 2016?

35. On July 19, 2023, the English Court rejected entirely the extended disclosure requests set forth in paragraphs (a) to (e) above, on the grounds that the subject matter of the requests was not relevant to the issues in dispute. A true and correct copy of the approved transcript of the July 19, 2023 hearing in the English Proceedings is attached hereto at **Exhibit G**. Specifically, the judge said as follows (emphasis added):

*"I am not going to direct issue 9(a) to (e) to be part of the list of issues for disclosure. They can all go. <u>The reason is that I do not consider the broad issues of the African business to be a key issue in these proceedings</u>. I note that there is evidence of a wider family dispute in which these documents may be relevant but my decision is not based on the allegation of collateral purpose, it is based on relevance. I have looked closely at the pleadings; I have been taken to the relevant passages by counsel and I have listened to what counsel have said. It seems to me that the main relevance of the African business is the third and fourth defendants' role in it.*
*…*
*As for the third and fourth defendants' role in the Africa business, I consider that to be sufficiently covered by 7(a), subject to one point which is a broadening of the model for extended disclosure to model D plus narrative documents, or with narrative documents. That should give the claimants sufficient material to consider to properly understand D3 and D4's role in the African business."*

---

[1] In the English Proceedings, Moussy Salem is sometimes referred to as "C", Freddy Salem is sometimes referred to as "D1", Monline UK Limited is sometimes referred to as "D2", Salim Levy is sometimes referred to as "D3", and Ezra Aghai is sometimes referred to as "D4".

36. As is made clear immediately afterwards in the transcript, the judge intended to refer to issue 7(b). That issue reads "Do D3 [Mr Levy] and D4 [Mr Aghai] hold their shares in D2 [Monline UK] on trust for or as nominees for D1 [Freddy Salem]?"

37. The judge's reference to "the model for extended disclosure" being "model D plus narrative documents" refers to a specific type of disclosure under which the parties must agree the scope of parameters for a search of documents (key words, custodians and date ranges), and the party ordered to search must then disclose documents directly relevant to that issue and adverse to its case, as well as documents relevant to the background or context of material facts and events regarding that issue (the "narrative" documents).

38. Therefore, the English High Court has held that (a) the only relevance of the African Business in the English Proceedings is the role that Mr Levy and Mr Aghai played in it and (b) disclosure on that issue is sufficiently addressed by searches for documents relating to the issue of whether Mr Levy and Mr Aghai hold their shares in Monline UK on trust for or as nominees for Freddy Salem, together with background documents to that issue.

39. The rejection by the English Court of the "*broad issues of the African business*" as issues for disclosure is conclusive of the scope of disclosure it will order. While the English case law has established that there is a residual discretion to order "specific disclosure" (i.e. further discovery), that residual discretion will only be granted where it is reasonable and necessary and (crucially) it does not undermine the integrity of the process for disclosure under the relevant court rules (PD57AD, or Practice Direction 57AD): *Pinewood Technologies Asia Pacific Limited v Pinewood Technologies Plc* [2023] EWHC 2506 (TCC) at paragraph [66] (attached hereto as **Exhibit H**). The English Court has unambiguously stated that none of the issues sought under draft issue 9 are relevant to the Monline Proceedings. Moussy Salem has chosen not to appeal the English Court's order and the time for any appeal has long since passed. Therefore, in my opinion the English Court is highly unlikely to make any further order for disclosure in relation to issues concerning the African Business.

40. A true and correct copy of the "Disclosure Review Document" approved by the English Court following the hearing on 19 July 2023 is attached hereto as **Exhibit I**. It will be noted that the former issue 9 is omitted entirely from this document.

41. Finally, I understand that Moussy Salem claims that the very broad requests for discovery from Beno Salem are required because the English Court will need to determine the underlying revenue generated from, or expenditure incurred by, the African Businesses in order to assess the value of the "Parker Services" that he alleges have been wrongfully diverted from Monline International. That is simply wrong, for three reasons.

