# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-23186-MOORE/Elfenbein

*In re* **Application of**

**MOUSSY SALEM**,

        Applicant,

**Pursuant to 28 U.S.C. § 1782 for**
**Judicial Assistance in Obtaining**
**Evidence for Use in a Foreign Proceeding**.
_____/

## <u>REPORT AND RECOMMENDATION</u>

**THIS CAUSE** is before the Court on Applicant Moussy Salem's ("Applicant") Application for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 (the "Application"), *see* ECF No. [1], and Respondent Beno Salem's ("Respondent") Motion to Dismiss or Stay the Application and for Entitlement to Fees and Costs (the "Motion"), *see* ECF No. [30]. The Application seeks the Court's assistance in obtaining discovery from Respondent in aid of litigation in the United Kingdom (the "English Proceedings"), *see* ECF No. [1], and the Motion seeks to prevent Respondent from producing the requested discovery, *see* ECF No. [30]. The Honorable K. Michael Moore referred this matter to me "to take all necessary and proper action as required by law and/or for a Report and Recommendation with respect to the Application for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782." *See* ECF No. [43]. For the reasons explained below, I recommend that the Application, **ECF No. [1]**, be **GRANTED** and the Motion, **ECF No. [30]**, be **DENIED**.

## I.    BACKGROUND[1]

This matter involves two men connected by blood and business.  Applicant and Respondent are both members of the Salem family, which is "composed of" the four "children of Moussa Salem" ("Moussa") and "their descendants."  *See* ECF No. [4] at 6.  Three branches of Moussa Salem's family tree are relevant here: one includes Applicant, who is Moussa's grandson (the "R branch"); the second includes Respondent, who is Moussa's son and Applicant's uncle (the "B branch"); and the third includes Freddy Salem ("Freddy"), who is Moussa's son, Respondent's brother, and Applicant's uncle (the "F branch").  *See* ECF No. [4] at 6.

The Salem family "operates a trading business in West Africa" that, until 2013, the R, B, and F branches managed equally (the "African Businesses").  *See* ECF No. [4] at 7.  According to Applicant, starting in 2013 the B and F branches "excluded" the R branch "from activities associated with running the African Businesses."  *See* ECF No. [4] at 7–8.  That exclusion left the R branch with "very limited information" about "the operation of the African Businesses," but it "remained entitled" to its "share of profits from" those businesses as beneficiary of various Salem family trusts.  *See* ECF No. [4] at 8.  After the R branch "was excluded from management of the African Businesses, the profits" it received from those businesses "through the Salem family trusts suffered a sudden and inexplicable decline."  *See* ECF No. [4] at 8.

In the English Proceedings, Applicant alleges that the B and F branches—which "continue to manage the trading companies overseeing the African Businesses"—have "altered the

---

[1] The Court takes the details it provides in this Section from the Parties' filings.  These details are only included to put the Application and Motion in context.  These details are neither factual findings nor legal conclusions, and the Court takes no position on whether they are true.  *See In re Moussy Salem*, No. 24 MISC. 5 (JPC), 2024 WL 3026670, at *1 n.1 (S.D.N.Y. June 17, 2024); *cf. Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014) (noting the court "cannot simply assume" allegations in a "1782 application are false" because it is "in no position to assess the merits" of the associated foreign litigation).

management of" those businesses "to divert profits away from" the R branch.  *See* ECF No. [4] at

8.   Specifically, Applicant alleges that in 2016 the B and F branches transferred a logistics

agreement that was the "core asset" of Parker Logistics Limited, an English company the three

branches co-owned, to Monline International Limited, a British Virgin Islands company the R and

F branches co-owned and of which Freddy was a director.  *See* ECF No. [4] at 3–9.  Then, on June

7, 2016, Freddy "caus[ed], procur[ed], or otherwise permit[ed]" the transfer of Monline

International's assets to Monline UK Limited, an English company incorporated on the same day

and owned and directed by two people not in the Salem family in trust for Freddy, without paying

sufficient consideration to the R branch.  *See* ECF No. [4] at 3–9; ECF No. [4-1] at 9; ECF No.

[78] at 76.

The English Proceedings assert three claims[2]: (1) breach of duty by Freddy; (2) gratuitous

transfer by Freddy; and (3) conspiracy to divest Monline International of its assets to place those

assets out of Applicant's reach.  According to Applicant, Respondent "is likely to have critical

documents" about the B and F branches' efforts "to restructure management of the African

Businesses to prevent" the R branch "from receiving the profits owed" because Respondent has

"been responsible since 2013 for" the "management of several of the African Businesses" and

"assisted" the F branch "in taking steps to inhibit" the R branch "from benefiting from the profits

of the African Businesses."  *See* ECF No. [4] at 4–5.  Respondent is also likely to have "detailed

information" about the value of the logistics agreement when Freddy transferred it from Monline

International to Monline UK, which is relevant to the English Proceedings because it would show

---

[2] The claims in the English Proceedings were initiated by liquidators that a British Virgin Islands court
appointed after ordering that Monline International be wound up.  *See* ECF No. [4] at 10.  The liquidators
investigated and determined that Monline UK, its two non-Salem directors, and Freddy committed
"wrongdoing" in connection with Monline International's assets.  *See* ECF No. [4] at 10.  Monline
International then assigned the claims to Applicant, *see* ECF No. [4] at 10, who has been prosecuting them
since October 2022, *see* ECF No. [29] at 3.

"whether sufficient compensation was paid when this asset was transferred" and would help "determine the quantum of damages owed due to Freddy's wrongful acts." *See* ECF No. [4] at 5.

To obtain those documents and that information from Respondent, Applicant first filed a § 1782 application (the "New York Application") in the Eastern District of New York ("the New York Court") because he believed Respondent resided in that district. *See* ECF No. [4] at 14. The New York Court granted the New York Application, but Respondent filed a motion to quash it because he resides in Sunny Isles Beach, Florida. *See* ECF No. [4] at 14–15. Based on Respondent's declaration that he resides in South Florida, Applicant voluntarily dismissed the New York Application. *See* ECF No. [4] at 15. Three weeks later, Applicant filed this action. *See* ECF No. [1].

In the Application, Applicant contends that he both "meets the four statutory requirements" in § 1782 and "satisfies the four discretionary factors annunciated by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004)." *See* ECF No. [1] at 1. Specifically, Applicant argues that: (1) the "documents and information sought are relevant to the ongoing English Proceedings"; (2) he "seeks the requested discovery for purposes of use in" those proceedings; (3) the "discovery sought is neither unduly burdensome nor intrusive on" Respondent; and (4) the English Court "is receptive to the discovery sought and Applicant is not using" the § 1782 application "as an attempt to circumvent the requirements of the English judicial process." *See* ECF No. [1] at 1–2. Applicant also noted that "service is not required under" § 1782 but that, because Respondent knew about Applicant's attempts to obtain discovery from him, Applicant would "take every effort to serve him with" the Application and "afford" him "an opportunity to timely respond to" it. *See* ECF No. [1] at 2.