42. First, as is clear from the "Disclosure Review Document" at Exhibit I, the English Court has not ordered any disclosure of documents which relate to the operations and expenditures of the African Businesses. Moussy Salem did not propose that any issues of that kind were relevant before the hearing on July 19, 2023. In fact, as explained above, the Court thought that documents relating to the "African Business" were totally irrelevant save for those which may show Mr Levy and Mr Aghai's role in it.

43. That is important in the context of what I understand Moussy Salem's Counsel said at the hearing on July 19, 2023 about <u>why</u> disclosure was being sought about the African Business. Mr Hubbard, Counsel for Moussy Salem, said as follows (at page 29 of the transcript at Exhibit G):

    *MR HUBBARD: Thank you, Judge. The relevance of the African business is a separate disclosure issue. We say really this is about the relationship between - for the purposes of this case it is about the relationship between D1 and D3 and D4. We say…that D3 and D4 are trusted associates of D1 and they have throughout worked together in the African business, and this is a relevant question when determining what we say is an issue of liability, who really owns D2, what was really going on at the time of the UK transfer, who was directing what and on what basis?*

44. It follows that disclosure about the African Business beyond documents showing the relationship between <u>Freddy</u> Salem, Salim Levy and Ezra Aghai was not represented by Moussy Salem as being relevant to the issues in the Monline Proceedings. The role of <u>Beno</u> Salem, and documents which Beno Salem may have regarding the underlying African Business, is totally irrelevant to the Monline Proceedings.

45. Second, it is not even Moussy Salem's case in the English Proceedings that the revenue or expenditure of the African Businesses is relevant to the loss he alleges that Monline International suffered. A true and correct copy of a document entitled "Claimant's Response to the First Defendant's Request for Further Information Dated 12 March 2024" is attached hereto at **Exhibit J**. This is a document in which Moussy Salem responded to various requests made by Freddy Salem for further and better particulars of Moussy Salem's case. Under the heading "Request 2", Freddy Salem has made requests asking for Moussy Salem to particularise the amount of equitable compensation and/or damages that he claims was suffered due to Freddy Salem's alleged wrongful acts. Moussy Salem's response is that the best particulars he can give of the losses sustained by Monline International is the amount of the services fee received by Parker Logistics in the year to 30 March 2016 adjusted for inflation and pro-rated over the period 7 June 2016 to the date of assessment. Moussy Salem gives several "alternative bases of calculation", but all of those alternative bases also assess loss and damage by reference to the services fee which allegedly would have been received by Monline International performing the Parker Services, calculated by reference to projected expenses of Monline International from data which, for the most part, Moussy Salem has already obtained in disclosure in England. None of the projections rely upon disclosure of the revenue generated from or the expenditure incurred by the African Businesses.

46. In short, it appears that it is not Moussy Salem's case in England that the English High Court cannot make an assessment of the damages owed to Monline International without disclosure of documents which prove the revenue generated from or the expenditure incurred by the African Businesses.

47. Third, the disclosure which the English Court <u>has</u> ordered in respect of the provision of Parker Services is circumscribed. The only issues for disclosure that the English Court has ordered

which relate to the Parker Services, as noted on the "Disclosure Review Document", are as follows:

    a. Issue 4: "*On what basis did the Company supply Parker Services to Morsgate from 30 March 2016 to 6/7 June 2016*"

    b. Issue 5(a): "*What dealings were there between (i) the Company (ii) the parties and (iii) Morsgate with respect to the UK Transfer and/or the supply of Parker Services in the period 16 March 2016 to 1 August 2016*"

    c. Issue 8(f): "*Did D2 cease to supply Parker Services to Morsgate after 1 August 2016 and if so when and in what circumstances?*"

    d. Issue 8(g): "*Has D2 supplied Parker Services or other services to persons other than Morsgate and if so when, on what terms and in what circumstances*"

    e. Issue 8(h): "*What payments has D2 received since 7 June 2016 from persons other than Morsgate and what has become of them?*"

48. That is the full extent of the issues which Moussy Salem himself represented to the English Court were relevant in respect of the provision of Parker Services. As I have noted above, the English Court is highly unlikely to order that there be any further order for specific disclosure beyond the list of issues which it has determined are relevant to the proceedings.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on July 1, 2024

*[signature]*

**Nicholas Marsh**