Unable to serve Respondent through traditional means, Applicant requested and received

permission from this Court to effect substitute service and ultimately effectuated service on Respondent.  *See* ECF Nos. [16], [23], and [26].  Respondent then filed an Opposition to the Application (the "Opposition").  *See* ECF No. [29].  In the Opposition, Respondent argues the Application should be denied because it violates the terms of an April 2016 settlement agreement between Applicant, Respondent, and Freddy (among others) that contains a "covenant not to sue" (the "Settlement Agreement").  *See* ECF No. [29] at 1–6.  Respondent also argues that the Application "improperly seeks discovery that has already been denied in the underlying English Proceedings."  *See* ECF No. [29] at 1–3, 6–9.

On the same day he filed the Opposition, Respondent also filed the Motion seeking to dismiss the Application.  *See* ECF No. [30].  In the Motion, Respondent again argues that the Application should be denied because it breaches the Settlement Agreement, which "expressly prohibits" Applicant "from bringing *any* legal proceedings against Respondent that relate to the African Business[es]" — even a § 1782 application.  *See* ECF No. [30] at 1–7.  Respondent alternatively argues that, "if the Application is not dismissed in its entirety," the Court should stay it under Federal Rule of Civil Procedure 41(d) until Applicant pays Respondent the costs he incurred in connection with the New York Application.  *See* ECF No. [30] at 2, 7–13.

The Court held a combined hearing on the Application and the Motion (the "Hearing").  *See* ECF No. [74]; ECF No. [78].  The Parties filed on the docket all documents they intended to use, or did use, during the Hearing.  *See* ECF No. [66]; ECF No. [69]; ECF No. [76]; ECF No. [77].

## II.    LEGAL STANDARDS

### A.  Jurisdiction

If subject-matter jurisdiction is lacking, a party may raise that defense by filing a motion under Federal Rule of Civil Procedure 12(b)(1).  *See* Fed. R. Civ. P. 12(b)(1).  A party's motion, however, is not the only way a lack of subject-matter jurisdiction can be addressed.  "A federal court not only has the power but also [has] the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."  *Fitzgerald v. Seaboard Sys. R.R.*, 760 F.2d 1249, 1251 (11th Cir. 1985).

A "district court must have at least one of three types of subject matter jurisdiction: (1) jurisdiction under a specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)."  *PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1305 (11th Cir. 2016) (citation omitted).  Section 1782 specifically grants district courts "authority to grant an application for judicial assistance."  *See* 28 U.S.C. § 1782(a).

"A covenant not to sue constitutes a promise not to sue a party on a claim, but does not modify or extinguish the claim itself."  *In re W.B. Care Ctr., LLC*, 419 B.R. 62, 73 (Bankr. S.D. Fla. 2009).  For that reason, breaching a covenant not to sue does not generally divest the court of subject-matter jurisdiction to decide a case.[3]  *See, e.g.*, *id.*; *Harris Corp. v. Fed. Express Corp.*,

---

[3] There is one specific context in which a covenant not to sue divests courts of subject-matter jurisdiction: patent invalidity claims.  *See, e.g.*, *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058–60 (Fed. Cir. 1995).  A covenant not to sue strips the court of subject-matter jurisdiction in the patent invalidity context because patent invalidity claims proceed under the Declaratory Judgment Act, and "[s]ubject matter jurisdiction in a declaratory judgment suit depends upon the existence of 'a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *See Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1345 (Fed. Cir. 2010) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).  A "covenant not to sue for patent infringement divests the trial court of subject matter jurisdiction over claims that the patent is invalid, because the covenant eliminates any case or controversy between the parties."  *Id.* at 1346. While this jurisdiction-stripping principle is well established in the patent validity context, it does not apply outside of that context.  Instead, as explained above, the breach of a covenant not to sue is treated

670 F. Supp. 2d 1306, 1311 (M.D. Fla. 2009); *Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1294–96 (S.D. Fla. 2004), *aff'd*, 470 F.3d 1036 (11th Cir. 2006); *Foliar Nutrients, Inc. v. Plant Food Sys., Inc.*, No. 13-CV-748-ORL, 2014 WL 3510594, at *4 (M.D. Fla. July 14, 2014).  Instead, breach of a covenant not to sue merely "gives rise to a" claim or "counterclaim for damages."  *See In re W.B. Care Ctr.*, 419 B.R. at 73.

### B.  Applications Under 28 U.S.C. § 1782

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247.  The "history of Section 1782 reveals Congress' wish to strengthen the power of district courts to respond to requests for international assistance." *Application of Consorcio*, 747 F.3d at 1269 (emphasis and quotation marks omitted).

"A district court has the authority to grant an application for judicial assistance if the following statutory requirements in § 1782(a) are met: (1) the request must be made 'by a foreign or international tribunal,' or by 'any interested person'; (2) the request must seek evidence, whether it be the 'testimony or statement' of a person or the production of 'a document or other thing'; (3) the evidence must be 'for use in a proceeding in a foreign or international tribunal'; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance." *In re Clerici*, 481 F.3d 1324, 1331–32 (11th Cir. 2007) (footnote omitted) (quoting § 1782(a)).  "If these requirements are met, then § 1782 'authorizes, but does not require, a federal district court to provide assistance.'" *Id.* at 1332 (quoting *Intel*, 542 U.S. at 255); *see also United Kingdom v. United States*, 238 F.3d 1312, 1319 (11th Cir. 2001) ("[A] district court's compliance with a § 1782 request is not mandatory.").

---

like the breach of any other contract provision — it gives rise to a claim for damages, not a divestiture of jurisdiction. *See, e.g.*, *In re W.B. Care Ctr.*, 419 B.R. at 73.

"Once the prima facie [statutory] requirements are satisfied, the Supreme Court in *Intel* noted these factors to be considered in exercising the discretion granted under § 1782(a): (1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,' because 'the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is otherwise 'unduly intrusive or burdensome.'" *In re Clerici*, 481 F.3d at 1334 (quoting *Intel*, 542 U.S. at 264–65). None of these factors is required or automatically dispositive — they simply "bear consideration in ruling on a § 1782(a) request." *See Intel*, 542 U.S. at 264. In fact, even if a court concludes an application contains "unduly intrusive or burdensome requests," it may still exercise its discretion to grant the application because those specific requests "may be rejected or trimmed." *Id.* at 265.

Finally, though the Supreme Court has not specifically listed it as a factor in the analysis, sometimes courts look at how granting or denying a § 1782 application would impact international comity concerns. That is because "the animating purpose of § 1782 is comity: Permitting federal courts to assist foreign and international governmental bodies promotes respect for foreign governments and encourages reciprocal assistance." *ZF Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619, 632 (2022); *see also In re Pimenta*, 942 F. Supp. 2d 1282, 1289 (S.D. Fla. 2013) (noting "the twin aims of the statute: providing an efficient means of assistance to participants in international litigation and encouraging foreign countries to provide reciprocal assistance to our courts").

**C.  Costs and Stays Under Federal Rule of Civil Procedure 41(d)**

"If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied." Fed. R. Civ. P. 41(d).  The plain language of the statute demonstrates that a court's authority to impose costs under Rule 41(d) is discretionary, not mandatory.  *See, e.g.*, *Sanderson v. Ford Motor Co.*, 90 F.R.D. 375, 376 (N.D. Ala. 1981) (noting that Rule 41 "is discretionary"); *Marino v. Broward Sheriff's Off.*, No. 20-CV-60980, 2021 WL 9563808, at *1 (S.D. Fla. Jan. 29, 2021) ("Rule 41's use of the word 'may' renders the award of costs discretionary."); *cf. Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015) (characterizing "may" as "permissive language" in Fed. R. Civ. P. 55(b)(2)).  For that reason, when "both explicit requirements of Rule 41(d) have been satisfied, this Court has discretion whether to require" the filing party "to pay Rule 41(d) costs associated with the" previously filed action.  *See Tassinari v. Key W. Water Tours, L.C.*, No. 06-CV-10087, 2007 WL 9702571, at *7 (S.D. Fla. Aug. 28, 2007).

"[I]n deciding whether to exercise its discretion to assess Rule 41(d) costs, the Court may consider" a party's "motivation in dismissing and then re-filing the action."  *USA Ent. Grp., Inc. v. City of Pompano Beach*, No. 18-CV-62740, 2019 WL 498743, at *2 (S.D. Fla. Feb. 8, 2019).  "[B]ut the Court is not required to consider" a party's "motivation when deciding whether to award Rule 41(d) costs."  *Tassinari*, 2007 WL 9702571, at *10.  And "Rule 41(d) does not require the Court to conclude that" the party "acted in bad faith or with other improper motive in order to assess costs."  *USA Ent. Grp., Inc.*, 2019 WL 498743, at *2.  Instead, courts must look at "whether the circumstances of the case warrant an award of costs to prevent prejudice to the defendant."  *Id.* (quotation marks omitted).

### III.    DISCUSSION

Because Respondent contends that the Settlement Agreement, with its covenant not to sue, divests this Court of subject-matter jurisdiction, the Court first evaluates whether it has the authority to decide the Application.  The Court then analyzes whether, even apart from its potential jurisdictional implications, the Settlement Agreement bars the Application such that the Motion should be granted.  Next, the Court evaluates whether the Application satisfies the statutory requirements, meets the *Intel* factors, and furthers the policies underlying § 1782.  Finally, the Court assesses whether an award of costs under Rule 41(d) is appropriate.

### A.  Jurisdiction

It typically goes without saying that a district court has subject-matter jurisdiction over § 1782 applications.  Indeed, the statute itself explicitly gives district courts "authority to grant an application for judicial assistance."  *See* 28 U.S.C. § 1782(a).  That language is both a "specific statutory grant" and enough to support "federal question jurisdiction pursuant to" § 1331.  *See PTA-FLA, Inc.*, 844 F.3d at 1305 (quotation marks omitted).

Of course, a federal court has "the obligation" to "inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."  *Fitzgerald*, 760 F.2d at 1251.  Respondent has raised that possibility with his contention that the Settlement Agreement's covenant not to sue divests this Court of subject-matter jurisdiction.  *See* ECF No. [30] at 4.  Respondent then reaffirmed his contention at the Hearing, when he explained that he filed the Motion "ultimately under Rule 12(b)(1)" and argued that "the Court should dismiss for lack of subject matter jurisdiction."  ECF No. [78] at 20–22; *see also* Fed. R. Civ. P. 12(b)(1).

In support of his contention, Respondent cites to two unpublished decisions from this District.  *See* ECF No. [30] at 4 (citing *PayRange, Inc. v. KioSoft Techs.*, No. 20-CV-24342, 2022

WL 823885, at *7 (S.D. Fla. Mar. 18, 2022); *Pat. Licensing & Inv. Co. v. Green Jets Inc.*, No. 11-CV-80689, 2012 WL 13019189, at *1 (S.D. Fla. May 9, 2012)).  And those decisions contain language indicating that an "unconditional promise not to sue by one party onto another divests a trial court of subject matter jurisdiction."  *See PayRange, Inc.*, 2022 WL 823885, at *7 (quoting *Green Jets Inc.*, 2012 WL 13019189, at *1).  Read in isolation, that language certainly suggests that Respondent's jurisdiction-stripping argument has merit.  But as always, context matters.

The *PayRange* and *Green Jets* decisions arose in the patent invalidity/infringement context. *See PayRange, Inc.*, 2022 WL 823885, at *2 (granting a stay because the "procedural posture" was that "two of the three patents at issue in" the "infringement lawsuit" were then "being evaluated by the" Patent Trial and Appeal Board "for invalidity"); *Green Jets Inc.*, 2012 WL 13019189, at *1 (noting that the complaint sought "injunctive relief for alleged acts of patent infringement").  As the Federal Circuit — the authority on patent law — has explained, patent invalidity claims proceed under the Declaratory Judgment Act.  *See, e.g.*, *Super Sack*, 57 F.3d at 1058–60.  And "[s]ubject matter jurisdiction in a declaratory judgment suit depends upon the existence of 'a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *See Dow Jones*, 606 F.3d at 1338 (quoting *MedImmune, Inc.*, 549 U.S. at 127).

For that reason, "a patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over [an infringement] case by filing a covenant not to assert the patent at issue against the putative infringer with respect to any of its past, present, or future acts."  *See Super Sack*, 57 F.3d at 1058.  So, in the patent context, a "covenant not to sue for patent infringement divests the trial court of subject matter jurisdiction over claims that the patent is invalid, because the covenant eliminates any case or controversy between the parties."

*See Dow Jones*, 606 F.3d at 1346.

The same is not true in the § 1782 application context or in most others.  Outside of the patent context, a "covenant not to sue constitutes a promise not to sue a party on a claim, but does not modify or extinguish the claim itself."  *See, e.g.*, *In re W.B. Care Ctr.*, 419 B.R. at 73.  In other words, the breach of a covenant not to sue is no different than the breach of any other contract provision.  Agreeing to a covenant not to sue in a general contract does not subject parties to a risk that breaching the provision will divest a court of jurisdiction to decide a lawsuit brought to enforce it.  *See id.*; *cf. Harris Corp.*, 670 F. Supp. 2d at 1311 (noting a covenant not to sue does not always divest courts of jurisdiction even in the patent infringement/invalidity context); *Foliar Nutrients*, 2014 WL 3510594, at *4 (noting the same because some patent claims "are not brought pursuant to the Declaratory Judgment Act and are therefore not subject to its unique justiciability requirements").  Instead, breaching a covenant not to sue subjects the parties to the same danger associated with breaching any other contract provision: it "gives rise to a" claim or "counterclaim for damages."  *See In re W.B. Care Ctr.*, 419 B.R. at 73.

As the preceding discussion makes clear, it is the "unique justiciability requirements" of certain patent claims that give a covenant not to sue the power to strip subject-matter jurisdiction from a district court.  *See Foliar Nutrients*, 2014 WL 3510594, at *4.  That is not the kind of claim at issue here, so the Settlement Agreement's covenant not to sue does not divest this Court of jurisdiction to decide the Application and the Motion.

**B.  Motion to Dismiss**

Having determined that there is subject-matter jurisdiction over the Application and the Motion, the Court must now analyze whether the Settlement Agreement bars the Application such that Respondent's Motion should be granted.

As explained above, Respondent made clear at the Hearing that he filed the Motion "under Rule 12(b)(1)."  ECF No. [78] at 20–22.  Under Rule 12(b)(1), the Court must dismiss "a claim for relief" if there is a "lack of subject-matter jurisdiction."  *See* Fed. R. Civ. P. 12(b)(1); ECF No. [30] at 4 (arguing that the Settlement Agreement's covenant not to sue divests this Court of subject matter jurisdiction); ECF No. [78] at 20–22 (arguing that "the Court should dismiss for lack of subject matter jurisdiction").  For the reasons noted in the previous section, the Court has subject-matter jurisdiction to decide the Application.  *See supra* Section III.A.  Because lack of subject-matter jurisdiction under Rule 12(b)(1) is Respondent's basis for the Motion, I recommend that it be denied.  Even assuming, however, that Respondent filed the Motion under the other potentially relevant subsection of Rule 12 — "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6) — I still recommend that the Motion be denied for at least two reasons.

First, as Respondent acknowledged at the Hearing, courts analyzing Rule 12(b)(6) motions generally "can't go beyond the pleadings."  ECF No. [78] at 21.  Indeed, the Eleventh Circuit has explained that a "district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint" unless the material is "central to the plaintiff's claim" and its "authenticity . . . is not challenged."  *See, e.g.*, *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005).  While a § 1782 application does not fit neatly into the traditional litigation framework of claims and pleadings, *see United States v. Zubaydah*, 595 U.S. 195, 214 (2022) (noting that an "application for discovery under § 1782" is "a purely evidentiary proceeding and thus unlike most litigation"), to the extent the request for discovery aid in the Application can be considered a "claim," the Settlement Agreement is not central to it.

In the Application, Applicant seeks discovery related to the management of and profits from the African Businesses, along with the value of the logistics agreement Freddy transferred

from Monline International to Monline UK.  *See* ECF No. [4] at 4–5.  The Settlement Agreement, which resolves earlier litigation between Applicant, Respondent, Freddy, and other members of the Salem family, is not "a necessary part" or "at the very heart of" Applicant's "effort to make out a claim that" he should receive the discovery he seeks.  *See Day*, 400 F.3d at 1276.  It does not support or negate any of the four statutory requirements of § 1782, nor does it support or negate any of the four discretionary factors the Supreme Court set out in *Intel*.  In fact, Respondent agreed at the Hearing that "analyzing the settlement agreement . . . should be a matter of whether the Court has jurisdiction in the first instance . . . under 12(b)(1), as opposed to" it being "considered under the *Intel* factors."[4]  *See* ECF No. [78] at 21–22.

Even if the Court looked to the more traditional claims in the English Proceedings instead of the actual "claim" at issue here (Applicant's § 1782 request for discovery aid), the Settlement Agreement still would not be central.  There are three claims in the English Proceedings, each of which has its own set of elements that must be proven.  *See* ECF No. [4] at 4–5 (noting claims for breach of duty, gratuitous transfer, and conspiracy to divest).  The Settlement Agreement, a document that resolved litigation predating the transfer upon which the English Proceedings are based, cannot possibly be adequate proof of any of those elements.  At most, the covenant not to

---

[4] Before the Hearing, the Court asked the parties to "come prepared to answer questions relating to . . . [t]he proper analytical step at which this Court should consider the Settlement Agreement — specifically, under which statutory or discretionary factor does any potential consideration of the Settlement Agreement fit." *See* ECF No. [64] at 2.  The Court posed that question to both parties several times during the Hearing, but neither Applicant nor Respondent had a definitive answer. *See generally* ECF No. [78].  Applicant argued the Court should consider the Settlement Agreement as "an *Intel* factor question," but never identified which factor. *See* ECF No. [78] at 80–84.  Respondent, on the other hand, suggested that "if" the Court "were going to analyze it under an *Intel* factor," it "would look at factor two, which allows the Court to look at the character of the proceedings under way abroad." *See* ECF No. [78] at 19–20. But as explained above, Respondent ultimately argued that the Settlement Agreement analysis is a jurisdictional question under Rule 12(b)(1), not an *Intel* factor question.  *See* ECF No. [78] at 21–22.  Indeed, in a moment of commendable candor, Respondent acknowledged that "the *Intel* factors don't really necessarily contemplate" whether "a covenant not to sue . . . covers this kind of proceeding."  *See* ECF No. [78] at 22.

sue in the Settlement Agreement may be an affirmative defense (if it is interpreted as a release of the claims in the English Proceedings), *see, e.g.*, *Hall v. Sargeant*, No. 18-80748-CIV, 2020 WL 1536435, at *9 (S.D. Fla. Mar. 30, 2020), or the basis for a separate claim by Respondent against Applicant for breaching that provision, *see, e.g.*, *In re W.B. Care Ctr.*, 419 B.R. at 73; *Habitat for Human. Int'l, Inc. v. Morris*, No. 2:19-CV-456-JLB-MRM, 2021 WL 4974837, at *4 (M.D. Fla. Oct. 26, 2021).

While an affirmative defense may ultimately end a lawsuit and a counterclaim may eventually make a party whole, those things do not occur at the motion-to-dismiss stage. *See, e.g.*, *Hall*, 2020 WL 1536435, at *9; *Krush Commc'ns, LLC v. Network Enhanced Telecom, LLP*, No. 13-CV-2688-T-30TGW, 2014 WL 12625758, at *2 (M.D. Fla. Apr. 29, 2014). Indeed, "federal district courts routinely deny motions to dismiss that . . . simply attack the complaint with an affirmative defense of release" making "the released party . . . have to defend itself at least through summary judgment." *Hall*, 2020 WL 1536435, at *9. As long as a "claim contains the necessary elements," it is "not the Court's role to interpret the contract's meaning" on a motion to dismiss. *Krush Commc'ns*, 2014 WL 12625758, at *2 ("[T]he Court will not dismiss the claim at this juncture. The claim contains the necessary elements of a breach of contract claim, i.e., the existence of a contract, breach, and damages. And it is not the Court's role to interpret the contract's meaning at this juncture."); *see also Torjagbo v. United States*, 285 F. App'x 615, 617, 621 (11th Cir. 2008) (enforcing covenant not to sue, as a bar to suit, at summary judgment stage); *Morris*, 2021 WL 4974837, at *8 (enforcing covenant not to sue, as breach of contract claim, at summary judgment stage). For that reason, the Settlement Agreement is also not central to the claims in the English Proceedings and cannot be a basis upon which to dismiss the Application.[5]

---

[5] In situations like this one, where the movant offers extrinsic evidence along with a motion to dismiss, the Court has discretion to convert the motion to dismiss into a motion for summary judgment. *See, e.g.*, *Day*,

Second, even if the Court were to consider the Settlement Agreement central to Applicant's request for discovery aid or to the claims in the English Proceedings such that it could justify dismissing the Application, Respondent's Motion still fails.  That is because, by its own terms, the Settlement Agreement does not apply here.

In the "covenant not to sue" provision of the Settlement Agreement, Applicant agreed that he would not "bring any **Proceedings** in England and Wales or in any other jurisdiction against" Respondent "in relation to any **Claims** or otherwise assert a Claim against" Respondent.  *See* ECF No. [44-1] at 12, § 5.1 (emphasis added).  The definition section of the Settlement Agreement defines "Proceedings" to mean "any legal, arbitral, administrative, regulatory or other action or proceedings," ECF No. [44-1] at 10, § 1.1, and relevant here, it defines "Claims" to mean "any and all claims relating to any and all **Liabilities** arising from or related to or in connection with . . . the relationships between the Parties, but only . . . in so far as those Liabilities relate to the African Business," ECF No. 44-1 at 7, § 1.1 (emphasis added).  It further defines "Liabilities" to mean:

> any and all liabilities in respect of any **existing (as at the date of this Settlement [Agreement])** matter, fact, action or inaction giving rise to any demand, liability, obligation, complaint, claim, counterclaim, right of set-off, right to net, indemnity, right of contribution, cause of action (including, without limitation, in negligence), administrative or regulatory claim or infraction, petition, right or interest of any kind or nature whatsoever, whether in law or equity, direct or indirect, joint or several, foreseen or unforeseen, contingent or actual, accrued or unaccrued, liquidated or unliquidated, known or unknown, disclosed or undisclosed, suspected or unsuspected, howsoever arising in whatever capacity and jurisdiction.

ECF No. [44-1] at 10, § 1.1 (emphasis added).

The Settlement Agreement's definitions of "Claims" and "Liabilities" are broad. But as noted above, an "application for discovery under § 1782" is not a claim in the traditional sense.

---

400 F.3d at 1275–76; *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002) (noting that "[w]hen that conversion occurs, the district court must comply with the requirements of Rule 56," must "notify the parties that the motion has been converted," and must "give the parties 10 days in which to supplement the record").  The Court declines to exercise that discretion here.

*See Zubaydah*, 595 U.S. at 214.  It is not a bid for relief contained in a pleading, as the Federal Rules describe, *see* Fed. R. Civ. P. 12(b) (listing "defense[s] to a claim for relief in any pleading"); *cf.* Fed. R. Civ. P. 7(a) (defining the seven types of pleadings, which does not include a § 1782 application), and the Settlement Agreement itself contemplates, *see* ECF No. [44-1] at 10, § 1.1 (listing many traditional types of relief and components of pleadings). Instead, it is "a purely evidentiary proceeding and thus unlike most litigation." *See Zubaydah*, 595 U.S. at 214.

More importantly, neither Applicant's nontraditional § 1782 request for discovery aid nor the more traditional claims in the English Proceedings existed as of the date of the Settlement Agreement.  The Settlement Agreement took effect on April 15, 2016, *see* ECF No. [44-1] at 6, but the allegedly improper transfer underlying the claims in the English Proceedings did not occur until June 7, 2016, *see* ECF No. [4-1] at 9.  It appears that the English Proceedings themselves did not begin until 2022, *see* ECF No. [4-1] at 1, and the Application was not filed until 2023, *see* ECF No. [1].  As those dates demonstrate, the earliest any kind of claim based on the actions giving rise to the English Proceedings (and therefore, the Application) could have accrued is nearly two months *after* the Settlement Agreement went into effect.

At the Hearing, Respondent argued that the right at issue in the English Proceedings — Monline International's entitlement to deliver on and be paid for the services included in the logistics agreement — accrued on March 30, 2016.  *See* ECF No. [78] at 9–16, 78–79, 88, 93; ECF No. [4-1] at 11.  He asserted the existence of that right satisfies the definition of Liabilities because that definition includes a "right or interest of any kind or nature whatsoever," even if it is "unforeseen," "contingent," "unaccrued," "unknown," "undisclosed," or "unsuspected."  *See* ECF No. [78] at 10–18; ECF No. [44-1] at 10, § 1.1.  But what must exist as of April 2016 is not the "right" but rather the "action or inaction giving rise to" that right. *See* ECF No. [44-1] at 10, § 1.1.

And the relevant action here is not the promise of the logistics agreement to Monline International, it is the allegedly improper transfer of the logistics agreement to Monline UK.  *See* ECF No. [4] at 3–9.  That transfer did not occur, and the company receiving it did not even exist, until June 2016.  *See* ECF No. [4] at 3–9; ECF No. [4-1] at 9; ECF No. [78] at 76.

In sum, the Court agrees with Applicant that a right does not become a right on which a party can recover "until that right has actually been taken away."  *See* ECF No. [78] at 79.  That is, a right is a "condition precedent" to bringing a claim, but a right is not enforceable until there has been a wrong.  *See* ECF No. [78] at 79; *Dore v. Kleppe*, 522 F.2d 1369, 1373 (5th Cir. 1975) ("The general rule is that a cause of action accrues when the alleged wrong occurs, which is when the plaintiff has a right to enforce his claim.").  The action that created an enforceable right here was the June 2016 transfer, and that action did not exist as of the April 2016 date of the Settlement Agreement.  This means that, under its own terms, the Settlement Agreement does not apply to the Application and cannot be a basis for dismissing it.[6]  As a result, I respectfully **RECOMMEND** that Respondent's request to dismiss the Application, **ECF No. [30],** be **DENIED**.  The Report will separately address Respondent's alternative request for costs and a stay below.

## C. The § 1782 Application

While the Court recommends denying the Motion, that denial does not mean the Application should automatically be granted. The Application must still satisfy the statutory requirements, meet the *Intel* factors, and further the policies underlying § 1782.  The Court concludes that it does.

---

[6] The Court acknowledges that the English Court must make the ultimate decision about the applicability of the Settlement Agreement to the English Proceedings.  *See* ECF No. [44-1] at 19, §§ 17–18 (noting that English law governs the Settlement Agreement and English courts have "exclusive jurisdiction" to settle disputes arising out of it).  But as will be explained in Section III.C, whether the English Court decides to admit any discovery that flows from the Application does not impact this Court's analysis about whether to grant the Application (or the Motion).

1.      **Applicant Has Met the Four Requirements of § 1782**

The four factors set out in § 1782 govern the first step of the analysis.  *See* 28 U.S.C.

§ 1782.  As a reminder, they are: (1) a foreign or international tribunal or any interested person

makes the request; (2) the request seeks testimonial or documentary evidence; (3) the evidence is

for use in a proceeding in a foreign or international tribunal; and (4) the person from whom

discovery is sought resides or is found in this District.  *See In re Clerici*, 481 F.3d at 1331–32.

Here, Applicant has met each factor.

First, an "interested person" is making the request.  *See* § 1782(a); *In re Clerici*, 481 F.3d

at 1331.  Applicant is a litigant in the English Proceedings — specifically, he "is the claimant in

the English Proceedings" and needs the evidence he seeks through the Application to "support"

and "help him prosecute the claims" in that proceeding.  *See* ECF No. [4] at 16.  As the Supreme

Court has noted, "litigants are included among, and may be the most common example of, the

'interested persons' who may invoke § 1782."  *See Intel*, 542 U.S. at 256 (alteration adopted).

Second, Applicant's request "seek[s] evidence," including the "'testimony or statement' of

a person" and the production of "'a document or other thing.'"  *See In re Clerici*, 481 F.3d at 1331–

32 (quoting § 1782(a)).  Indeed, the subpoenas attached to the Application explicitly note that

Applicant seeks to depose Respondent, *see* ECF No. [1-2] at 2, and to obtain document production

from him, *see* ECF No. [1-2] at 5–13.

Third, the evidence Applicant seeks is "for use in a proceeding in a foreign or international

tribunal."  *See* § 1782(a); *In re Clerici*, 481 F.3d at 1332.  As explained in the Application, the

"documents and information sought are relevant to the ongoing English Proceedings" and "for

purposes of use in these proceedings."  *See* ECF No. [1] at 1.  The documents and information are

relevant because, as Applicant explains in his supporting Memorandum, evidence about "the revenues generated by" the allegedly improperly transferred logistics agreement "will assist the English Court in understanding the value of the" logistics agreement "at the time of the transfer (and in the future), and what adequate consideration would have been for such service." *See* ECF No. [4] at 17–18.   That, in turn, will help the English Court "assess the adequacy of any consideration paid" to Applicant.  *See* ECF No. [4] at 18.  The evidence will also aid Applicant's "efforts to quantify the value [of] his claims."  *See* ECF No. [4] at 18.

Applicant expects that the evidence will reveal the "continued changing hands of the administrator of the" logistics agreement, which will "will aid the English Court in understanding what services were provided to" later customers of the logistics agreement, whether those services "were still required after March 2021, and who provided such services from that point onward." *See* ECF No. [4] at 18.  Put another way, the evidence will "aid the English Court in understanding the full chain of events surrounding the provision of" the services that the logistics agreement governed "and in assessing the adequacy of the consideration paid for the transfer of the" logistics agreement.  *See* ECF No. [4] at 18.  Applicant, as the claimant in the English Proceedings, "has the practical ability to inject the requested information into the foreign proceeding," and "the requested discovery is something that will be employed with some advantage or serve some use in the proceeding."  *See In re Bernal*, No. 18-MC-21951, 2018 WL 6620085, at *4 (S.D. Fla. Dec. 18, 2018) (quotation marks omitted) (evaluating the "for use" requirement with those two factors).

Fourth, the person from whom Applicant seeks the evidence "resides or is found" in this District.  *See* § 1782(a); *In re Clerici*, 481 F.3d at 1332.  In his declaration responding to the New York Application, Respondent "declared that he resides in Sunny Isles Beach, Florida, intends to reside in Florida for all of the foreseeable future, is a member of a synagogue in Florida, has a

Florida driver's license, and owns two personal vehicles which are registered in Florida under his current address."  *See* ECF No. [4] at 17 (alteration adopted, quotation marks omitted); ECF No. [44-1] at 53.

Finally, the Court notes that Respondent does not challenge any of Applicant's arguments on the § 1782(a) factors.  *See generally* ECF No. [29]; ECF No. [30]; *accord In re Bernal*, 2018 WL 6620085, at *2 (noting that Respondents "do not dispute" three of the four § 1782 factors, which "means that" Applicant "satisfies" them); *In re Moussy Salem*, 2024 WL 3026670, at *10 (noting Respondent, who in that case was Freddy, "does not dispute" certain of the § 1782 and *Intel* factors and finding them satisfied based on Applicant's evidence).  For those reasons, the Court finds that Applicant has satisfied the four statutory factors under § 1782.

### 2.    The *Intel* Factors Weigh in Favor of Granting the Application

Once the statutory requirements are satisfied, the discretionary factors the Supreme Court set out in *Intel* govern the second step in the § 1782 analysis.  As a reminder, they are: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign court to U.S. federal-court judicial assistance; (3) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is otherwise unduly intrusive or burdensome.  *See Intel*, 542 U.S. at 264–65; *In re Clerici*, 481 F.3d at 1334.  Here, each of the four *Intel* factors weighs in favor of granting the Application.

First, the person from whom Applicant seeks the discovery is not a participant in the foreign proceeding.  *See Intel*, 542 U.S. at 264; *In re Clerici*, 481 F.3d at 1334.  As the Supreme Court has explained, "when the person from whom discovery is sought is a participant in the foreign

proceeding," the "need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad" because a "foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel*, 542 U.S. at 264. "In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.* Respondent is not a participant in the English Proceedings — only Applicant, Freddy, Monline UK, and Monline UK's two non-Salem directors are participants. *See* ECF No. [4] at 3–9; ECF No. [4-1] at 9; ECF No. [78] at 76. And Respondent does not challenge Applicant's arguments on the first *Intel* factor. *See generally* ECF No. [29]; ECF No. [30]. So, the first *Intel* factor weighs in favor of granting § 1782(a) aid.

Second, the "nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance" all suggest that the Application should be granted. *See Intel*, 542 U.S. at 264; *In re Clerici*, 481 F.3d at 1334. The English Court uses an adversary system like that of this country, and the English Proceedings are a "civil litigation" in which discovery is permitted. *See* ECF No. [4] at 3, 10; ECF No. [4-1] at 5–6 (noting the discovery disclosures the English Court required in the English Proceedings); *In re Moussy Salem*, 2024 WL 3026670, at *3. And, as Applicant explains, courts "in this District have repeatedly found English courts to be receptive to discovery assistance." *See* ECF No. [4] at 20 (citing decisions).

Although Respondent argues that "[t]here is no evidence that the English Court would be receptive to" § 1782 assistance, *see* ECF No. [29] at 8–9, that misunderstands the standard for the second *Intel* factor. This Court need not look at whether there are indications that the English Court would be receptive to § 1782 evidence but instead whether there is "authoritative proof that

a foreign tribunal would *reject* evidence obtained with the aid of § 1782." *See In re Bernal*, 2018 WL 6620085, at *6 (citation omitted). Respondent asserts there is proof that the English Court would reject the § 1782 discovery Applicant seeks because it "has already determined that discovery concerning the African Business is not relevant to the claims at issue in the English Proceedings." *See* ECF No. [29] at 9. Having reviewed the transcript of the English Court's decision, *see* ECF No. [69-8], however, the Court disagrees.

As extensively explained by one of the previous district courts to evaluate this issue, the English Court did not announce "a categorical bar to *any* discovery related to African Businesses" or "a blanket prohibition on all discovery related to the African Businesses." *See In re Moussy Salem*, 2024 WL 3026670, at *12. Instead, the English Court "appeared to recognize the relevance of discovery related to the African Businesses' trading activity" and cut a disclosure request about the African Business only because of its "sheer breadth" and "its overlap in scope with other approved disclosure issues." *See id.* at *5, *12. "The suggestion that the English Court — in rejecting [a] specific set of requests . . . — deemed irrelevant *all* disclosure concerning the African Businesses is, at best, misguided." *See id.* at *12.

After comparing the discovery requested in the Application to the disclosure disallowed by the English Court, the Court notes that the topics are not identical. *Compare* ECF No. [1-2] at 12–13, *with* ECF No. [69-7] at 7–8. In fact, many of the topics in Applicant's § 1782 subpoena requests were also included in the disclosure the English Court allowed, including information about the transfer of the logistics agreement and the ownership and control of Monline UK. *Compare* ECF No. [1-2] at 12–13, *with* ECF No. [69-7] at 7–8. The fact that the discovery Applicant requests from Respondent encompasses much of what the English Court allowed from Freddy supports a conclusion that the English Court would not reject Applicant's § 1782 evidence.

*See In re Bernal*, 2018 WL 6620085, at *6.  Because it appears the English Court would be receptive to evidence gathered through a § 1782(a) proceeding, the second *Intel* factor weighs in favor of granting the Application.

Third, the Application does not "conceal[] an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *See Intel*, 542 U.S. at 265; *In re Clerici*, 481 F.3d at 1334.  As already noted, English courts are generally receptive to evidence gathered through § 1782 proceedings.  *See, e.g.*, *In re Novoship (UK) Ltd.*, No. 20-60876-MC, 2020 WL 3286308, at *3 (S.D. Fla. June 18, 2020) ("[T]here is no indication that the courts of the United Kingdom would be unreceptive to American evidence and, in fact, § 1782 is routinely used to obtain evidence for proceedings in that country.").  And Respondent's assertion that the "English Court has already considered, and has already rejected, the overbroad discovery into the African Business that Applicant originally sought in the English Proceedings themselves," *see* ECF No. [29] at 8, is inaccurate for the reasons explained above.

Even if the English Court had rejected the exact same discovery requests Applicant makes here, which it has not, that does not require denial of the Application.  *See In re Moussy Salem*, 2024 WL 3026670, at *14; *accord In re Chevron Corp.*, 633 F.3d 153, 163 (3d Cir. 2011) (noting that "[w]ithout a definitive determination" that the foreign court "has denied" the applicant "access to the same documents" the applicant seeks in its § 1782 application, it "cannot be said" the § 1782 application "is an attempt to circumvent foreign proof-gathering restrictions" and also that "it would be a stretch to conclude" a § 1782 proceeding was a circumvention attempt "where the foreign court might be receptive" to § 1782 evidence (quotation marks omitted)).  Other courts in this District have explained that the relevant question for the third *Intel* factor is not whether the English Court "would order the requested discovery if it had jurisdiction over" Respondent but

instead whether there are English "proof-gathering restrictions that are akin to privileges that would prohibit the acquisition or use of the items sought." *In re Bernal*, 2018 WL 6620085, at *8. That is because "there is no requirement to first seek discovery from the non-US tribunal or exhaust other options before applying to a district court for § 1782 discovery," "even when the requested documents may be available in the foreign jurisdiction." *See In re: Application of Bracha Found.*, 663 F. App'x 755, 765 (11th Cir. 2016).

In sum, the English Court did not reject the very same discovery Applicant seeks here, there is no requirement that he first ask the English Court for that discovery, and there is no indication that the English Court has proof-gathering restrictions that would prohibit the discovery. As a result, the third *Intel* factor weighs in favor of granting the Application.

Finally, Applicant's request is not unduly intrusive or burdensome. *See Intel*, 542 U.S. at 265; *In re Clerici*, 481 F.3d at 1334. As an initial matter, Respondent has not adequately and specifically explained how the requested discovery would be unduly intrusive or burdensome. In the Opposition, Respondent offers only broad conclusory statements. *See* ECF No. [29] at 9 (noting the requests ask for 11 years of information about 13 businesses in 7 jurisdictions but failing to explain why that request is overbroad or unduly burdensome); *id.* at 9–10 (arguing without explanation that the requests "would vastly exceed the scope of permissible discovery," "are overly broad," and "are unduly burdensome"). At the Hearing, even after repeated questioning from the Court, Respondent again failed to explain exactly how Applicant's requests are unduly intrusive or burdensome. *See* ECF No. [78] at 40–49.

As noted at the Hearing, without any substantive information from Respondent about the number of potentially responsive documents, the number of hours it would take to produce the documents, the expense associated with the production, or any other tangible information beyond

25

boilerplate objections, the Court's ability to analyze the fourth *Intel* factor is limited to the requests themselves. *See* ECF No. [78] at 43–46; *accord In re Moussy Salem*, 2024 WL 3026670, at *16. Looking at the requests, they appear to be "narrowly tailored to the discovery sought." *See In re Bernal*, 2018 WL 6620085, at *9. The materials they seek — including documents and testimony about the value, profits, and transfer of the logistics agreement and the creation, ownership, and operation of Monline UK, *see* ECF No. [1-2] at 12–13 — are relevant to Applicant's claims in the English Proceedings and proportional to the Applicant's needs, given his limited access to the information sought and the importance of the information to the resolution of Applicant's claims. *See* Fed. R. Civ. P. 26(b)(1); 28 U.S.C. § 1782(a) ("To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."); *In re Moussy Salem*, 2024 WL 3026670, at *16. On the current record, the Court finds the likely benefit of the proposed discovery to Applicant outweighs the possible burden or expense to Respondent, *see* Fed. R. Civ. P. 26(b)(1); *In re Moussy Salem*, 2024 WL 3026670, at *16, making the fourth *Intel* factor weigh in favor of granting the Application.[7]

For these reasons, the Court finds that all four *Intel* factors weigh in favor of granting the Application for § 1782 aid.

### 3. Granting the Application Would Further the Policy Underlying § 1782

As a final consideration, the Court evaluates whether granting the application would further the policy underlying § 1782, which is to encourage international comity. *See ZF Auto.*, 596 U.S. at 632; *In re Pimenta*, 942 F. Supp. 2d at 1289. Allowing Applicant to marshal the power of our

---

[7] The Court encourages the parties to "meet and confer on document requests" once they have "an understanding of what actually exists," as they both represented at the Hearing they would do, *see* ECF No. [78] at 49, 61–62, to minimize the effort and cost of the discovery.

courts to assist him in gathering evidence to use in the English Proceedings aligns with "Congress'

wish to strengthen the power of district courts to respond to requests for international assistance."

*See Consorcio Ecuatoriano*, 747 F.3d at 1269 (emphasis and quotation marks omitted).  And it

would certainly "encourage[e] foreign countries to provide reciprocal assistance to our courts."

*See In re Pimenta*, 942 F. Supp. 2d at 1289.  As a result, the Court finds that granting the application

would further the international comity concerns that underlie § 1782.

Because Applicant has satisfied the four statutory factors under § 1782, all four *Intel* factors

weigh in favor of granting the Application, and granting the application would further the

international comity policy underlying § 1782, I respectfully **RECOMMEND** that the

Application, **ECF No. [1]**, be **GRANTED**.

### D.  Motion for Stay and Costs Under Fed. R. Civ. P. 41(d)

In the Motion, Respondent requested alternative relief "if the Application is not dismissed

in its entirety."  Specifically, he requested that Applicant be directed under Rule 41(d) to pay the

costs Respondent incurred in connection with the New York Application and that the Court stay

the Application until Applicant certifies that he has paid those costs.  *See* ECF No. [30] at 2, 7–13.

Although Rule 41(d) authorizes the Court to award costs (and impose a stay) against a party who

previously dismissed an action and then files another action "including the same claim against the

same" opposing party, the Rule does not require it.  *See Sanderson*, 90 F.R.D. at 376; *Marino*,

2021 WL 9563808, at *1.  Whether to award Rule 41(d) costs is left to the Court's discretion.  *See*

*Tassinari*, 2007 WL 9702571, at *7.

Similarly, while the Court may consider a party's motivation in dismissing and then re-

filing the action and whether the party acted in bad faith or with other improper motive when

deciding if it will award Rule 41(d) costs, the Court does not have to consider either.  *See USA*

*Ent. Grp., Inc.*, 2019 WL 498743, at *2; *Tassinari*, 2007 WL 9702571, at *10.  Instead, courts must look at whether the circumstances of the case warrant an award of costs to prevent prejudice to the defendant.  *USA Ent. Grp., Inc.*, 2019 WL 498743, at *2.

Looking at the circumstances of this case, the Court finds that Rule 41(d) costs are not warranted.[8]  Applicant had a reasonable belief that Respondent resided in the Eastern District of New York, including a March 2010 email to Applicant notifying him of Respondent's new Brooklyn, New York address, *see* ECF No. [66-9], and the fact that Respondent's witness to his signature on the April 2016 Settlement Agreement also listed a Brooklyn, New York address, *see* ECF No. [44-1] at 29.  There is also no indication in the record that Applicant acted in bad faith or with improper motive when filing the New York Application, which is a factor the Court is not required to, but may, consider when exercising its discretion to award Rule 41(d) costs.

Finally, it appears Applicant immediately stopped pressing the *ex parte* New York Application when he discovered Respondent moved to Florida. *See* ECF No. [16] at 2–3.  As a result, Respondent's costs associated with the New York Application encompass only one motion to quash the subpoenas.  *See* ECF No. [16] at 2; ECF No. [42] at 16 (noting that at the time of dismissal Respondent's "work in the New York proceedings was minimal—he had filed only one eight-page motion to quash and three short declarations totaling six pages"); ECF No. [78] at 89 (noting the "total briefing" on that motion "was eight pages," only some of which were related to the jurisdiction issue and not the ongoing merits).

Accordingly, I respectfully **RECOMMEND** that Respondent's alternative request in the

---

[8] Because the Court concludes that Rule 41(d) costs are not warranted, it does not discuss whether attorney's fees are appropriately included in the definition of costs, which is an issue about which courts have taken divergent views.  *See, e.g.*, *MSP Recovery Claims, Series LLC v. Northland Ins. Co.*, No. 20-CV-24176, 2021 WL 3410390, at *4 (S.D. Fla. Aug. 4, 2021) ("Neither the Rule nor the Advisory Committee Notes define the term 'costs' in Rule 41(d)[,] and courts are divided whether it includes attorney['s] fees.").

Motion, **ECF No. [30]**, for costs (including attorney's fees) and a stay under Rule 41(d) be **DENIED.**

## IV.    CONCLUSION

For the reasons explained above, I respectfully **RECOMMEND** that the Application, **ECF No. [1]**, be **GRANTED**, and the Motion, **ECF No. [30]**, be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the Parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.  Failure to timely file objections shall bar the Parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND ORDERED** in Chambers in Miami, Florida on August 28, 2024.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc: All counsel of record